James Wheaton
Lowell Chow
FIRST AMENDMENT PROJECT
1736 Franklin Street, 9th floor
Oakland, California 94612
Phone: 510/208-7744
Fax: 510/208-4562

Mary Lou Boelcke
LAW OFFICES OF MARY LOUISE BOELCKE
PO Box 31033
Albuquerque, NM 87190-1033
Phone: (505) 804-1632
Fax: (505) 232-9718

William Simpich
LAW OFF ICE WILLIAM SIMPICH
1736 Franklin Street, 10th floor
Oakland, California 94612
Phone: 510/444-0226

Attorneys for Plaintiff Philip Mocek

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| PHILLIP MOCEK, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND DECLARATORY RELIEF** |
| CITY OF ALBUQUERQUE, ALBUQUERQUE AVIATION POLICE DEPARTMENT, MARSHALL KATZ, in his official capacity as Chief of Police of the Albuquerque Aviation Police Department, JONATHAN BREEDON, GERALD ROMERO, ANTHONY SCHREINER, ROBERT F. DILLEY a/k/a BOBBY DILLEY, LANDRA WIGGINS, JULIO DE LA PENA, and DOES 1–25, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Phillip Mocek, by and through his attorneys, in support of his Complaint for Damages, Injunctive Relief, and Declaratory Relief, hereby alleges as follows:

### PRELIMINARY STATEMENT

1.     Phil Mocek is an outspoken advocate of free software, open standards,

government transparency, drug policy reform, and civil liberties. He has traveled via commercial air for most of his adult life, mostly without incident. Starting around 2007, after beginning to harbor reservations about the Transportation Security Administration ("TSA")'s passenger identification procedures, Mocek began refraining from showing documentation of identity when flying. Normally, Mocek would simply be diverted to another line to await assistance from other TSA agents and would eventually be allowed to board his flights.

2.     In 2009, Mocek began researching TSA's regulations and policies regarding prohibitions on photography, video recording, and filming at airport screening locations. The research revealed that TSA itself does not prohibit photography, video recording, or filming at screening locations. The research further revealed that at the Albuquerque International Sunport in Albuquerque, New Mexico, no state or local laws prohibited photography in public areas of the airport.

3.     On November 15, 2009, Mocek was returning from a trip to New Mexico and attempted to fly out of the Albuquerque Sunport. As he had many times before, Mocek declined to provide TSA agents with documentation of his identity. This time, however, expecting to encounter a new identification procedure announced the previous year by the TSA and concerned about potential retaliation for his willful and lawful refusal to show documentation of identity, Mocek took out his camera and began filming and audio recording the TSA agents to document the process.

4.     TSA agents took exception to Mocek's filming of them, and ordered him to cease. He calmly refused and noted that no law or regulation prohibited him from doing so. The agents persisted and eventually summoned Albuquerque law enforcement.

5.     At all times, Mocek was in the publicly accessible areas of the airport. Throughout what followed, Mocek remained calm and restrained in the face of the officers' increasingly agitated behavior.

6.     The law enforcement officers who arrived demanded that Mocek comply with the TSA's unwarranted instructions, or else he would be escorted out of the airport. After Mocek stated that he had established that he had a right to film, the law

enforcement officers told him that he was going to be escorted out of the airport. Officers then demanded to see Mocek's documentation of identity, under threat of arrest for concealing identity. Without taking any actions and while following police instructions, Mocek was suddenly told that he was under investigation for disturbing the peace.

7.     Mocek was then arrested. His camera was seized and searched, and police deliberately attempted to delete its contents. Ultimately, Mocek was charged with four crimes: disorderly conduct; concealing identity with intent to obstruct, intimidate, hinder, or interrupt; resisting, obstructing, or refusing to obey a lawful order of an officer; and criminal trespass.

8.     For none of these crimes was there any probable cause to arrest. Rather, Mocek's arrest was a result of clear retaliation by TSA and Albuquerque law enforcement for his having filmed them under circumstances in which he had a right to do so.

9.     Mocek successfully restored the video footage, which provided conclusive evidence of the baseless nature of the charges against him. This footage was shown to the jury when he was tried in New Mexico state court. After a brief trial and even briefer deliberations, the jury acquitted him of all charges.

10.     By this Complaint, Mocek seeks the following relief: (1) to obtain compensation for the Defendants' violations of his First, Fourth, and Fourteenth Amendment rights; (2) to obtain compensation for false arrest and abuse of process; (3) to declare that the Defendants acted unconstitutionally in violation of the above rights; and (4) to ensure that the Defendants undertake training and other remedial steps to prevent such abuses from happening in the future.

## JURISDICTION AND VENUE

11.     This case arises under the United States Constitution; the Civil Rights Act, 42 U.S.C. § 1983; the Declaratory Relief Act, 28 U.S.C. §§ 2201-02; and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), 1343 (civil rights), and 2201 (declaratory relief). Additionally, this Court has supplemental jurisdiction over each of the state law claims alleged herein pursuant to

28 U.S.C. § 1367(a).

13.     The unlawful acts alleged herein occurred in Bernalillo County, which is within this judicial district. Venue is proper in this district under 28 U.S.C. §§ 1391(b), (e).

14.     Plaintiff has complied with the New Mexico Torts Claims Act, NMSA 1978, § 41-4-16, by presenting a government claim within 90 days of the date upon which the cause of action accrued.

## PARTIES

15.     Plaintiff PHILLIP MOCEK is, and at all times relevant was, a citizen of the State of Washington residing in Seattle, Washington.

16.     Defendant CITY OF ALBUQUERQUE ("City") is a municipal corporation and a political subdivision of the State of New Mexico. Defendant City includes, operates, governs, and is responsible for the Albuquerque Aviation Police Department.

