UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **PHILLIP MOCEK,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-cv-1009-BB/KBM |
| ) | |
| **CITY OF ALBUQUERQUE, ET AL.,** ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>**MEMORANDUM IN SUPPORT OF INDIVIDUAL**</u>
<u>**FEDERAL DEFENDANTS' MOTION TO DISMISS**</u>

### I.   INTRODUCTION

This case involves an attempt by the Plaintiff, Phillip Mocek, to pursue legal action against federal transportation security officers (TSOs) at the Albuquerque International Sunport. The Plaintiff seeks to hold three Transportation Security Administration (TSA) employees personally liable for allegedly violating his First and Fourth Amendment rights.[1] According to his complaint, the Plaintiff, a self-proclaimed "outspoken advocate," decided to challenge the TSA's security procedures by refusing to provide identification at the Albuquerque International Sunport security checkpoint. After one of the TSOs initiated alternative screening measures, the Plaintiff began video recording in the midst of the screening process. After the Plaintiff refused the TSOs' requests to stop recording, the TSOs asked for assistance from local authorities. The local police initially requested that the Plaintiff comply with the TSA officers' requests or be removed

---

[1] Defendants Jonathon Breedon was a lead TSO at the time of the incident, while defendant Anthony Schreiner was a Supervisory TSO and the defendant Gerald Romero was a Transportation Security Manager. *Comp.* ¶¶ 19-21. For ease of reference, this motion will refer to them as TSOs. The Plaintiff has also brought suit against the City of Albuquerque, the Albuquerque Aviation Police Department and members of that Department. However, those allegations are not at issue in this Motion to Dismiss.

from the airport. After the Plaintiff refused to comply, the police asked for his identification. After again failing to comply with the police, the Plaintiff was arrested for concealing his identity.

The three TSA defendants, Jonathan Breedon, Gerald Romero and Anthony Schreiner, are entitled to qualified immunity on both of the constitutional claims against them. The First Amendment retaliation claim should be dismissed because the TSA defendants acted reasonably, under the circumstances, in requesting that the Plaintiff cease recording their activities at the airport's security checkpoint, a non-public forum. It is also clear from the Plaintiff's complaint that the TSA defendants did not cause the injuries the Plaintiff identifies as resulting from the alleged violation of his First Amendment rights, namely his arrest and the subsequent search of his person or property. Finally, it was not clearly established that the Plaintiff had a First Amendment right to video record TSOs conducting alternative screening procedures to verify his identity at a security checkpoint.

Similarly, the Plaintiff has not demonstrated that the TSA defendants violated his Fourth Amendment rights because the complaint does not show that they caused or participated in his seizure or the search, and alleged mishandling, of his property.  Finally, the only action that the complaint alleges the TSA defendants did take, "summoning law enforcement," is not a clearly established violation of the Plaintiff's Fourth Amendment rights. *Comp.* ¶ 97.

## II.     FACTUAL BACKGROUND[2]

### A.    TSA Procedures

In the wake of the terrorist attacks of September 11, 2001, Congress created the TSA to maintain "security in all modes of transportation" in the United States, including civil aviation. 49 U.S.C. § 114(d).[3] As part of that responsibility, the TSA must "assess current and potential threats to the domestic air transportation system," including the "extent to which there are

---

[2] For purposes of this Motion to Dismiss only, the well plead factual allegations in the complaint are accepted as true. *See Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2079 (2011).

individuals with the capability and intent to carry out terrorist or related unlawful acts against that system and the ways in which those individuals might carry out those acts." 49 U.S.C. § 44904(a). In airports, the TSA is statutorily required to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft." 49 U.S.C. § 44901(a); *see also* 49 U.S.C. § 114(e)(1) (stating that the TSA is "responsible for the day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation" under sections 44901 and 44935 of 49 U.S.C.).

That screening includes confirming that the traveler who presents himself at the security checkpoint shares the same identity as the individual named on the boarding pass in order to ensure that all passengers have been appropriately vetted against federal watch lists pursuant to 49 U.S.C. § 44903(j)(2)(C). *See also* 49 U.S.C. § 114(h)(1) & (4) (providing the TSA with the authority to cross-check passengers against databases identifying individuals who pose a threat to transportation or national security); 49 C.F.R. § 1540.107(c) ("an individual may not enter a sterile area or board an aircraft if the individual does not present a verifying document . . ., when requested for the purposes of watch list matching . . ., unless otherwise authorized by TSA on a cases-by-case basis."); 49 C.F.R. pt 1560 (detailing TSA's watch list matching program, Secure Flight).

For flights originating in the United States, the TSA's screening of passengers must take place prior to boarding. 49 U.S.C. § 44901(a). Passenger compliance with airport security screening procedures is critical to the TSA's ability to efficiently and effectively carry out its duties, and is a mandatory recondition for boarding and flying on commercial airlines.[4] To this end, TSA regulations

---

[3] 49 U.S.C. § 114 refers to the TSA's Administrator as "the Under Secretary of Transportation for Security" because the TSA was originally a part of the Department of Transportation. The TSA's functions, as well as the Under Secretary's, were transferred to the Department of Homeland Security pursuant to section 403(2) of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat 2135 (codified at 6 U.S.C.§ 203(2)). The Under Secretary is now known as the Administrator of the TSA. *See* 49 C.F.R. § 1500.3.

[4] See 49 C.F.R. §§ 1540.105(a)(2) (prohibiting individuals from entering a secured or sterile airport area "without complying with the systems, measures, or procedures being applied to control access to, or presence or movement in, such areas"); 1540.107(a) ("no individual may . . . board an aircraft without submitting to the screening and inspection of his or her person . . . in accordance with the procedures being applied to control access to that area or aircraft . . . ."); *see also* 49 U.S.C. §§ 44901-44903.

prohibit passengers from interfering with screening personnel who are performing their duties at airport screening checkpoints. 49 C.F.R. § 1540.109 ("No person may interfere with, assault, threaten, or intimidate [TSA] screening personnel in the performance of their screening duties under this subchapter.")

