James Wheaton
Lowell Chow
FIRST AMENDMENT PROJECT
1736 Franklin Street, 9th floor
Oakland, California 94612
Phone: 510/208-7744
Fax: 510/208-4562

Mary Lou Boelcke
LAW OFFICES OF MARY LOUISE BOELCKE
PO Box 31033
Albuquerque, NM 87190-1033
Phone: (505) 804-1632
Fax: (505) 232-9718

William Simpich
LAW OFFICE WILLIAM SIMPICH
1736 Franklin Street, 10th Floor
Oakland, California 94612
Phone: 510/444-0226

Attorneys for Plaintiff Philip Mocek

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| PHILLIP MOCEK, | No. 1:11-cv-01009-BB-KBM |
| Plaintiffs, | **PLAINTIFF'S [AMENDED] OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| CITY OF ALBUQUERQUE, ALBUQUERQUE AVIATION POLICE DEPARTMENT, MARSHALL KATZ, in his official capacity as Chief of Police of the Albuquerque Aviation Police Department, JONATHAN BREEDON, GERALD ROMERO, ANTHONY SCHREINER, ROBERT F. DILLEY a/k/a BOBBY DILLEY, LANDRA WIGGINS, JULIO DE LA PENA, and DOES 1–25, inclusive, | |
| Defendants, | _____ |

1

2

## I.   DEFENDANTS CANNOT RECAST AND MISCHARACTERIZE THE FACTS AND ALLEGATIONS IN THE COMPLAINT

3

4

On a motion to dismiss under Rule 12(b)(6) the Court accepts the complaint as it is written and

5

must view the allegations in the light most favorable to the plaintiff.  *Smith v. United States*, 561 F.3d

6

1090, 1098 (10th Cir. 2009). Accordingly, the federal defendants may neither  add facts that contradict

7

the complaint's allegations, nor recast them in a light unfavorable to the plaintiff.  Defendants' motion

8

is replete with both errors.  Just two examples illustrate the point that the federal defendants have

9

added facts or misinterpreted them to contradict or recast the allegations of the complaint.

10

11

### A.   Mocek did not premeditatedly decide to film his interaction at the Albuquerque Sunport and did not know it was likely that that his inability to provide I.D. would result in his denial of access to enter secure areas of the airport

12

The federal defendants imply that plaintiff Mocek premeditatedly decided to video record his

13

14

interactions with TSA staff and employees. (Mtn. at 4.) The complaint describes no such

15

premeditation. Mocek did conduct research into laws and regulations regarding photography at various

16

airports. However, Mocek began using his camera at the Sunport only after it became clear that

17

Albuquerque TSA employees were subjecting him to an "atypical, alternative identification policy."

18

Compl. ¶ 46.

19

20

Defendants also claim that Mocek "knew it was likely that his refusal to provide I.D. would

21

result in him being denied access to the secure areas of the airport, including the departure gates."

22

(Mtn. at 14.) This claim is false and contradicts the complaint's allegations. In fact, Mocek had

23

successfully flown without I.D. since 2007, and believed that if he attempted to fly without I.D., the

24

typical TSA reaction would be to send him to a separate line to await assistance and additional

25

questioning from a TSA employee. Compl. ¶¶ 27-28.

26

### B.   Mocek did not engage in disorderly or disruptive conduct

27

28

1    Throughout their memorandum, the federal defendants attempt to rewrite the narrative of

2  events, casting Mocek as a disorderly passenger intent on acting disruptively.[1] They use variations of

3  "disrupt" and "disturb" 24 times in a 27 page brief.  They even title one section with the heading

4  "Plaintiff's Complaint Describes a Reasonable Response by the Individual TSA Defendants to

5  Disruptive Activity in the Airport Security Screening Area." (Mtn. at 11.)  At another point the

6  memorandum claims, "The complaint clearly states that the Plaintiff intended to disrupt the screening

7  process by willfully failing to follow TSA's screening procedures and the TSOs' instructions." (Mtn. at

8  12.)[2]

9    The complaint alleges otherwise. Mocek at no time acted disruptively. "Mocek in fact

10  consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law

11  enforcement officers. Mocek did not yell 'I know my rights.'" Compl. ¶ 71. Mocek's conduct even in

12  declining to follow TSA's unlawful orders was "calm" and "restrained" even in the face of TSA

13  agents' and law enforcement officers' increasingly agitated behavior. Compl. ¶¶ 4, 5; *see also* Compl.

14  ¶¶ 69, 71.

15    Nor was there any evidence that Mocek's behavior disturbed other passengers. "[V]ideo

16  footage shows people walking by without any hesitation" and "the traveling public in general did not

---

[1]    Notably, the defendants' own factual background section does not suggest that Mocek acted in a disruptive manner, only noting that one of the police officers said that Mocek was "causing a commotion." (Mtn. at 6 (citing Compl. ¶ 51).) The complete paragraph in the complaint reads as follows: "Dilley told Mocek to comply with the TSA agents' instructions or else he would be escorted out of the airport. One of the officers said that Mocek was causing a commotion. Mocek said, 'I haven't raised my voice. I'm not trying to stop you from doing your job.' Mocek said that he intended to comply with all of the TSA's rules and regulations." Compl. ¶ 51.

