IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PHILLIP MOCEK,

        Plaintiff,

vs.                                        Case No: 11-1009 JB/KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE AVIATION POLICE DEPARTMENT,
 MARSHALL KATZ, in his official capacity as Chief of Police of
The Albuquerque Aviation Police Department,
JONATHAN BREEDON, GERALD ROMERO,
ANTHONY SCHREINER, ROBERT F. DILLEY a/k/a BOBBY DILLEY,
LANDRA WIGGINS, JULIO DE LA PENA, and DOES 1-25 inclusive,

        Defendants.

## JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN

Pursuant to FED. R. CIV. P. 26(f), a meeting was held on December 17, 2012 and was attended by:

Mary Lou Boelcke for Plaintiff

Jeffrey L. Baker and Renni Zifferblatt for Defendants City of Albuquerque, Albuquerque Aviation Police Department, Marshall Katz, Robert Dilley, Julio De La Pena, and Landra Wiggins (the "Airport Defendants").

## NATURE OF THE CASE

This is a case involving allegations of violations of the First Amendment, Fourth Amendment, Fourteenth Amendment, and violations of state law (malicious prosecution and false arrest). Plaintiff also seeks a declaratory judgment that the conduct alleged violated Plaintiff's First and Fourth Amendment Rights, was retaliatory, that the Court declare that filming in the area in question is constitutionally protected, and that Airport Defendants undergo

1

training to ensure that similar conduct does not occur in the future.

## AMENDMENTS TO PLEADINGS AND JOINDER OF PARTIES

Plaintiff intends to file:  Plaintiff intends to amend his Complaint if necessary after the Court's ruling on the TSA defendants' motion to dismiss.  If the Court dismisses the First Amendment claims plaintiff intends to request the Court to certify the First Amendment issue pursuant to Fed.R.App.Proc. 54 and file an immediate appeal.

The resolution of the claims against the TSA is paramount to this case.  The arresting officer's sole motivation for placing Phil Mocek under arrest was a pretext to seize his camera and prevent his lawful fact gathering.  The First and Fourth Amendment claims are intertwined and the underlying facts which support both claims are identical. The Fourth Amendment claims are dependent on the same set of facts underlying the First Amendment claims.

Plaintiff should be allowed until January 24, 2013, or fourteen days after the Court rules on the TSA defendants' motion to dismiss, whichever is later, to amend the pleadings and join additional parties.

Airport Defendants intend to file:     None

Airport Defendants should be allowed until February 8, 2013 to amend the pleadings and until February 8, 2013 to join additional parties, or fourteen days after Plaintiff amends his pleadings and joins additional parties, whichever is later.

## STIPULATIONS

The parties hereto stipulate and agree that venue is properly laid in this District; that the United States District Court for the District of New Mexico has jurisdiction of the parties and the subject matter.

The parties are willing to further stipulate to the following facts:

2

1.      Plaintiff was arrested by Defendant Robert Dilley at the Albuquerque International Airport on November 15, 2009.

2.      At all times material to the allegations in the Complaint, Defendants Robert Dilley, Landra Wiggins, and Julio De la Pena were acting under color of law, and within the scope of their duties as police officers at the airport.

3.      Plaintiff was charged with disorderly conduct, refusing to obey, criminal trespass, and concealing his identity.

4.      Plaintiff was booked into the Bernalillo County Metropolitan Detention Center following his arrest.

5.      Plaintiff was acquitted of the charges by a Bernalillo County jury in the Bernalillo County Metropolitan Court.

The parties further stipulate and agree that the law governing this case is: 42 USC §1983; 42 USC §1988; 28 U.S.C. §1367(a): and the New Mexico Tort Claims Act.

## PLAINTIFF'S CONTENTIONS:

Plaintiff Phillip Mocek is a citizen of the State of Washington residing in Seattle.  He has traveled via commercial air for most of his adult life, mostly without incident. Starting around 2007, after beginning to harbor reservations about the Transportation Security Administration's ("TSA") passenger identification procedures, Mocek began refraining from showing documentation of identity when flying. Normally, Mocek would simply be diverted to another line to await assistance from other TSA agents and would eventually be allowed to board his flights.  In 2009, Mocek began researching TSA's regulations and policies regarding prohibitions on photography, video recording, and filming at airport screening locations. The research revealed that TSA itself does not prohibit photography, video recording, or filming at screening

3

locations. The research further revealed that at the Albuquerque International Sunport in Albuquerque, New Mexico, no state or local laws prohibited photography in public areas of the airport.

On November 15, 2009, Mocek attempted to fly out of the Albuquerque Sunport with Jessie Gallegos.  Mocek declined to provide TSA agents with documentation of his identity. Mocek took out his camera and began filming and audio recording the TSA agents to document the process.

TSA agents took exception to Mocek's filming of them and ordered him to cease. He calmly refused and noted that no law or regulation prohibited him from doing so. The agents persisted and eventually summoned Albuquerque law enforcement.  At all times, Mocek was in the publicly accessible areas of the airport.  Throughout what followed, Mocek remained calm and restrained in the face of the officers' increasingly agitated behavior.

