IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PHILLIP MOCEK,

          Plaintiff,

vs.                                         Case No:  11-1009 JB/KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE AVIATION POLICE DEPARTMENT,
 MARSHALL KATZ, in his official capacity as Chief of Police of
The Albuquerque Aviation Police Department,
JONATHAN BREEDON, GERALD ROMERO,
ANTHONG SCHREINER, ROBERT F. DILLEY a/k/a BOBBY DILLEY,
LANDRA WIGGINS, JULIO DE LA PENA, and DOES 1-25 inclusive,

          Defendants.

## CITY OF ALBUQUERQUE DEFENDANTS' MOTION TO DISMISS

COME NOW, Defendants City of Albuquerque, Albuquerque Aviation Police

Department, and Chief Marshall Katz ("City Defendants"), by and through their attorneys of

record Jeffrey L. Baker and Renni Zifferblatt ("The Baker Law Firm"), and hereby respectfully

ask this Court to dismiss the claims against these Defendants for failure to state a claim for

which relief may be granted under Fed. R. Civ. P. 12(b)(6). Pursuant to the law of the case

doctrine, this Court's Memorandum Opinion and Order ("Order") [Doc. 49] on the Individual

Federal Defendants' Motion to Dismiss is dispositive of Plaintiff's remaining claims. Since this

Court has determined that Plaintiff has failed to state a viable constitutional claim, Plaintiff's

remaining claims are ripe for dismissal.

## I.    Relevant Procedural Facts:

1.     Plaintiff filed a Complaint asserting a number of federal civil rights claims against

Transportation Security Administration ("TSA") employees and the City of Albuquerque, its

aviation police department, and its employees, arising out of an incident which occurred on November 15, 2009. [Complaint ¶43]. Respecting the TSA Defendants, Plaintiff contended that TSA agents ordered him to stop filming at a security checkpoint, and subsequently requested the assistance of Airport police officers, which resulted in: 1) his alleged unlawful arrest without probable cause; 2) the unlawful search and seizure of his property; 3) the use of excessive force; 4) and malicious abuse of process, all in retaliation for exercising his First Amendment rights. [See Complaint ¶¶6-9 & Counts I and III at pages 21-22].

2.      Plaintiff's allegations against the individual City Defendants (Dilley, Wiggins, and De la Pena) include a First Amendment Retaliation Claim [Count II at 22], a Fourth Amendment claim for an alleged unlawful arrest, alleged excessive force, the alleged search and seizure of his camera  [*Id.* Count IV at 23], a False Arrest claim based on the alleged lack of probable cause to arrest [Count V at 23-24], and a state law claim for Malicious Abuse of Process for allegedly instituting and misusing the criminal process in retaliation for Plaintiff's First Amendment activities. [Count VI at 24]. Plaintiff also brought a municipal liability claim against the City of Albuquerque, the Albuquerque Aviation Police Department, and Chief Marshall Katz (in his official capacity), for alleged unconstitutional customs or policies which Plaintiff alleges were the moving force behind the Airport Defendants' alleged unconstitutional conduct. [*Id.* Count VII 24-25]. Finally, along with monetary damages, Plaintiff seeks a declaratory judgment that all Defendants' actions were unconstitutional, and requests remedial relief to prevent future violations by these Defendants. [*Id.*¶10 and Count VIII at 25-26, Prayer For Relief ¶¶a-c].

3.      The TSA Defendants filed their Individual Federal Defendants' Motion To Dismiss, asking this Court to dismiss the TSA Defendants on qualified immunity grounds. [Doc 25 at 2¶2]. The TSA Defendants argued that Plaintiff's First Amendment retaliation claim should be

dismissed because the TSA Defendants' actions in ordering Plaintiff to cease recording at the Airport security checkpoint, a non-public forum, was reasonable under the circumstances, and that Plaintiff's asserted First Amendment right to video record TSA activities was not clearly established law. [*Id.* ¶2]. The TSA Defendants also argued that the TSA Defendants did not participate in the alleged violation of Plaintiff's Fourth Amendment rights, and that requesting law enforcement assistance was not a clearly established violation of the Fourth Amendment. [*Id.*].

4.      This Court issued its Memorandum Opinion and Order ("Order") on the Individual Federal Defendant's Motion to Dismiss on January 14, 2013. [Doc. 49]. In the Order, this Court held in part that: 1) Plaintiff "…had not sufficiently stated a plausible claim that the TSA violated his First Amendment rights…" [Doc. 49 at 99]; 2) Plaintiff's First Amendment Right to gather information and right to record law enforcement in the course of their duties is not clearly established law in this Circuit or the United States Supreme Court [*Id.* at 102-103¶1]; 3) Plaintiff failed to state a viable Fourth Amendment claim because: 1) reasonable suspicion that Plaintiff was engaging in criminal activity existed, thereby authorizing Defendant Dilley to demand Plaintiff's identification; 2) Plaintiff's failure to produce identification provided probable cause for his arrest; 3) the search of Plaintiff's property incident to his arrest was lawful. [*Id.* at 104-105,111-112]; and 4) Plaintiff did not allege a plausible excessive force claim because he did not allege that the City Defendant officers used more force than was necessary to effectuate his arrest. [Doc. 114].

## II.    LEGAL ANALYSIS

### I.    Motion to Dismiss Standard

This Motion is brought under Fed R. Civ. P. 12(b)(6), which authorizes a court to

dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). This Court has already comprehensively set forth the scope of this standard, namely that review is limited to the four corners of the complaint, and "…a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor." [Doc. 49 at 49 ¶¶2, 50] (citing to *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Accordingly, further description of this standard would be redundant and unnecessary. Furthermore, this Court's exhaustive recitation of the facts set forth in the Complaint [*Id.* at 2-8] are the sole basis of the holdings in the Order, [See Doc. 49 at 87 §I rejecting review of documents outside the Complaint], and the City Defendants are not submitting any exhibits or discussing any facts outside Plaintiff's allegations which are found in his Complaint. Accordingly, rather than repeat those facts, these Defendants incorporate by reference this Court's recitation of the facts in the Order. [Doc 49 at 2-8].

## II.    Qualified immunity

Defendants Dilley, Wiggins, and De la Pena have asserted qualified immunity as an affirmative defense in their Answer to the Complaint. [Doc. 9 at pp. 15 ¶¶1-3]. This Court has also comprehensively discussed: 1) the high burden that Plaintiff must meet under the two prong qualified immunity analysis; 2) the discretion that courts have in analyzing the prongs in whatever order deemed appropriate; 3) the important policy underlying qualified immunity to resolve cases efficiently without burdening governmental actors with preparation for and trials where appropriate; and 4) described pleading requirements applicable in the context of qualified immunity. [Doc. 49 at 55-62 ¶1]. Therefore, these Defendants will not burden the Court with unnecessary analysis of the qualified immunity test. Pursuant to this Court's Order, however, it is

instructive to note that Plaintiff's First Amendment, Fourth Amendment, and False Arrest claims

under §1983 asserted against Defendants Dilley, Wiggins, and De la Pena  are subject to

dismissal under either the constitutional right or the clearly established law prongs.

