IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILLIP MOCEK,

Plaintiff,

vs.                                             Case No: 11-1009-JB-KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE AVIATION POLICE
DEPARTMENT, MARSHALL KATZ,
in his official capacity as Chief of Police of
The Albuquerque Aviation Police Department,
JONATHAN BREEDON, GERALD ROMERO
ANTHONY SCHREINER, ROBERT F. DILLEY
a/k/a BOBBY DILLEY, LANDRA WIGGINS,
JULIO DE LA PENA, and DOES 1-25 inclusive,

Defendants.

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR
LEAVE TO FILE AMENDED COMPLAINT**

**In the past, Mocek has flown by commercial air without needing to provide
documentation of identity**

Throughout most of his adult life, Phil Mocek has flown by commercial air typically

once or twice per year. On or around 2006, Mocek read, via blogs and elsewhere on the Web,

about John Gilmore's and his friend Ben Livingston's experiences flying via commercial air

without presenting identity documents ("I.D.") to TSA staff at the airport. Mocek began to

believe that the TSA's airline passenger identification procedures were designed to serve two

purposes: (1) airline revenue production (airlines are now able to resell tickets when passengers

fail to make their flights), and (2)  facilitation of a system of restriction of movement based on

government blacklists.  Moreover, Mocek believed that he should not have to request and

1

receive permission from the government to travel from one state to another, nor that his name should be a deciding factor in whether he is able to engage in interstate travel.  (Complaint, para. 26)

.        Around 2007, Mocek started flying without showing I.D.  Mocek was always careful to say that he did not have any I.D. for the TSA agent, never that Mocek did not have any I.D. with him or that he did not want to show I.D., for his need to travel had priority over his desire to flex his rights and he did not want to lie to TSA agents.     (Complaint, para. 27)

In or about the middle of 2008, TSA's policy on airline passenger identification seems to have changed. TSA announced via press release that passengers who "willfully refuse[d]" to show I.D. would not be allowed past their checkpoint, but those whose I.D. was merely "misplaced" or "stolen" would be allowed to pass through if they cooperated with alternative procedures:

Beginning Saturday, June 21, 2008 passengers that willfully refuse to provide identification at security checkpoint will be denied access to the secure area of airports. This change will apply exclusively to individuals that simply refuse to provide any identification or assist transportation security officers in ascertaining their identity.   This new procedure will not affect passengers that may have misplaced, lost or otherwise do not have ID but are cooperative with officers.  Cooperative passengers without ID may be subjected to additional screening protocols, including enhanced physical screening, enhanced  carry-on and/or checked baggage screening, interviews with behavior detection or law enforcement officers and other measures. (Complaint, para. 30)

In November 2009, Mocek traveled to Albuquerque, New Mexico. On November 15, 2009, Mocek intended to return to his home in Seattle by flying out of ABQ. Mocek's

Washington State driver's license was his only documentation of identity.  When Mocek arrived at ABQ, he handed his driver's license to Jesse Gallegos, Mocek's friend and travel companion, who carried it from that time until Mocek later retrieved it  from him.  (Complaint, para. 43)

**Mocek declines to provide identification documents, films TSA and Albuquerque police officers, and is arrested**

Mocek approached the podium where TSA agents were checking passenger documents. Mocek presented his boarding pass to TSA agent Greg Martinez. Martinez asked Mocek for I.D., and Mocek answered that he did not have any form of I.D. Mocek then told Martinez that it was his understanding that he was not required to produce any such documents, only his boarding pass. Martinez told Mocek to go stand in a different line nearby. Mocek waited as approximately four people ahead of him were processed. (Complaint, para. 44)

At or around 2:32 p.m., Defendant Jonathan Breedon, a TSA security agent, took Mocek's boarding pass and asked if Mocek had anything else to help identify him, such as a credit card or other I.D. Mocek said that he did not think he was required to provide I.D. Breedon said Mocek was correct and asked if he could verify his identity in another way. Mocek again stated that he would not provide anything because it was his belief that he was not required to. Breedon notified Mocek that he would contact the TSA's Security Operations Center, which would try to verify Mocek's identity, and if they could not, Mocek would not be allowed to proceed through the security checkpoint. At this point in time, there was no indication from any of the TSA agents present that there was any intent to involve law enforcement.  (Complaint, para. 45)

.    Mocek began using his camera to video record this manifestation of what he perceived to be an atypical, alternative identification policy. Breedon told Mocek that he would need to

stop filming. Mocek responded that he did not believe that filming of a publicly accessible area was illegal. Breedon tried to take Mocek's camera, and then told him that no photography or videotaping was allowed at the security checkpoint.  (Complaint, para. 46)

Breedon called for police assistance. In the meantime, Defendants Anthony Schreiner, a TSA security supervisor, and Gerald Romero, a TSA manager, approached the security checkpoint area after Breedon summoned for assistance. Breedon briefed Schreiner on the events that just took place. (Complaint, para. 47)

Romero ordered Mocek repeatedly to put down the camera and attempted to grab either Mocek or the camera. Mocek and Romero had the following verbal exchange:

ROMERO: Why don't you put it down for now, okay?