17.     Defendant ALBUQUERQUE AVIATION POLICE DEPARTMENT ("Police Department" or "Aviation Police") is an agency primarily responsible for law enforcement at the Albuquerque International Sunport in Albuquerque, New Mexico. Defendant Aviation Police employs Defendants Katz, Dilley, Wiggins, and De La Pena, and Doe Aviation Police officers.

18.     Defendant MARSHALL KATZ is Chief of Police at the Albuquerque Aviation Police Department. At all relevant times, Defendant Katz acted under color of law and in the course and scope of his employment with the Aviation Police. He is sued in his official capacity.

19.     Defendant JONATHAN BREEDON is a Transportation Security Administration ("TSA") employee and was Lead Transportation Security Officer for the incident. At all relevant times, Defendant Breedon acted under color of law and in the course and scope of his employment with the TSA. He is sued in his individual and official capacities.

20.     Defendant GERALD ROMERO is a TSA employee and was

Transportation Security Manager for the incident. At all relevant times, Defendant Romero acted under color of law and in the course and scope of his employment with the TSA. He is sued in his individual and official capacities.

21.     Defendant ANTHONY SCHREINER is a TSA employee and was Supervisory Transportation Security Officer for the incident. At all relevant times, Defendant Schreiner acted under color of law and in the course and scope of his employment with the TSA. He is sued in his individual and official capacities.

22.     Defendant ROBERT F. DILLEY, a/k/a BOBBY DILLEY, is an officer of the Albuquerque Aviation Police and was the lead arresting officer. At all relevant times, Defendant Dilley acted under color of law and in the course and scope of his employment with the Aviation Police. He is sued in his individual and official capacities.

23.     Defendant LANDRA WIGGINS is an officer of the Albuquerque Aviation Police. At all relevant times, Defendant Wiggins acted under color of law and in the course and scope of his employment with the Aviation Police. He is sued in his individual and official capacities.

24.     Defendant JULIO DE LA PENA is an officer of the Albuquerque Aviation Police. At all relevant times, Defendant De La Pena acted under color of law and in the course and scope of his employment with the Aviation Police. He is sued in his individual and official capacities.

25.     Defendants DOES, on information and belief, are each responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Plaintiff is further informed and believes, and on this basis alleges, that at all material times these Defendants owned, operated, managed, directed, controlled, and/or employed other defendants in this action. The true names and capacities of these Defendants are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names, and Plaintiff will seek leave to amend this Complaint to show their true names and capacities when the same are ascertained.

## FACTUAL ALLEGATIONS

**A.     In the past, Mocek has flown by commercial air without needing to provide**

**documentation of identity**

26.     Throughout most of his adult life, Phil Mocek has flown by commercial air typically once or twice per year. On or around 2006, Mocek read, via blogs and elsewhere on the Web, about John Gilmore's and his friend Ben Livingston's experiences flying via commercial air without presenting identity documents ("I.D.") to TSA staff at the airport. Mocek began to believe that the TSA's airline passenger identification procedures were designed to serve two purposes: (1) airline revenue production (airlines are now able to resell tickets when passengers fail to make their flights), and (2) facilitation of a system of restriction of movement based on government blacklists. Moreover, Mocek believed that he should not have to request and receive permission from the government to travel from one state to another, nor that his name should be a deciding factor in whether he is able to engage in interstate travel.

27.     Around 2007, Mocek started flying without showing I.D. He always carried identity documents, but upon reaching the front of the line, when the TSA agent addressed him, he would present just the required boarding pass. Typically, the agent would react as if Mocek had simply forgotten to also show I.D., and, after a few moments of confusion, the agent would ask Mocek to show documentation of his identity. Mocek would inform the TSA agent that he did not have any I.D. to show him—a statement that was designed to avoid disclosing whether Mocek in fact had I.D. in his possession. Mocek was always careful to say that he did not have any I.D. for the TSA agent, never that Mocek did not have any I.D. with him or that he did not want to show I.D., for his need to travel had priority over his desire to flex his rights and he did not want to lie to TSA agents.

28.     Typically, once TSA staff realized he did not intend to present I.D., Mocek would be diverted to a separate line to await assistance and additional questioning from another TSA agent.

29.     In or about 2008, Mocek had a string of trips to take for which he desired a minimum of delay, so for these flights he presented his I.D. to move through security quickly with minimum hassle and risk of delay. Whenever he showed I.D., he was not

searched as thoroughly. He walked through the metal detector instead of being patted

down or frisked, and his luggage was searched via X-ray instead of by hand.

**B.      TSA revises its policy regarding flying without documentation of identity**

30.      In or about the middle of 2008, TSA's policy on airline passenger

identification seems to have changed. TSA announced via press release that passengers

who "willfully refuse[d]" to show I.D. would not be allowed past their checkpoint, but

those whose I.D. was merely "misplaced" or "stolen" would be allowed to pass through if

they cooperated with alternative procedures:

> Beginning Saturday, June 21, 2008 passengers that willfully refuse to
> provide identification at security checkpoint will be denied access to the
> secure area of airports. This change will apply exclusively to individuals
> that simply refuse to provide any identification or assist transportation
> security officers in ascertaining their identity.
>
> This new procedure will not affect passengers that may have misplaced,
> lost or otherwise do not have ID but are cooperative with officers.
> Cooperative passengers without ID may be subjected to additional
> screening protocols, including enhanced physical screening, enhanced
> carry-on and/or checked baggage screening, interviews with behavior
> detection or law enforcement officers and other measures.