**B.      The Plaintiff Willfully Failed to Comply with TSA Procedures**

Plaintiff objected to having to present identity documents (I.D.) to TSA staff at airport security checkpoints prior to boarding commercial flights. *Comp.* ¶ 26.  He "believed that he should not have to request and receive permission from the government to travel from one state to another, nor that his name should be a deciding factor in whether he is able to engage in interstate travel." *Id.*[5] Although the Plaintiff states that he sometimes presents his I.D. "to move through security with minimum hassle and risk of delay," prior to a departure from Albuquerque International Sunport in November of 2009, he decided that he would willfully refuse to provide I.D. *Id.* at ¶¶ 29, 43.

In addition, the Plaintiff decided to video record his interaction with TSA staff and the procedures used at the airport security checkpoint, including the alternative screening procedures used by TSA to verify the identity of a passenger without I.D. Prior to his trip he visited a TSA website, entitled the TSA Blog, and asked about taking photos at security checkpoints. *Id.* at ¶¶ 31-32. The Plaintiff was informed that there was no general prohibition against taking photographs "as long as you're not interfering with the screening process or slowing things down." *Id.* at ¶ 32. Plaintiff was also told that photography of the TSA monitors was prohibited. *Id.* ¶ 35. In addition, the Blog suggested that the Plaintiff contact the Customer Support Manager of the airport at issue to ensure that there were no local rules or regulations that might restrict photography of a TSA airport security checkpoint. *Id.* ¶ 32. In response to the Plaintiff's inquiry, a TSA employee at Albuquerque International Sunport informed the Plaintiff that the TSA checkpoint is a "restricted area" that is "just

---

[5] The Plaintiff is mistaken in this assumption. *See* 49 C.F.R. § 1540.107(c); *Gilmore v. Gonzales*, 435 F.3d 1125, 1136-40 (9th Cir. 2006) (holding that the TSA's requirement that passengers present I.D. before boarding a flight does not violate the First or the Fourth Amendment, and there is no constitutional right to interstate travel by air.)

for ticketed passengers," and recommended that the Plaintiff make advance coordination with TSA officials if he wished to film at or near a TSA checkpoint. *Id.* at ¶ 39, 40-41. The Plaintiff does not allege that he tried to make this coordination with TSA officials prior to his flight.

**C.      The Plaintiff Refused to Stop Recording His Interaction with TSOs**

On November 15, 2009, the Plaintiff traveled to Albuquerque International Sunport for his return flight to Seattle. *Id.* at ¶ 43.  Prior to arriving at the TSA checkpoint, he handed his only I.D., a driver's license, to his friend and traveling companion. *Id.* at ¶ 43.  He then approached the podium where TSOs were checking documents and was asked for his I.D. *Id.* at ¶ 44.  The Plaintiff answered "that he did not have any form of I.D." and that it was his understanding that he only had to produce a boarding pass. *Id.* The Plaintiff was told to stand in a different line. *Id.*

TSO Breedon then took the Plaintiff's boarding pass and asked if the Plaintiff had anything else that might help verify his identity. *Id.* at ¶ 45. The Plaintiff responded that he did not have any form of I.D., and it was his understanding that he was not required to produce any documents other than a boarding pass to fly. *Id.* According to the Plaintiff, TSO Breedon asked if he could verify his identity in some other manner. *Id.* The Plaintiff "again stated that he would not provide anything because it was his belief that he was not required to." *Id.* TSO Breedon then told the Plaintiff that he would contact the TSA's Security Operations Center, which would try to verify the Plaintiff's identity, and if they could not, the Plaintiff would not be allowed to proceed through the security checkpoint. *Id.*

At that point, the Plaintiff began using his camera to video record his interactions with TSO Breedon, including the alternative procedures used to verify his identity. *Id.* at ¶ 46.  The Plaintiff claims that TSO Breedon told the Plaintiff he would "need to stop filming," but the Plaintiff responded that he did not believe the filming was illegal and continued recording. *Id.* The Plaintiff states that TSO Breedon called for police assistance, and while awaiting the police, TSA supervisors Schreiner and Romero arrived at the security checkpoint. *Id.* at ¶ 47.  TSO Romero then had a conversation with the Plaintiff in which he asked the Plaintiff to put his camera "down for now" five times, but the Plaintiff refused and kept recording. *Id.* at ¶¶ 48, 69,

79.

**D.  Once the Police Arrived They Took Control of the Situation**

Three members of the Albuquerque Aviation Police Department (AAPD), Officers
Dilley, Wiggins and De La Pena, then arrived and were allegedly told by a TSA defendant that
the Plaintiff would not put down his camera. *Id.* at ¶ 49. Police Officer Dilley instructed the
Plaintiff to comply with the TSOs' instructions but the Plaintiff continued recording. *Id.* at ¶ 51.
One of the Police Officers indicated that the Plaintiff was causing a commotion, but the Plaintiff
continued to insist that he had a right to record at the TSA security checkpoint. *Id.* at ¶¶ 51-52.
The Plaintiff was then told for a second time to comply with the TSOs' instructions or he would
be escorted out of the airport. *Id.* at ¶ 52.

Police Officer Dilley then requested the Plaintiff's I.D. *Id.* at ¶ 54. The Plaintiff stated
that he did not have any I.D. *Id.*  Dilley reiterated twice that the Plaintiff was now part of a
criminal investigation and was required to produce his I.D. The Plaintiff then responded by
stating that he was going to remain silent and wanted to talk to an attorney. *Id.*  Dilley then
placed the Plaintiff under arrest for concealing his identity, and escorted him to the AAPD Office
for processing.  *Id.* at ¶¶ 55, 57.

Following the Plaintiff's arrest, TSOs Breedon and Schreiner authored written
statements of interaction they had with the Plaintiff on November 15, 2009. *Id.* at ¶¶ 75-78.
*See also* Defense Exhibit (DEX) 1 (TSO Breedon's Statement) and DEX 2 (TSO Schreiner's
Statement).[6] In addition, TSO Breedon testified during the prosecution of the Plaintiff. *Id.* at ¶ 87.