[2]    The memorandum further describes generally that "TSOs must have discretion to ask a passenger to refrain from filming and refer him or her to law enforcement officers when he or she refuses to comply with multiple TSA procedures and causes a disruption." (Mtn. at 14.) Such a discussion of what TSOs generally may do is irrelevant where the passenger did not act in this manner: Mocek neither refused to comply with multiple procedures nor caused any disruption.

1   'stop and take notice.'" Compl. ¶¶ 71, 73. The TSA's own written statements, moreover (which the

2   federal defendants have attached as exhibits to their motion), make no suggestion that Mocek caused

3   any public disturbance. Compl. ¶ 79. At all times, Mocek never went through the security checkpoint

4   and remained in publicly accessible areas of the airport. Compl. ¶¶ 5, 56.

5          By attempting to characterize Mocek and his behavior as disruptive, the federal defendants in

6   their motion are attempting to do precisely what they did in November 2009—to falsely accuse Mocek

7   of disorderly conduct. The criminal accusations of disorderly conduct were deemed false by a jury.

8          The federal defendants should not be permitted to justify their unlawful behavior on a motion

9   under FRCP 12(b)(6) by creating a narrative of the events that is at odds with the allegations in the

10  complaint and is based on statements and characterizations already found to be untrue.

11

12  **II.     THE COMPLAINT PROPERLY ALLEGES VIOLATIONS OF MOCEK'S WELL**
13          **ESTABLISHED FIRST AMENDMENT RIGHTS BY THE FEDERAL**
14          **DEFENDANTS**

15         The federal defendants note that plaintiff was arrested by the state defendants for  disorderly

16  conduct; concealing identity with intent to obstruct, intimidate, hinder, or interrupt; resisting,

17  obstructing, or refusing to obey a lawful order of an officer; and criminal trespass.  None of these was

18  true and at trial, Plaintiff won a swift and full acquittal.

19         The federal defendants argue for dismissal on three major points. First, they argue that

20  whatever the local police may have done with regard to the arrest confiscation and handling of Mr.

21  Mocek's property, the federal defendants did nothing wrong.  They argue that they merely called the

22  police, that the police "took control," and that any unconstitutional acts are attributed solely to the

23  police.  Secondly, they argue there is no right to record events occurring in a public place.  Thirdly,

24  they argue that if there is such a right to record, it was not clearly established.  They are wrong on all

25  three points.

While it is true that the local police defendants conducted the arrest and seizure, the federal defendants must answer for the unlawful, unreasonable and unconstitutional order to cease recording events of public interest occurring in a public place.  Their orders to cease engaging in perfectly lawful and peaceful activity that posed no threat to anyone – conduct with a First Amendment component – created a constitutional injury.  (See the "unconstitutional order" discussion citing *Wright v. Georgia,* *373 U.S. 284, 291–92, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963),* as well as the "chilling effect" discussion citing *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994), *infra*.)  The injury was compounded when, in order to put that order into effect, the federal defendants enlisted the police to give force to their unconstitutional demand.                         \

Therefore, it is to the remaining arguments - whether there is a constitutional right, whether the elements for a retaliation cause of action have been met, and whether the constitutional right was clearly established - that we now turn.

**III.    PLAINTIFF CAN ESTABLISH ALL THE ELEMENTS TO ESTABLISH A FIRST AMENDMENT CLAIM**

To establish a claim that his First Amendment rights were violated, the Plaintiff must establish the following elements: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (*citing Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper. *DeLoach v. Bevers,* *922 F.2d 618, 620 (10th Cir.1990).*     The federal courts have allowed *Bivens* suits for a wide variety

1  of constitutional violations, including the First Amendment.  *Dellums v. Powell*, 566 F.2d 167, 194-

2  195 (D.C. Cir. 1977).

3  ### A. THE FIRST AMENDMENT PROTECTS THE PUBLIC'S RIGHT TO

4  ### GATHER INFORMATION

5  Gathering information is among the freedoms that are "necessary to the enjoyment of other

6  First Amendment rights." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). The

7  First Amendment "embodies more than a commitment to free expression and communicative exchange

8  for their own sakes; it has a structural role to play in securing and fostering our republican system of

9  self-government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586-88 (1980) (Brennan, J.,

10 concurring).

11 It has now long been established that information gathering is an activity protected by the First

12 Amendment. *See id.* at 576 (plurality opinion) (noting that the First Amendment incorporates a right

13 "to gather information"); *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) ("The

14 Supreme Court has recognized that newsgathering is an activity protected by the First Amendment.").

15 The Supreme Court has held that the government may not "limit[] the stock of information from which

16 members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). For this

17 reason, therefore, "[t]here is an undoubted right to gather news 'from any source by means within the

18 law.' " *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (quoting *Branzburg v. Hayes*, 408 U.S. 665,

19 681-82 (1972)).[3]

20

21

22

23 _____

24 [3]       To the extent the federal defendants attempt to conflate Mocek's failure to have
   identification with the recording of their conduct and so render all of his acts that day unlawful,
25 they mislead the court.  First, Mocek's failure to have identification is not a violation of any
   law.  In any case it has a simple and direct remedy – he is no longer permitted to go through
26 the security check or enter the secure area.  He is told to depart.  But that is not why he was
   confronted, nor why the agents created any disturbance.  It occurred because the federal
27 defendants on their own fabricated a false and unconstitutional order and then sought to
   enforce it with escalating means.  The order they manufactured ran counter to their own
28 agency's policy.  Mocek did not violate any law, rule or policy in trying to gather information;
   (Continued...)