The Albuquerque Aviation police officers who arrived demanded that Mocek comply with the TSA's unwarranted instructions, or else he would be escorted out of the airport.  After Mocek stated that he had established that he had a right to film, the officers told him that he was going to be escorted out of the airport. Officers then demanded to see Mocek's documentation of identity, under threat of arrest for concealing identity. Without taking any actions and while following police instructions, Mocek was suddenly told that he was under investigation for disturbing the peace.

Mocek was then arrested. His camera was seized and searched, and police deliberately attempted to delete its contents. Ultimately, Mocek was charged with four crimes: disorderly conduct; concealing identity with intent to obstruct, intimidate, hinder, or interrupt; resisting, obstructing, or refusing to obey a lawful order of an officer; and criminal trespass.

No defendant had probable cause to arrest Mocek. Rather, Mocek's arrest was a result of clear retaliation by TSA and Albuquerque law enforcement for his having filmed them under circumstances in which he had a right to do so.  Mocek successfully restored the video footage, which provided conclusive evidence of the baseless nature of the charges against him. This footage was shown to the jury when he was tried in New Mexico state court. After trial, the jury acquitted him of all charges.

Mocek seeks the following relief: (1) to obtain compensation for the Defendants' violations of his First, Fourth, and Fourteenth Amendment rights; (2) to obtain compensation for false arrest and abuse of process; (3) to declare that the Defendants acted unconstitutionally in violation of the above rights; and (4) to ensure that the Defendants undertake training and other remedial steps to prevent such abuses from happening in the future.

In 2006, Mocek read, via blogs and elsewhere on the Web, about John Gilmore's and his friend Ben Livingston's experiences flying via commercial air without presenting identity documents ("I.D.") to TSA staff at the airport.  Mocek began to believe that the TSA's airline passenger identification procedures were designed to serve two purposes: (1) airline revenue production (airlines are now able to resell tickets when passengers fail to make their flights), and (2) facilitation of a system of restriction of movement based on government blacklists. Moreover, Mocek believed that he should not have to request and receive permission from the government to travel from one state to another, nor that his name should be a deciding factor in whether he is able to engage in interstate travel.  Whenever Mocek showed an I.D. at the airport, he was not searched as thoroughly. He walked through the metal detector instead of being patted down or frisked, and his luggage was searched via X-ray instead of by hand.

In June 2008, TSA's policy on airline passenger identification changed. TSA announced via press release that passengers who "willfully refuse[d]" to show I.D. would not be allowed past their checkpoint, but those whose I.D. was merely "misplaced" or "stolen" would be allowed to pass through if they cooperated with alternative procedures.

TSA maintains an official Web site at blog.tsa.gov, which includes a section in which it answers questions from the public. Entitled "The TSA Blog," the site's stated purpose is described as follows: "This blog is sponsored by the Transportation Security Administration to facilitate an ongoing dialogue on innovations in security, technology and the checkpoint screening process." The blog is written by, among other authors, Curtis Robert Burns, described as a "Social Media Analyst with the Office of Strategic Communications and Public Affairs" "currently residing at TSA headquarters" "to manage and write for the Blog." Posts by Burns, who writes using the user name "Blogger Bob," consequently bear the authority of the TSA and can be attributed as representative of the views and policies of the TSA.  On March 31, 2009, Burns posted a blog entry titled "Can I Take Photos at the Checkpoint and Airport?":

"We don't prohibit public, passengers or press from photographing, videotaping, or filming at screening locations. You can take pictures at our checkpoints as long as you're not interfering with the screening process or slowing things down. We also ask that you do not film or take pictures of our monitors. . . . [W]hile the TSA does not prohibit photographs at screening locations, local laws, state statutes, or local ordinances might.  Your best bet is to call ahead and see what that specific airport's policy is."

The entry then made a suggestion for persons interested in photographing airports:

"I suggest you use the Got Feedback program to directly contact the Customer Support

Manager at the airport you're going to be traveling through. They will have an answer for you

and if they don't, they can connect you with somebody who does."

Burns closed the entry with the observation that he had personally photographed in airports:

"I've taken photographs in checkpoints, terminals, and on planes and I have never had an issue. I

know some of you have and hopefully this information helps you a little."

In April 2009 Mocek took the advice in the blog entry and contacted 50 U.S. airports via

TSA's "Got Feedback?" form to ask each if it had local laws or regulations regarding

photography in airport public areas.  About half of the airports responded. Mocek documented

every response, along with his follow-ups, on a discussion thread on the Web site FlyerTalk

Forums.  Burns refused to allow comments on the TSA blog referencing Mocek's project,

purportedly because Mocek published, without redaction, the e-mails he received from TSA

public relations representatives at each airport. Burns expressed concern about Mocek's

providing access to the representatives' work phone numbers—although these phone numbers

were included in the signature line of every message the representatives sent in response to

public inquiries.  Burns stated in the main text of the blog entry that TSA "asks" people not to

photograph TSA's computer monitors. Later, in the comments, Burns changed that to a TSA

prohibition. Despite numerous requests from Mocek asking Burns to back his claim with any

verifiable information, Burns never did so.