**III**.    **Law of the case doctrine**

In the Order, this Court made a series of determinations which are dispositive of the

allegations asserted against all of the City Defendants. [See Doc. 49 §II at 90-102, §III A1 at

105, §2 106-114, §3 at 113-114 & §C 114-119]. Pursuant to '"[T]he law of the case doctrine' [][]

when a court decides upon a rule of law, that decision should continue to govern the same issues

in subsequent stages in the same case.'"  *McIlravy v. Kerr-McGee Coal Corp.,* 204 F.3d 1031,

1034 & fn. 1 (10th Cir. 2000) (explaining that the doctrine "…is concerned with the extent to

which law applied in a decision at one stage of litigation becomes the governing principle in later

stages of the same litigation") (citing to *United States v. Monsisvais,* 946 F.2d 114, 115 (10th

Cir.1991) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983). The law of the case doctrine

applies to criminal and civil cases, *United States v. Nechy,* 827 F.2d 1161, 1164 (7th Cir.1987),

only applies to decisions made on the actual merits, *Wilmer v. Board of Cty. Comm'rs,* 69 F.3d

406, 409 (10th Cir.1995) (citation and internal quotation omitted), and applies to issues

previously decided either explicitly or by necessary implication." *Copart, Inc. v. Administrative

Review Bd., U.S. Dept. of Labor*, 495 F.3d 1197, 1102 (10th Cir. 2007) (citing *Guidry v. Sheet

Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700 (10th Cir. 1993); *Quern v. Jordan,* 440

U.S. 332, 347 n. 18 (1979) ("The doctrine of law of the case comes into play only with respect to

issues previously determined"). Thus, where parties to a litigation attempt to re-litigate issues

already decided, courts may apply the law of the case doctrine to preclude re-argument of the

same legal issues and facts. See e.g. *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1258

(10th Cir. 2004) (" 'when a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from re-litigating the legal issue,' " and also applies to revisitation of claims of other plaintiffs' claims on appeal) (quoting *U.S. v. LaHue,* 261 F.3d 993, 1010 (2001)) (quoting *United States v. Aramony,* 166 F.3d 655, 661 (4th Cir.1999); see also *Huffman v. Saul Holdings Ltd. P'ship,* 262 F.3d 1128, 1132 (10th Cir.2001) (applying law-of-the-case doctrine and explaining that the doctrine seeks to preserve the finality of judgments, to prevent "continued re-argument of issues already decided ... and to preserve scarce court resources.") (internal quotations and citations omitted); *United States v. Triangle Oil,* 277 F.3d 1251, 1259 (10th Cir.2002) ("Courts use law of the case to promote decisional finality and rely on it to prevent relitigation of an issue already decided in prior proceedings of the same case.") (internal quotations omitted).

Courts "…routinely recognize[] that the law of the case doctrine is 'discretionary, not mandatory', and that the rule 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power.'" *Stifel, Nicolaus & Co., v. Woolsey & Co.,* 81 F.3d 1540, 1544 (10th Cir.1996) (quoting *Messenger v. Anderson,* 225 U.S. 436, 444 (1912) (Holmes, J.). Issues such as "subject matter jurisdiction" or "appellate jurisdiction" may be "particularly suitable for reconsideration…" particularly where the prior decision is deemed to be clearly erroneous. *Id.* (quoting Wright & Miller § 4478, at 799 & n. 32) (other citation omitted).

"Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction § 4478, at 788 (1981); *United States v. Alvarez,* 142 F.3d 1243, 1247 (10th Cir.1998) (quotations and internal citations omitted) (This

doctrine is based on sound public policy that litigation should come to an end and should preclude continuation or re-argument of issues already decided); see also *Gage v. General Motors Corp.,* 796 F.2d 345, 349 (10th Cir.1986) (citations omitted) (explaining that the doctrine also serves to avoid "…both a wasteful expenditure of resources by courts and litigating parties and the gradual undermining of public confidence in the judiciary… The law of the case doctrine is a restriction self-imposed by the courts in the interests of judicial efficiency.") (citations omitted).

In the context of a district court case, the law of the case doctrine traditionally applies to subsequent motions which are premised on the same standard of review. See e.g. *Robbins v. Wilkie,* 433 F.3d 755, 765 (10th Cir. 2006) (noting that district court's denial of a defendant's motion to dismiss on qualified immunity grounds was not law of the case for subsequent summary judgment motion based on qualified immunity because the two motions raised differing legally relevant factors applied to each motion especially since the non-movant in response to the summary judgment motion attached numerous exhibits to support his claims which were not available at the motion to dismiss stage) (citing *Behrens v. Pelletier,* 516 U.S. 299, 309 (1996)) (noting that in a motion to dismiss, the court evaluates the conduct alleged in the complaint in determining whether the plaintiff has alleged a violation of clearly existing law whereas a motion for summary judgment necessitates review of evidence gathered through discovery); but see *Kimberlin v. Quinlan*, 199 F.3d 496, 500-01 (D.C.Cir.1999) (the Court of Appeals for the District of Columbia upheld a district court's reliance on law of the case in dismissing defendant's motion to dismiss or for summary judgment on qualified immunity when the district court had previously determined on a prior motion to dismiss or for summary

judgment that plaintiff had alleged a violation of clearly established law because  same facts and

issues were considered in both motions, making the law of the case doctrine applicable).

There are three "exceptionally narrow" grounds for departure from the doctrine: "(1)

when the evidence in a subsequent trial is substantially different; (2) when controlling authority

has subsequently made a contrary decision of the law applicable to such issues; or (3) when the

decision was clearly erroneous and would work a manifest injustice." *Wessel v. City of*

*Albuquerque,* 463 F.3d 1138, 1143 (10th Cir. 2006) (citing *United States v. Alvarez,* 142 F.3d

1243, 1247 (10th Cir.), *cert. denied,* 525 U.S. 905 (1998) (citing *Monsisvais,* 946 F.2d at 117)

(The Tenth Circuit reads "…these exceptions narrowly, requiring district courts to apply the law

of the case unless one of the exceptions specifically and unquestionably applies"); see *also*

Wright & Miller § 4478, at 790 & n. 5 ("Most recent decisions suggest that the major grounds

that justify reconsideration involve an intervening change of controlling law, the availability of

new evidence, or the need to correct a clear error or prevent manifest injustice.").

In this case, none of the exceptions are applicable. First, these Defendants have not asked

this Court to consider any material outside the Plaintiff's Complaint. Second, there is no law in

either the Tenth Circuit or the United States Supreme Court which has issued since this Court

rendered its determination less than a month ago that would change the Court's analysis or

holdings on Plaintiff's First Amendment, Fourth Amendment, or Excessive Force claims.

Finally, the clearly erroneous standard is an equally untenable basis for this Court to revisit or

alter its holdings. The clearly erroneous standard is commonly employed in motions to

reconsider and/or motions to alter or amend a judgment under Fed. R. Civ. P. 59(e), is

discretionary, and generally is considered on three major grounds: 1) an intervening change in

controlling law; 2) availability of new evidence; and 3) the need to correct clear error or prevent

manifest injustice. *See Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981). An order is clearly erroneous when, "on the entire evidence [the reviewing court] is left with the definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow industries*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Under Rule 59(e)  "...[a]ltering a ruling is considered "an extraordinary remedy which should be used sparingly." *See*, 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995). The language from the Seventh Circuit is instructive in demonstrating that the clearly erroneous standard is afforded significant deference. "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling, Inc.,* 866 F.2d 228, 233 (7th Cir. 1988.).

Regarding the manifest justice standard, while no general definition of manifest injustice has been developed, courts routinely look at the matter on a case-by-case basis and reject arguments based on unsubstantiated arguments or disagreements with a court's determination. See e.g. *Torre v. Federated Mutual Ins. Co.,* 906 F.Supp. 616, 619 (D.Kan.1995) (unsubstantiated assertion could not lead to a finding of manifest injustice); *Attorney Registration & Disciplinary Com. of Supreme Court v. Betts,* 157 B.R. 631 (Bankr.N.D.Ill.1993) (mere disagreement with court's findings does not rise to level of manifest injustice. Some courts have determined that, " '[w]hat is clear from the case law, and from a natural reading of the term itself, is that a showing of manifest injustice requires that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy'"; see also  *Grynberg v. Ivanhoe Energy, Inc.,* No. 08–cv–2528, slip op. at 3 (D. Colo. Jul. 15, 2010) ('In the context of a motion for reconsideration, a "manifest

injustice" is defined as an error by the court that is "direct, obvious, and observable.") (citations omitted).