MOCEK: I'd prefer not to.

ROMERO: No. Put it down for now.

MOCEK: Can I get your name?

ROMERO: I said put it down for now. I said put it down for now.

MOCEK: Don't touch me.

ROMERO: Put it down for now.

MOCEK: Do not touch me.  (Complaint, para. 48)

Defendants Robert Dilley, Landra Wiggins, and Julio De La Pena, officers of the Albuquerque Aviation Police Department, arrived on the scene, and received a complaint from the TSA agents upon the law enforcement officers' arrival that Mocek would not put down his camera. When Dilley, the first to arrive, appeared on the scene, TSA agents described the encounter to the law enforcement personnel with the following phrases: "causing a disturbance,"

"he won't put his camera down, either", and that he was "taking pictures of all of us."
(Complaint, para. 49)

Mocek's filming was the primary, if not the sole, cause for the events that followed,
including his ultimate arrest.  (Complaint, para. 50)

Dilley told Mocek to comply with the TSA agents' instructions or else he would be escorted
out of the airport. One of the officers said that Mocek was causing a commotion. Mocek said, "I
haven't raised my voice. I'm not trying to stop you from doing your job." Mocek said that he
intended to comply with all of the TSA's rules and regulations.  (Complaint, para. 51)

Dilley told Mocek again to comply or he would be escorted out of the airport. Mocek
reiterated that he did not believe there was a rule that barred him from using a camera in publicly
accessible areas of the airport. Wiggins stated that this was a federal checkpoint and that Mocek
could not film there. Mocek replied, "I've checked into it and I know that I can do it here."
Wiggins said, "Well, you can be arrested, then you can check into it more."  (Complaint, para.
52)

Wiggins said, "You're almost there. You pushin' it, okay? You're really pushin' it." After a
moment's confusion, De La Pena remarked, "He don't want to show his I.D., either." Dilley said,
"Let's go, sir. You're leaving the airport. You're being escorted out at this point. Let's go. And if
you refuse, we'll arrest you. Let's go." Mocek said, "I don't understand."  (Complaint, para. 53)

Dilley then changed his mind about escorting Mocek out of the airport, stating that he was
going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing his
identity. Mocek said that he did not have any I.D. to show Dilley.   Dilley stated that Mocek was
now a part of a criminal investigation and was required to give I.D. When Mocek asked what he
was being investigated for, Dilley replied that it was for disturbing the peace. Mocek said that he

had not disturbed the peace. Dilley once again said that he needed Mocek to provide him with I.D. Mocek then said he was going to remain silent and that he wanted to talk to an attorney. Dilley said, "We're gonna end up arresting you. Come on, let's go. We're gonna search your property, and if we find I.D. on you—on your property, we will arrest you for concealing I.D." (Complaint, para. 54)

Dilley subsequently said, "You're under arrest. You don't have no options. Let's go." Dilley placed Mocek under arrest without a warrant. Dilley did not state the reason for the arrest. (Complaint, para. 55)

From the time Mocek arrived at the airport to his arrest, Mocek, having not gone through the security checkpoint, had fully remained within publicly accessible areas of the airport. (Complaint, para. 56)

On or around 2:39 p.m., Dilley and Wiggins walked Mocek across the airport to the Aviation Police Department office. Mocek assumed at this point that the officers would complete some paperwork and then release him in time to make his flight. Mocek and the officers entered the office, walked down a short hall, and entered a small room with a couple computers on desks. The officers then locked Mocek in a small holding cell (about $4 \times 8$ feet in size). Next, the officers searched Mocek's belongings in the room just outside the cell door. Any items with his name on them were sealed in two envelopes. These included business cards, credit cards, and insurance cards. (Complaint, para. 57)

Mocek was detained in this holding cell for about two hours. During this time, Dilley wrote an incident report while Wiggins watched football on the Internet and went to Southwest Airlines to find out if Mocek had checked any luggage. Wiggins returned saying that Mocek had not checked any luggage. (Complaint, para. 58)