**C.      The TSA communicates to the public that there are no TSA prohibitions on
photography, video recording, or filming at screening locations**

31.      TSA maintains an official Web site at blog.tsa.gov, which includes a

section in which it answers questions from the public. Entitled "The TSA Blog," the

site's stated purpose is described as follows: "This blog is sponsored by the

Transportation Security Administration to facilitate an ongoing dialogue on innovations

in security, technology and the checkpoint screening process." The blog is written by,

among other authors, Curtis Robert Burns, described as a "Social Media Analyst with the

Office of Strategic Communications and Public Affairs" "currently residing at TSA

headquarters" "to manage and write for the Blog." Posts by Burns, who writes using the

user name "Blogger Bob," consequently bear the authority of the TSA and can be

attributed as representative of the views and policies of the TSA.

32.      On March 31, 2009, Burns posted a blog entry titled "Can I Take Photos at

the Checkpoint and Airport?":

> We don't prohibit public, passengers or press from photographing,

> videotaping, or filming at screening locations. You can take pictures at our checkpoints as long as you're not interfering with the screening process or slowing things down. We also ask that you do not film or take pictures of our monitors. . . . [W]hile the TSA does not prohibit photographs at screening locations, local laws, state statutes, or local ordinances might. Your best bet is to call ahead and see what that specific airport's policy is.

The entry then made a suggestion for persons interested in photographing airports:

> I suggest you use the Got Feedback program to directly contact the Customer Support Manager at the airport you're going to be traveling through. They will have an answer for you and if they don't, they can connect you with somebody who does.

Burns closed the entry with the observation that he had personally photographed in airports:

> I've taken photographs in checkpoints, terminals, and on planes and I have never had an issue. I know some of you have and hopefully this information helps you a little.

33.    In April 2009, Mocek, having read the blog entry, took the advice contained therein and contacted 50 U.S. airports via TSA's "Got Feedback?" form to ask each if it had local laws or regulations regarding photography in airport public areas. About half of the airports responded. Mocek documented every response, along with his follow-ups, on a discussion thread on the Web site FlyerTalk Forums.

34.    Burns refused to allow comments on the TSA blog referencing Mocek's project, purportedly because Mocek published, without redaction, the e-mails he received from TSA public relations representatives at each airport. Burns expressed concern about Mocek's providing access to the representatives' work phone numbers—although these phone numbers were included in the signature line of *every* message the representatives sent in response to public inquiries.

35.    Burns stated in the main text of the blog entry that TSA "asks" people not to photograph TSA's computer monitors. Later, in the comments, Burns changed that to a TSA prohibition. Despite numerous requests from Mocek asking Burns to back his claim with any verifiable information, Burns never did so.

**D.    Mocek surveys airport photography policies and determines that filming is permitted at the Albuquerque airport**

36.    The Albuquerque International Sunport ("ABQ" or "the Airport") was one

of the airports Mocek contacted, and one of those from which he received a response.

37.     Susanne Spencer from TSA at ABQ, with e-mail address Susanne.Spencer @dhs.gov, wrote in an e-mail on April 8, 2009: "There aren't any state or city laws/ordinances that prohibit photography in the public areas of the airport." The e-mail continued: "However, it is advisable to contact the Airport's Public Affairs Officer Dan Jiron at djiron@cabq.gov or by telephone at 505.244.7780. If you wish to film at or near the TSA checkpoint, advance coordination would need to be made with Maggie Santiago at Maggie.santiago@dhs.gov or by telephone at 505.246.4106." This e-mail was signed with the text: "Transportation Security Administration, Albuquerque, NM, Desk: 505-246-4313." Mocek reasonably believed that all communications from Spencer represented official TSA rules and policies.

38.     Mocek replied to ask why advance coordination would be required to film at or near the TSA checkpoint. He wrote in an e-mail to Spencer on April 8, 2009: "I'm not aware of any related TSA policies other than the one that says any photography or video recording must not interfere with TSA operations."

39.     Spencer replied in an e-mail on April 10, 2009 that TSA "ask[s] for advance coordination" and that this was "a local practice and not available in writing." Spencer stated that advance coordination would allow TSA to advise law enforcement officers (LEOs) stationed at the checkpoint of the filming. The e-mail also stated that the checkpoint area is a "restricted area" and "just for ticketed passengers."

40.     Mocek responded in an e-mail on April 10, 2009 that he would not interact with law enforcement and that, as a passenger, he would be authorized to be in the screening area. Spencer responded the same day: "The information I have provided to you is a recommendation. We only encourage individuals to contact TSA in advance so we can facilitate the photography."

41.     Mocek asked for clarification of the ambiguity in Spencer's answer by e-mail on April 14, 2009 in which he asked, "So shall I disregard your statement that advance coordination is *required*?" Spencer answered in an e-mail the same day that stated unequivocally: "Again, the information I have provided to you is a

recommendation. We only encourage individuals to contact TSA in advance so we can facilitate the photography."

42. As a result of this exchange, Mocek reasonably believed that neither TSA nor state or local laws prohibited him from photographing or filming at the TSA checkpoint at the Albuquerque airport, other than possibly a prohibition against filming TSA monitors.

**E. Mocek travels to Albuquerque and attempts to fly back to Seattle**

43. In November 2009, Mocek traveled to Albuquerque, New Mexico. On November 15, 2009, Mocek intended to return to his home in Seattle by flying out of ABQ. Mocek's Washington State driver's license was his only documentation of identity. When Mocek arrived at ABQ, he handed his driver's license to Jesse Gallegos, Mocek's friend and travel companion, who carried it from that time until Mocek later retrieved it from him.

**F. Mocek declines to provide identification documents, films TSA and Albuquerque police officers, and is arrested**

44. Mocek approached the podium where TSA agents were checking passenger documents. Mocek presented his boarding pass to TSA agent Greg Martinez. Martinez asked Mocek for I.D., and Mocek answered that he did not have any form of I.D. Mocek then told Martinez that it was his understanding that he was not required to produce any such documents, only his boarding pass. Martinez told Mocek to go stand in a different line nearby. Mocek waited as approximately four people ahead of him were processed.