---

[6] Attaching these statements to a Fed. R. Civ. P. 12(b)(6) motion does not convert the pleading to
a Fed. R. Civ. P. 56 motion for summary judgment because the Plaintiff's summarization of the
documents causes them to be "incorporated into the complaint by reference." *TMJ Implants, Inc.
v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007) (*quoting Tellebs, Inc. v. Makor Issues &
Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### III.    ARGUMENT

The individual federal defendants, TSOs Breedon, Romero and Schreiner, move to dismiss the Plaintiff's First and Third Counts pursuant to Fed. R. Fed. P. 12(b)(6). These claims, which seek damages for alleged violations of the First and Fourth Amendments under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), are subject to dismissal because the Plaintiff has failed to state a claim upon which relief can be granted.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering such a motion, a court should assume to be true only the complaint's well-pleaded factual allegations, setting aside its legal conclusions. *See id.* Conducting a plausibility inquiry is a "context-specific task" that "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citation omitted). Where the facts as presented by the plaintiff do not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief," and the dismissal motion should be granted. *Id.* (*citing* Fed. R. Civ. P. 8(a)(2)).

Applying these principles to the complaint, the Plaintiff has not pled facts sufficient to give rise to the plausible inference of either a First or Fourth Amendment violation and his First and Third Counts should be dismissed accordingly.

### A.    Qualified Immunity Bars the Plaintiff's Claims Against the Individual Federal Defendants

The Plaintiff's First and Third Counts should be dismissed because the individual federal defendants are protected by qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has provided a two-part inquiry for the analysis of a qualified immunity defense. *Pearson v. Callahan*, 555 U.S. 223, 235 (2009); *see also Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995) ("Once a defendant pleads qualified immunity, the plaintiff initially bears a heavy two-part burden.") The first inquiry asks whether the facts alleged, viewed in the light most favorable to the Plaintiff, show that the official's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (*abrogated by Pearson v. Callahan*, 555 U.S. 223 (2009)). The second asks whether the constitutional right the official is accused of violating was "clearly established" under the circumstances at the time of the alleged violation. *Saucier*, 533 U.S. at 201. If the answer to either question is no, qualified immunity attaches and the inquiry ends.[7] Qualified immunity is intended to shield officials from the harassment of litigation as much as the fear of damages. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). It thus provides "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the Supreme Court has repeatedly stressed that qualified immunity defenses should be resolved at the earliest possible stage of litigation. *See*, *e.g.*, *Hunter v. Bryant*, 502 U.S. 224 (1991) (*per curiam*); *Anderson*, 483 U.S. at 646 n.6.

The qualified immunity defense raises a high bar, protecting government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether the official could have reasonably believed that his or her conduct was lawful, courts examine the state of the law at the relevant time, and the information available to the defendants in the case. *Anderson*, 483 U.S. at 641. The court must examine the

---

[7] While in the past courts were required to consider the question of whether a constitutional violation had occurred before turning to the "clearly established" prong, it is now the case that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

existence and parameters of the right allegedly violated "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, a plaintiff asserting the violation of a constitutional right in the *Bivens* arena must define the right allegedly violated not as a general proposition, but "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Further, the test asks whether reasonable officials, not judges or constitutional scholars, could have thought the alleged conduct was permissible under the Constitution. *Wilson v. Layne,* 526 U.S. 603, 618 (1999). Therefore, courts reviewing an assertion of qualified immunity must make "accommodation for reasonable error." *Hunter*, 502 U.S. at 229 (internal citation omitted).

　　In keeping with this principle, the Supreme Court has stated that an appropriate starting point for a qualified immunity analysis is to define the claimed right with specificity. *See, e.g.*, *Brousseau v. Haugen*, 543 U.S. 194, 200 (2004) (question is whether Fourth Amendment jurisprudence clearly established that it was a violation for officers to shoot "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight" (internal citation omitted)); *Wilson*, 526 U.S. at 615 ("[T]he appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed."); *Conn v. Gabbert*, 526 U.S. 286, 291 (1991) (relevant question is whether Fourteenth Amendment case law clearly establishes that "use of a search warrant by government actors violates an attorney's right to practice his profession"); *see also Mitchell,* 472 U.S. at 535 (holding that the "decisive fact is not that [the defendant's] position turned out to be incorrect, but that the question was open at the time he acted."). Mere citation to a constitutional provision is inadequate, as the Constitution's text is "cast at a high level of generality," such that its

application to particular facts will clearly establish a governing rule only in "obvious" cases. *Brousseau, 5*43 U.S. at 194, 199 (2004) (internal citation omitted).

"In order to carry his burden, the plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it. Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity, and demonstrate a substantial correspondence between the conduct in question and prior law . . . ." *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995) (citation and internal quotation omitted). Further, because a government official may only be held personally liable under *Bivens* "for his own misconduct," the plaintiff must allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. 676-77.

Here, the Plaintiff has failed to allege facts sufficient to support the inference of a constitutional violation on behalf of the individual federal defendants. That alone is sufficient to warrant qualified immunity. Even assuming that the Plaintiff has alleged a constitutional violation, the federal defendants are entitled to qualified immunity because the constitutional rights invoked by the Plaintiff are not clearly established, and the individual federal defendants acted reasonably under the circumstances.

### 1. The Complaint Fails to Allege a First Amendment Violation

In his Count I, the Plaintiff claims that the individual federal defendants summoned law enforcement in retaliation for his "video and audio recording" at the TSA security checkpoint which resulted in his arrest and the seizure of his belongings. *Comp.* ¶ 93. To establish a First Amendment retaliation claim, the Plaintiff must establish the following elements: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the

10

plaintiff's exercise of constitutionally protected conduct." *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (*citing Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).  Under the requisite pleading standard, a defendant claiming a First Amendment violation must allege sufficient facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (internal citation omitted). When a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).