Importantly, this First Amendment right to gather information is not limited to newsgathering or to members of the press; it applies equally to all citizens. *See, e.g.*, *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) ("[T]he First Amendment guarantee of freedom of the press is for the benefit of all the people and not a device to give the press a favored status in society."). Indeed, "[i]t is not just news organizations . . . who have First Amendment rights to make and display videotapes of events." *Smith v. City of Cumming*, 212 F.2d 1332, 1333 (11th Cir. 2000) (citing *Lambert v. Polk Co.*, 723 F. Supp. 128, 133 (S.D. Iowa 1989)).  Therefore activists – even pesky ones – enjoy a right to gather information about their cause so that they may communicate to interested members of the public information about the conduct and policies of the public servants who act in our name.

### B.  DEFENDANTS' ACTIONS CAUSED MOCEK TO SUFFER AN INJURY THAT WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM CONTINUING TO ENGAGE IN THAT ACTIVITY

Governmental action designed to prevent and chill a plaintiff's "confrontational yet non-violent political activities…strikes at the heart of the First Amendment." *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986)*, cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987)*.* "Accordingly, the victim of such action is entitled to sue the responsible" officers.  Id. A plaintiff "may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives." *Id.* However, where a plaintiff "allege[s] discrete acts of police surveillance and intimidation directed solely at silencing" her or him, a civil rights claim will lie. *Id.* The defendant's intent *is* an element of the claim. *See Thomas v. Carpenter,* 881 F.2d 828, 829 (9th Cir.1989) [to avoid dismissal of claim for retaliatory firing, plaintiff need only allege that defendant's conduct "was motivated by an intent to retaliate for [the plaintiff's] exercise of constitutionally

_____

(...Continued)

the federal defendants did when they tried to stop him from engaging in peaceful, constitutionally protected conduct.

protected rights"], *cert. denied,* 494 U.S. 1028, 110 S.Ct. 1475, 108 L.Ed.2d 612 *and cert. denied,* 497 U.S. 1003, 110 S.Ct. 3236, 111 L.Ed.2d 747 (1990).          As to this element, a reasonable construction of the Complaint shows that the federal defendants caused plaintiff "an injury that would chill a person of ordinary firmness from continuing to engage in that activity."   Defendants' adverse actions were substantially – if not entirely -- motivated by plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000)).  Also see *Lackey v. County of Bernalillo,* 1999 WL 2461, at *3.

The most fundamental activity, of course, was the information gathering itself.   There are also allegations that defendant Romero repeatedly ordered Mocek to put down the camera and repeatedly tried to seize the camera.  (Complaint, ¶ 48).  Breedon committed the same acts as Romero. (Complaint, ¶ 46).  Breedon asked Schreiner, the supervisory TSO, to call the state police officers; Schreiner relayed the request. (Complaint, ¶¶ 21, 75-77)   After Mocek "challenged the notion that taking pictures was prohibited", Schreiner complained to state defendant police officer Dilley about Mocek's taping and  picture taking.  (Complaint ¶ 77)  Schreiner's report after the arrest described Mocek as "hostile", "belligerent", and "taking photographs in a threatening manner".  (Complaint, ¶¶ 77-78).  TSA agents, which may have included one or more of the federal defendants, made the following statements to the state defendants about the plaintiff:  "creating a disturbance", "he won't put his camera down, either" and "taking pictures of all of us".  (Complaint, ¶ 49)  None of Mocek's actions violated any law, regulation or policy.  Mocek never entered the security checkpoint, remaining within the publicly accessible areas of the airport during the entire airport encounter.  (Complaint, ¶ 56).          While Mocek showed an extraordinary amount of fortitude in continuing to exercise his rights, that is not the test.  These federal defendants intended to do everything they could to prevent that exercise.  Their very purpose in issuing the orders was to not only chill but freeze his right to gather information about public officials conducting public duties in a public place.  All three of them

did this by repeatedly - and with increasing vigor - ordering him to halt his information gathering and to turn off the recorder.   Breedon and Romero also attempted to seize the recorder away from Mocek's possession.   Each of those acts chilled Mocek's First Amendment rights.  A plaintiff of "ordinary firmness" would be inclined to discontinue such activity.

## C. THE PLEADINGS ALSO SHOW THAT THE DEFENDANTS' ADVERSE ACTION WAS SUBSTANTIALLY MOTIVATED AS A RESPONSE TO MOSEK'S EXERCISE OF CONSTITUTIONALLY PROTECTED CONDUCT

The federal defendants' adverse action was substantially motivated as a response to  Mocek's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Also see *Lackey v. County of Bernalillo*, 1999 WL 2461, at *3.