Mocek contacted the Albuquerque International Sunport ("ABQ" or "the Airport") and

Susanne Spencer from TSA at ABQ responded from the e-mail address Susanne.Spencer

@dhs.gov April 8, 2009: "There aren't any state or city laws/ordinances that prohibit

photography in the public areas of the airport. . . . However, it is advisable to contact the

Airport's Public Affairs Officer Dan Jiron at djiron@cabq.gov or by telephone at 505.244.7780.
If you wish to film at or near the TSA checkpoint, advance coordination would need to be made
with Maggie Santiago at Maggie.santiago@dhs.gov or by telephone at 505.246.4106." This e-
mail was signed with the text: "Transportation Security Administration, Albuquerque, NM,
Desk: 505-246-4313."  These communications from Spencer represent official TSA rules and
policies.  Mocek replied in an e-mail to Spencer on April 8, 2009: "I'm not aware of any related
TSA policies other than the one that says any photography or video recording must not interfere
with TSA operations."  Spencer replied in an e-mail on April 10, 2009 that TSA "ask[s] for
advance coordination" and that this was "a local practice and not available in writing."  Spencer
stated that advance coordination would allow TSA to advise law enforcement officers (LEOs)
stationed at the checkpoint of the filming. The e-mail also stated that the checkpoint area is a
"restricted area" and "just for ticketed passengers."

Mocek responded in an e-mail on April 10, 2009 that he would not interact with law
enforcement and that, as a passenger, he would be authorized to be in the screening area. Spencer
responded the same day: "The information I have provided to you is a recommendation. We only
encourage individuals to contact TSA in advance so we can facilitate the photography." Mocek
asked for clarification of the ambiguity in Spencer's answer by e-mail on April 14, 2009 in
which he asked, "So shall I disregard your statement that advance coordination is *required*?"
Spencer answered in an e-mail the same day that stated unequivocally: "Again, the information I
have provided to you is a recommendation. We only encourage individuals to contact TSA in
advance so we can facilitate the photography."

Mocek reasonably believed that neither TSA nor state or local laws prohibited him from
photographing or filming at the TSA checkpoint at the Albuquerque airport, other than possibly a

8

prohibition against filming TSA monitors.  When Mocek attempted to fly out of Albuquerque on

November 15, 2009, he approached the podium where TSA agents were checking passenger

documents. Mocek presented his boarding pass to TSA agent Greg Martinez.  Martinez asked

Mocek for I.D., and Mocek answered that he did not have any form of I.D. Mocek then told

Martinez that it was his understanding that he was not required to produce any such documents,

only his boarding pass. Martinez told Mocek to go stand in a different line nearby. Mocek waited

while approximately four people ahead of him were processed.

   At around 2:32 p.m., Jonathan Breedon, a TSA security agent, took Mocek's boarding

pass and asked if Mocek had anything else to help identify him, such as a credit card or other

I.D.  Mocek said that he did not think he was required to provide I.D.  Breedon agreed and asked

if he could verify his identity in another way. Mocek again stated that he would not provide

anything because it was his belief that he was not required to. Breedon notified Mocek that he

would contact the TSA's Security Operations Center, which would try to verify Mocek's

identity, and if they could not, Mocek would not be allowed to proceed through the security

checkpoint.

   None of the TSA agents present indicated that there was any intent to involve law

enforcement.  Mocek began using his camera to video record this manifestation of what he

perceived to be an atypical, alternative identification policy.  Breedon told Mocek that needed to

stop filming.  Mocek responded that he did not believe that filming of a publicly accessible area

was illegal. Breedon tried to take Mocek's camera, and then told him that no photography or

videotaping was allowed at the security checkpoint. Breedon called for police assistance. In the

meantime, Anthony Schreiner, a TSA security supervisor, and Gerald Romero, a TSA manager,

approached the security checkpoint area after Breedon summoned for assistance. Breedon

briefed Schreiner on the events that just took place.  Romero ordered Mocek repeatedly to put

down the camera and attempted to grab either Mocek or the camera. Mocek and Romero had the

following verbal exchange:

ROMERO: Why don't you put it down for now, okay?

MOCEK: I'd prefer not to.

ROMERO: No. Put it down for now.

MOCEK: Can I get your name?

ROMERO: I said put it down for now. I said put it down for now.

MOCEK: Don't touch me.

ROMERO: Put it down for now.

MOCEK: Do not touch me.

Defendants Robert Dilley, Landra Wiggins, and Julio De La Pena, all officers of the

Albuquerque Aviation Police Department, arrived soon thereafter. The first complaint from the

TSA agents upon the law enforcement officers' arrival was that Mocek would not put down his

camera. When Dilley, the first to arrive, appeared on the scene, TSA agents described the

encounter to the law enforcement personnel with the following phrases: "causing a disturbance,"

"he won't put his camera down, either," and "taking pictures of all of us."  Mocek's filming was

the primary, if not the sole, cause for the events that followed, including his ultimate arrest.