In this case, the Court's Order is exhaustive both in its factual and legal analysis of applicable legal precedent and standards. Accordingly, there is no basis for a finding of either clear error or manifest injustice regarding the holding set forth in the Order.  In contrast, Plaintiff's claims against these Defendants are subject to dismissal for three reasons. First, Defendants are requesting dismissal based on the same standard of review by which the Court decided the TSA's Motion to Dismiss. Second, Defendants are not providing any new evidence or facts outside the Complaint in requesting the relief sought in this Motion. Lastly, the same legal analysis applies to the claims brought against the TSA and to the remaining Defendants. Pursuant to the policy underlying the doctrine, judicial economy is best served by applying the doctrine to this Motion and dismissing remaining Defendants on the same grounds by which the TSA defendants were dismissed.

**IV.     This Court's holding on Plaintiff's First Amendment claim is dispositive of the claims asserted against the remaining Defendants**

In his Complaint, Plaintiff alleges that Defendants Dilley, Wiggins, and De la Pena violated his First Amendment right to free speech and association by allegedly unlawfully arresting him, seizing and searching his camera, attempting to destroy the camera's contents, and filing criminal charges against him in retaliation for "Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and [to] chill Plaintiff from such activity in the future." (Complaint ¶95 Count II). Similar allegations were asserted against the TSA Defendants, except that Plaintiff asserted that they violated his First Amendment rights by unlawfully ordering him to cease his recording activities and summoning the police, which he

claims caused the alleged unlawful actions of the City Defendants. [Complaint ¶93 at pps. 21-22].

In the Order, this Court held that Plaintiff  "…had not sufficiently stated a plausible claim that the TSA violated his First Amendment rights…" [Doc. 49 at 99].  In reaching that determination, this Court found the following:

- The Tenth Circuit has not yet recognized a First Amendment right to record police officers' activities in the course of their duties or to record them for the purpose of newsgathering [*Id.* at 90¶1 ]
-  "The Tenth Circuit has established that there "'is no general First Amendment right of access to all sources of information within governmental control.'"  (citation omitted) [*Id.* at 91 ¶1].
-  The Tenth Circuit has held that "…engaging in new-gathering activities does not exempt a person from Federal Aviation Administration safety regulations" [*Id.* at 91 ¶1].
- Whether Plaintiff was engaging in newsgathering or his asserted right to record police in the course of carrying out their responsibilities, such activity  which has not been recognized by the Tenth Circuit as a protected First Amendment activity, and "…'is subject to reasonable time, manner, and place restrictions'" in the circuits which do recognize the right."[*Id.* at 91 ¶1 quotation omitted]. Furthermore, the United States Supreme Court "…has not made an unambiguous announcement that such conduct is 'uncontested' First Amendment Activity, (citation omitted) [*Id.* at 92], and both the Supreme Court and the Tenth Circuit have stated that recording of governmental actors' activities in public is limited in scope. [*Id.*].
-  The United States Supreme Court has held that Airport terminals are non public forums and as such are subject to reasonable governmental restrictions on First Amendment activities. [*Id.* at 92]. Furthermore, accepting Plaintiff's assertions as true that he was engaging in newsgathering and/or recording the activities of government officials at the screening checkpoint…his recording entails less First Amendment protection that of other individuals engaging in religious solicitation activities within airport terminals. (citation omitted).  [*Id.* at 93 ¶1].
- Based on Plaintiff's allegations, he has failed to demonstrate that the security checkpoint at the Airport "…has historically been made available for speech activity." (citation omitted) [*Id* at ¶2], and the primary purpose of airport security checkpoints is to ensure that passengers and buildings are safe, rather than areas which are intentionally and traditionally held open to the public for expressive activity. [*Id.* at 94].
- The United States Supreme Court has upheld bans affecting First Amendment rights in airports due to the disruptive effect that said activities have on airport business. (citation omitted). [*Id.*]. Furthermore, Plaintiff's description of his activities could have had a disruptive effect because he did not advise TSA agents why he was filming, leading them to potentially speculate about whether his conduct was illicit in nature, his activities diverted the attention of TSA agents from their duties, and potentially caused security

11

concerns and delays to other passengers, rendering the restriction on his activities at the security checkpoint reasonable. [*Id.* at 95¶2, 96, 97 ¶1].

- Plaintiff could have arranged to film the area in advance of the incident but did not do so and he was not prevented from filming in other areas of the airport where security concerns were less magnified, thus his expressive activity was not suppressed. [*Id.* at 97 ¶2]. Furthermore, Plaintiff did not allege that the TSA's actions were done in opposition to his viewpoint because he did not convey his viewpoint to TSA agents. [*Id.* at 99].
- For all of these reasons, the Court held that Plaintiff did not state a cognizable First Amendment claim against the TSA. [*Id.* at 99 ¶1].
- The Court also held that Plaintiff's alleged First Amendment violations (based on newsgathering and the right to record governmental actors' conduct in a public setting) are not clearly established law. [*Id.* at 99 ¶B]. In reaching this decision, the Court accurately noted that neither the Tenth Circuit nor the United States Supreme Court has held that the right to gather news in this context is clearly established, and in fact the United States Supreme Court has expressly held that restricting First Amendment activities in airport terminals is constitutional as long as the restrictions are reasonable. (citation omitted) [*Id.*]. Accordingly, the Court properly concluded, based on existing precedent, that the right to gather news may be limited by the government and that the absence of developed law indicating that the right to gather news in an airport has been clearly established would lead a reasonable TSA agent to conclude that restricting filming activities and summoning police when Plaintiff refused to comply with TSA's directives was not prohibited by current law. [*Id.* &* 101 ¶1].
- In relation to Plaintiff's argument that he has a First Amendment right to record the activities of governmental actors in public, the Court rejected that proposition in part because neither the Tenth Circuit nor the United States Supreme Court "…has recognized such a right, and the weight of authority from other circuits has not found the law to be as Mocek maintains. [*Id.* at 101 ¶2]. The Court noted that the only Tenth Circuit to pass on filming of police officers was an unpublished decision that held that destruction of a plaintiff's videotapes of police conduct was "…not a clearly established First Amendment violation." [*Id.*]. The Court properly determined that the unpublished decision would naturally inform a reasonable TSA employee that Plaintiff's filming at the security checkpoint was not a First Amendment right that could be violated by asking Plaintiff to cease recording. [*Id.*].The Court also correctly cited to cases from other circuits that stand for the proposition that the right to record police activities is limited and subject to reasonable restrictions, particularly during traffic stops which have been held to be inherently dangerous. [*Id.* at 102]. In evaluating the context of Plaintiff's recording at the security checkpoint, the Court noted the number of safety concerns that are raised at airport security checkpoints make the location particularly dangerous, and not in line with cases where Courts have found that a First Amendment right to film police activities was protected by the First Amendment when the filming occurred at some distance from the events and did not interfere with law enforcement actions or duties. [*Id.*]
- Based on the weight of the law and lack of precedent in the Tenth Circuit or United States Supreme Court establishing a right to film police conduct, the Court had ample grounds to find that the law is "'sufficiently clear [such that] …every reasonable official

would have understood that ordering Mocek to stop recording at the screening checkpoint would violated his First Amendment rights.'" [*Id.*& 103 ¶1].