Dilley had some difficulty completing various forms without using Mocek's name. Nevertheless, Mocek was not asked to state his name while Dilley was filling out of the forms. Once Mocek was in the cell, however, Dilley asked Mocek if he wanted to identify himself, but at this point Mocek was unsure how to answer, as he did not want to do anything that he was not required to do, and it was entirely unclear whether he was required to identify himself. When Mocek tried to find out if he was required to identify himself, Dilley asked him to stop talking. (Complaint,  paragraph 59)

Eventually, Mocek's concern about the possibility of violating any laws that required him to proactively identify himself outweighed his concern about speaking to those who were investigating him. Mocek stated clearly to Dilley and Wiggins, "My name is Phillip Anthony Mocek." Dilley told Mocek to stop talking.   (Complaint, para. 60)

Meanwhile, at or around 3:14 p.m., Mocek's friend Ben Livingston called the airport to ask about Mocek's status. Livingston at first did not identify himself. The telephone operator taking the call contacted Sergeant Ernesto Rojas of the Aviation Police. Rojas said that if the caller did not identify himself, Rojas would not talk to him.  Livingston then identified himself with his first and last name and stated his affiliation with Mocek. Rojas said that he definitely did not want to talk to Livingston. Referring to Mocek, Rojas said, "This gentleman is an adult, and he's gonna be booked, and he can talk to him after he gets booked."  (Complaint, para. 61)

Dilley told Mocek that the jail where he was going next would not accept his belongings, because he was being processed "as a John Doe." Instead, Mocek's belongings would be kept in safe storage at the Aviation Police Department office. Dilley read a statement to Mocek and asked if he understood. Mocek's only response was that he wished to remain silent.  (Complaint, para. 62)

.       The officers then placed Mocek in handcuffs and walked him to a police car outside. Dilley drove Mocek to the downtown police department. They did not speak.  Upon arrival at or around 4:54 p.m., they walked inside, Mocek's handcuffs were removed, and he was placed in a holding cell. Dilley filled out some paperwork. Mocek was brought out to stand in front of a counter while being searched, and then returned to the cell. After Mocek was searched, Dilley left.  (Complaint, para. 63)

Mocek was handcuffed and walked to a van outside and driven about minutes, mostly on a two-lane highway. Mocek was not informed where they were taking him.  (Complaint, para. 64)

Eventually, Mocek learned that he was brought to the Bernalillo County Metropolitan Detention Center, where he was put in a large cell. Mocek was fingerprinted and photographed and spoke with medics about his health. Someone in the room with the medics gave Mocek a paper to sign, and when Mocek saw that the form stated his name was John Doe, he told that person that there was a mistake and provided his real name.  (Complaint, para. 65)

After receiving permission, Mocek approached a desk in the center of the room that was surrounded by holding cells and asked what charges were against him. He then received some paperwork showing the charges and that his bail was set at $3,000.  (Complaint, para. 66)

Around 8 to 9 p.m., Mocek was called out and sent to a videoconferencing terminal, where he spoke with a court clerk who took some information from him and said his arraignment would be the next morning.  (Complaint, para. 67)

.       **City defendants write a false criminal complaint and false incident reports**

Sometime after the arrest, Dilley authored a false incident report and criminal complaint, each of which contained numerous misstatements and mischaracterizations of the events at the

Albuquerque airport. According to the incident report, Mocek "caus[ed] a disturbance by Disorderly Conduct," refused to identify himself, and "was finally issued a Criminal Trespass Order which he refused to obey."  Dilley wrote that Mocek refused to comply with instructions and that Mocek raised his voice to such a level that it caused a disturbance. Dilley wrote that he ordered Mocek four times to lower his voice or else Mocek would be ordered to leave the airport, and that Mocek refused. Dilley wrote, "Finally, I issued him a verbal Criminal Trespass Order and ordered him to leave the airport[;] he refused." Dilley wrote that he placed Mocek under arrest, informing him that the arrest was for "Disorderly Conduct and Refusing to Obey a lawful order of a police officer." Likewise, Dilley wrote in the criminal complaint (which contained a similar narrative) that Mocek "was refusing and began causing a disturbance, by yelling," that Mocek "had his voice raised at a level that it was now creating a disturbance."  (Complaint, para. 68)