45. At or around 2:32 p.m., Defendant Jonathan Breedon, a TSA security agent, took Mocek's boarding pass and asked if Mocek had anything else to help identify him, such as a credit card or other I.D. Mocek said that he did not think he was required to provide I.D. Breedon said Mocek was correct and asked if he could verify his identity in another way. Mocek again stated that he would not provide anything because it was his belief that he was not required to. Breedon notified Mocek that he would contact the TSA's Security Operations Center, which would try to verify Mocek's identity, and if

they could not, Mocek would not be allowed to proceed through the security checkpoint. At this point in time, there was no indication from any of the TSA agents present that there was any intent to involve law enforcement.

46.     Mocek began using his camera to video record this manifestation of what he perceived to be an atypical, alternative identification policy. Breedon told Mocek that he would need to stop filming. Mocek responded that he did not believe that filming of a publicly accessible area was illegal. Breedon tried to take Mocek's camera, and then told him that no photography or videotaping was allowed at the security checkpoint.

47.     Breedon called for police assistance. In the meantime, Defendants Anthony Schreiner, a TSA security supervisor, and Gerald Romero, a TSA manager, approached the security checkpoint area after Breedon summoned for assistance. Breedon briefed Schreiner on the events that just took place.

48.     Romero ordered Mocek repeatedly to put down the camera and attempted to grab either Mocek or the camera. Mocek and Romero had the following verbal exchange:

ROMERO: Why don't you put it down for now, okay?

MOCEK: I'd prefer not to.

ROMERO: No. Put it down for now.

MOCEK: Can I get your name?

ROMERO: I said put it down for now. I said put it down for now.

MOCEK: Don't touch me.

ROMERO: Put it down for now.

MOCEK: Do not touch me.

49.     Defendants Robert Dilley, Landra Wiggins, and Julio De La Pena, all officers of the Albuquerque Aviation Police Department, arrived soon thereafter. The first complaint from the TSA agents upon the law enforcement officers' arrival was that Mocek would not put down his camera. When Dilley, the first to arrive, appeared on the scene, TSA agents described the encounter to the law enforcement personnel with the following phrases: "causing a disturbance," "he won't put his camera down, either," and

"taking pictures of all of us."

50.     Mocek's filming was the primary, if not the sole, cause for the events that followed, including his ultimate arrest.

51.     Dilley told Mocek to comply with the TSA agents' instructions or else he would be escorted out of the airport. One of the officers said that Mocek was causing a commotion. Mocek said, "I haven't raised my voice. I'm not trying to stop you from doing your job." Mocek said that he intended to comply with all of the TSA's rules and regulations.

52.     Dilley told Mocek again to comply or he would be escorted out of the airport. Mocek reiterated that he did not believe there was a rule that barred him from using a camera in publicly accessible areas of the airport. Wiggins stated that this was a federal checkpoint and that Mocek could not film there. Mocek replied, "I've checked into it and I know that I *can* do it here." Wiggins said, "Well, you can be arrested, then you can check into it more."

53.     Wiggins said, "You're almost there. You pushin' it, okay? You're really pushin' it." After a moment's confusion, De La Pena remarked, "He don't want to show his I.D., either." Dilley said, "Let's go, sir. You're leaving the airport. You're being escorted out at this point. Let's go. And if you refuse, we'll arrest you. Let's go." Mocek said, "I don't understand."

54.     Dilley then changed his mind about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing identity. Mocek said that he did not have any I.D. to show Dilley. Dilley stated that Mocek was now a part of a criminal investigation and was required to give I.D. When Mocek asked what he was being investigated for, Dilley replied that it was for disturbing the peace. Mocek said that he had not disturbed the peace. Dilley once again said that he needed Mocek to provide him with I.D. Mocek then said he was going to remain silent and that he wanted to talk to an attorney. Dilley said, "We're gonna end up arresting you. Come on, let's go. We're gonna search your property, and if we find I.D. on you—on your property, we will arrest you for concealing I.D."

55.     Dilley subsequently said, "You're under arrest. You don't have no options. Let's go." Dilley placed Mocek under arrest without a warrant. Dilley did not state the reason for the arrest.

56.     From the time Mocek arrived at the airport to his arrest, Mocek, having not gone through the security checkpoint, had fully remained within publicly accessible areas of the airport.

**G.     Mocek is held in an airport holding cell**

57.     At or around 2:39 p.m., Dilley and Wiggins walked Mocek across the airport to the Aviation Police Department office. Mocek assumed at this point that the officers would complete some paperwork and then release him in time to make his flight. Mocek and the officers entered the office, walked down a short hall, and entered a small room with a couple computers on desks. The officers then locked Mocek in a small holding cell (about 4 × 8 feet in size). Next, the officers searched Mocek's belongings in the room just outside the cell door. Any items with his name on them were sealed in two envelopes. These included business cards, credit cards, and insurance cards.

58.     Mocek was detained in this holding cell for about two hours. During this time, Dilley wrote an incident report while Wiggins watched football on the Internet and went to Southwest Airlines to find out if Mocek had checked any luggage. Wiggins returned saying that Mocek had not checked any luggage.

59.     Dilley had some difficulty completing various forms without using Mocek's name. Nevertheless, Mocek was not asked to state his name while Dilley was filling out of the forms. Once Mocek was in the cell, however, Dilley asked Mocek if he wanted to identify himself, but at this point Mocek was unsure how to answer, as he did not want to do anything that he was not required to do, and it was entirely unclear whether he was required to identify himself. When Mocek tried to find out if he was required to identify himself, Dilley asked him to stop talking.