No court has considered whether the right claimed by paragraph 93 of the Complaint, the "constitutionally protected right to record audio and video" at the TSA security checkpoint, while a passenger is undergoing screening actually exists. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."). Even if the Plaintiff has alleged that the activity he was participating in was protected, it is clear that the restrictions imposed by the TSA defendants were reasonable and permissible under the First Amendment and that there is no causal connection between the individual federal defendants' actions and the injury he claims resulted from his engagement in protected activity.

a.   <u>Plaintiff's Complaint Describes a Reasonable Response by the Individual TSA Defendants to Disruptive Activity in the Airport Security Screening Area, and Fails to State a Plausible Claim of a First Amendment Violation</u>

The First Amendment permits reasonable restrictions on speech in nonpublic fora.  *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998).  The Supreme Court has held that the terminals of publicly-owned airports such as Albuquerque International Sunport are nonpublic fora.  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). In the context of activity within an airport terminal in general, as opposed to a security checkpoint, the Court held that restrictions on speech at airport terminals "need only be reasonable." *Id.* at 683. "It is

11

. . . black letter law that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007). At the same time, those restrictions must not be "an effort to suppress the speaker's activity due to disagreement with the speaker's view," *i.e.*, viewpoint discrimination as opposed to content discrimination. *Krishna* Consciousness, 505 U.S. at 679. *See also The News and Observer Publishing Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570, 577 (4th Cir. 2010).

Even assuming that video recording the TSOs constituted speech for purposes of this case, the Plaintiff has failed to establish the first prong of a First Amendment retaliation claim because the TSA defendants' actions, as alleged, constituted a reasonable limitation on the Plaintiff's attempt to video record TSA defendants and TSO procedures during the screening process. Further, the Plaintiff has not alleged that the TSA employees disagreed with his views, or that he even made any views known or had any expressive purpose at all in filming the TSOs.

The complaint clearly states that the Plaintiff intended to disrupt the screening process by willfully failing to follow TSA's screening procedures and the TSOs' instructions. *See Comp.* ¶¶ 27-30. During some previous trips the Plaintiff refused to provide TSOs with I.D. *Id.* at ¶ 27. "Typically, once TSA staff realized he did not intend to present I.D., Mocek would be diverted to a separate line to await assistance and additional questioning from another TSA agent." *Id.* at ¶ 28. During trips in "which he desired a minimum hassle and risk of delay" the Plaintiff would provide I.D. to the TSA screeners. *Id.* at 29. The Plaintiff alleges that in June of 2008 the TSA announced a new policy in which passengers like him who "willfully refuse to provide identification at security checkpoint[s] will be denied access to the secure areas of airports." *Id.* at ¶ 30.

Despite being aware of this policy, on November 15, 2009, the Plaintiff gave his only I.D., his driver's license, to his travel companion, and proceeded to the TSA security checkpoint with only his boarding pass. *Id*. at ¶¶ 43-44. After refusing to provide I.D., the Plaintiff was sent to a different line and was questioned concerning his identity by TSO Breedon. *Id*. at ¶ 45.  TSO Breedon indicated he would contact the TSA's Security Operations Center to attempt to verify the Plaintiff's identity so that he could fly.  *Id*. *See also* DEX 1.

The Plaintiff then began video recording his interaction with TSO Breedon. Comp. at ¶ 46. The Plaintiff claims that he had previously reviewed airport photography policies and sent e-mails to TSA websites, thereby determining that photography was permitted at TSA security checkpoints as long as he did not photograph TSA monitors and his actions did not interfere with TSA operations. *Id*. at ¶¶ 35, 38. In addition, the Plaintiff claims that a TSA Albuquerque official initially told him that the security checkpoint was a "restricted area" and "just for ticketed passengers" and that advanced coordination was needed to photograph the area. *Id*. at ¶¶ 37, 39. The Plaintiff claims that the same TSA official later told him that the advanced coordination was simply a recommendation that the Plaintiff ignored. *Id*. at ¶¶ 41-2. Once recording began, the Plaintiff refused TSO Breedon's request to "stop filming" and TSO Romero's subsequent requests to "put it [the camera] down for now." *Id*. at ¶¶ 46, 48.  The Plaintiff claims that it was his refusal to end his recording at the security checkpoint that resulted in TSO Breedon requesting local police assistance. *Id*. at ¶¶ 45-47, 93.

The complaint's allegations support the conclusion that the TSA defendants reacted reasonably to Plaintiff's attempt to create a disturbance by willfully refusing to provide his I.D. and filming the alternative screening process that ensued. The TSA has appropriately recognized that when there is a disruption at the security checkpoint, a TSO "may . . . need to summon a checkpoint screening supervisor and law enforcement officer, taking them away from other duties," and that "[c]heckpoint disruptions potentially can be dangerous in these situations."  67 Fed. Reg. 8340, 8344

(2002) (preamble to the final rule that initially promulgated TSA's regulations published in 49 C.F.R.); *see also* 49 C.F.R. § 1542.215 (requiring that airport operators provide law enforcement personnel.) Disruptive actions like the Plaintiff's can also create a security risk by potentially allowing others to evade scrutiny.  *See* 67 Fed. Reg. 8340, 8344 ("A [TSO] encountering such a situation [where a passenger is interfering with the TSO's job] must turn away from his normal duties to deal with the disruptive individual, which may affect the screening of other individuals").

The Plaintiff admits he knew his actions would likely require additional screening and delay his processing through the checkpoint.  He also knew it was likely that his refusal to provide I.D. would result in him being denied access to the secure areas of the airport, including the departure gates.  In addition, both his refusal to provide I.D. and his video recording of the screening process raised legitimate concerns about transportation security.  While it may be clear now that the Plaintiff had no intention of creating a disturbance for nefarious purposes, a reasonable TSA officer could not responsibly assume that the Plaintiff was neither attempting to evade the security system nor testing the system responses for future operations.