Mocek's complaint contains all necessary allegations that defendants' adverse action was substantially motivated as a response to his exercise of constitutionally protected conduct – the recording.  When Mocek told Breedon that he thought he was not required to provide ID, Breedon's response was that Mocek  was correct, that he would contact TSA's Security Operations Center, and that if Mocek could not be identified, Mocek would not be allowed to proceed through the security checkpoint.  At this point in time, there was no indication from any of the TSA agents present that there was any intent to order him to cease doing anything or, when their unlawful orders were not followed, to involve law enforcement.  (Complaint, ¶ 45).  It was only when Mocek began filming the Defendants' activities that the activities described above took place. (Complaint, ¶ ¶ 46-50; 75-76). Breedon asked Schreiner, the supervisory TSO, to call the state police officers; Schreiner relayed the request. (Complaint, ¶¶ 21, 75-77)   When Mocek "challenged the notion that taking pictures was prohibited", Schreiner falsely claimed that Mocek was "hostile", "belligerent", and "taking photographs in a threatening manner".  (Complaint, ¶¶ 77-78).  State defendant Dilley finally told Mocek to "comply with the TSA agents' instructions or else he would be escorted out of the airport".

1  (Complaint, ¶¶ 51).  When Mocek again stated that he had the right to record, the state defendants

2  arrested him for doing that.  The impetus for arrest is clear, because Mocek never refused to leave the

3  airport; in fact he acceded to it.  (Complaint, ¶¶ 52-55).

4  **IV.  QUALIFIED IMMUNITY IS NOT AVAILABLE, AS THIS RIGHT TO GATHER**

5  **NEWS WAS CLEARLY ESTABLISHED**

6

7      At this stage, Plaintiff has the duty to state the clearly established constitutional right and the

8  defendant's conduct which violated the right with specificity, and demonstrate a 'substantial

9  correspondence between the conduct in question and prior law ... establishing that the defendant's

10  actions were clearly prohibited.' " *Romero v. Fay,* 45 F.2d 1472, 1475 (10th Cir. 1995).   The right to

11  engage in information gathering is a right that was already clearly established.  The Supreme Court has

12  held that the government may not "limit[] the stock of information from which members of the public

13  may draw." First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978). The federal defendants' prolonged

14  argument about how judges are confused is a red herring, and is discussed in greater detail below.  But

15  as a threshold matter, at the time of the incident, Defendants' agency's own policy was clear and had

16  been communicated in writing, directly to the Plaintiff, as well as to the general public: Recording was

17  permitted.  The federal defendants nowhere contradict that this was in fact the agency's policy at the

18  time.  That was also the law at the time.  But these federal defendants cannot be heard to say that an

19  activity was clearly permitted but then, when they issue a command that contradicts this, claim their

20  own confusion somehow reflects confusion in the law.

21

22      The "clearly established" inquiry does not require "a case directly on point." *Ashcroft v. al-*

23  *Kidd*, 131 S. Ct. 2074, 2093 (2011). Importantly, to overcome a defense of qualified immunity, there

24  need not be "a published case involving identical facts," for "otherwise we would be required to find

25  qualified immunity wherever we have a new fact pattern." *York v. City of Las Cruces*, 523 F.3d 1205,

26  1212 (10th Cir. 2008) (internal quotation marks omitted). Rather, "a general constitutional rule can

27

28

apply with obvious clarity to the specific conduct in question, even though such conduct has not previously been held unlawful." *Id.* (internal quotation marks and alterations omitted). Thus, the court must "look to the 'general constitutional rule.' " *Id.* (citing *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

Many circuits have held that recording police officers and officials in the course of carrying out their duties is directly protected by the First Amendment. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011) ("The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [First Amendment] principles."); *Gilles v. Davis*, 427 F.3d 197, 212 (3d Cir. 2005) ("[V]ideotaping or photographing the police in the performance of their duties on public property may be a [First Amendment] protected activity."); *Smith*, 212 F.2d at 1333 ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 F.3d 436, 438-39 (9th Cir. 1995) (recognizing, in case where the plaintiff claimed that police violated his First Amendment rights by interfering with his attempts to videotape a protest march, that the right to gather information includes a "First Amendment right to film matters of public interest").

The weight of circuit authority thus supports Mocek's right to gather news via his video and audio recording, with this authority established well before the November 2009 incident.[4] The federal defendants assert that the existence of this right to record is unsettled in the courts. For example, the federal defendants cite *Kelly v. Borough of Carlisle*, 622 F.3d 248, 251 (3d Cir. 2010), and *Szymecki v.*

---

[4]      *Glik v. Cunniffee*, discussed below, was decided in 2011, but it relied in turn on an earlier First Circuit case, *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999), which obviously predates Mocek's arrest. *Iacobucci* denied qualified immunity for police officers who arrested a journalist for filming officials in a hallway outside a public meeting. *Iacobucci*, 193 F.3d at 18.