Dilley told Mocek to comply with the TSA agents' instructions or else he would be

escorted out of the airport. One of the officers said that Mocek was causing a commotion. Mocek

said, "I haven't raised my voice. I'm not trying to stop you from doing your job." Mocek said

that he intended to comply with all of the TSA's rules and regulations.  Dilley told Mocek again

to comply or he would be escorted out of the airport. Mocek reiterated that he did not believe

10

there was a rule that barred him from using a camera in publicly accessible areas of the airport. Wiggins stated that this was a federal checkpoint and that Mocek could not film there. Mocek replied, "I've checked into it and I know that I *can* do it here." Wiggins said, "Well, you can be arrested, then you can check into it more."  Wiggins said, "You're almost there. You pushin' it, okay? You're really pushin' it." After a moment's confusion, De La Pena remarked, "He don't want to show his I.D., either." Dilley said, "Let's go, sir. You're leaving the airport. You're being escorted out at this point. Let's go. And if you refuse, we'll arrest you. Let's go." Mocek said, "I don't understand."

Dilley then changed his mind about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing identity.  Mocek said that he did not have any I.D. to show Dilley.  Dilley stated that Mocek was now a part of a criminal investigation and was required to give I.D. When Mocek asked what he was being investigated for, Dilley replied that it was for disturbing the peace. Mocek said that he had not disturbed the peace. Dilley once again said that he needed Mocek to provide him with I.D. Mocek then said he was going to remain silent and that he wanted to talk to an attorney. Dilley said, "We're gonna end up arresting you. Come on, let's go. We're gonna search your property, and if we find I.D. on you—on your property, we will arrest you for concealing I.D." Dilley subsequently said, "You're under arrest. You don't have no options.  Let's go." Dilley placed Mocek under arrest without a warrant or stating a reason.

From the time Mocek arrived at the airport to his arrest, Mocek had fully remained within publicly accessible areas of the airport.  At around 2:39 p.m., Dilley and Wiggins walked Mocek across the airport to the Aviation Police Department office. Mocek assumed at this point that the officers would complete some paperwork and then release him in time to make his flight.  Mocek

and the officers entered the office, walked down a short hall, and entered a small room with a couple computers on desks. The officers then locked Mocek in a small holding cell (about $4 \times 8$ feet in size). Next, the officers searched Mocek's belongings in the room just outside the cell door. Any items with his name on them were sealed in two envelopes. These included business cards, credit cards, and insurance cards.  Mocek was detained in this holding cell for about two hours. During this time, Dilley wrote an incident report while Wiggins watched football on the Internet and went to Southwest Airlines to find out if Mocek had checked any luggage. Dilley had some difficulty completing various forms without using Mocek's name. Nevertheless, Mocek was not asked to state his name while Dilley was filling out of the forms. Once Mocek was in the cell, however, Dilley asked Mocek if he wanted to identify himself.  When Mocek tried to find out if he was required to identify himself, Dilley asked him to stop talking.  Then Mocek stated clearly to Dilley and Wiggins, "My name is Phillip Anthony Mocek." Dilley told Mocek to stop talking.

Dilley processed Mocek "as a John Doe," so his belongings remained in storage at the Aviation Police Department office. Dilley read a statement to Mocek and asked if he understood. Mocek's stated he wished to remain silent.  The officers handcuffed Mocek and walked him to a police car outside. Dilley drove Mocek to the downtown police department. They did not speak. Upon arrival at around 4:54 p.m., they walked inside, Mocek's handcuffs were removed, and he was placed in a holding cell. Dilley filled out some paperwork. Mocek was brought out to stand in front of a counter while being searched, and then returned to the cell. After Mocek was searched, Dilley left.

Mocek was handcuffed and walked to a van outside and driven to the Bernalillo County

Metropolitan Detention Center, where he was put in a large cell.  Mocek was fingerprinted and photographed and spoke with medics about his health. Someone in the room with the medics gave Mocek a paper to sign, and when Mocek saw that the form stated his name was John Doe, he told that person that there was a mistake and again provided his real name.  Mocek then received some paperwork showing the charges and that his bail was set at $3,000.  Around 8 to 9 p.m., Mocek was called out and sent to a videoconferencing terminal, where he spoke with a court clerk who took some information from him and said his arraignment would be the next morning.

Some time after the arrest, Dilley authored a false incident report and criminal complaint, each of which contained numerous misstatements and mischaracterizations of the events at the Albuquerque airport.  Audio and video recordings of the incident contradict the claims in Dilley's report. Mocek consistently used a calm, quiet tone of voice, and it was the officers' voices that were at times agitated and raised. Dilley never told Mocek to lower his voice nor issued a verbal Criminal Trespass Order.   At no point did Mocek refuse to comply with any of Dilley's orders.  Dilley never stated the justification for arresting Mocek. At various points during his encounter with Mocek, Dilley stated first that he was "going to arrest" Mocek for using a camera, then that Dilley would arrest Mocek if he refused to leave the airport, then that Dilley would arrest Mocek if he refused to provide I.D. When Dilley finally arrested Mocek, he did not state the reason for the arrest.

Some time after the arrest, De La Pena authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Albuquerque airport. Audio and video recordings of the incident contradict De La Pena's claims. Video

footage shows people walking by without any hesitation, Mocek complying with orders and using a calm speaking voice.

Some time after the arrest, Wiggins authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Sunport. Audio and video recordings of the incident contradict Wiggins's claims.