The same holdings apply to the allegations asserted against Defendants Dilley, Wiggins, and De la Pena. Plaintiff has failed to allege a viable First Amendment right to film at an airport security checkpoint. Neither the Tenth Circuit nor the Supreme Court has unequivocally stated that filming for the purpose of newsgathering or to record governmental actors' activities conducted in public is protected First Amendment activity. Moreover, the Supreme Court has upheld airport bans on religious solicitation, an activity which inherently has First Amendment protections, as opposed to Plaintiff's activities here, which this Court has determined has less protections. Moreover, because airports are not public forums, Officer Dilley's requests that Plaintiff comply with the TSA's reasonable time, place, and manner restrictions was equally reasonable. Furthermore, while Plaintiff alleges that Dilley, Wiggins, and De la Pena's actions were as a result of retaliation for his filming activities, this Court's observation that Plaintiff did not allege that he expressed a viewpoint to TSA agents is also true in relation to the Defendant officers. Plaintiff neither explained what he was doing nor expressed any view to the Defendant officers, except to deny that he was causing a commotion, state that he had the right to film in publicly accessible areas of the airport, refuse to provide identification, and then invoked his right to remain silent. [See Complaint ¶¶51-54]. In short, because at no time did Plaintiff allege that he expressed any viewpoint to the Defendant officers, his First Amendment retaliation claim is insufficient as a matter of law.

While Courts have recognized that the First Amendment's protection does not end at the spoken or written word - "conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Garcia v. Jaramillo* Not Reported in F.Supp.2d, 2006 WL 4079681 *10 (D.N.M. 2006) citing *Texas v. Johnson,* 491 U.S.

13

397, 404 (1989) (internal quotations omitted), the  United States Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien,* 391 U.S. 367, 376 (1968). In determining whether particular conduct possesses sufficient communicative elements to warrant First Amendment protection, courts should assess whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410-11 (1974); see also *United States v. Grace,* 461 U.S. 171, 176 (1983) (acknowledging the expressive nature of picketing); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 505 (1969) (recognizing the expressive nature of black armbands worn to protest U.S. military involvement in Vietnam); *Brown v. Louisiana,* 383 U.S. 131, 141-42 (1966) (noting the expressive nature of a sit-in by African-Americans in a "whites only" area to protest segregation). Since, as this Court recognized in the Order, Plaintiff did not allege that he was conveying any message, how could the City Defendant officers have determined that he was trying to convey a message, let alone glean what that message was?

Courts routinely reject First Amendment claims that lack sufficient indicia of expressive content. For example, in *Garcia v. Jaramillo* Not Reported in F.Supp.2d, 2006 WL 4079681 *15 (D.N.M. 2006), the plaintiff brought a First Amendment Retaliation claim asserting that he was arrested in retaliation for his expressive conduct in refusing to give the police officer defendant his driver's license. In finding that the defendant was entitled to qualified immunity, the Court first noted that the plaintiff's assertions of expressive conduct did not establish that the defendant violated his First Amendment Right to freedom of speech because the plaintiff failed "…to present sufficient evidence demonstrating that his conduct was intended to convey a

particularized message and fail[][ed] to show that there was a great likelihood that those who viewed his conduct would understand any such message." *Id.* citing *Spence v. Washington,* 418 U.S. 405, 410-411 (1974); see also *Zalewska v. County of Sullivan,* 316 F.3d 314, 319 (2d Cir.2003) ("To be sufficiently imbued with communicative elements, an activity need not necessarily embody a narrow, succinctly articulable message, but the reviewing court must find, at the very least, an intent to convey a particularized message along with a great likelihood that the message will be understood by those viewing it.") (internal citations and quotations omitted); *Church of the Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies and that party must advance more than a mere plausible contention that its conduct is expressive.") (internal citations and quotations omitted). As such, the *Garcia* Court did not find that the plaintiff's "…conduct possessed sufficient communicative elements to warrant First Amendment protection. *Id.* Thus, governmental actors may restrict expressive conduct more freely than it can the written or spoken word, as long as particular conduct is not proscribed because of expressive elements. *See Texas v. Johnson,* 491 U.S. U.S. 397, 406 (1989) (internal citations omitted).  To that end, the United States Supreme Court expressly stated in *R.A.V. v. City of St. Paul,* 505 U.S. 377, 385 (1992):

> We have long held ... that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses-so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not.

In the context of an airport, which poses serious security concerns and risks, regulation of conduct lacking in expressive content becomes even more reasonable. In the end, the City Defendant officers' actions in the face of an individual who refused to comply with TSA protocols was reasonable and fully compliant with the law governing expressive versus non-

expressive conduct. In contrast, Plaintiff's insistence that he did not have to stop filming at the checkpoint, and his unwillingness to comply with TSA directives, does not bear any indicia that he was attempting to convey a particularized message, or that there was a great likelihood that Defendants Dilley, Wiggins, or De la Pena, in viewing his conduct, would understand that any message was being conveyed through his conduct. Accordingly, Plaintiff's contention that he was engaged in protected First Amendment conduct is dubious at best.

That said, this Court has amply articulated both the Plaintiff's burden in establishing that clearly established law in the Tenth Circuit or United States Supreme Court supports his contentions, as well as the fact that the weight of the authority in the context of both newsgathering activities and filming of police activities demonstrates that such activities are subject to reasonable restrictions, particularly in the context of investigative stops which are inherently dangerous. This analysis applies equally to the City Defendant officers. The Court's holdings on Plaintiff's First Amendment claim are wholly dispositive of the First Amendment retaliation claim brought against Defendants Dilley, Wiggins, and De la Pena, and as such, Plaintiff's First Amendment claim is subject to dismissal.

In the event that Plaintiff's allegations against Defendants Dilley, Wiggins, and De la Pena are construed as a First Amendment retaliatory arrest claim, it would still fail. This Court has already ruled that Defendant Dilley had probable cause to arrest Plaintiff. [Doc. 49 at 106 ¶2]. Probable cause to arrest in the context of a retaliatory arrest claim precludes Plaintiff from proceeding with this claim. The United States Supreme Court in *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012) rejected the Tenth Circuit's reasoning that qualified immunity was not available to officers on the grounds that they had probable cause to arrest in the context of a First Amendment retaliatory arrest claim. Specifically, *Reichle* held that "… it was not clearly

established that an arrest supported by probable cause could violate the First Amendment." *Id.*

*Reichle* began its reasoning by noting that "This Court has never recognized a First Amendment

right to be free from a retaliatory arrest that is supported by probable cause; nor was such a right

otherwise clearly established at the time of Howards' [plaintiff's] arrest." *Id. Reichle* noted that at

the time that the United States Supreme Court issued its decision in *Hartman v. Moore,* 547 U.S.

250, 126 S.Ct. 1695, 164 L.Ed.2d 441, which resolved a split among the Circuits regarding

whether probable cause precluded a First Amendment retaliatory prosecution claim, the Tenth

Circuit and sister circuits tended to treat retaliatory arrests and retaliatory prosecution claims

similarly. *Id.* Accordingly, the Court found that a reasonable officer could conclude that

*Hartman* extended to retaliatory arrest claims. *Id.* at 2095.  *Reichle* noted that since the decision

in *Hartman*, a number of circuits had applied its rationale to retaliatory arrest claims, rendering

the certainty of the probable cause prong in the context of First Amendment retaliatory arrest

claims uncertain. *Id.* 2096-2097. Consequently, *Reichle* held that at the time of the plaintiff's

arrest, it was not clearly established that probable cause to arrest could result in a First

Amendment violation. *Id.* On remand, the Tenth Circuit reversed its decision and held that

officers were entitled to qualified immunity on the retaliatory arrest claim. *Howards v.*

*McLaughlin*, 478 Fed.Appx. 528, 529 (10th Cir. 2012). Since that time, the Tenth Circuit has held

that probable cause to arrest is applicable to a First Amendment retaliatory arrest claim. See e.g.