. Audio and video recordings of the incident contradict Dilley's claims. In fact, Mocek consistently used a calm, quiet tone of voice, and it was the officers' voices that were at times agitated and raised. Dilley never told Mocek to lower his voice.  Moreover, Dilley never issued a verbal Criminal Trespass Order. Instead, he had only told 1 Mocek, "You're leaving the airport. You're being escorted out at this point. Let's go. And if you refuse, we'll arrest you." And immediately after saying this, Dilley changed his mind, saying, "Actually, I'm gonna need your I.D. now," a request that would have required Mocek to stay in place. After a brief exchange over whether Mocek was required to provide I.D., Dilley said, "Let's go." Mocek immediately gathered his bags and began walking with Dilley away from the checkpoint. At no point did Mocek refuse to comply with any of Dilley's orders. Finally, Dilley never stated the justification

for arresting Mocek. At various points during his encounter with Mocek, Dilley stated first that he was "going to arrest" Mocek for using a camera, then that Dilley would arrest Mocek if he refused to leave the airport, then that Dilley would arrest Mocek if he refused to provide I.D. When Dilley finally and unequivocally placed Mocek under arrest, he did not state the reason for the arrest.  (Complaint, para. 69)

**De La Pena's supplemental incident report**

Sometime after the arrest, De La Pena authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Albuquerque airport. According to De La Pena's report, TSA agents reported to  Dilley that Mocek was causing a disturbance by "yelling at officers." De La Pena wrote that after Dilley asked Mocek to comply with TSA instructions, Mocek "state[d] 'I know my rights' with a loud voice causing attention from other passengers." De La Pena wrote, "In fact his voice was so loud he was causing other passengers to hesitate before continuing through the checkpoint." De La Pena wrote that Mocek "yelled out loud 'I know my rights[,] I refuse to be searched.' " Like Dilley, De La Pena wrote that Dilley issued a "verbal order to leave" to Mocek and that Mocek refused to do so.  (Complaint, para. 70)

.       Audio and video recordings of the incident contradict De La Pena's claims. As noted, Mocek in fact consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law enforcement officers. Mocek did not yell "I know my rights." Moreover, video footage shows people walking by without any hesitation.   Further, while Mocek did in fact refuse consent to being searched, Mocek did so by merely stating twice (and not yelling), "I don't consent to any search." And when Mocek 1    was told to place his bags down, Mocek

10

immediately complied with the request by placing his bags on the ground where indicated, a fact which is confirmed by video security footage.  (Complaint, para. 71)

.        **Wiggins's supplemental incident report**

Sometime after the arrest, Wiggins authored a false supplemental incident report containing numerous misstatements and mischaracterizations of the events at the Albuquerque airport. Wiggins wrote that Mocek "was talking in a loud tone of voice stating he did not do anything because it was his right to be able to take photos in a public accessible places [sic]." Wiggins wrote that Mocek's behavior "caused the traveling public to stop and take notice." Wiggins also wrote that Mocek "continue[d] to be recalcitrant."  (Complaint, para. 72)

Audio and video recordings of the incident contradict Wiggins's claims.  As noted, Mocek in fact consistently used a calm, quiet tone of voice. Moreover, the video footage reveals that the traveling public in general did not "stop and take notice."  Passengers walked by without any hesitation.  (Complaint, para. 73)

Statements from TSA officers Breedon and Schreiner do not corroborate the claims in Dilley's, De La Pena's, and Wiggins's accounts. (Complaint, para. 74)

Taken together, the City of Albuquereque police documents tell a story in which Mocek allegedly raises his voice and causes a disturbance, following which the law enforcement officers demand I.D. and issue a verbal no-trespass order (with both of which Mocek allegedly refuses to comply). The TSA written statements, by contrast, give no suggestion that Mocek caused any public disturbance and do not mention any no-trespass order. The video and audio recordings, moreover, make clear that Mocek did not raise his voice or refuse to obey an order to leave the airport. Rather, the recordings confirm that Mocek calmly and nonbelligerently insisted that he had a right to continue filming. It was this insistence that annoyed the officers, who then declared

that Mocek was "in trouble." Only after officers demanded that Mocek provide documentation of

identity, which Mocek declined to provide, did any officer suggest that Mocek had disturbed the

peace, and no one suggested how Mocek might have done so beyond a vague statement that

Mocek was causing a commotion" in some unspecified manner.  (Complaint, para. 79)

**Mocek is arraigned on charges of disorderly conduct, concealing identification, refusing an officer's order, and criminal trespass**

At or around 9 a.m. the next day, November 16, 2009, Mocek and others were taken to a

waiting area outside a virtual courtroom in which the judge and clerk appeared via

videoconference. He pleaded not guilty to each charge. The judge lowered his bail from $3,000

to $1,000. (Complaint, para. 80)

Mocek's bail was eventually posted around 5 p.m., although it took nearly five hours to

process Mocek's release. Mocek was dropped off in downtown Albuquerque through the jail

shuttle service at about 10:00 p.m. Mocek walked into the Hyatt, explained his situation to the

women at the front desk, and borrowed their phone to call 1his partner and let her know he was

free.   (Complaint, para. 81)