60.     Eventually, Mocek's concern about the possibility of violating any laws that required him to proactively identify himself outweighed his concern about speaking to those who were investigating him. Mocek stated clearly to Dilley and Wiggins, "My

name is Phillip Anthony Mocek." Dilley told Mocek to stop talking.

61.     Meanwhile, at or around 3:14 p.m., Mocek's friend Ben Livingston called the airport to ask about Mocek's status. Livingston at first did not identify himself. The telephone operator taking the call contacted Sergeant Ernesto Rojas of the Aviation Police. Rojas said that if the caller did not identify himself, Rojas would not talk to him. Livingston then identified himself with his first and last name and stated his affiliation with Mocek. Rojas said that he definitely did not want to talk to Livingston. Referring to Mocek, Rojas said, "This gentleman is an adult, and he's gonna be booked, and he can talk to him after he gets booked."

**H.     Mocek spends the night in jail**

62.     Dilley told Mocek that the jail where he was going next would not accept his belongings, because he was being processed "as a John Doe." Instead, Mocek's belongings would be kept in safe storage at the Aviation Police Department office. Dilley read a statement to Mocek and asked if he understood. Mocek's only response was that he wished to remain silent.

63.     The officers then placed Mocek in handcuffs and walked him to a police car outside. Dilley drove Mocek to the downtown police department. They did not speak. Upon arrival at or around 4:54 p.m., they walked inside, Mocek's handcuffs were removed, and he was placed in a holding cell. Dilley filled out some paperwork. Mocek was brought out to stand in front of a counter while being searched, and then returned to the cell. After Mocek was searched, Dilley left.

64.     Mocek was handcuffed and walked to a van outside and driven about 20 minutes, mostly on a two-lane highway. Mocek was not informed where they were taking him.

65.     Eventually, Mocek learned that he was brought to the Bernalillo County Metropolitan Detention Center, where he was put in a large cell. Mocek was fingerprinted and photographed and spoke with medics about his health. Someone in the room with the medics gave Mocek a paper to sign, and when Mocek saw that the form stated his name was John Doe, he told that person that there was a mistake and provided his real name.

66.    After receiving permission, Mocek approached a desk in the center of the room that was surrounded by holding cells and asked what charges were against him. He then received some paperwork showing the charges and that his bail was set at $3,000.

67.    Around 8 to 9 p.m., Mocek was called out and sent to a videoconferencing terminal, where he spoke with a court clerk who took some information from him and said his arraignment would be the next morning.

**I.    The law enforcement officers write a false criminal complaint and false incident reports, and TSA agents write statements that misstate and mischaracterize the events at the airport**

**A.    Albuquerque police documents**

**1.    Dilley's incident report and criminal complaint**

68.    Some time after the arrest, Dilley authored a false incident report and criminal complaint, each of which contained numerous misstatements and mischaracterizations of the events at the Albuquerque airport. According to the incident report, Mocek "caus[ed] a disturbance by Disorderly Conduct," refused to identify himself, and "was finally issued a Criminal Trespass Order which he refused to obey." Dilley wrote that Mocek refused to comply with instructions and that Mocek raised his voice to such a level that it caused a disturbance. Dilley wrote that he ordered Mocek four times to lower his voice or else Mocek would be ordered to leave the airport, and that Mocek refused. Dilley wrote, "Finally, I issued him a verbal Criminal Trespass Order and ordered him to leave the airport[;] he refused." Dilley wrote that he placed Mocek under arrest, informing him that the arrest was for "Disorderly Conduct and Refusing to Obey a lawful order of a police officer." Likewise, Dilley wrote in the criminal complaint (which contained a similar narrative) that Mocek "was refusing and began causing a disturbance, by yelling," that Mocek "had his voice raised at a level that it was now creating a disturbance."

69.    Audio and video recordings of the incident contradict Dilley's claims. In fact, Mocek consistently used a calm, quiet tone of voice, and it was the officers' voices that were at times agitated and raised. Dilley never told Mocek to lower his voice. Moreover, Dilley never issued a verbal Criminal Trespass Order. Instead, he had only told

Mocek, "You're leaving the airport. You're being escorted out at this point. Let's go. And if you refuse, we'll arrest you." And immediately after saying this, Dilley changed his mind, saying, "Actually, I'm gonna need your I.D. now," a request that would have required Mocek to stay in place. After a brief exchange over whether Mocek was required to provide I.D., Dilley said, "Let's go." Mocek immediately gathered his bags and began walking with Dilley away from the checkpoint. At no point did Mocek refuse to comply with any of Dilley's orders. Finally, Dilley never stated the justification for arresting Mocek. At various points during his encounter with Mocek, Dilley stated first that he was "going to arrest" Mocek for using a camera, then that Dilley would arrest Mocek if he refused to leave the airport, then that Dilley would arrest Mocek if he refused to provide I.D. When Dilley finally and unequivocally placed Mocek under arrest, he did not state the reason for the arrest.

### 2.    De La Pena's supplemental incident report

70.    Some time after the arrest, De La Pena authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Albuquerque airport. According to De La Pena's report, TSA agents reported to Dilley that Mocek was causing a disturbance by "yelling at officers." De La Pena wrote that after Dilley asked Mocek to comply with TSA instructions, Mocek "state[d] 'I know my rights' with a loud voice causing attention from other passengers." De La Pena wrote, "In fact his voice was so loud he was causing other passengers to hesitate before continuing through the checkpoint." De La Pena wrote that Mocek "yelled out loud 'I know my rights[,] I refuse to be searched.' " Like Dilley, De La Pena wrote that Dilley issued a "verbal order to leave" to Mocek and that Mocek refused to do so.