In addition, TSOs must be concerned about the recording of procedures and publicizing possible vulnerabilities for others who aspire to evade security procedures, including the implementation of the TSA's watch list matching program. While the TSA's policies may generally not prohibit all filming at the checkpoint, TSOs must have discretion to ask a passenger to refrain from filming and refer him or her to law enforcement officers when he or she refuses to comply with multiple TSA procedures and causes a disruption. A rule protecting such disruptive behavior in the security screening area could readily be manipulated by individuals or groups that do have malicious intent. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 810 (1985) ("the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum") *see also* 67 Fed. Reg. 8344; 49 C.F.R. § 1540.105 ("[n]o person may . . . attempt to circumvent . . . any security

14

system, measure, or procedure"). Under the circumstances described in the complaint, it was reasonable for TSO Breedon to take prompt action to end the disruption by requesting the presence of local police officers to ensure that the plaintiff was not a risk to the traveling public.

The Supreme Court has recognized that it is reasonable to regulate speech so as to avoid disruptions to the general airport environment.[8] Such interests are significantly heightened within the security checkpoint-where disruption as explained above, can directly create a serious security threat. *See Krishna Consciousness*, 505 U.S. at 681 (recognizing need for "a new inquiry [in each different type of transport facility] whether the transportation necessities are compatible with various kinds of expressive activity"). In addition, the TSA has a legitimate and substantial interest in "conduct[ing] the screening of passengers as efficiently as possible." *See Rendon v. Transp. Security Admin.*, 424 F.3d 475, 479 (6th Cir. 2005). Given the TSA's mission to identify dangerous individuals or materials at the security checkpoint and the importance of avoiding disturbances and distractions in allowing the TSA to achieve this mission, it is reasonable for TSOs to ask disruptive or suspicious passengers to cease filming at the checkpoint and, if necessary, refer them to law enforcement officers quickly for further inquiry.

      b.    <u>The TSA Defendants Did Not Cause the Plaintiff's Arrest and the Other Adverse Actions the Plaintiff Alleges in Plaintiff's Count I</u>

The Plaintiff has also failed to meet the second prong of First Amendment Retaliation, "that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Klen*, 661 F.3d 508. Although the Plaintiff's Count I alleges that the TSA defendants "summoning law enforcement" resulted "in unlawfully

---

[8] *See Krishnan Consciousness*, 505 U.S. at 682-83; *id.* at 686, 689 (O'Connor, J., concurring) (agreeing "that publically owned airports are not public fora" and that solicitation "disrupts passage"); *Board of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (striking down bar on all First Amendment activities at airport, but recognizing that authority could "regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those at LAX").

arresting Plaintiff, seizing his camera and memory contained therein, searching his camera and its memory, attempting to destroy evidence by deleting the contents of the camera, and filing criminal charges against him," the factual recitations of his own complaint fail to support his conclusory allegations. *Comp.* ¶ 93. Instead, the complaint demonstrates that the TSA defendants were not responsible for the complained-of injuries, namely the Plaintiff's arrest, the handling of his property, or the filing of criminal charges. *Id.* at ¶¶ 49-67, 83. *See also* DEX 2 ("Officer Dilley moved right in front of the [Plaintiff] and took control of the situation . . .").

The Plaintiff admits that the AAPD did not initially plan on arresting him. *Comp.* ¶¶ 51-54. Police Officer Dilley twice told the Plaintiff to "comply" with TSO's instructions or he "would be escorted out of the airport. *Id.* at ¶¶ 51-2. Even after one of the police officers indicated the Plaintiff was "causing a commotion" the Plaintiff was given another opportunity to comply or be escorted out of the airport. *Id.* at ¶¶ 51-2. It was not until after the Plaintiff refused to provide the police with his identification, despite being told he could be arrested for concealing his identity during an investigation, that the Plaintiff was arrested. *Id.* at ¶ 54. The complaint makes it clear that Police Officer Dilley made the decision to arrest the Plaintiff. *Id.* at ¶¶ 54-5. ("Dilley then changed his mind about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing identity.") Because the complaint shows that the individual TSA defendants did not make the decision to arrest the Plaintiff, search him or his belongings, or file criminal charges against him, or request that any of the above occur, their actions did not cause the Plaintiff to suffer the injuries he complains of in paragraph 93 of the complaint. *See Iqbal*, 556 U.S. at 676-77 (holding that because the government official may only be held personally liable under *Bivens* "for his or her own misconduct," the plaintiff must allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

The Eighth Circuit recently considered similar facts in a less sensitive forum than an airport security checkpoint. *See Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012). In that case, the Director of Security for a school system told police that a member of the audience at a school board meeting was "disruptive and refused to leave." *Id.* at 753. The audience member, Green, denied being disruptive, but when the police arrived he "refused *their* request" to leave and was arrested based on refusing this order of the police. *Id.* (emphasis in the original). Because the arrest was based on Green's refusal to obey the police order, the Eighth Circuit affirmed the dismissal of his First Amendment retaliation claim, finding the "sequence fails to show a sufficient causal connection between the actions" of the Director of Security and "Green's subsequent arrest and prosecution." *Id.* Similarly, there is no causal connection for First Amendment retaliation purposes between TSO Breedon's request for police assistance, and the arrest of the Plaintiff after he refused the police order to provide his identification. Instead, it is clear from the Plaintiff's rendition of the facts that the police seizure, search and alleged deletion of his camera's memory and the filing of criminal charges occurred as a result of the police arrest and not the actions of the TSA defendants. *Comp.* ¶¶ 54, 57, 83.