*Houck*, 353 F. App'x 852, 853 (4th Cir. 2009), as evidence of disagreement among the circuits. However, the cases are unavailing here.[5]

The First Circuit in *Glik* explicitly rejected the use of these cases in the defendants' attempts to support qualified immunity, holding that neither case was relevant to the determination of whether the right to film police in the performance of their duties in a public place was clearly established. As to *Szymecki*, the *Glik* court noted that *Szymecki* was an unpublished opinion with no precedential value, and that the case at any rate only summarily concluded that the right to record police was not clearly established.  There was no discussion of facts or relevant law. *See Glik*, 655 F.3d at 84. Next, *Kelly* is distinguishable for a multitude of reasons. The *Glik* court noted that *Kelly* involved a traffic stop in Pennsylvania, which was a factual scenario "worlds apart" from the arrest involved in Massachusetts, in part because of the dangers of traffic. *See id.*

Moreover, even *Kelly* itself acknowledged that there is a "broad right to videotape police," narrowed only by the qualification that "videotaping without an expressive purpose may not be protected." *Kelly*, 622 F.3d at 262. Thus, if the plaintiff in *Kelly* had had an expressive purpose behind his videotaping of the officers, the analysis and result might well have been different. *See id.* at 251 (noting that it was the plaintiff's habit "to record people for no particular reason").[6] In the instant case, contrary to the federal defendants' claims, Mocek clearly had an expressive purpose here in

---

[5]    Notably, both cases post-date the events here.  Any uncertainty in the law then arguably came *after* the events here.  As noted the law was actually quite clear before these more recent cases, which have also been both distinguished and disregarded as wrongly decided.

[6]    An additional reason cited by the *Kelly* court for its conclusion was the fact that a traffic stop is an "inherently dangerous" situation, making such scenarios unique for the "risk of harm to both the police and the occupants [of a stopped vehicle]" such that an officer's unquestioned command of the situation is justified. *Kelly*, 622 F.3d at 262-63 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Here, there is no such inherent danger to the public official, the information gatherer or any third party.  The most dangerous wheeled vehicle in a security checkpoint is a baby stroller.

PLAINTIFF'S OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS

documenting what he perceived to be an atypical, alternative identification policy, making *Kelly* of little value to the federal defendants. *See* Compl. ¶¶ 1, 3, 46.

The "chilling effect" in this case is similar to that in *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994). In *Sloman*, the plaintiff campaigning for a ballot measure on a public sidewalk alleged that a police officer "used his official powers, specifically his power to warn, cite, and arrest, to retaliate against Sloman's exercise of his free speech rights, and to deter Sloman's exercise of those rights in the future". *Id.,* at 1469. As in *Sloman*, "Although officials may constitutionally impose time, place, and manner restrictions on political expression carried out on sidewalks and median strips, they may not "discriminate in the regulation of expression on the basis of the content of that expression." *Hudgens v. NLRB*, 424 U.S. 507, 520, 96 S.Ct. 1029, 1036, 47 L.Ed.2d 196 (1976). Minimal time, place, and manner restrictions were in place here. The only rule was "don't photograph the TSA computer monitors" – there is no contention in Defendants' motion nor any allegation in the Complaint that Plaintiff did anything of the kind.   (Complaint, ¶¶ 35, 42).   Under *Sloman*, the federal defendants violated Mocek's First Amendment rights if their actions deterred or chilled Mocek's newsgathering and expressive conduct, and such deterrence was a substantial or motivating factor in federal defendants' conduct in convincing the state defendants to issue citations and warnings to him. Also see *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

Finally, what the federal defendants perceive to be a lack of clarity in this area of First Amendment law has a perfectly reasonable explanation: The "terseness" and "brevity" of First Amendment discussion in those cases that have recognized a right to film government officials or matters of public interest in public spaces is a result of the "fundamental and *virtually self-evident nature* of the First Amendment's protections in this area." *Glik*, 655 F.3d at 85 (emphasis added). Indeed, some constitutional violations are so "self-evident" that no particularized case law is needed to substantiate them. *Lee v. Gregory*, 363 F.3d 931, 936 (9th Cir. 2004). The court here should recognize

the well-established authority protecting the right of anyone to gather nondisruptive information by video or audio recording of public officials in the performance of their public duties in a public space.

If any more authority on this issue was necessary on the day of the event, it can be found in the very agency in question.  When asked in 2009, agency personnel stated unequivocally that recording was permitted in public areas.  To claim at this remove that whether recording was permitted was confusing or unknown is absurd – the agency did not hesitate to give its answer and the agency got it right.  As held in *Calhoun v. Gaines*, 982 F.2d 1470, 1475 (10th Cir. 1992), officials have a duty to "know well developed legal principles and to relate and apply them to analogous factual situations".  The fault lies not in confusion about the constitution or the law, it lies in these federal defendants who took it upon themselves to fabricate an order that ran counter to the constitution and the agency's own policies.  Put simply, they got it wrong, and it was not a close call.