Statements from Breedon and Schreiner do not corroborate the claims in Dilley's, De La Pena's, and Wiggins' accounts. Breedon's statement indicates that he did not request police involvement until he asked Mocek to cease using his camera.   In Schreiner's statement, Breedon asked for assistance from a law enforcement officer.  Schreiner wrote that Mocek pointed a camera at him and challenged the notion that taking pictures was prohibited. Schreiner wrote that when Dilley arrived, Schreiner told Dilley of Mocek's "resistance to comply with clearance procedures and his taping and picture taking." Schreiner wrote that with each question asked by law enforcement, Mocek "in a threatening manner took photos of each of the officers."

Taken together, the police documents tell a story in which Mocek allegedly raises his voice and causes a disturbance, following which the law enforcement officers demand I.D. and issue a verbal no-trespass order (with both of which Mocek allegedly refuses to comply). The TSA written statements, by contrast, give no suggestion that Mocek caused any public disturbance and do not mention any no-trespass order. The video and audio recordings make clear that Mocek did not raise his voice or refuse to obey an order to leave the airport. Rather, the recordings confirm that Mocek calmly insisted that he had a right to continue filming. It was this insistence that annoyed the officers, who then declared that Mocek was "in trouble." Only after officers demanded that Mocek provide documentation of identity, which Mocek declined to provide, did any officer suggest that Mocek had disturbed the peace, and no one suggested how

Mocek might have done so beyond a vague statement that Mocek was "causing a commotion" in some unspecified manner.

At or around 9 a.m. on November 16, 2009, Mocek was taken to a waiting area outside a virtual courtroom in which the judge and clerk appeared via videoconference. He pleaded not guilty to each charge. The judge lowered his bail from $3,000 to $1,000.  Mocek's bail was posted around 5 p.m., although it took nearly five hours to process Mocek's release. Mocek was dropped off in downtown Albuquerque through the jail shuttle service at about 10:00 p.m. Mocek walked into the Hyatt, explained his situation to the women at the front desk, and borrowed their phone to call his partner and let her know he was free.

The next morning Mocek went to the airport's police office to retrieve his things. After receiving his possessions, Mocek stopped in the hall to turn on his camera and found that all images had been deleted. Mocek returned to notify the police that someone had tampered with his camera.  Officer Raymond Vigil told Mocek that he was not involved, and suggested that Mocek file a report.

On November 18, 2009, Mocek's experience at the airport security checkpoint was uneventful. On the plane, Mocek used forensic software that locates and recovers deleted files, and was able to recover his video from his camera's memory card.

Beginning on January 20, 2011, Mocek was tried in Bernalillo County Metropolitan Court, Criminal Case No. 2573709, before Judge Kevin L. Fitzwater, on the four charges against him.  During the trial, Breedon and Dilley testified for the state. In addition, the prosecution offered into evidence Mocek's videorecording of the incident at the Albuquerque airport security checkpoint area and played the video for the jury. Mocek did not offer any evidence of his own.

On January 21, 2011, following two days of testimony, Mocek was acquitted of all four charges against him by a six-person jury after approximately an hour of deliberations.

Defendants' unlawful and unconstitutional conduct resulted in Mocek's arrest, detention, seizure and attempted destruction of his property, institution of baseless criminal proceedings against him, and other financial and emotional distress. Mocek incurred in excess of $34,000 in legal costs to defend against the criminal charges.

The conduct of the Defendants in threatening arrest and prosecution would chill a person of ordinary firmness from continuing to engage in lawful, constitutionally protected activity.

The Defendants have violated plaintiff's rights under the first, fourth and fourteenth amendments to the United States Constitution.

Defendants' policies, practices, and conduct in unlawfully arresting Plaintiff, seizing his camera and memory, searching his camera and its memory, attempting to destroy evidence by deleting the contents of the camera, and filing criminal charges against him, in retaliation for his video and audio recording of them, were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future. These policies, practices, and conduct violate Plaintiff's free speech and associational rights as guaranteed by the First Amendment.

Defendants' policies, practices, and conduct in seizing and arresting Plaintiff without reasonable suspicion or probable cause, subjecting him to excessive force, searching his person, seizing and searching his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera, in willful, wanton, and reckless disregard of Plaintiff's rights, violated Plaintiff's rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment.

Defendants' actions were intended to and did cause damages to Plaintiff.

Defendants' policies, practices, and conduct in instituting criminal judicial proceedings against Plaintiff and misusing and actively participating in misusing the legal process by filing a criminal complaint against Plaintiff without probable cause or by inducing the filing of a criminal complaint against Plaintiff without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against Plaintiff for his video and audio recording of them, were intended to and did cause damages to Plaintiff.

Defendant City through its policymakers had in force and effect a policy, practice, or custom to prohibit lawful photography and filming in publicly accessible areas of the Sunport, even though no statute or ordinance prohibits such photography and filming; to require individuals to provide documentation of identity even when providing such documentation is not required; and to arrest or threaten to arrest individuals who seek to engage in such lawful actions.