*Storey v. Taylor*, 696 F.3d 987, 997 (10th Cir. 2012) (noting that where an arrest was lawful

"...there is no but-for causation for a related tort requiring a retaliatory motive," and qualified

immunity applies but reversing and remanding the case because the arrest was not lawful) (citing

to *Reichle* at 2096). This Court has also had occasion to discuss *Reichle* in the context of the

clearly established law analysis. See *Todd v. Montoya,* 877 F.Supp.2d 1048, 1086 (D.N.M. 2012)

(Honorable Judge James. O. Browning) ("Conflicting or unclear case law can be the basis for concluding that a right is not clearly established"( citing to *Reichle v. Howards,---U.S.---132 S.Ct. 2088, 2096-97, 182 L.Ed. 2d 985 (2012)* for the proposition that "…a circuit court decision from the circuit where the conduct occurred had 'injected uncertainty into the law governing retaliatory arrests particularly in light of' that decision's 'rationale and the close relationship between retaliatory arrest and prosecution claims,' and that the 'uncertainty was only confirmed by subsequent appellate decisions that disagreed over whether the decision's 'reasoning…applied similarly to retaliatory arrests.'"). Since the Tenth Circuit has determined that probable cause to arrest entitles an officer to qualified immunity for a First Amendment retaliatory arrest claim, this is an additional ground to dismiss this claim against Defendants' Dilley, Wiggins, and De la Pena.

Ultimately, the reasoning of the Third Circuit is instructive here.  "A court in considering a First Amendment retaliation claim against a police officer should be cautious in allowing it to proceed to trial in the face of the officer's [] [dispositive motion]. In this regard we observe that officers should not by reason of potential civil liability be discouraged from intervening when their services are needed by the not surprising circumstance that a claim has been lodged against a person with whom they have had previous adverse dealings. Society may pay a high price if officers do not take action when they should do so." *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3rd Cir. 2003). Such is the case here, as this Court has comprehensively demonstrated in evaluating the specialized nature of airport security checkpoints. In the end, a plaintiff lodging such a claim must do much more than simply claim a constitutional violation. Plaintiff has failed to meet his burden, entitling Defendants Dilley, Wiggins, and De la Pena to qualified immunity on this claim.

**V.      The Court's determination on Plaintiff's Fourth Amendment claim is dispositive of all remaining claims in this case.**

> **A.      Plaintiff's Fourth Amendment Claim:**

Plaintiff contends that: 1) he was unlawfully seized and arrested without reasonable suspicion or probable cause; 2) he was subjected to unspecified excessive force; 3) he was searched, his camera was seized and searched; and 4) Defendants attempted to destroy the contents of his camera, "…in willful, wanton, and reckless disregard of Plaintiffs rights, violated Plaintiffs rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment." [Complaint Count IV at 23 ¶99]. This Court held in its Order that Defendants Dilley, Wiggins, and De la Pena "…had reasonable suspicion that Mocek was engaging in criminal conduct, thus Dilley's demand that Mocek produce identification was a lawful order." The Court also held that Mocek's arrest was lawful and that the search incident to his arrest was not unlawful. [*Id.* at 104-105¶1]. In reaching that determination, the Court held:

- Based on current law governing the circumstances under which officers can demand identification, the Defendant Officers in this case had the authority to direct Plaintiff to produce identification if they developed "…reasonable suspicion to believe that he was, or had been engaging in criminal conduct." (citation omitted) [*Id.* at 106 ¶3].
- Reasonable suspicion exists where s/he possesses "'some minimal level of objective justification' for making the stop," which falls far below the preponderance of evidence standard and does not require the officer to articulate a specific offense believed to have been committed, or provide evidence of a specific criminal activity suspected. (citations omitted) [*Id.* at 106 ¶4, 107 ¶1].
- The Tenth Circuit applies an objective standard to the reasonable suspicion analysis, reviewing the facts available to the accused officer to a reasonable officer and determining whether the reasonable officer would have concluded that reasonable suspicion existed. [*Id.* at 107 ¶2, 108¶1].
- Taking Mocek's allegations as true, Mocek's filming activities caused a distraction to TSA agents in their duties and raised security concerns. [*Id.* at 108 ¶2]. Pursuant to federal law, TSA agents had ample authority to summon law enforcement once Plaintiff caused a distraction and raised safety concerns. [*Id.* at 109 ¶1].

- According to Mocek, he contested the Defendant Officers' statements that he could not film at the security checkpoint and did not comply with Defendant Dilley's request that he produce identification. [*Id.*].

- The Defendant officers were truthfully  advised that Mocek was causing a disturbance and would not comply with their orders that he stop filming, the officers observed Mocek's unwillingness to comply with TSA or law enforcement directives, and observed the fact that Mocek's actions distracted at least two TSA agents from their security duties at the checkpoint. [*Id.*]. Mocek's conduct constituted sufficient information for a reasonable officer to form a reasonable suspicion that Mocek "…had an intent to film sensitive screening procedures, or otherwise disrupt the screening procedures so that another could evade the TSA employees' screening procedures. [*Id.* at 110]. Dilley's subjective characterization of Plaintiff's conduct is irrelevant to the reasonable suspicion analysis. [*Id.*].

- While Plaintiff's conduct might not have constituted disorderly conduct under state law, reasonable suspicion may exist even if Plaintiff's conduct was not a violation of a crime with which he was charged because officers are not required to articulate a particular crime in evaluating whether reasonable suspicion exists (citation omitted) [*Id.* at 110 & 111].

- The TSA's report to the Defendant officers was a sufficient and reliable basis to form reasonable suspicion and did not require the officers to independently determine whether Plaintiff's conduct was innocent under reasonable suspicion standards. [*Id.* at 111].

- Plaintiff's arrest was lawful because the Defendant officers were authorized to direct Plaintiff to provide his identification once reasonable suspicion existed and his failure to comply provided sufficient probable cause to arrest him under New Mexico's concealing identification statute. [*Id.* at 112 ¶2].

- The search incident to Plaintiff's lawful arrest was valid because a legitimate arrest occurred and the search occurred after the lawful arrest. (citations omitted). [*Id.*].

- Because the arrest was lawful and the search incident to his arrest was valid, Plaintiff has failed to state a viable Fourth Amendment violation. [*Id.*].


This Court's determination that Defendants Dilley, Wiggins, and De la Pena had reasonable suspicion that Plaintiff had or was committing a criminal offense, they were authorized to demand Plaintiff's identification once reasonable suspicion arose, and once Plaintiff did not produce his identification, probable cause to arrest him for failing to produce his identification under state law existed, is fatal to Plaintiff's Fourth Amendment claims against Defendants' Dilley, Wiggins, and De la Pena. The Court accurately articulated the governing

standards regarding reasonable suspicion and probable cause, considered only Plaintiff's

allegations, and properly applied the law to Plaintiff's facts.  The fact that this incident occurred

at the security checkpoint of an airport makes the Court's determination that investigatory stops

are inherently dangerous especially appropriate. In places of public transport, such as airports,

officers are given significant latitude in conducting brief investigative stops. For example, in

*Florida v. Bostick,* 501 U.S. 428, 431 (1991), the Supreme Court noted:

> Drug interdiction efforts have led to the use of police surveillance at airports, train
> stations, and bus depots. Law enforcement officers stationed at such locations routinely
> approach individuals, either randomly or because they suspect in some vague way that
> the individuals may be engaged in criminal activity, and ask them potentially
> incriminating questions.