**Mocek returns to the airport to fetch his belongings and notices that his camera has been tampered with while in police custody**

Tuesday morning, Mocek met with a defense attorney to get some basic advice. She told

him that it was safe to return to the airport. The attorney also advised him against filming, even

with a TV crew, suggesting instead that he focus on getting home quietly. (Complaint, para. 82)

Mocek went to the airport's police office and said he needed to retrieve his things. After

being reunited with his possessions, Mocek stopped in the hall to turn on his camera and found

that all images had been deleted. Mocek returned to notify the police that someone had tampered

with his camera. An officer, Raymond Vigil, told Mocek that he was not involved, and suggested that Mocek file a report.   (Complaint, para. 83)

**Mocek recovers deleted images and footage of the airport incident**

The next day, November 18, 2009, Mocek's experience at the airport security checkpoint was uneventful. Mocek presented his driver's license to the TSA staff. Gallegos, Mocek's friend and travel companion, heard one of them say something to another guard indicating that Mocek was "the guy who was arrested."  (Complaint, para. 84)

On the plane, Mocek used forensic software that locates and recovers deleted files, and was able to recover his video from his camera's memory card. (Complaint, para. 84)

**Mocek is tried and acquitted in New Mexico state court**

Beginning on January 20, 2011, Mocek was tried in Bernalillo County Metropolitan Court, Criminal Case No. 2573709, before Judge Kevin L. Fitzwater, on the four charges against him. (Complaint, para. 86)

During the trial, Breedon and Dilley testified for the state. In addition, the prosecution offered into evidence Mocek's videorecording of the incident at the Albuquerque airport security checkpoint area and played the video for the jury. Mocek did not offer any evidence of his own. During closing argument, defense counsel for Mocek argued that the law enforcement and TSA witnesses were not credible; that their testimony was contradicted by Mocek's video and by common sense; that what law enforcement and the TSA really objected to was Mocek's having legally taken pictures of and filmed them; and that any disorderly conduct was on the part of TSA and law enforcement, not Mocek.  (Complaint, para. 87)

On January 21, 2011, following two days of testimony, Mocek was acquitted of all four

charges against him by a six-person jury after only approximately an hour of deliberations.

(Complaint, para. 88)

.     **Consequences of the Defendants' actions**

Defendants' unlawful and unconstitutional conduct resulted in Mocek's arrest, detention,

seizure and attempted destruction of his property, institution of baseless criminal proceedings

against him, and other financial and emotional distress.   (Complaint, para. 89)

.     Mocek incurred in excess of $34,000 in legal costs to defend against the criminal charges.

(Complaint, para. 90)

Moreover, Defendants have set a dangerous standard and sent a message to individuals

intending to fly through the Albuquerque airport that they should be fearful of exercising their

right to interstate air travel without having to provide documentation of identity and their right to

photograph and film in publicly accessible areas of the airport, lest the TSA and Albuquerque

police conspire to arrest and retaliate against them.  The conduct of the Defendants in threatening

arrest and prosecution would chill a person of ordinary firmness from continuing to engage in

lawful, constitutionally protected activity.  (Complaint, para. 91)

**Causes of Action**

Plaintiff's First Amendment claim against these officers was for "Defendants' above-

described unlawful policies, practices and conduct in arresting Plaintiff, seizing his camera and

memory contained therein, searching his camera and its memory, attempting to destroy evidence

by deleting the contents of the camera, and filing criminal charges against him, in retaliation for

his video and audio recording of them, were intended to and did interfere with Plaintiff's

constitutionally protected right to record audio and video where such recording was permitted,

and chill Plaintiff from such activity in the future. These policies, practices, and conduct violate

Plaintiff's free speech and associational rights as guaranteed by the First Amendment."

(Complaint, para. 95)

Plaintiff also alleged that the above-described policies, practices and conduct violate the

Fourth Amendment.  (Complaint, para. 98);

Constituted a false arrest by conducting the arrest without probable cause (Complaint,

para. 101)

Constituted abuse of process by instituting criminal judicial proceedings against Plaintiff

and misusing and actively participating in the misusing of the legal process by filing a criminal

complaint against Plaintiff without probable cause or by inducing the filing of a criminal

complaint against Plaintiff without probable cause, through the providing of information while

knowing it to be false, in furtherance of the illegitimate end of retaliating against Plaintiff for his

video and audio recording of them, were intended to and did cause damages to Plaintiff.