71.    Audio and video recordings of the incident contradict De La Pena's claims. As noted, Mocek in fact consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law enforcement officers. Mocek did not yell "I know my rights." Moreover, video footage shows people walking by without any hesitation. Further, while Mocek did in fact refuse consent to being searched, Mocek did so by merely stating twice (and not yelling), "I don't consent to any search." And when Mocek

was told to place his bags down, Mocek immediately complied with the request by placing his bags on the ground where indicated, a fact which is confirmed by video security footage.

### 3.   Wiggins's supplemental incident report

72.   Some time after the arrest, Wiggins authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Albuquerque airport. Wiggins wrote that Mocek "was talking in a loud tone of voice stating he did not do anything because it was his right to be able to take photos in a public accessible places [sic]." Wiggins wrote that Mocek's behavior "caused the traveling public to stop and take notice." Wiggins also wrote that Mocek "continue[d] to be recalcitrant."

73.   Audio and video recordings of the incident contradict Wiggins's claims. As noted, Mocek in fact consistently used a calm, quiet tone of voice. Moreover, the video footage reveals that the traveling public in general did not "stop and take notice." Passengers walked by without any hesitation.

### B.   TSA statements

74.   Statements from Breedon and Schreiner do not corroborate the claims in Dilley's, De La Pena's, and Wiggins's accounts. Breedon's and Schreiner's statements, however, also misstate the events to some degree.

### 1.   Breedon's statement

75.   Some time after the arrest, Breedon authored a written statement containing his observations of Mocek's encounter with him and with Albuquerque law enforcement. According to Breedon's statement, Mocek presented his boarding pass (a document that contained his name) to TSA agent Greg Martinez, who asked for identification. According to the statement, after Mocek said he had none, Martinez said that Mocek would have to undergo additional screening. Breedon wrote that he then took over the process, asking Mocek if he could verify his identity. Breedon wrote that Mocek indicated that he did not wish to provide verification of his identity, and that Breedon then said that he would contact the "Security Operations Center" which would attempt to

verify Mocek's identity, and if they could not, Mocek would not be allowed to fly. Breedon stated that he then summoned a Behavior Detection Officer, Laura Moots, and that as he began filling out paperwork required by the Identity Verification Call Center, Breedon noticed that Mocek appeared to be taking pictures or filming him. Breedon wrote that he asked Mocek to stop, to which Mocek responded that he believed filming was permissible. According to the statement, Breedon asked his supervisor, Schreiner, to send law enforcement immediately; Schreiner and Romero arrived soon thereafter. Breedon wrote that Romero asked Mocek to put his camera away, to which Mocek again replied that it was permissible to take pictures. Breedon stated that Dilley, Wiggins, and De La Pena then arrived, and Dilley was briefed by Romero. According to Breedon's statement, the police officers "asked Mocek several questions and then the situation escalated to the point where an AAPD officer informed Mocek he would not be allowed to fly." Breedon wrote that he handed Mocek's boarding pass to Dilley. According to the statement, the situation "escalated again" and the officers escorted Mocek away.

76. Breedon's statement importantly indicates that he did not request police involvement until he asked Mocek to cease using his camera. The statement also mentions that the situation "escalated" but notably omits the fact that much of the escalation was due to the conduct of the officers and not Mocek, who throughout remained calm and composed.

### 2. Schreiner's statement

77. Some time after the arrest, Schreiner authored a written statement containing his observations of Mocek's encounter with him and with Albuquerque law enforcement. According to Schreiner's statement, Breedon asked for assistance from a law enforcement officer, which Schreiner relayed to TSA security supervisor Adam Sena. Schreiner wrote that upon first approaching the area he noticed Mocek, a "hostile male individual." Schreiner wrote that Mocek pointed a camera at him and challenged the notion that taking pictures was prohibited. Schreiner wrote that when Dilley arrived, Schreiner told Dilley of Mocek's "resistance to comply with clearance procedures and his taping and picture taking." Schreiner wrote that with each question asked by law

enforcement, Mocek became "more belligerent" and "in a threatening manner took photos of each of the officers."

78.     Schreiner's statement portrays Mocek as "hostile" and "belligerent," characterizations not borne out by the video footage. Nor is it clear from the statement how Mocek would have taken pictures "in a threatening manner."

### C.     The reports and statements taken together

79.     Taken together, the police documents tell a story in which Mocek allegedly raises his voice and causes a disturbance, following which the law enforcement officers demand I.D. and issue a verbal no-trespass order (with both of which Mocek allegedly refuses to comply). The TSA written statements, by contrast, give no suggestion that Mocek caused any public disturbance and do not mention any no-trespass order. The video and audio recordings, moreover, make clear that Mocek did not raise his voice or refuse to obey an order to leave the airport. Rather, the recordings confirm that Mocek calmly and nonbelligerently insisted that he had a right to continue filming. It was this insistence that annoyed the officers, who then declared that Mocek was "in trouble." Only after officers demanded that Mocek provide documentation of identity, which Mocek declined to provide, did any officer suggest that Mocek had disturbed the peace, and no one suggested how Mocek might have done so beyond a vague statement that Mocek was "causing a commotion" in some unspecified manner.

### J.     Mocek is arraigned on charges of disorderly conduct, concealing identification, refusing an officer's order, and criminal trespass

80.     At or around 9 a.m. the next day, November 16, 2009, Mocek and others were taken to a waiting area outside a virtual courtroom in which the judge and clerk appeared via videoconference. He pleaded not guilty to each charge. The judge lowered his bail from $3,000 to $1,000.

81.     Mocek's bail was eventually posted around 5 p.m., although it took nearly five hours to process Mocek's release. Mocek was dropped off in downtown Albuquerque through the jail shuttle service at about 10:00 p.m. Mocek walked into the Hyatt, explained his situation to the women at the front desk, and borrowed their phone to call

his partner and let her know he was free.