## 2.   The Complaint Fails to Allege a Fourth Amendment Violation

The pleading standard established in *Ashcroft v. Iqbal* requires the plaintiff to allege facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). The Court made clear that personal participation in the alleged misconduct is necessary, as "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676.  *See also Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under §1983 must be based on personal involvement in the alleged constitutional violation."); *Strepka v. Miller*, 28 Fed. Appx. 823, 828 (10th Cir. 2001) (unpublished) ("To state a

claim for violation of a constitutional right . . . plaintiff had to allege facts showing that each defendant personally participated in or caused the constitutional violation"). Accordingly, the claims against the TSA Defendants may only go forward if the Plaintiff sufficiently stated that each of them personally participated in or caused the alleged Fourth Amendment violation.

However, as discussed above, the Plaintiff's recitation of the facts does not allege that the TSA defendants personally participated in or directed the police defendants in this case to search or seize the Plaintiff or his belongings. *Comp.* ¶ 97.[9] In fact, the Plaintiff does not allege that any of the TSA defendants actually participated in any of these actions. The Plaintiff does not claim that any of the three TSA Defendants used any force against him. Nor does he claim that the TSA defendants searched him or his camera, or seized his camera as indicated in his Count III.

Instead, the Plaintiff appears to be alleging that by alerting members of the AAPD to his behavior, the TSA defendants are responsible for any alleged misconduct by the local police. The complaint concedes, however, that TSA involvement ended once the police arrived and took control of the situation and the TSA defendants did not personally participate in the ensuing events. Further, as stated in Section A(1)(b), *supra*, the complaint clearly states that the Police defendants did not initially intend to search the Plaintiff or his camera.[10] Instead the Plaintiff admits that the Police initially requested the Plaintiff to "comply" with TSA instructions or he "would be escorted out of the airport. *Comp.* ¶¶ 51-2. Even after one of the police officers indicated the Plaintiff was "causing a commotion," the Plaintiff was given another opportunity to comply or be escorted out of the airport.

---

[9] Plaintiff's Count III alleges that the TSA Defendants "summoning [of] law enforcement, resulting in subjecting him to excessive force, searching his person, seizing and searching his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera" violated his Fourth Amendment rights. *Comp.* ¶ 97.

[10] Plaintiff's factual recitation does not include any allegations of excessive force, or any force, against any of the defendants. *Comp.* ¶¶ 1-91. Conclusory allegations of excessive force, with no factual support, are first mentioned in Plaintiff's Counts III and IV, but not in the portion of the complaint entitled Factual Allegations. *Id. at* ¶¶ 96-99.

*Id.* It was not until after the Plaintiff refused to provide the police with his identification, despite being told he could be arrested for concealing his identity during an investigation, that the <u>police</u> arrested the Plaintiff, which resulted in the search of his person and search and seizure of his camera by the <u>police</u>. *Id.* at ¶ 54.

Just as it considered a similar First Amendment Retaliation issue, in *Green* the Eighth Circuit upheld qualified immunity on a Fourth Amendment claim for a security officer who told police that the plaintiff "was disruptive and had refused a request to leave." 676 F.3d at 755. The court found that despite summoning the police, the security officer was not the proximate cause of the plaintiff's subsequent arrest. *Id*. After reporting the incident, the security officer "left the situation in the hands of the police, and [the Plaintiff] was not arrested and removed until he refused to obey the [police] officer's command." *Id.* Likewise, in *Tobey v. Napolitano*, 808 F.Supp. 2d 830, 850 (E.D.Va. 2011), *appeal docketed* Nos. 11-2230 and 11-2276 (4th Cir. Nov. 9, 2011), the court found that TSOs who sought assistance from local police had not violated the Fourth Amendment and therefore were entitled to qualified immunity on that claim.[11] In *Tobey*, TSOs requested airport police assistance after the plaintiff began removing his clothes inside the security screening area. *Id.* The court stated that given "the heightened security interest at airport security checkpoints" it was "eminently reasonable" for the TSOs to seek police assistance. *Id.* In addition, the court found that the plaintiff's complaint was "devoid of any facts suggesting" that the TSO Officers asserted that the plaintiff "committed, or was about to commit a crime" or that the plaintiff should be arrested. *Id.* As in this case, because it

---

[11] Currently on appeal in *Tobey* is the court's finding, concerning the plaintiff's First Amendment retaliation claim, that there was an issue of fact as to whether the TSO radioed for police assistance based on the content of the plaintiff's message. 808 F.Supp.2d at 850-51. Unlike that case, as stated in Section 1(a), *supra*, the Plaintiff has not alleged that any viewpoint was communicated by his videotaping or that the TSOs referred him to local law enforcement because they disagreed with his views.

was the police who were responsible for the plaintiff's arrest, there was no Fourth Amendment violation. *Id.*

### 3.  The Complaint Fails to Allege a Violation of a Clearly Established Right

The Plaintiff's constitutional claims against the TSA defendants are also barred because the rights he claims were violated are not clearly established. To overcome an assertion of qualified immunity, a plaintiff pleading the violation of a constitutional right must show not only that the right existed and was violated, but that the right was clearly established in the specific factual circumstances. If the plaintiff's allegations fail to state a claim of violation of clearly established law, "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*, 472 U.S. at 526 (internal citation omitted).

For purposes of qualified immunity, a right must be clearly established at the time the alleged violation occurred. *See Wilson v. Layne,* 526 U.S. 603, 604 (1999) ("the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (*quoting Anderson*, 483 U.S. at 640). Specifically, the plaintiff must point to case law in a similar context that clearly established the right in question. *See Saucier*, 533 U.S. at 209 (a right cannot be clearly established if no case demonstrates a clearly established rule "prohibiting [a law enforcement officer] from acting as he did."). The Tenth Circuit has explained that, for a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v.* Montoya, 597 F.3d 1150, 1155 (10th Cir. 2010) (quotation omitted). Although there does not need to be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). In short, courts should not "define clearly established law at a high level of generality." *Id.* at 2084.

If officers of reasonable competence could disagree on the issue, a right is not clearly

established. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) "Qualified immunity gives government

officials breathing room to make reasonable but mistaken judgments about open legal questions.