## V.    THESE DEFENDANTS ALSO VIOLATED MOCEK'S  FOURTH AMENDMENT RIGHTS

Plaintiff's Count III alleges that the unconstitutional conduct of the TSA Defendants resulted in Mocek's arrest, detention, (and) seizure…institution of baseless criminal proceedings against him, and other financial and emotional distress".  (Complaint, paragraphs 89, 96).  It further alleges that he was subjected to excessive force, searching his person, seizing and searching his camera and memory contained therein…"   (Complaint, paragraph 97).                    The complaint repeatedly states that Plaintiff engaged in no commotion, disruption or interference with the duties of the Defendants.  As stated in Section I, this is a 12(b)(6) proceeding, and Defendants have to accept the complaint as written, not as they'd like it to be written .  They use various forms of the word "disturb" and corollaries like "disrupt" on virtually every page, trying to paint a false picture of a Phil Mocek – just as they did in 2009 – as someone bent on distracting them and preventing them from doing their job.

The federal defendants also attempt to confuse the Court by conflating Mocek's lack of possession of ID with the recording.  They are not related.  They did not stop him from going about his

business because of the recording; they did it because he did not have ID.  Federal defendants have policies and procedures deal with this, and a host of other things regularly prevent them from processing someone quickly (ID that has expired; people in wheelchairs; elderly people who need help; language issues; purportedly-random selection of people for more invasive searches and X-rays).  But in any case, the recording did not disrupt or interfere with anything.

The state defendant police officers were not contacted by the federal defendants because of the ID issue; nor was the Plaintiff arrested for that.   Not only are these claims wholly inaccurate, they directly contradict the  complaint.  But for the acts of the federal defendants, Plaintiff would not have been arrested.  The federal defendants contacted the state defendants expressly because he would not follow their illegal order to stop filming.  And the state defendant police officers adopted this line of attack, ordering the Plaintiff to comply with federal defendants' unlawful orders under threats of ejection from the airport and of arrest.    The federal defendants violated the Constitution with their blatantly illegal order, for which the law was clearly established.

The federal defendants compounded their already unconstitutional activities in two additional ways.  First was the order to the Plaintiff to turn off the recorder, closely followed by grabbing at the recorder in efforts to take it away from the Plaintiff.    In and of itself, those acts chilled the Plaintiff's First Amendment rights.  A plaintiff of "ordinary firmness" would not be inclined to continue such activity.

Secondly, federal defendants falsely accused the Plaintiff of committing disorderly conduct.  As stated in Paragraph 70:  "According to De La Pena's report, TSA agents reported to Dilley that Mocek was causing a disturbance by 'yelling at officers'." Paragraph 71 establishes that "Mocek in fact consistently used a calm quiet tone of voice.  Mocek did not yell at any TSA agents or law enforcement officers".   Plaintiff was still in the public area of the airport (not the screening section) and had taken reasonable steps to ensure that he was not in violation of any TSA regulation by filming

in that area.  (Complaint, paragraphs 31-44). State defendants will doubtlessly argue that they "reasonably relied" on this false statement at summary judgment.  Only at that stage can it be determined if any of the defendants had a nondisputed factual basis to complain about Mocek's conduct that could be used as a basis for probable cause.

## VI.   THE FOURTH AMENDMENT PROTECTS THE PLAINTIFF'S RIGHT FROM WRONGFUL ARREST, AND THE FEDERAL DEFENDANTS WERE THE DIRECT CAUSE OF THE WRONGFUL ARREST WITH THEIR UNCONSTITUTIONAL DEMAND TO HALT RECORDING

The pleading standard established in *Ashcroft v. Iqbal* requires the plaintiff to allege facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Court made clear that personal participation in the alleged misconduct is necessary, as "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 676. See also *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under §1983 must be based on personal involvement in the alleged constitutional violation.")

The state defendant police officers arrested the Plaintiff, but only after the federal defendants made unconstitutional demands that the Plaintiff abandon his right to engage in information gathering. Moreover, if the federal defendants had refrained from summoning them, no arrest would have been made.  There was no basis whatsoever for summoning the state defendants.  An unconstitutional demand (and subsequent false statements about Mocek's behavior) were pretexts for calling the state police and are necessarily linked to the false arrest.  The federal defendants are responsible for all the harm that follows.

As TSA officers, Schreiner, Breedon and Romero were all employed by a different agency than the state defendants.  Pursuant to Tenth Circuit law, plaintiff has met his burden by alleging that these

nonsupervisory defendants committed acts that establish "cause in fact between the conduct complained of and the constitutional deprivation". *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir.1990), *cert. denied,* 499 U.S. 976 (1991). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.*  Put another way, the federal defendants did not have the power to arrest Mocek, so they instead set in motion a chain of events designed to cause that harm.  See *Wright v. Georgia,* 373 U.S. 284, 291–92, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963) (a person cannot be punished for failing to obey the command of a police officer if that command is itself in violation of the Constitution); *United States v. Dickinson,* 465 F.2d 496. 510 (5th Cir. 1972) (court order prohibiting two reporters from writing about any aspect of evidentiary hearing in open court).