Defendant City through its policymakers had in force and effect a policy, practice, or custom to engage in retaliatory behavior, such as charging or threatening to charge individuals with disorderly conduct or criminal trespass even in the absence of genuine threats of violence or no-trespass orders, against those who seek to exercise their lawful right to use cameras in areas where no legitimate time, place, and manner restrictions were in place.

Defendant City through its policymakers had in force and effect a policy, practice, or custom to fail to properly discipline, train, and supervise City police officers, including the individual law enforcement Defendants in this case, in the legality of not having to provide documentation of identity, in the legality of filming in the Albuquerque airport, and in the illegality of retaliating against individuals who seek to exercise their lawful rights.

Defendant City had actual or constructive knowledge of these unlawful practices yet failed to take any reasonable or adequate steps to remedy them.

The policies, practices, or customs led City law enforcement to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated, making it foreseeable that officers would violate individuals' rights in precisely the manner in which Plaintiff's rights were violated.  Defendant City through its final policymakers was deliberately indifferent to this risk.  Defendant City's policies, practices, or customs were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process, causing damages to Plaintiff.

## AIRPORT DEFENDANTS' CONTENTIONS

On November 15, 2009, Plaintiff arrived at the Albuquerque International Sunport ("Airport") with the specific intent of challenging Transportation Security Administration ("TSA") identification policies which he disagreed with.  Prior to approaching the TSA checkpoint for an outbound flight, Plaintiff gave his only form of identification to his traveling companion, Jesse Gallegos. Mr. Gallegos produced his identification at the security checkpoint and cleared the checkpoint without incident. However, when Plaintiff produced his boarding pass to TSA agent Jonathan Breedon, he stated that he did not have identification when he was asked for it. Jonathan Breedon asked Plaintiff to step out of the line so that an alternative identification process could assist in identifying him so that he could fly out of Airport. Agent Breedon then asked Plaintiff if he had any other identification such as a credit card, debit card, or library card. At that point, Plaintiff began to record the conversation with Agent Breedon, using his cell phone, but did not provide any such identifying documentation. Agent Breedon advised Plaintiff that he was going to call the operations center which would attempt to verify Plaintiff's identity,

18

but that if it was unable to do so, Plaintiff would not be able to proceed through the checkpoint.

Plaintiff's traveling companion, who was standing in close proximity to Plaintiff and Agent

Breedon, loudly stated two times during the discussion between Agent Breedon and Plaintiff that

he intended to "bear witness."

Shortly thereafter, Plaintiff began to record the exchange with Agent Breedon using a

video camera that he was carrying. Agent Breedon called a supervisor for assistance, and advised

Plaintiff that he had law enforcement on the way. Agent Breedon then asked Plaintiff to turn the

camera off. Plaintiff refused, and began to question Agent Breedon about whether or not TSA

allowed filming in the area.  TSA supervisor Gerald Romero arrived at the checkpoint at that

point.  Supervisor Romero was advised by Agent Breedon that Plaintiff refused to provide

identification and was filming at the checkpoint. Supervisor Romero asked Plaintiff to put the

camera down temporarily, but Plaintiff refused to do so, and was non-responsive when asked for

his name. Supervisor Romero again asked Plaintiff to put the camera down temporarily.  Once

again, Plaintiff refused.  Supervisor Romero approached Plaintiff and sought to turn the camera

off.  Plaintiff resisted his attempts, while his companion stated in a loud voice, "I am bearing

witness."

Defendants Dilley, Wiggins, and De la Pena observed this exchange, during which time

they noted that other airport passengers exhibited signs of uncertainty, hesitation, and concern.

Defendant Dilley motioned for the passengers to pass through, and advised them that everything

was "okay." When Defendant Dilley moved to the location of the incident, a TSA agent advised

Defendant Dilley that Plaintiff was causing a disturbance and was filming at the checkpoint.

Defendant Dilley approached Plaintiff and calmly asked Plaintiff to comply with TSA

procedures or he would be escorted out of the airport because he was causing a commotion.

Plaintiff denied that he was causing a disturbance, and he began arguing with Defendant Dilley about his right to film in publicly accessible areas of the airport. Defendant Wiggins advised Plaintiff that he could not film at a federal checkpoint, and that he could be arrested for doing so. Plaintiff continued to insist that he had the right to film at the security checkpoint. Defendant Dilley made the decision to escort Plaintiff out of the airport because it was evident that Plaintiff was not going to comply with his directives, and that he would continue to cause a disturbance at the checkpoint. Defendant Dilley advised Plaintiff that he was going to be escorted out of the airport and asked Plaintiff to follow him, warning him that he would be arrested if he didn't. Rather than comply, Plaintiff continued to question Defendant Dilley. At that point, Defendant Dilley asked Plaintiff for his identification because Plaintiff's conduct rose to the level of reasonable suspicion that Plaintiff was disturbing the peace. Plaintiff questioned why he had to produce his identification, at which point Defendant Dilley advised Plaintiff that he was required to produce identification because he was disturbing the peace. Rather than provide his identification, Plaintiff stated that he intended to remain silent until he spoke with an attorney. Plaintiff did not produce identification, leaving Defendant Dilley with no viable options but to arrest Plaintiff.