In addition the United States Supreme Court has also held that "[d]etention of a traveller

at our borders is justified because of a national interest in self protection; so that the person may

be required to identify himself and his effects as lawfully entitled to enter." *See Carroll v. United*

*States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Thus, a traveller may be

detained or searched at the border absent probable cause or a warrant without transgressing his

Fourth Amendment rights because such a detention or search has historically been deemed

reasonable." *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617

(1977).  Reflective of the serious dangers which can occur at a border, two circuits have

determined that the same rule with respect to detention and/or search applies at those places

considered the functional equivalents of the border, such as airports. *U.S. v. Eighty Thousand Six*

*Hundred Thirty-Three Dollars ($80,633.00),* 512 F.Supp.2d 1196, 1203 (M.D. Ala. 2007) ("At

border stops, or the functional equivalents of border stops, the detention and search of persons

seeking admission is considered inherently reasonable and passes constitutional muster even

absent probable cause or a warrant") (citing  *U.S. v. Sugrim*, 732 F.2d 25, 29 (2nd Circuit 1984))

("A non-stop international flight arriving at an international airport inside the United States is considered a functional equivalent of a border"); see also  *See United States v. Brown,* 499 F.2d 829 (7th Cir.) ("[A] traveller landing at O'Hare International Airport in Chicago on a non-stop international flight is subject to a border detention and search"), *cert. denied,* 419 U.S. 1047 (1974). Thus this Court's assessment of the dangers which Plaintiff's conduct potentially posed are all the more appropriate when considering the airport as the functional equivalent of a border.

In addition, under state law, Defendants Dilley, Wiggins, and De la Pena were not only authorized, but compelled to investigate once the TSA agents advised them of Plaintiff's conduct, and if they hadn't they could potentially be liable under state law for failing to investigate. See e.g. NMSA (1978) § 29-1-1 ("It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware…"); see also *Torres v. State*, 119 N.M. 609,  612 (N.M. 1995) (Pursuant to 29-1-1, "…the legislature has imposed on law enforcement officers a duty to investigate crimes called to their attention, and an action for injuries proximately caused by an officer's negligent breach of this duty is within the contemplation of Section 41-4-12." (citing to  *Schear v. Board of County Comm'rs,* 101 N.M. 671, 676, (1984); *California First Bank v. State,* 111 N.M. 64 (1990) (recognizing private cause of action under  §41-4-12 when law enforcement officer's negligent failure to discharge duties under Section 29-1-1 results in personal injury). Plaintiff's Complaint appears to suggest that he should have been excused from an investigation and/or arrest because in his exchange with the City Defendant officers, he denied that he was disturbing the peace, stating that he intended to comply with the TSA requests, believed that he could film at the security checkpoint, and did not believe that he had to show identification once Defendant Dilley

asked him for it. [Complaint at 12 ¶¶51-54).  In reality, however, Plaintiff's beliefs or statements to Defendants Dilley, Wiggins, and De la Pena did nothing to alter the fact that these officers were authorized and required to fulfill their statutory duties.

Finally, in this Circuit, officers are not required to forego arresting an individual based on the initial discovery of facts demonstrating probable cause because the Plaintiff has a different explanation or argues that a more diligent investigation should have occurred prior to the arrest. See e.g. *Romero v. Fay,* 45 F.3d 1472, 1478 fn. 3 (citing to *Marx v. Gumbinner,* 905 F.2d 1503, 1507 n. 6 (11th Cir.1990) ("[The police officers] were not required to forego arresting [plaintiff] based on initially discovered facts showing probable cause simply because [plaintiff] offered a different explanation"]; *Criss v. City of Kent,* 867 F.2d 259, 263 (6th Cir.1988) ("A policeman ... is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."); *Thompson v. Olson,* 798 F.2d 552, 556 (1st Cir.1986) ( "[H]aving once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car."), *cert. denied,* 480 U.S. 908 (1987); *cf. Baker v. McCollan,* 443 U.S. 137, 145-46 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."). Thus, the Court's analysis of probable cause, while accepting Plaintiff's allegations as true, was properly evaluated in the larger continuum underlying the probable cause standard. Ultimately, the Court's finding of probable

cause renders Plaintiff's Fourth Amendment claims against Defendants' Dilley, Wiggins, and De la Pena non-actionable, entitling these Defendants to qualified immunity.

Even if that were not the case, the Tenth Circuit has previously determined there is no Tenth Circuit or United States Supreme Court case holding that arresting a person for refusing to provide identification is a violation of the Fourth Amendment. *Albright v. Rodriguez,* 51 F.3d 1531 (10th Cir. 1995) (Noting that the  Supreme Court has specifically refused to determine whether an individual can be arrested for refusing to identify himself in the context of a lawful investigatory stop in two separate cases) (citing to *Brown v. Texas,* 443 U.S. 47 (1979); *Kolender v. Lawson,* 461 U.S. 352 (1983). Thus, *Albright* held that it is not clearly established that an arrest based on refusal to provide identification is a Fourth Amendment violation and noting that sister circuits have not found that it is. *Id.* The District of New Mexico has applied the same analysis. In *Nagol v. State of N.M.*, 923 F.Supp. 190, 191 (D.N.M. 1996), a person arrested for failing to provide identification to a requesting officer filed a civil rights action against the officer. The Honorable Judge Black held that the police officer did not violate arrestee's clearly established rights when he placed arrestee under arrest for failing to provide proper identification, in violation of state law, entitling officer to qualified immunity. *Id.* In reaching that decision, Judge Black reasoned that :

> It stretches the imagination to see how a police officer who applies a presumably valid law in a valid fashion could be said to have 'violated a person's clearly established constitutional right' of which 'any reasonable official would have known.' The duty of a police officer is to enforce the laws passed by the legislature, not to question the validity of these laws. A police officer cannot be held liable under § 1983 for properly enforcing the laws the officer is sworn to uphold. *Id* at 192.

The Court also held that the plaintiff had not and could not demonstrate that the officer violated a well established constitutional right of which a reasonable official would have known when he arrested the plaintiff. *Id.* New Mexico Courts have also found that a failure to provide

identification during a traffic stop falls within the ambit of the state's concealing of identity criminal statute. See e.g. *State v. Andrews,* 123 N.M. 95, 98 (N.M. App. 1997) ("in an otherwise valid traffic stop, drivers have no reasonable expectation of privacy in their driver's licenses, or in the information contained therein, when lawfully requested by a police officer' and "...in the context of a valid traffic stop, a failure to provide the information contained in a driver's license falls within the reach of the concealing identity statute regardless of whether a driver also provides his or her true name").

Thus, there is ample additional ground to find that probable cause to arrest Plaintiff existed when he failed to produce his identification when asked to do so by law enforcement. Since there is no clearly established law in either the Tenth Circuit or the United States Supreme Court holding that there is Fourth Amendment right to refuse to provide identification to an officer during the course of a lawful investigatory stop, Plaintiff does not have a viable constitutional claim.