(Complaint, para. 103);

That Defendant City through its policymakers had in force and effect a policy, practice,

or custom to prohibit lawful photography and filming in publicly accessible areas of the

Albuquerque airport, even though no statute or ordinance prohibits such photography and

filming; to require individuals to provide documentation of identity even when providing such

documentation is not required; and to arrest or threaten to arrest individuals who seek to engage

in such lawful actions.  (Complaint, para. 105);

That Defendant City through its policymakers had in force and effect a policy, practice,

or custom to engage in retaliatory behavior, such as charging or threatening to charge individuals

with disorderly conduct or criminal trespass even in the absence of genuine threats of violence or

no-trespass orders, against those who seek to exercise their lawful right to use cameras in areas where no legitimate time, place, and manner restrictions were in place. (Complaint, para. 106)

Plaintiff is informed and believes, and on this basis alleges, that at the time of the conduct complained herein, Defendant City through its policymakers had in force and effect a policy, practice, or custom to fail to properly discipline, train, and supervise City police officers, including the individual law enforcement Defendants in this case, in the legality of not having to provide documentation of identity, in the legality of filming in the Albuquerque airport, and in the illegality of retaliating against individuals who seek to exercise their lawful rights. (Complaint, para. 107)

Plaintiff is informed and believes, and on this basis alleges, that the final policymakers of Defendant City had actual or constructive knowledge of these unlawful practices yet failed to take any reasonable or adequate steps to remedy them. (Complaint, para. 108)

Plaintiff is informed and believes, and on this basis alleges, that the above-described policies, practices, or customs led City law enforcement to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated, making it foreseeable that officers would violate individuals' rights in precisely the manner in which Plaintiff's rights were violated. Plaintiff is informed and believes, and on this basis alleges, that Defendant City through its final policymakers were deliberately indifferent to this risk. (Complaint, para. 109)

The above-described policies, practices, or customs were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process, causing damages to Plaintiff. (Complaint, para. 110)

Finally, as Defendants deny that their conduct violates Plaintiff's rights under the Constitution and laws of the United States. Plaintiff fears he is now and will again be subjected to such unlawful and unconstitutional actions. Plaintiff seeks a judicial declaration that Defendants' conduct deprived Plaintiff of his rights under the Constitution and laws of the United States.  (Complaint, para. 112)

**ARGUMENT**

1. **The City Defendants conducted a pretextual arrest and search**

   A.  **This conduct violated the Fourth Amendment**

Defendants' arrest and search was a sham.  It was a spontaneous and pretextual act to injure Plaintiff's rights, seize the camera, and make the film  unusable at trial or anywhere else. Although "reasonable suspicion" is conducted with an objective analysis, a pretextual search - where officers attempt to justify on a ground which does not correspond to their real purpose - may cause a constitutional violation.

That this was a pretext is self-evident in that

(a) Mr. Mocek was not disturbing the TSA officers;

(b) nonetheless, he agreed to be escorted away ;

(c) the TSA defendants did not ask the City defendants that Phil be arrested;

(d) The City  defendants arrested Mr. Mocek even though he had identified himself, and then lied and claimed that he did not identify himself;

(e) The numerous misstatements made in the City Defendants' reports;

(f) The City defendants seized the camera because it contained "evidence", but they then tried their best to destroy that evidence.

In *Winters v. Board of County Commissioners*, 4 F.3d 848 (10th Cir. 1993), the court held that a seizure of ring from pawnshop could not be justified on ground that officers were lawfully present to conduct administrative search, when they had gone to the shop to look for the ring.

In this case, the City defendants were bound and determined to arrest Mocek on any basis whatsoever once they learned that the federal defendants wanted him arrested. When the City defendants realized the weakness of their case, they proceeded to attempt to destroy the very videotape that Mr. Mocek had created. Happily, Mr. Mocek knew how to restore the tape, and the viewing of the tape by the jury in Mocek's ensuing criminal trial was the key to his full acquittal. This attempt to suppress exculpatory evidence violates both the 4th Amendment and the 6th Amendment right to a fair trial. *Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988).

### B.   This conduct also violated Plaintiff's 6th Amendment right to a fair trial

Based on *Geter*, Plaintiff seeks to amend the complaint to add the Sixth Amendment theory as well. The events set forth repeatedly illustrate that the City Defendants did their best to destroy the very evidence that ensured that Mr. Mocek was acquitted on all four counts after the jury deliberated for one full hour.