**K.   Mocek returns to the airport to fetch his belongings and notices that his camera has been tampered with**

82.    Tuesday morning, Mocek met with a defense attorney to get some basic advice. She told him that it was safe to return to the airport. The attorney also advised him against filming, even with a TV crew, suggesting instead that he focus on getting home quietly.

83.    Mocek went to the airport's police office and said he needed to retrieve his things. After being reunited with his possessions, Mocek stopped in the hall to turn on his camera and found that all images had been deleted. Mocek returned to notify the police that someone had tampered with his camera. An officer, Raymond Vigil, told Mocek that he was not involved, and suggested that Mocek file a report.

**L.   Mocek recovers deleted images and footage of the airport incident**

84.    The next day, November 18, 2009, Mocek's experience at the airport security checkpoint was uneventful. Mocek presented his driver's license to the TSA staff. Gallegos, Mocek's friend and travel companion, heard one of them say something to another guard indicating that Mocek was "the guy who was arrested."

85.    On the plane, Mocek used forensic software that locates and recovers deleted files, and was able to recover his video from his camera's memory card.

**M.   Mocek is tried and acquitted in New Mexico state court**

86.    Beginning on January 20, 2011, Mocek was tried in Bernalillo County Metropolitan Court, Criminal Case No. 2573709, before Judge Kevin L. Fitzwater, on the four charges against him.

87.    During the trial, Breedon and Dilley testified for the state. In addition, the prosecution offered into evidence Mocek's videorecording of the incident at the Albuquerque airport security checkpoint area and played the video for the jury. Mocek did not offer any evidence of his own. During closing argument, defense counsel for Mocek argued that the law enforcement and TSA witnesses were not credible; that their testimony was contradicted by Mocek's video and by common sense; that what law

enforcement and the TSA really objected to was Mocek's having legally taken pictures of and filmed them; and that any disorderly conduct was on the part of TSA and law enforcement, not Mocek.

88.     On January 21, 2011, following two days of testimony, Mocek was acquitted of all four charges against him by a six-person jury after only approximately an hour of deliberations.

**N.     Consequences of the Defendants' actions**

89.     Defendants' unlawful and unconstitutional conduct resulted in Mocek's arrest, detention, seizure and attempted destruction of his property, institution of baseless criminal proceedings against him, and other financial and emotional distress.

90.     Mocek incurred in excess of $34,000 in legal costs to defend against the criminal charges.

91.     Moreover, Defendants have set a dangerous standard and sent a message to individuals intending to fly through the Albuquerque airport that they should be fearful of exercising their right to interstate air travel without having to provide documentation of identity and their right to photograph and film in publicly accessible areas of the airport, lest the TSA and Albuquerque police conspire to arrest and retaliate against them. The conduct of the Defendants in threatening arrest and prosecution would chill a person of ordinary firmness from continuing to engage in lawful, constitutionally protected activity.

## COUNT I

### VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION UNDER *BIVENS v. SIX UNKNOWN AGENTS*

**Claim for Damages Against Defendants Breedon, Romero, Schreiner, and Does 1–25 in Their Individual Capacities**

92.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 91 above, as though fully set forth.

93.     Defendants' above-described policies, practices, and conduct in unlawfully ordering Plaintiff to cease video and audio recording of them and summoning law

enforcement, resulting in unlawfully arresting Plaintiff, seizing his camera and memory contained therein, searching his camera and its memory, attempting to destroy evidence by deleting the contents of the camera, and filing criminal charges against him, in retaliation for his video and audio recording of them, were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future. These policies, practices, and conduct violate Plaintiff's free speech and associational rights as guaranteed by the First Amendment.

## COUNT II

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983

**Claim for Damages Against Defendants Dilley, Wiggins, De La Pena, and Does 1–25 in Their Individual Capacities**

94.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 93 above, as though fully set forth.

95.     Defendants' above-described policies, practices, and conduct in unlawfully arresting Plaintiff, seizing his camera and memory contained therein, searching his camera and its memory, attempting to destroy evidence by deleting the contents of the camera, and filing criminal charges against him, in retaliation for his video and audio recording of them, were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future. These policies, practices, and conduct violate Plaintiff's free speech and associational rights as guaranteed by the First Amendment.

## COUNT III

### VIOLATION OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION UNDER *BIVENS v. SIX UNKNOWN AGENTS*

**Claim for Damages Against Defendants Breedon, Romero, Schreiner, and Does 1–25 in Their Individual Capacities**

96.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 95 above, as though fully set forth.

97.     Defendants' above-described policies, practices, and conduct in summoning law enforcement, resulting in subjecting him to excessive force, searching his person, seizing and searching his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera, in willful, wanton, and reckless disregard of Plaintiff's rights, violated Plaintiff's rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment.

## COUNT IV

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983

### Claim for Damages Against Defendants Dilley, Wiggins, De La Pena, and Does 1–25 in Their Individual Capacities

98.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 97 above, as though fully set forth.

99.     Defendants' above-described policies, practices, and conduct in seizing and arresting Plaintiff without reasonable suspicion or probable cause, subjecting him to excessive force, searching his person, seizing and searching his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera, in willful, wanton, and reckless disregard of Plaintiff's rights, violated Plaintiff's rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment.

## COUNT V

### FALSE ARREST

### Claim for Damages Against Defendants Dilley, Wiggins, De La Pena, and Does 1–25 in Their Individual Capacities

100.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 99 above, as though fully set forth.

101.     Defendants' above-described policies, practices, and conduct in detaining, seizing, and arresting Plaintiff, without probable cause or legal justification, and while knowing that they lacked lawful authority to do so, were intended to and did cause

damages to Plaintiff.