When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate

the law.'" *al-Kidd*, 131 S. Ct. at 2085 (*quoting Malley*, 475 U.S. at 341). Even if the officer's conduct

is later deemed unlawful, the officer is nevertheless entitled to qualified immunity if the officer made

an objectively reasonable decision. *Hunter*, 502 U.S. at 227 (1991). Finally, that an official's conduct

violates some other source of law, such as regulations, manual provisions, or state law, does not strip

the officer of qualified immunity. *Davis*, 468 U.S. at 193-96.

      a.      <u>The Plaintiff's Allegations Do Not Make Out A Violation of Clearly Established</u>
              <u>Law Under the First Amendment</u>

There is no case law directly addressing the factual scenario facing the three TSA

defendants. The fact that no court has addressed the Plaintiff's allegation that he had a

"constitutionally protected right to record audio and video" at a TSA security checkpoint is itself a

clear indication that the right is not clearly established. *Comp.* ¶ 93. Moreover, existing case law

clearly indicates that an individual does not have the right to remain outside the attention of law

enforcement when the individual is acting in a manner that sparks suspicion in a reasonable officer's

mind. *See, e.g. U.S. v. Cothran*, 286 F.3d 173, 176 (3rd Cir. 2002) (upholding conviction for verbal

threats made against an airline). Likewise, in *Rendon v. Transportation Security Administration*, 424

F.3d 475 (6th Cir. 2005), the Sixth Circuit rejected a First Amendment challenge to a civil penalty

assessed against a passenger who started cursing inside the screening area. *See id*. at 477-78 (after

cursing at the TSA agent, plaintiff "loudly replied . . . that he had a First Amendment right to say

what he wanted"). The plaintiff claimed that the applicable regulation, 49 C.F.R. § 1540.109, which

"prohibits interfering with . . . screening personnel . . . is, as applied, a content-based regulation in

violation of his First Amendment right to freedom of speech" because plaintiff's profanities were

protected speech. *Id.* at 478. The Sixth Circuit rejected this challenge, holding that the regulation, "as applied, does not violate the Petitioner's First Amendment right to freedom of speech." *Id.* at 481. While the Sixth Circuit decision presents different facts from those here, it would no doubt teach a TSO that he or she has constitutional leeway in responding to a person's disruptive speech and behavior in the security screening area.

Even the question of whether there is a clearly established right to videotape police conduct in a public forum or public street, a situation which is factually too far removed to provide precedent for this case, is unsettled in the Circuits. Both the First and Eleventh Circuits have found that there is a First Amendment right to videotape police conduct in public places. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that there is a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct."); *Glik v. Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011). However, in, *Kelly v. Borough of Carlisle*, 622 F.3d 248, 251 (3rd Cir. 2010), the Third Circuit held that there was not a clearly established right to videotape police officers during a traffic stop. 622 F.3d at 262. *See also Szymecki v. Houck*, 353 Fed. Appx. 852, 853 (4th Cir. 2009) (unpublished) ("right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"); *Adkins v. Guam Police Department*, No. 09-00029, 2010 WL 3385176, at *12 (D. Guam Aug. 24, 2010) ("It would not have been clear to a reasonable officer in the Defendant's position that prohibiting the Plaintiff from taking photos at an accident scene would violate the Plaintiff's First Amendment rights."); *Gravolet v. Tassin*, No. 08-3646, 2009 WL 1565864, at *4 (E.D. La. June 2, 2009) ("Given the uncertainty in the caselaw and the lack of guidance from the Fifth Circuit, this Court is unable to find as a matter of law that there was a clearly established right to videotape police officers at the time of the arrest under these circumstances.") (quotations omitted).

This line of cases is distinguishable for two reasons. First, airport security checkpoints are not public fora and First Amendment activity at such checkpoints is subject to reasonable restrictions. *See* Section A(1)(a), *supra*. Second, TSOs are not law enforcement officials and the Plaintiff concedes that the law enforcement authority exercised in this case that allegedly gave rise to the constitutional violations was performed by the police and not the TSOs. *See Comp*. ¶¶ 54, 57, and 83; *see also* TSA Management Directive 1100.88-1 4(A) at 2, available at

http://www.tsa.gov/assets/pdf/foia/TSA_MD_1100_88_1_FINAL_070511.pdf (omitting security screeners from the categories of TSA employees authorized to make arrests).[12]

Moreover, even to the extent that the filming of police activity in a public forum is analogous to this case, the facts at issue are far closer to those in *Kelly*, where the court held that a passenger did not have the right to film a traffic stop of the car he was riding in, than to *Glik*, where the filming of police activity took place at a distance in a public park. The First Circuit's decision in *Glik*, which postdates the Plaintiff's interaction with the TSA defendants, indeed distinguished the facts before it from the traffic stop in *Kelly*, noting that "a traffic stop is worlds apart from an arrest on the Boston Common" which it described as the "apotheosis of a public forum." 655 F.3d at 85. The court also noted that the plaintiff in *Glik* "filmed [the officers] from a comfortable remove and neither spoke to nor molested them in any way (except in directly responding to the officers when they addresses him"). *Id.* at 84 (internal quotations omitted). Here, as in *Kelly*, the conduct took place in a setting that is "worlds apart from . . . the Boston Common." *Id.* at 85.

---

[12] Because TSOs are not law enforcement officers, TSA is responsible for requiring each operator of an airport to "establish an air transportation security program that provides a law enforcement presence and capability at each of those airports that is adequate to ensure the safety of passengers" through the use of "qualified State, local, and private law enforcement personnel." 49 U.S.C. § 44903(c).

Even if *Glik and Smith* were sufficiently on point, in the Tenth Circuit there is no clearly established First Amendment right to record law enforcement officers, even in a public place, because there is no Supreme Court or Tenth Circuit decision on point, and there is a split of authority in other circuits. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."); *see also Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1189-90 (10th Cir. 2001) (finding, in light of a split in circuits, and considering district court decisions on similar issues, the arrestee had no clearly established right not to be hog-tied).