The Ninth Circuit goes even further, holding in *Bergstralh v. Lowe,* 504 F.2d 1276, 1278 (9th Cir.1974) that "all force reasonably necessary" can be used to resist unlawful arrest.  ("Bergstralh was entitled to use all force reasonably necessary to resist an unlawful arrest. Thus, in order to conclude that Bergstralh was guilty of resisting arrest, the jury would have had to have concluded that his arrest was legal.") (citations omitted).   In *United States v. Moore,* 483 F.2d 1361, 1364 (9th Cir.1973), the Ninth Circuit assumed that the right remained valid and was available as a defense to a prosecution under 18 U.S.C. § 111.  Again, Plaintiff's complaint alleges that he created no disturbance of any kind.

*Hodge v. Lynd*, 88 F. Supp. 1232, 1234 (D. N.M. 2000) is the Tenth Circuit case on "unconstitutional orders" by a police officer.  *Hodge* came to the same conclusion as in *Wright* and the aforementioned 5th and 9th Circuit cases - "if (the police officer's) order excluding plaintiff from the fairgrounds was unconstitutional (for wearing his cap backwards in violation of the fairground dress code), (Plaintiff) could not validly be arrested for non-violently disobeying that order".  The complaint alleges more than sufficient facts to comply with the standards for this cause of action for each of the three federal defendants.   (See Complaint, paragraphs 20-22, 46-49).

If there is any conceivable question about whether that standard is met because the complaint is not always certain what each of the federal defendants said or did (i.e., paragraph 49), in those instances that information is held by the federal defendants themselves.  In *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 463-464 (9th Cir. 1994), the plaintiffs alleged that they were falsely arrested by state defendant police officers for carrying bombs, based on inaccurate information provided to them by federal defendant FBI officers:

> The reference in…complaint to the FBI Agents' knowledge of the bomb's location, together with  representation that his information regarding the bomb came from FBI Agents, suffice to meet our circuit's heightened pleading standard. It's true that the (state defendant police officer's) affidavit attributes information to "F.B.I. Agents" without identifying them by name. But *which* Agents among the four named as defendants told (state defendant police officer) "that the bomb device was on the floor board behind the driver's seat" is a question only the FBI Agents can answer. *See Branch I, 937 F.2d at 1386-87* (rejecting D.C. Circuit's requirement that § 1983 or *Bivens* plaintiff meet heightened pleading standard with *direct,* as opposed to circumstantial, evidence of defendant's intent because such evidence "is largely within the control of the defendant and often can be obtained only through discovery").

In this vein, *Northington v. Marin*, 102 F3d 1564 (10th Cir. 1996) is instructive.  *Northington* states that in cases of concurrent liability where tortious conduct of more than one person combine to harm plaintiff, the burden shifts to defendant to prove to which the harms resulted from other concurrent causes.  In a case of alternate liability, all must be named as defendants to find out who is culpable.  The principal focus in an unlawful arrest case is on the objective reasonableness of the officer's probable cause determination. *See Caballero v. City of Concord, 956 F.2d 204, 206 (9th Cir.1992)* (" 'An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable [arrest]; nor will an officer's good intentions make an objectively unreasonable [arrest] constitutional.' ") (alterations in original) (quoting *Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)*). As with the *Mendocino* plaintiffs, the court must apply the traditional 12(b)(6) standard to Mocek's Fourth Amendment claim alleging an unlawful arrest based on an absence of probable cause.

Each federal defendant relied on by the stated defendants provided statements conveying that

there was probable cause for Mocek's arrest.  These statements, by themselves, cannot provide the "facts and circumstances" necessary to support a finding of probable cause. *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").  Probable cause exists only if the statements made by fellow officers are supported by actual facts that satisfy the probable cause standard. In *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) the court held that the lawfulness of a seizure made in reliance on the statements of fellow officers turns on whether the officers who *issued* the [statements] possessed probable cause to make the arrest.

*Mendocino*, *supra*, at 462-464, held that the federal defendants were liable for their participation in the unlawful arrest and judicial deception created by providing false information to the state defendants that conducted the initial arrest and subsequent searches pursuant to warrant.  Another illustrative case is *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989), the defendant police officer argued that he should not be liable for his limited role in an illegal search.  The defendant had gone to the door with the officer who actually searched the premises, and stood at the door armed with a gun while the entry took place.  The court held that both officers had performed police functions that were integral to the search and that the defendant was a full and active participant, not a mere bystander.

The federal defendants' reliance on *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011) is misplaced.  The Plaintiff's Complaint is packed with facts suggesting that the federal defendants made assertions and indicated to the police that Plaintiff should be arrested.  Unlike the *Tobey* plaintiff, Mocek does not concede that there was any basis to call the police whatsoever.  The federal defendants never refused permission for Mocek to board the airplane.  They summoned the police when Plaintiff began recording their conduct.  Also, unlike *Tobey,* Plaintiff had not yet entered the screening area, nor was he engaged in any disorderly conduct, nor had he entered the screening

1   area from the public area of the airport.  Plaintiff had made certain that he was not in violation of any

2   law or regulation before he commenced recording.