Plaintiff was escorted to the Airport Police Department and placed under arrest for disorderly conduct, criminal trespass, concealing his identity, and refusing to obey. Plaintiff's luggage was searched incident to his arrest to ensure that he did not possess any items or weapons that would endanger the officers. Plaintiff's belongings were then placed in the Sergeant on Duty's office under lock and key. Plaintiff refused to provide his name and was booked into the Metropolitan Detention Center under the name John Doe. Plaintiff was arraigned the following day, paid his bail, and returned to the Airport to retrieve his belongings. Plaintiff

produced his identification at the TSA security checkpoint and boarded his plane without incident.

Defendant Dilley had reasonable cause to ask Plaintiff for his identification based on Plaintiff's refusal to comply with TSA procedures, and based on his conduct which tended to disturb the peace of the airport.

Defendant Dilley had probable cause to arrest Plaintiff based on his conduct and its effect on the peace and security of the airport, rather than based on an alleged retaliatory motive.

Airport Defendants deny Plaintiff's allegations that he was retaliated against, or that his rights under state or federal law were violated.

## PROVISIONAL DISCOVERY PLAN

The parties jointly propose to the Court the following discovery plan:  *(Use separate paragraphs or subparagraphs as necessary if parties disagree.)*

---

List all witnesses who, at this time, you think will either testify or be deposed, giving their name, title, address and a brief summary of their testimony.  It is insufficient to list witnesses' addresses, save for clients, "in care of counsel."

List all documents which you believe, at this time, will be exhibits at the trial.

List all experts who you believe, at this time, will testify at the trial, giving their name, address, area of expertise, and a brief summary of the anticipated testimony.

---

**Plaintiffs Witnesses:**
1. All witnesses named by defendants, who will testify to the facts alleged in the complaint and as set forth below.

2. A police practices expert who has not yet been named who will testify to the proper police procedures in an incident such as the one alleged in plaintiff's Complaint.

3. Any witness identified in discovery.

4.   Any witness necessary to lay a foundation for the admission of any exhibit at trial.

5.   Any rebuttal witnesses necessary.

**Airport Defendants' Witnesses:**

1.   Phillip Mocek c/o Mary Lou Boelcke.

Plaintiff is expected to testify to the incident which is the basis of this lawsuit, including but not limited to his intent as he approached the TSA checkpoint on November 15, 2009, Plaintiff's rationale for refusing to provide his identification or comply with TSA directives, his motivation for testing TSA policies, the basis of his claims, his experience in airports, and the damages he is claiming in this suit.

2.   Jesse Gallegos. Address unknown at this time.

Mr. Gallegos is expected to testify to the arrangement he had with Plaintiff regarding Plaintiff's plan as he approached the TSA checkpoint on November 15, 2009, his conduct in relation to this incident, his observations, and other information relevant to the allegations raised in the Complaint.

3.   Officer Robert Dilley c/o The Baker Law Firm.

Officer Dilley is expected to testify to his training and experience as a law enforcement officer generally and at the airport specifically, his legal duties, authority, and law governing his activities as a law enforcement officer, his observations on the date of the incident, what actions he took in relation to Plaintiff, and his reasons for asking for Plaintiff's identification and subsequent arrest of Plaintiff.

4.   Officer Landra Wiggins c/o The Baker Law Firm

Officer Wiggins is expected to testify to his training and experience as a law enforcement officer employed at the Airport, his legal duties, authority, and law governing his activities as a law enforcement officer, and his observations and actions in relation to this incident.

5.   Officer Julio De la Pena c/o The Baker Law Firm

Officer De la Pena is expected to testify to his training and experience as a law enforcement officer employed at the Airport, his legal duties, authority, and law governing his activities as a law enforcement officer, and his observations and actions in relation to this incident.

6.   Chief Marshall Katz c/o The Baker Law Firm

Chief Katz is expected to testify to the policies and procedures, training, and security mandates (state and federal) which law enforcement officers employed at the Airport are required to undertake, the reasonable suspicion standard, probable cause to arrest standard, investigative

stops at the airport, and his role and oversight of the Aviation Police Department as its Chief of Police.

7.      Jonathan Breedon c/o Edward Martin, United States Department of Justice

Mr. Breedon is expected to testify about his training, experience, and policies regarding security checkpoint procedures, security concerns related to identification procedures and experience with the public in relation to these policies, and his interactions and observations of Plaintiff on the day of the incident

8.      Gerald Romero c/o Edward Martin, United States Department of Justice

Mr. Romero is expected to testify regarding his supervisory role of TSA agents at the Airport, training and security protocols utilized at the airport as well as their rationales, and his observations and actions in relation to Plaintiff on the day of the incident.

9.      Yet to be identified Metropolitan Detention Center corrections officer(s) and medical/mental health staff who can be located at 100 Deputy Dean Miera Dr. SW Albuquerque, NM 87151. Telephone : (505) 839-8700.

These individuals are expected to testify to the specific information obtained during Plaintiff's booking process, including medical and mental health screening information, and the general booking process used at the MDC.

10.     Deputy District Attorney Mark Drebing
        2nd Judicial District Attorney's office
        520 Lomas Blvd NW
        Albuquerque, NM 87102
        (505) 841-7408

Mr. Drebing is expected to testify to his decision to prosecute Plaintiff, and he can authenticate audio and video recordings, and transcripts, from his prosecutor's file.

11.     Any witness identified in discovery.

12.     Any witness necessary to lay a foundation for the admission of any exhibit at trial.

13.     Any witness necessary for rebuttal.

**Plaintiff's Exhibits:**

1.      All exhibits identified by Defendants.

2.      Transcript of the jury trial Case No. CR 25737-09

3.      Booking worksheet filed by Defendant Dilly

4.      Reports and Supplement Reports written by Anthony M. Schreiner, Jonathan

Breedon, Julio A. De La Pena, Landra Wiggins, Raymond F. Vigil

5.      Police call log from November 15, 2009

6.      TSA documents: Form 2301: Traveler Identification Verification (May 2006), TSA

Certification of Identity, Taking Pictures at Checkpoints

(www.tsa.gov/travelers/airtravel/taking_pictures.htm), ID requirements, FAQs

7.      Video of Mocek at checkpoint and audiotape of same.

8.      Audiotapes of interviews with Wiggins, De La Pena, Dilly, Greg Martinez, Laura

Moot, Gerard Romero, Anthony Schreiner, Jonathan Breedon, Jesse Gallegos and

transcripts.

9.      Audiotape of Albuquerque Operations Center, SW Airlines Operations, Albuquerque

FBI

10.     Officers' belt tapes of Mocek interactions and transcripts

11.     Airport Surveillance camera tapes

12.     Exhibits for impeachment

13.     Exhibits in plaintiff's rebuttal case

14.     Exhibits identified during discovery

**Defendants' Exhibits:**

1.      Transcript and recording from Plaintiff's cell phone recorded on November 15, 2009.

2.      Videotape transcript and recording which Plaintiff recorded on November 15, 2009.

3.      Defendant Wiggins' belt tape recording which began after Plaintiff was detained on
        November 15, 2009.

4.      Still photographs of TSA checkpoint on and around the time of the incident.

5.      TSA policies regarding identification and filming protocols at Airport security

checkpoints.

6.     Training materials and curriculum used at the Albuquerque Airport Police Department.

7.     Relevant Airport policies and procedures related to training, investigations, security concerns, and arrests.

8.     Metropolitan Detention Center booking and intake forms for Plaintiff, dated November 15, 2009.

9.     Bernalillo Metropolitan Court file in case no. CR 2573709.

10.    Transcript and recording of Plaintiff's press conference following the verdict in Plaintiff's underlying criminal case.

11.    Freedom of Information Act paperwork forwarded to Plaintiff per his request.

12.    Plaintiff's email exchanges with local TSA officials.

13.    Police report of the incident.

14.    Criminal Complaint.

15.    Any documents identified during discovery.

**Plaintiff's Expert Witnesses:**   Plaintiff intends to identify an expert witness in police procedures and practices.

**Airport Defendants' Expert Witnesses:**  None

Discovery will be needed on the following subjects:  *(Brief description of subjects on which discovery will be needed.)*  Liability and Damages

Maximum of 25 interrogatories by each party to any other party.  (Responses due 30 days after service).

Maximum of 25 requests for admission by each party to any other party.  (Response due 30 days after service).

Maximum of 10 depositions by Plaintiff and 10 by Airport Defendants.

Each deposition (other than of parties and experts) limited to maximum of 4 hours unless

extended by agreement of parties.

Reports from retained experts under Rule 26(a)(2) due:

from Plaintiff(s) by  _March 15, 2013__

from Defendants by  _N/A_

Supplementation under Rule 26(e) due per Rules of Civil Procedure *(set time(s) or interval(s)).*

All discovery commenced in time to be complete by May 31, 2013.  Discovery on *(issue for early discovery)* to be completed by N/A.

Other Items:  *(Use separate paragraphs or subparagraphs as necessary if other parties disagree.)*

**PRETRIAL MOTIONS**

Plaintiff intends to file:  Motion for Summary Judgment, Motions in Limine.

Airport Defendants intend to file:  Motions for Summary Judgment, Motions in Limine.

**ESTIMATED TRIAL TIME**

The parties estimate trial will require 3-4 days.

This is a jury case.

The parties request a pretrial conference in July, 2013 or later.

**SETTLEMENT**

The possibility of settlement in this case cannot be evaluated prior to the completion of discovery. The parties request a settlement conference in June, 2013. (Where counsel cannot agree to any recitation herein, exceptions shall be listed.)

APPROVED WITH/WITHOUT EXCEPTIONS
(note exceptions above)

Law Offices of Mary Lou Boelcke
s/s Mary Lou Boelcke

First Amendment Project
/s/ James Wheaton
/s/ Lowell Chow

Law Offices of William Simpich
/s/ William Simpich

Attorneys for Plaintiff

-AND-

The Baker Law Firm
/s/ Renni Zifferblatt
Jeffrey L. Baker and Renni Zifferblatt
20 First Plaza Suite 402
Albuquerque, N.M. 87102
505-247-1855
Attorneys for Defendants City of Albuquerque, Aviation Police Department, Katz, Dilley, Wiggins, and De la Pena.