**B.      Plaintiff's excessive force claim is non-actionable**

Plaintiff generally contends in his Complaint that Defendants Dilley, Wiggins, and or De la Pena subjected him to unspecified excessive force. [Complaint at 23 ¶97 Count III]. This Court held in its Order that the facts in the Complaint are insufficient to support a plausible excessive force claim in violation of his Fourth Amendment Rights. [Doc. 49 at 114 ¶1]. In reaching that determination, the Court discussed Plaintiff's allegations that he was escorted to the Aviation Police Department office and was placed in a small holding cell for two hours. [*Id.*]. The Court provided the accurate objective standard applied to excessive force claims and determined that Plaintiff's allegations were more akin to the reasonable level of force typically associated with effectuating an arrest, rather than a viable excessive force claim. (citation omitted). [*Id.*].

The same analysis and determination applies to the excessive force claim brought against Defendants Dilley, Wiggins, and De la Pena, which is identical to the claims asserted against the TSA Defendants. Plaintiff's general unhappiness with his arrest and placement in a holding cell is wholly insufficient to support a viable excessive force claim under the Fourth Amendment. Defendants are entitled to qualified immunity because Plaintiff has failed to state a viable excessive force claim.

### C.   The Court's probable cause determination is dispositive of Plaintiff's False Arrest and state law Malicious Abuse of Process claims

### 1.   FALSE ARREST:

Plaintiff contends that  Defendants'  "… conduct in detaining, seizing, and arresting Plaintiff, without probable cause or legal justification, and while knowing that they lacked lawful authority to do so, were intended to and did cause damages to Plaintiff." [Complaint Count V at 23-24 ¶101]. To state a claim under 42 U.S.C. § 1983 for false arrest, a plaintiff must prove both that (1) defendants have deprived him of a right secured by the "Constitution and laws" of the United States, and that (2) the defendant acted "under color of law." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). "In this circuit, the state law tort of false arrest [and] false imprisonment . . . provides a starting point for analyzing a corresponding claim under § 1983." *Jackson v. New Mexico Pub. Defender's Office*, 361 F. App'x 958, 964 (10th Cir. 2010) (unpublished) (citations omitted); *Hoffman v. Martinez*, 92 F. App'x 628, 632 n.3 (10th Cir. 2004) (unpublished) (stating the same). In New Mexico, "…an essential element of each of those torts is a lack of probable cause." *Jackson*, 361 F. App'x at 964 (citations omitted); *Hoffman*, 92 F. App'x at 631-32 (stating the same); *see also Santillo v. New Mexico Dep't of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007) ("An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to

carry out the arrest."). Because this Court has determined that probable cause to arrest Plaintiff existed, Defendants Dilley, Wiggins, and De la Pena are entitled to qualified immunity on Plaintiff's false arrest claim.

**2.      Malicious Abuse of Process:**

Plaintiff's state law claim for Malicious Abuse of Process alleges that Defendants, in "…instituting criminal judicial proceedings against Plaintiff and misusing and actively participating in the misusing of the legal process by filing a criminal complaint against Plaintiff without probable cause or by inducing the filing of a criminal complaint against Plaintiff without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against Plaintiff for his video and audio recording of them, were intended to and did cause damages to Plaintiff." [Complaint Count VII at 24 ¶103]. In order to state a viable claim for this tort, Plaintiff must prove "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was <u>no probable cause to support the original arrest</u>, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Novitsky v. City of Aurora,* 491 F.3d 1244, 1255–56 (10th Cir.2007) (emphasis added). Similar to the analysis above, where probable cause for the arrest is established, this claim fails. See e.g. *Wilkins v. DeReyes,* 528 F.3d 790, 801(10th Cir.2008) (Probable cause is a requirement for a malicious prosecution claim). Accordingly, the Court's determination that probable cause for Plaintiff's arrest existed precludes Plaintiff from proceeding with this claim. The same would be true if this claim were brought under §1983. See e.g. *Hoffman v. Martinez,* 92 F. App'x 628, 631 (10th Cir. 2004) ("claims of false arrest, false imprisonment, and malicious prosecution must be premised on a lack of probable cause").

**VI.     Plaintiff's failure to establish a constitutional violation precludes him from pursuing a municipal liability claim.**

Plaintiff's  municipal liability claim is brought against the City of Albuquerque, although the Albuquerque Aviation Department and Chief Marshall Katz are also named in the caption of the Complaint. [Complaint Count VII at 24]. Essentially, Plaintiff contends that the City, through its policy makers, "…had in force and effect"  policies, practices, or customs: 1) "to prohibit lawful photography and filming in publically accessible areas of the airport…" 2) to arrest or threaten to arrest individuals who seek to engage in such lawful actions; 3) to engage in retaliatory conduct by threatening or arresting persons with disorderly conduct or criminal trespass against persons who exercise their right to film in public; 4) that the City failed to properly discipline, train, or supervise City police officers regarding an individual's right not to produce identification, right to film at the Airport, and the illegality of retaliating against persons who exercise these rights; 5) the City had actual or constructive knowledge of these unlawful practices and took no reasonable steps to correct them;  6) these alleged unlawful practices, policies, and customs led Albuquerque Airport police that unconstitutional conduct would be tolerated, that they would not investigate said conduct, and that it was foreseeable that officers would violated individual's rights in the same way that Plaintiff's rights were violated, and the City was indifferent to this risk; and 7) these policies, practices and customs "…were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process..." [Complaint at 24 ¶¶105-106, 25 ¶¶ 107-110].  To the extent that the Complaint could be construed to include the Albuquerque Aviation Police Department (named in the Complaint Caption), it should be dismissed. Rule 17(b) of the Federal Rules of Civil Procedure states that the capacity of an entity to sue or be sued shall be determined by the law of the state in which the district court is held. Accordingly, any allegations made against the Albuquerque Aviation Police

Department must first be evaluated in terms of whether it is an entity separate from the City of Albuquerque with the capacity to be sued, and must be determined under New Mexico law. However, in this district a police department is not a legal entity that may be held liable apart from a municipal corporation. See *Kline v. City of Santa Fe*, Civil No. 00-495, Memorandum Opinion and Order filed March 8, 2001 (Conway, J.); accord *Gonzales v. Morrow*, Civil No. 93-1216, Memorandum Opinion and Order filed October 25, 1994.  Moreover, the Tenth Circuit has also determined that a police department is not a separate municipal entity subject to suit under §1983. See *Ketchum v. Albuquerque Police Dept.*, 958 F.2d 381 (Table) *2 (10th Cir. 1992) ("Defendants correctly state that police departments such as RPD, TPD, and APD are not sueable entities under § 1983, because they lack legal identities apart from the municipality" and are "subsumed within the larger municipality") (citing to *Martinez v. Winner,* 771 F.2d 425, 443 (10th Cir.1985). Accordingly, the AAPD is not a proper party under §1983 and should be dismissed accordingly.

Similarly, to the extent that the municipal liability claim could be construed to include Chief Marshal Katz, he too should be dismissed from this suit. Where a plaintiff chooses to sue both the municipality and the municipal officials in their official capacities, courts routinely dismiss the official capacity claims as redundant. *See*, *e.g.*, *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (district court was correct in dismissing § 1983 claims against all municipal officers in their official capacities because allegations duplicated claims against governmental entities themselves); *Rose R. v. Connelly*, 889 F.2d 435, 437 (2d Cir. 1989) (affirming dismissal of § 1983 claim against school superintendent in official capacity because school board was real party in interest); *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (noting that suit against both city and mayor in his official capacity is really suit against only one

defendant; nothing was added by suing mayor in his official capacity because city is liable for official actions of its senior policy-making official); *DeYapp v. Tracy*, No. Civ. 02-452 JP/RLP, slip op. at 12 (D.N.M. June 28, 2004) ("Because Plaintiff's claim against Chief McCloskey in his official capacity is duplicative of the claim brought against the City, the Court finds that the official capacity claim against Chief McCloskey should be dismissed."); *Sims v. Unified Gov't of Wyandotte County/Kansas City*, 120 F.Supp.2d 938, 944 (D. Kan. 2000) (claims against officials in official capacities are duplicative of claims against Unified Government and should be dismissed); *Doe v. Douglas County Sch. Dist.*, 775 F.Supp. 1414, 1416 (D. Colo. 1991) (where plaintiff brought § 1983 claim against school district and against school psychologist in his official capacity, court dismissed redundant official capacity claim as matter of judicial economy and efficiency).

In relation to Plaintiff's municipal liability claim against the City of Albuquerque, the Court's determination in the Order that no First Amendment or Fourth Amendment constitutional violation can be supported is also dispositive of this claim. The touchstone of a § 1983 action against a governmental body is an allegation that official policy is responsible for deprivation of rights protected by the Constitution. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978). Municipal liability may not be premised on employment of a tortfeasor with liability imposed under a respondeat superior theory. *Id*. at 691. Rather, municipalities can be held liable only when an injury was inflicted by execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Id*. at 694. Thus, a plaintiff suing a municipality pursuant to § 1983 for the acts of one or more of its employees must prove: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the

constitutional deprivation." *Myers v. Okla. County Bd. of County Comm'rs,* 151 F.3d at 1316

(citing *Monell v. Dep't of Social Servs.,* 436 U.S. at 694, 98 S.Ct. 2018). (emphasis added).

Consequently, if a plaintiff cannot show that the state employee's actions amounted to a

constitutional violation, then the municipality cannot be held liable to the plaintiff under § 1983

for the state employee's actions. See *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986);

*Trigalet v. City of Tulsa*, 239 F.3d 1150, 1151 (10th Cir. 2001) (a city cannot be held liable for

arbitrary or conscious-shocking action if there are no unconstitutional acts by an individual

officer). The same holds true under a theory of  inadequate training, since a plaintiff must show

first that the officers exceeded constitutional limits.  *Allen v. Muskogee, Okla*., 119 F.3d 837,

841-42 (10th Cir. 1997), cert. denied, 522 U.S. 1148 (1998) (citing *Zuchel v. City and County of

Denve*r, 997 F.2d 730, 734-35 (10th Cir. 1993). Applying these standards, the Tenth Circuit has

expressly barred a plaintiff from proceeding with a §1983 action where there is no constitutional

violation. Specifically, in *Jiron v. City of Lakewood,* 392 F.3d 410 (10th Cir.2004), the Tenth

Circuit stated:

> [S]ome dismissals against the officer on the basis of qualified immunity do not preclude a
> suit against the municipality. However, when a finding of qualified immunity is based on
> a conclusion that the officer has committed no constitutional violation—i.e., the first step
> of the qualified immunity analysis—a finding of qualified immunity does preclude the
> imposition of municipal liability. (emphasis added).

This same standard has been applied in sister circuits contending with the absence of

constitutional violation. See e.g. *Evans v. Avery,* 100 F.3d 1033, 1039–40 (1st Cir.1996) (finding

that, absent constitutional violation by officer, city cannot be held liable); *Scott v. Clay County,

Tenn.,* 205 F.3d 867, 879 (6th Cir.2000) (holding that conclusion no officer-defendant deprived

plaintiff of any constitutional right a fortiori defeats claim against county), *cert. denied,* 531 U.S.

874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000); *Estate of Phillips v. City of Milwaukee,* 123 F.3d

586, 596–97 (7th Cir.1997) (determining that officers did not violate constitution in seizing plaintiff's decedent mandated conclusion that neither city nor police chief could be held liable); *Kiser v. City of Huron,* 219 F.3d 814, 816 (8th Cir.2000) (plaintiff must first establish that officers' actions are unlawful before municipality can be held liable); *Brodnicki v. City of Omaha,* 75 F.3d 1261, 1266 (8th Cir.1996) (holding that, because officers did not violate plaintiff's rights, it follows that claim against city under theory of inadequate custom or municipal custom lacks merit); *Quintanilla v. City of Downey,* 84 F.3d 353, 355 (9th Cir.1996) (holding public entity not liable under §1983  for policy "that can cause constitutional deprivations when the fact finder concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff); *Scott v. Henrich,* 39 F.3d 912, 916 (9th Cir.1994) (holding that, although liability of municipalities does not turn on liability of individual officers, "it is contingent on a violation of constitutional rights"; where no constitutional violation occurred, municipality could not be held liable). Plaintiff has failed to state a viable constitutional claim in this case. Accordingly, the City of Albuquerque is equally entitled to dismissal.

**VII.   Plaintiff's Declaratory Judgment request is moot.**

Finally, Plaintiff's request for declaratory judgment is moot based on the Court's Order finding no constitutional violation. Plaintiff seeks a judgment that all Defendants violated his First and Fourth Amendment Rights. [Complaint at 26 ¶112 and Prayer at a]. The Courts are bound by "Article III, Section 2 of the United States Constitution [which] limits the federal courts' jurisdiction to actual cases and controversies." *Salazar v. City of Albuquerque,* 776 F.Supp.2d 1217, 1227 (D.N.M.2011) (Browning, J.). "Federal courts are without authority to decide questions that cannot affect the rights of litigants in the case before them." *Ford v. Sully,*

773 F. Supp. 1457, 1464 (D. Kan.1991) (citing *North Carolina v. Rice,* 404 U.S. 244, 246 (1971); accord *Johansen v. City of Bartlesville, Okla.,* 862 F.2d 1423, 1426 (10th Cir.1988); *Johnson v. Riveland,* 855 F.2d 1477, 1480 (10th Cir.1988). Moreover, the court "lack[s] power to hear moot claims…" *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138 (10th Cir. 2009) (citation omitted). The mootness of claims is a "threshold inquiry, because the existence of a live case or controversy is a constitutional prerequisite to the jurisdiction of the federal courts." *Dais-Naid, Inc. v. Phoenix Resource Cos.*, 974 F.2d 1246, 1247 (10th Cir. 1991). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 (1997). Here, because the Court has determined that Plaintiff's constitutional rights were not violated, the declaratory judgment request is moot.

## VIII.   CONCLUSION

Under the law of the case doctrine, this Court has ample authority to dismiss all remaining Defendants and claims in this case. The Court's exhaustive legal analysis in its Order [Doc. 49] precludes the prospect that any portion of the Order was clearly in error or constitutes manifest injustice. Plaintiff has not met his burden in establishing a viable constitutional claim. Accordingly, Defendants' Dilley, Wiggins, and De la Pena are entitled to qualified immunity on Plaintiff's First Amendment and Fourth Amendment claims.  The absence of a constitutional violation also forecloses Plaintiff from proceeding on his false arrest claim, his state law claim for Malicious Abuse of Process, as well as his municipal liability claim. The interests of justice and judicial economy are best served when, after a Court construes a plaintiff's allegations liberally, comprehensively evaluates the law, and applies the law to the facts dispassionately and in accord with the applicable standards, its determination extends to remaining claims which

require the same analysis, but which the Court has not yet ruled upon. This Court, having

meticulously evaluated both Plaintiff's contentions and the law governing each claim, reached

the appropriate conclusions pursuant to governing standards. Under 12(b)(6), Plaintiff has not

met his burden.  As such, the entire case is subject to dismissal.

Respectfully Submitted,

/s/ Renni Zifferblatt

The Baker Law Firm
Jeffrey L. Baker
Renni Zifferblatt
20 First Plaza Suite 402 NW
Albuquerque, N.M. 87102
505-247-1855

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was provided to counsel of record on this 1st
day of February 2013 via the CM/ECF filing system.

/s/ Jeffrey L. Baker