### C.   This conduct violated Plaintiff's First Amendment rights

To establish a claim that his First Amendment rights were violated and to make a retaliation claim, the Plaintiff must establish the following elements: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212

(10th Cir. 2000)).       An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990).     The federal courts have allowed *Bivens* suits for a wide variety of constitutional violations, including the First Amendment.  *Dellums v. Powell*, 566 F.2d 167, 194-195 (D.C. Cir. 1977).

Law enforcement activities which are instituted in order to retaliate against persons for criticizing government officials violates the First Amendment.  Mr. Mocek was, in effect, protesting against an unlawful order and criticizing the TSAs for issuing the order, all the while being non-disruptive.  So the City Defendants arrested Mr. Mocek both to punish him for the criticism and to use it as a pretext to seize the camera.  See *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988) (en banc), where the court held that when a member of a civil service commission sued the police chief and officers for retaliation based on his criticism of the department, the court concluded that the plaintiff may proceed if the evidence is sufficient to demonstrate that the police were motivated by an improper purpose.  Also see *Glasson v. Louisville*, 518 F.2d 899, 905-906 (6th Cir. 1975); *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994), where the supporter of a ballot measure was warned, cited and arrested by officer, court held the officer violates plaintiff's First Amendment rights if by his actions he chills or deters plaintiff's political speech and such deterrence was a substantial or motivating factor in officer's conduct.

## 2.    These facts also support Plaintiff's claim for abuse of process

Plaintiff's abuse of process claim was never addressed in the Motion to Dismiss, except to state in a cursory manner that if there is no probable cause pursuant to the 4th Amendment, this claim cannot survive.  For that reason alone, this cause of action should remain.  Plaintiff's claim of no probable cause should survive, as well as Plaintiff's claim of pretext which is set forth repeatedly

in the complaint. It would not be right to permit Defendant to address this issue for the first time in the reply brief.

   3.   **Even if  there were no pretext, defendants would still be liable for the 1st and 4th Amendment violations**

         A.   **The *Tobey* case illustrates that Plaintiff's conduct was non-disruptive and is protected in the airport screening context**

 Even if there was no pretext, defendants would <u>still</u> be liable for the constitutional violations. Several points that address the City Defendant' liability are made in *Tobey v. Jones*, 2013 WL 286226 (4th Cir. 2013).  In *Tobey*, the plaintiff claimed that enhanced screening procedures at airport violated Fourth Amendment's prohibition against unreasonable searches and seizures and that his arrest for protesting procedures violated his constitutional rights.  Plaintiff removed his shirt at the TSA checkpoint and displayed the text of the Fourth Amendment written on  his chest.  Plaintiff was arrested.

   The *Tobey* court made several key rulings upholding travelers' 1st Amendment rights and continuing and extending a line of decisions upholding personal liability on the part of individuals responsible for illegal actions at checkpoints:

   1. Freedom of speech and protection from retaliation are rights protected under the 1st Amendment, even inside TSA checkpoints.  *Id.*, pp. 5, 8-10.

   2. Ignorance of the 1st Amendment by law enforcement is no excuse.  *Id.*, pp. 9-10.

   3. Protest or other expressive conduct is not per se disruptive.  *Id.*, pp. 7-8.

   As to the non-disruptive nature of the conduct of the Plaintiff, *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988), the court held that some investigation may be required before an arrest is made, depending on the circumstances.  New Mexico law regarding the duty of police officers to conduct an investigation harmonizes with this consitutitonal dictate, as set forth in the City

Defendants' MPA at pp. 22-23.  The court reasoned that because an objective test is to be used to determine whether there is probable cause for an arrest, the calculation should be made not on the basis of the subjective perceptions of the officer but on the situation "as a police officer acting reasonably under the circumstances should have perceived it".  Thus, it would be permissible to consider what further investigation the officer should have conducted at the scene.

As in *Tobey,* the complaint alleges that Mocek at no time acted disruptively. "Mocek in fact consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law enforcement officers. Mocek did not yell 'I know my rights.'" Compl. ¶ 71. Mocek's conduct even in declining to follow the defendants' unlawful orders was "calm" and "restrained" even in the face of TSA agents' and law enforcement officers' increasingly agitated behavior. Compl. ¶¶ 4, 5; *see also* Compl. ¶¶ 69, 71.   Harassment of individuals based on their life style violates rights protected under the 1st, 4th and 14th Amendments.  *Marland v. Heyse*, 315 F.2d 312 (10th Cir. 1963).

Nor was there any evidence that Mocek's behavior disturbed other passengers. "[V]ideo footage shows people walking by without any hesitation" and "the traveling public in general did not 'stop and take notice.'" Compl. ¶¶ 71, 73. Neither the city defendants or the TSA's own written statements, moreover (which the federal defendants have attached as exhibits to their motion), make no suggestion that Mocek caused any public disturbance. Compl. ¶ 79. At all times, Mocek never went through the security checkpoint and remained in publicly accessible areas of the airport. Compl. ¶¶ 5, 56.

**B.   The City Defendants' attempts to force Plaintiff to speak violates the 5th Amendment**

The City Defendants also sought to make the plaintiff speak despite his attempts to remain silent, in the hope of obtaining a statement that could be used as a threat of impeachment

if the defendant testified in his own behalf.  Such conduct has been found as reprehensible, as it violated the plaintiff's Fifth Amendment rights.  *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc).   Based on *Cooper*, Plaintiff seeks to amend the complaint to add this Fifth Amendment cause of action.

### C. Although Plaintiff may be forced to provide his name, Plaintiff did provide it and Defendant Dilley lied about it

Finally, it must be said that the complaint states that Plaintiff did provide his name to Defendant Dilley, and Dilley lied about it and arrested him anyway, claiming that he withheld it. Plaintiff had  no ID in his possession.  (Complaint, paragraph 43)  He repeatedly told the City Defendants who he was – his name was on the ticket.

Nonetheless, "concealing identity" was one of the four counts for the arrest of the Plaintiff.  The counts were disorderly conduct; concealing identity with intent to obstruct, intimidate, hinder, or interrupt; resisting, obstructing, or refusing to obey a lawful order of an officer; and criminal trespass.  None of these was true and at trial, Plaintiff won a swift and full acquittal.

### 4. Plaintiff is Confident that the Court Will Agree that the Law of the Case Doctrine is Inapplicable in Ruling on Defendant's Motion, as New Evidence is Presented that Was Inappropriate or Unavailable for the Federal Defendants' Motion

The court made various rulings on the Federal Defendants' motion, such as that Defendant Dilley had probable cause to arrest Plaintiff.  [Doc. 49 at 106 ¶2).  The court also held that held that Mocek's arrest was lawful and that the search incident to his arrest was not unlawful. [*Id.* at 104-105¶1].  The court also held that Plaintiff did not give his name to the City Defendants.  [*Id.* at 112 ¶2].

These and related rulings should not be utilized in this motion, as new evidence is being presented in this motion that was not relevant in the context of rebutting the Federal Defendants' motion.

This evidence includes the above-described pretextual evidence; the events that occurred after TSA left the scene and before Defendant Dilley arrested the Plaintiff and the subsequent searches; the fact that Plaintiff did provide his name to Defendant Dilley; and the decision to take the film shot by the Plaintiff and attempt to destroy it and deny the Plaintiff the right to a fair trial.  All of this constitutes "new evidence" that should obviate the application of the Law of the Case Doctrine as discussed in Defendants' brief at pp. 6-8.

**5.   Municipal Liability Claim Should Go Forward, As Unconstitutional Acts are Alleged**

As unconstitutional policies, practices and conduct are properly alleged, Plaintiff's claim should  go forward.  If any of  these acts are protected by qualified immunity, a cause of action against that municipal defendant would still be valid. *Medina vs. City and County of Denver*, 960 F.3d 1493 (10th Cir. 1992); *Barber v. City of Salem, Ohio,* 953 F.2d 232, (6th Cir. 1992).

**6.   Declaratory Relief Claim Should Go Forward, As Case is Not Moot**

Defendants state in their brief that the declaratory relief claim should be  dismissed, as case is moot.  Plaintiff argues that the case is not moot, and the relief is appropriate.

**7.   Plaintiff Seeks Leave to Amend the Complaint**

In any case, Plaintiff seeks leave to amend the complaint.  Plaintiff seeks to amend the complaint  to include the theories based on the 5th and 6th Causes of Action, as discussed above at pages 18 and 21-22.  Plaintiff also seeks leave to amend the complaint to include a transcript of the conversations between the  Plaintiff and the Defendants, which the Defendants later attempted to destroy.  A copy of that transcript is included as Exhibit 1 to this Opposition.

*///*

*///*

Respectfully submitted,

Dated:  February 25, 2013

WILLIAM M. SIMPICH

MARY LOU BOELCKE

JAMES WHEATON

LOWELL CHOW

/s/ William M. Simpich

_____

William Simpich, Attorney at Law
1736 Franklin Street, 10th Floor
Oakland, CA 94612
Telephone:  (510) 444-0226 / Fax:  (510) 444-1704

## CERTIFICATE OF NOTICE

I hereby certify that a true copy of the foregoing was provided to counsel of record on the 1st of March, 2013 via the CM/ECF filing system.

/s/   William M. Simpich

_____