## COUNT VI

## MALICIOUS ABUSE OF PROCESS

**Claim for Damages Against Defendants Dilley, Wiggins,
De La Pena, and Does 1–25 in Their Individual Capacities**

102.    Plaintiff realleges and incorporates here the allegations in Paragraphs 1
through 101 above, as though fully set forth.

103.    Defendants' above-described policies, practices, and conduct in instituting
criminal judicial proceedings against Plaintiff and misusing and actively participating in
the misusing of the legal process by filing a criminal complaint against Plaintiff without
probable cause or by inducing the filing of a criminal complaint against Plaintiff without
probable cause, through the providing of information while knowing it to be false, in
furtherance of the illegitimate end of retaliating against Plaintiff for his video and audio
recording of them, were intended to and did cause damages to Plaintiff.

## COUNT VII

**MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983 AND
*MONELL v. DEPARTMENT OF SOCIAL SERVICES OF THE
CITY OF NEW YORK*, 436 U.S. 658 (1978)**

**Claim for Damages Against Defendant City**

104.    Plaintiff realleges and incorporates here the allegations in Paragraphs 1
through 103 above, as though fully set forth.

105.     Plaintiff is informed and believes, and on this basis alleges, that at the
time of the conduct complained herein, Defendant City through its policymakers had in
force and effect a policy, practice, or custom to prohibit lawful photography and filming
in publicly accessible areas of the Albuquerque airport, even though no statute or
ordinance prohibits such photography and filming; to require individuals to provide
documentation of identity even when providing such documentation is not required; and
to arrest or threaten to arrest individuals who seek to engage in such lawful actions.

106.     Plaintiff is informed and believes, and on this basis alleges, that at the
time of the conduct complained herein, Defendant City through its policymakers had in

force and effect a policy, practice, or custom to engage in retaliatory behavior, such as charging or threatening to charge individuals with disorderly conduct or criminal trespass even in the absence of genuine threats of violence or no-trespass orders, against those who seek to exercise their lawful right to use cameras in areas where no legitimate time, place, and manner restrictions were in place.

107.    Plaintiff is informed and believes, and on this basis alleges, that at the time of the conduct complained herein, Defendant City through its policymakers had in force and effect a policy, practice, or custom to fail to properly discipline, train, and supervise City police officers, including the individual law enforcement Defendants in this case, in the legality of not having to provide documentation of identity, in the legality of filming in the Albuquerque airport, and in the illegality of retaliating against individuals who seek to exercise their lawful rights.

108.    Plaintiff is informed and believes, and on this basis alleges, that the final policymakers of Defendant City had actual or constructive knowledge of these unlawful practices yet failed to take any reasonable or adequate steps to remedy them.

109.    Plaintiff is informed and believes, and on this basis alleges, that the above-described policies, practices, or customs led City law enforcement to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated, making it foreseeable that officers would violate individuals' rights in precisely the manner in which Plaintiff's rights were violated.  Plaintiff is informed and believes, and on this basis alleges, that Defendant City through its final policymakers were deliberately indifferent to this risk.

110.    The above-described policies, practices, or customs were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process, causing damages to Plaintiff.

## COUNT VIII

### DECLARATORY RELIEF UNDER 28 U.S.C §§ 2201, 2202

#### Claim for Equitable Relief Against All Defendants
in Their Official Capacities

111.    Plaintiff realleges and incorporates here the allegations in Paragraphs 1 through 110 above, as though fully set forth.

112.    There exists an actual, present, and justiciable controversy between Plaintiff and Defendants concerning their rights and duties with respect to Defendants' conduct described herein. Plaintiff contends that Defendants violated Plaintiff's rights under the Constitution and laws of the United States. Plaintiff is informed and believes, and on this basis alleges, that Defendants deny that their conduct violates Plaintiff's rights under the Constitution and laws of the United States. Plaintiff fears he is now and will again be subjected to such unlawful and unconstitutional actions. Plaintiff seeks a judicial declaration that Defendants' conduct deprived Plaintiff of his rights under the Constitution and laws of the United States.

113.    This controversy is ripe for judicial decision, and declaratory relief is necessary and appropriate so that the parties may know the legal obligations that govern their present and future conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks relief from this Court as follows:

a.    Issue a judicial declaration that Defendants' actions as alleged in this Complaint violated the First and Fourth Amendments of the United States Constitution;

b.    Issue a court order enjoining Defendants from prohibiting the use of cameras and other recording devices in publicly accessible areas of the Albuquerque airport where no legitimate time, place, and manner restrictions are in place, and from retaliating against individuals who seek to exercise their right to use such cameras and other recording devices;

c.    Issue a court order requiring Defendants to undertake training and other prophylactic measures to ensure Defendants' conduct is not repeated in the future;

d.    Award Plaintiff compensatory, nominal, and special damages, in an amount according to proof, and to the extent permitted by law;

e.    Award Plaintiff prejudgment and postjudgment interest to the extent permitted by law;

f.      Award Plaintiff his costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1988 and 28 U.S.C. § 2412;

g.      Award such other relief as is just and proper.

### DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a jury trial for all issues triable by jury.

This claim is timely made and is presently within jurisdictional time limits to present claims.

Dated November 14, 2011                    Respectfully submitted,

                                           James Wheaton
                                           Lowell Chow
                                           FIRST AMENDMENT PROJECT

                                           Mary Lou Boelcke
                                           LAW OFFICES OF MARY LOUISE
                                           BOELCKE

                                           William Simpich
                                           LAW OFFICE WILLIAM SIMPICH

                               By:  /s/ Mary L Boelcke
                                    Attorneys for Plaintiff Phillip Mocek