In finding a right to film police activity in a public forum, the First Circuit recognized that there may be a split in circuits. *Glik*, 655 F.3d at 85.[13] Faced with this split in authority outside of the Tenth Circuit, and no authority in the Tenth Circuit, a TSO could not reasonably be expected to know whether his or her conduct in preventing a passenger, who willfully refused to comply with TSA procedures, from filming his alternative screening process at a security checkpoint, a non-public forum, violated the First Amendment. The fact that there is disagreement between the judges makes it clear that qualified immunity on the Plaintiff's First Amendment claim is appropriate for the TSA defendants. *See Wilson*, 526 U.S. at 618.

      b.    <u>The Plaintiff's Allegations Do Not Make Out A Violation of Clearly Established Law Under the Fourth Amendment</u>

The TSA defendants are also entitled to qualified immunity because the only purported Fourth Amendment right cited by the Plaintiff - to be free from TSOs "summoning law enforcement" when the Plaintiff intentionally challenges TSA rules that require passengers provide I.D. and then

---

[13] *Glik* was decided after the date of the Plaintiff's allegations, and therefore, even if there was not a split in the circuits, could not have provided the TSA defendants with guidance concerning clearly established law. *See Anderson*, 483 U.S. at 641 (courts examine the state of the law at the relevant time); *see also Brousseau*, 543 U.S. at 198 ("[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.")

videotaping TSA's alternative screening procedures at a security checkpoint - is not clearly established. *See Comp.* ¶ 97. To the contrary, to the extent that the parameters of a domestic airline traveler's Fourth Amendment rights are clearly established, it is clear that the actions taken by the federal defendants fell well-within the boundaries of acceptable and constitutional behavior.

In Fourth Amendment analysis, an area of law in which "the result depends very much on the facts of each case," an officer cannot have fair notice if the extant cases do not "squarely govern." *Brousseau*, 543 U.S. at 201; *see also Saucier,* 533 U.S. at 205 (acknowledging that it is often "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.") The novel Fourth Amendment theory put forth by the Plaintiff has not been squarely addressed in case law, where the vast majority of airport search cases involve challenges to the actions of the officers who <u>actually</u> conducted the searches. *See United States v.* Aukai, 497 F.3d 955, 962 (9th Cir. 2007) (en banc) (upholding an airport security search in which an individual was referred for additional screening because he failed to present photo identification); *United States v. Hartwell*, 435 F.3d 174, 181 (3rd Cir. 2006) (search of air passenger was "permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety.") In the Plaintiff's case, he has brought Fourth Amendment claims against TSOs who his complaint concedes, had nothing to do with "searching his person, seizing his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera." *Comp.* ¶ 97. Instead, the Plaintiff attempts to fault the TSOs for the alleged actions of the AAPD. *See Comp*. ¶¶ 54, 57, and 83. Although there is no Supreme Court or Tenth Circuit decision on point, and no clearly established weight of authority from other courts concerning the "summoning" of law enforcement, as indicated earlier, courts that have considered the issue have found no constitutional violation when the police make their own independent decision to arrest or search.  See *Green,* 676 F.3d at 755; *Tobey*, 808 F.Supp. 2d at 850.

To the extent that the existing cases and statutes do clearly establish any Fourth Amendment rule, they support the conclusion that the individual federal defendants acted constitutionally. TSA officials have a statutory duty to maintain airport security, which they accomplish, in part, through administrative searches and identifying passengers who merit closer scrutiny.[14] For Fourth Amendment purposes, the Plaintiff only challenges the TSOs ability to contact law enforcement upon being confronted with a passenger who raises security concerns by refusing to comply with the agency's screening procedures or follow the directions of the TSOs. The TSA system relies upon local law enforcement personnel to investigate passengers who are potential security concerns or behave in disruptive or threatening manner. *See* 49 U.S.C. § 44903(c) (TSA is responsible for requiring each operator of an airport to "establish an air transportation security program that provides a law enforcement presence and capability at each of those airports that is adequate to ensure the safety of passengers" through the use of "qualified State, local, and private law enforcement personnel."); 49 C.F.R. § 1514.215-221. Because it is not clearly established that referring a passenger who refuses to follow the directions of TSO's to local law enforcement for further investigation violates the Fourth Amendment, the TSA defendants are entitled to qualified immunity.

**B.      The Plaintiff is Not Entitled to Declaratory Relief Because His Constitutional Rights Have Not Been Violated**

Since the TSA Defendants have not violated the Plaintiff's Constitutional Rights he is not entitled to any declaratory relief. Even plaintiffs who have been "constitutionally injured . . . cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future." *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).  Because there is

---

[14] TSA is "responsible for security in all modes of transportation[,]" 49 U.S.C. § 114(d), and is statutorily charged with developing and executing airport screening search procedures. *See* 49 U.S.C. § 44901(a). TSA is generally responsible for creating "regulations to protect passengers and property on an aircraft . . . against an act of criminal violence or aircraft piracy." 49 U.S.C. § 44903(b).

no constitutional right to video record in a TSA security checkpoint, and the Plaintiff has not

demonstrated any likelihood that he will be likewise injured in the future, his request for declaratory

relief should be denied.

## CONCLUSION

For the reasons stated above, this Court should dismiss this action against the three TSA

defendants.

Dated: June 1, 2012                              Respectfully Submitted

Kevin J. O'Connor                                Stuart F. Delery
United States Attorney                           Acting Assistant Attorney General

                                                 Rupa Bhattacharyya
                                                 Director, Torts Branch

                                                 Andrea W. McCarthy
                                                 Senior Trial Counsel

                                                 /S/ Edward J. Martin
Manuel Lucero                                    Edward J. Martin
Assistant United States Attorney                 Trial Attorney, Torts Branch
                                                 Civil Division
                                                 United States Department of Justice
                                                 P.O. Box 7146, Ben Franklin Station
                                                 Washington, D.C. 20044
                                                 Tel: 202-616-1024
                                                 Fax: 202-616-4314
                                                 Edward.Martin2@usdoj.gov