3       The federal defendants also rely on *Green v. Nocciaro*, 676 F.3d 748, 751.  (8th Cir. 2012).  Unlike

4   the *Green* plaintiff, Plaintiff engaged in no disorderly conduct of any kind.  Plaintiff never refused to

5   leave the airport; instead, he was arrested at the airport because the federal defendants summoned the

6   state police who told Plaintiff "comply with the feds' orders or else".        This happened because the

7   federal defendants falsely told the police that Plaintiff was violating lawful orders and was engaging in

8   disorderly conduct.      This situation is more analogous to *Beard v. City of Northglenn*, 24 F.3d 110

9   (10th Cir. 1994) (if claimant proves that officers deliberately submitted false information to obtain a

10  search warrant, there is no qualified immunity).

11

12  **VII. DEFENDANTS VIOLATED  A CLEARLY ESTABLISHED RIGHT, AS THE FEDERAL**

13  **DEFENDANTS' AGENCY'S POLICY  WAS THAT RECORDING WAS PERMITTED**

14

15      As discussed in Parts I-III of this brief, the clear rights to engage in information gathering and to

16  resist unconstitutional orders were already established.  There are no novel First or Fourth Amendment

17  issues in this case.  At the time of the incident, the federal defendants' policy and belief was clear:

18  recording was permitted.  An order to cease doing so, coupled with summoning the police to enforce

19  the order, buttressed with false statements about his behavior - does not create "confusion" in the law.

20      The qualified immunity inquiry in unlawful arrest cases is an objective one, focusing on whether "a

21  reasonable officer could have believed that probable cause existed to arrest" the plaintiff. *Hunter v.*

22  *Bryant,* 502 U.S. 224, ----, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam); *Fuller v. M.G.*

23  *Jewelry,* 950 F.2d 1437, 1443 (9th Cir.1991) ("The doctrine of qualified immunity does not require

24  that probable cause to arrest exist."). The defendant's knowledge is relevant, since the objective

25  analysis is focused on a reasonable officer confronted with the clearly established law and information

26  "readily available" to the officer. *Romero v. Fay*, 42 F.2d 1472, 1476-1477 (10th Cir. 1995), which

27

28

PLAINTIFF'S OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS

states that the probable cause standard of the Fourth Amendment requires officers to "reasonably interview witnesses *readily available at the scene,* investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."

In this case, the Plaintiff never refused to leave the area, nor was he asked to leave the area.  He was asked to stop recording, and he did not stop.  He was completely within his rights, as he was violating no law or regulation.  It was incompetent for the TSA officers to summon the police and illegally demand that Plaintiff stop filming, which led to his arrest and prosecution.  The complaints by the federal defendants that Plaintiff had engaged in disorderly conduct were flat-out false, and form the basis for liability to the extent that the state defendants relied on this information as the basis for arrest.

At a minimum, the federal defendants should have halted their complaints about recording, completed their determination about whether to let him board the plane, and then have him either allowed him to enter the screened area or asked him to leave the airport.  Only if it was determined that he was violating a regulation by recording or by refusing to comply with a requirement to leave the airport was it appropriate to summon the police.  Until then, they were asking the police to enforce an unconstitutional demand, and made false statements to effectuate the arrest.

## VIII.   DECLARATORY RELIEF

The Supreme Court has made it clear that no "likelihood of recurrence" need be shown if the injury suffered in the past has "continuing, present adverse effects".  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983; *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *Rizzo v. Goode*, 423 U.S. 362, 372 (1976).

The classic constitutional injury with such continuing present effects is injury to one's First Amendment freedom of expression.  Where a plaintiff's right to free speech has been penalized or infringed in the past, the chilling effect on free speech is deemed to be a sufficient continuing injury to merit standing to enjoin the unconstitutional statute or policy.  See *Secretary of State of Maryland v.*

*Joseph H. Munson Co.*, 467 U.S. 947, 956-957 (1984); *Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965).

In *Meese v. Keene*, 481 U.S. 465 (1987), the Court described the "chill" required for standing as "'a claim of specific present objective harm or a threat of specific future harm.'…(T)he government action need not have a direct effect on the exercise of First Amendment rights (but) it must have caused or threaten to cause a direct injury to plaintiffs…The injury must be 'distinct and palpable'". *Id.* at 472 (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972), and *Allen v. Wright,* 468 U.S. 737, 751 (1984). The need to take affirmative steps to avoid harm to reputation itself constituted sufficient injury for standing purposes. Thus, where police conduct violates, infringes or deters expressive activity protected by the First Amendment, a "continuing, present adverse effect" is shown for purposes of withstanding a challenge to standing. Plaintiff should not have to demonstrate a likelihood that the unconstitutional conduct will recur so long as the chilling effect of the past violations is justified by the realistic *possibility* that the violations will recur.

**CONCLUSION**

Plaintiff's complaint states causes of action against these federal defendants under both the First and Fourth Amendments. The rights violated were clear, and clearly established at the time. Their conduct violated both, and they do not enjoy qualified immunity here. If the court has any concerns about any defendant under either cause of action, Plaintiff respectfully requests the right to amend.

Dated: June 29, 2012                                    Respectfully submitted,


_____/S/_____
WILLIAM M SIMPICH
Attorney for Plaintiff

1

2          _____
           JAMES WHEATON
3          LOWELL CHOW
           Attorneys for Plaintiff
4

5

6          _____
           MARY LOUISE BOELCKE
7          Attorney for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS