# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PHILLIP MOCEK,

       Plaintiff,

vs.                                    No. CIV 11-1009 JB/KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE AVIATION POLICE
DEPARTMENT, MARSHALL KATZ, in
his official capacity as Chief of Police of the
Albuquerque Aviation Police Department,
JONATHAN BREEDON, GERALD
ROMERO, ANTHONY SCHREINER,
ROBERT F. DILLEY a/k/a BOBBY
DILLEY, LANDRA WIGGINS, JULIO
DE LA PENA, and DOES 1-25, inclusive,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the City of Albuquerque Defendants'
Motion to Dismiss, filed Feb. 1, 2013 (Doc. 54)("City MTD"). The Court held a hearing on July
12, 2013. The primary issues are: (i) whether to apply law-of-the-case doctrine to dispose of the
City MTD using the findings and conclusions of the Court's earlier Memorandum Opinion and
Order, filed January 14, 2013 (Doc. 49)("MOO"); (ii) whether Plaintiff Phillip Mocek has
alleged a plausible claim that Defendants Albuquerque Aviation Police Department ("AAPD")
officers Robert Dilley, Landra Wiggins, and Julio De La Pena (collectively, "the AAPD
officers"), in their individual capacities, violated his rights under the First and Fourteenth
Amendments to the Constitution of the United States when they allegedly refused to permit him
to video record the official conduct of Transportation Security Administration ("TSA") agents at
an airport security screening checkpoint, investigated him, and ultimately arrested him for

refusing to produce identification, and whether they can be held liable under 42 U.S.C. § 1983 over a defense of qualified immunity; (iii) whether Mocek has alleged a plausible claim that the AAPD officers, in their individual capacities, violated his rights -- to freedom from unreasonable search and arrest and excessive use of force -- under the Fourth and Fourteenth Amendments to the Constitution when they allegedly demanded that Mocek produce identification and arrested him when he declined, and whether they can be held liable under § 1983 over a defense of qualified immunity; (iv) whether Mocek has alleged a plausible claim that the AAPD officers committed false arrest under § 1983 or New Mexico state law; (v) whether Mocek has alleged a plausible claim that the AAPD officers committed malicious abuse of process, a tort under New Mexico state law; (vi) whether Mocek has  alleged a plausible claim that the AAPD officers violated his rights under the Fifth and Fourteenth Amendments to the Constitution when they allegedly repeatedly demanded that Mocek identify himself, and whether they can be held liable under § 1983 over a defense of qualified immunity; (vii) whether Mocek has alleged a plausible claim that the AAPD officers violated his rights under the Sixth and Fourteenth Amendments to the Constitution when they allegedly attempted to destroy a videotape that became exculpatory evidence at Mocek's criminal trial in New Mexico state court, and whether they can be held liable under § 1983 over a defense of qualified immunity; (viii) whether Mocek has alleged a plausible claim that Defendant City of Albuquerque can be held liable under § 1983 and Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), over a defense of qualified immunity, for having in place a policy, practice, or custom that subjected Mocek to a violation of his constitutional rights; and (ix) whether Mocek is entitled to declaratory relief from Defendant AAPD, Defendant Marshall Katz in his official capacity as the Chief of the AAPD, the City of Albuquerque, and the AAPD officers (collectively, "the City Defendants") in their

official capacities.  Having already dismissed all of Mocek's claims against TSA agents Jonathan

Breedon, Gerald Romero, and Anthony Schreiner (collectively, "the Federal Defendants") in its

MOO, the Court will now grant the City Defendants' MTD in all respects and dismiss all

remaining claims.   The Court will not apply law-of-the-case doctrine, because of the

interlocutory nature of the MOO, but will decide the City MTD on the merits without deferring

to the findings and conclusions of the MOO.  Mocek has not sufficiently alleged that the AAPD

officers violated his rights under the First Amendment, because the Supreme Court of the United

States has recognized that airports -- much less airport security screening checkpoints -- are

nonpublic forums for First Amendment purposes, and thus subject to "reasonable time, manner,

and place restrictions," meaning that Mocek's conduct was not constitutionally protected for the

purposes of a First Amendment retaliatory arrest claim.  Additionally, although such restrictions

must be viewpoint neutral, there is no plausible allegation that the City Defendants discriminated

against Mocek on the basis of his viewpoint, which he did not express to either the TSA agents

or the AAPD officers.  Even if the AAPD officers' actions violated the First Amendment, they

are entitled to qualified immunity, because Mocek's alleged right to gather news at an airport

screening checkpoint, and to record police activity in public, are not clearly established.  The

facts alleged in the Complaint do not support Mocek's claim of excessive force under the Fourth

Amendment, because it says nothing about any force used against Mocek, let alone excessive

force, and the Court will dismiss that claim.  Mocek has also not sufficiently alleged an

unreasonable search or arrest under the Fourth Amendment, or a false arrest under § 1983,

because the AAPD officers had reasonable suspicion to demand that Mocek produce identifying

documents, and, upon his failure to comply, probable cause for his arrest.  Mocek's claims under

state law for false arrest and malicious abuse of process require that the arrest was made without

probable cause, and, thus, fail along with the Fourth Amendment claim.  Mocek's Fifth Amendment claim fails, because the only alleged attempt that the AAPD officers made to prompt Mocek to inculpate himself was their request that Mocek produce identification, which, as a matter of law, is insufficient to constitute a violation of the Fifth Amendment.  Mocek's claim that the City Defendants violated his Sixth Amendment right to a fair criminal trial also fails, because Mocek received a fair trial and was acquitted of all charges.  There can be no municipal liability on the part of the City of Albuquerque: even if the City of Albuquerque had an illegal policy, practice, or custom in place, it could not be the proximate cause of any injury to Mocek, because the AAPD officers did not violate Mocek's rights.  Last, Mocek is not entitled to declaratory relief, because he suffered no violation of his constitutional or federal statutory rights.  The Court, therefore, grants the City MTD.

## FACTUAL BACKGROUND

Mocek is an "outspoken advocate of free software, open standards, government transparency, drug policy reform, and civil liberties."  Complaint for Damages, Injunctive Relief, and Declaratory Relief [and] Demand for Jury Trial ¶ 1, at 1-2, filed Nov. 14, 2011 (Doc. 1)("Complaint").  Mocek began to "harbor reservations" regarding the TSA's passenger identification procedures in 2007 and from that time did not always show documentation of identity when flying on commercial airlines.  Complaint ¶ 1, at 2; id. ¶ 27, at 6.  "Typically, once TSA staff realized he did not intend to present identification, Mocek would be diverted to a separate line to await assistance and additional questioning from another TSA agent."  Complaint ¶ 28, at 6.  Mocek would usually be allowed to board his flights without showing identification, although he noticed that his person and his bags were searched more thoroughly when he did not show identification than when he did.  See Complaint ¶ 1, at 2 id. ¶ 29, at 6-7.

Around mid-2008, the TSA announced that passengers who "willfully refused" to show identification would not be allowed to pass through screening checkpoints, but that passengers who had misplaced their identification or whose identification were stolen would be allowed to pass through if they complied with alternative procedures.  Complaint ¶ 30, at 7.

In 2009, Mocek researched the TSA's regulation and policies regarding photography, video recording, and filming at airport screening locations, and learned that the TSA does not prohibit any of these actions at a screening location.  See Complaint ¶ 2, at 2; id. ¶ 32, at 7-8.  He was informed, through sources he believed to be expounding TSA policy, that TSA does not allow passengers to take pictures of the monitors at checkpoints, but that taking pictures was generally permitted so long as it did not interfere "with the screening process or slow[] things down."  Complaint ¶ 32, at 8.    A TSA employee at the Albuquerque International Sunport Airport ("Albuquerque Sunport") informed Mocek that there are no state or local laws prohibiting photography in public areas of the Albuquerque Sunport, but the TSA employee also advised Mocek that he should contact the Albuquerque Sunport's public affairs staff in advance to coordinate photography.  Mocek believed that these statements "represented official TSA rules and policies."   Complaint ¶ 37, at 9.   When Mocek inquired regarding the necessity of coordinating photography in advance, the same TSA employee informed Mocek that advance coordination of photography was a "local practice and not available in writing," but that advance coordination would allow TSA to inform law enforcement officers at the checkpoint of the photography.  Complaint ¶ 39, at 9.  The TSA employee informed Mocek that the TSA screening checkpoint at the Albuquerque Sunport is a "restricted area and just for ticketed passengers."  Complaint ¶ 39, at 9 (internal alterations omitted).  The TSA employee later informed Mocek, after another inquiry from him, that the information the employee provided was "a

recommendation" and that the TSA "only encourage[s] individuals to contact the TSA in advance so we can facilitate the photography."   Complaint ¶ 40, at 9.   When Mocek asked if he could disregard the employee's statement that advance coordination is "required," the employee reiterated that her statement was a recommendation and that advance coordination was encouraged only so that TSA "can facilitate the photography."   Complaint ¶ 41, at 9-10.   Mocek believed, from this exchange, that "neither TSA nor state or local laws prohibited him from photography or filming at the TSA checkpoint" at the Albuquerque Sunport, other than filming the TSA monitors.   Complaint ¶ 42, at 10.

On November 15, 2009, Mocek attempted to fly out of the Albuquerque Sunport without providing identification.   Although he possessed a Washington state driver's license, he had given his license to his travelling companion, Jesse Gallegos, before approaching the TSA screening checkpoint.   See Complaint ¶ 43, at 10.   Mocek expected that he might encounter the "new identification procedure," which TSA announced in 2008, and was concerned that he might face retaliation for his "willful . . . refusal to show documentation of identity."   Complaint ¶ 3, at 2.

When Mocek reached the TSA podium, he presented his boarding pass to a TSA employee, but did not present identification.   He informed the TSA employee that "it was his understanding that he was not required to produce any such documents, only his boarding pass."   Complaint ¶ 44, at 10.   The TSA employee told Mocek to stand in a different line nearby, where Mocek waited.   See id. ¶ 44, at 10.

TSA agent Breedon then approached Mocek and asked him if he had any other forms of identification, such as a credit card, which might help to identify him, and Mocek responded that he did not believe he was required to produce identification.   Breedon informed Mocek that he

was correct and asked Mocek if he could verify his identity in another way.  Mocek stated that he would not provide any form of identification, because he believed he was not required to provide identification.  Breedon told Mocek that he would contact the TSA's Security Operations Center, which would attempt to verify Mocek's identity, and that if the Security Operations Center could not verify Mocek's identity, he would not be allowed to board the plane.  See Complaint ¶ 45, at 10-11.  None of the TSA agents present indicated that they had any intent to involve law enforcement at that time.  See Complaint ¶ 45, at 11.

Mocek then began using his camera to record on video "what he perceived to be an atypical, alternative identification policy."  Complaint ¶ 46, at 11.  Breedon told Mocek to stop filming, but Mocek responded that he did not believe that filming in a "publicly accessible" area was illegal.  Complaint ¶ 46, at 11.  Breedon attempted to take Mocek's camera, and told him that no photography or videotaping was permitted at the checkpoint.  See Complaint ¶ 46, at 11.  Breedon then called for police assistance.  See Complaint ¶ 47, at 11.

TSA agents Romero and Schreiner approached Breedon and Mocek.  See id.  Romero "ordered Mocek repeatedly to put down the camera and attempted to grab either Mocek or the camera."  Id. ¶ 48, at 11.  Mocek "remained calm and restrained" throughout the incident, while the TSA agents became increasingly agitated.  Complaint ¶ 5, at 2.  Mocek did not consent to being searched.  See Complaint ¶ 71, at 16.

The AAPD officers arrived soon thereafter.  The TSA agents complained to the AAPD officers that Mocek would not cease filming, was "taking pictures of all of [them]," and was "causing a disturbance."  Complaint ¶ 49, at 11-12.  AAPD officer Dilley told Mocek to comply with the TSA agents' instructions and that, if he did not, Mocek would be escorted out of the airport.  Mocek asserted that he was not causing a commotion, was not attempting to hinder TSA

agents from doing their job, and was complying with all TSA rules and regulations.  See
Complaint ¶ 51, at 12.  When Dilley again informed Mocek that he could either comply or be
escorted out of the airport, Mocek stated that he "did not believe there was a rule that barred him
from using a camera in publicly accessible areas of the airport."  Complaint ¶ 52, at 12.  AAPD
officer Wiggins informed Mocek that he could not film at the screening checkpoint, but Mocek
asserted that he had looked into the legality of his actions and that he could film.  Wiggins
responded that "you can be arrested, then you can check into it more."  Complaint ¶ 52, at 12.

        The AAPD officers then attempted to escort Mocek out of the airport, and Mocek stated
that he did not understand why he was being escorted out, but he did not refuse to comply with
the AAPD officers' order that he leave.  See Complain ¶ 53, at 12; id. ¶ 69, at 16.  Dilley stopped
attempting to escort Mocek out of the airport and asked to see Mocek's identification.  Dilley
informed Mocek that he would need to see his identification or else Mocek would be arrested for
concealing his identity.   See Complaint ¶ 54, at 12.   Mocek stated that he did not have
identification to show Dilley.   Dilley then informed Mocek that he was part of a criminal
investigation for disturbing the peace and was required to show identification.  Mocek asserted
that he had not disturbed the peace, and when asked again by Dilley to provide identification,
Mocek stated that he wanted to talk to an attorney.  See Complaint ¶ 54, at 12.  Dilley then
arrested Mocek.  See Complaint ¶ 55, at 13.  Mocek was in a publicly accessible area of the
Albuquerque Sunport during these interactions with TSA agents and AAPD officers.   See
Complaint ¶ 5, at 1.

        Dilley and Wiggins then walked Mocek to the AAPD office at the Albuquerque Sunport,
where they placed him in an airport holding cell.  See Complaint ¶ 57-67, at 13.  The holding cell
was approximately four by eight feet in size.  See Complaint ¶ 57, at 13.   The officers searched

Mocek's belongings.  See Complaint ¶ 57, at 13.  About three hours later, Dilley drove Mocek to the Metropolitan Detention Center.  See Complaint ¶¶ 62-65, at 14.  Dilley's incident report stated that Mocek committed a "disturbance by Disorderly Conduct" at the Albuquerque Sunport, refused to identify himself, and refused to comply with a criminal trespass order. Complaint ¶ 68, at 15.  Dilley's statement related that Mocek was "causing a disturbance by yelling" and that Mocek had refused to lower his voice even though Dilley ordered him to lower his voice four times.  Complaint ¶ 68, at 15.  AAPD officer De La Pena's incident report relates that TSA agents informed the AAPD officers that Mocek was "causing a disturbance and yelling at officers."  Complaint ¶ 70, at 16 (internal quotation omitted).  Audio and video recording from the incident reveal that Dilley never asked Mocek to lower his voice, and that Mocek remained calm throughout the incident.  See Complaint ¶ 69, at 15.  Video recording also indicates that passengers continued to pass through the checkpoint during the incident without delay.  See Complaint ¶ 71, at 16; id. ¶ 73, at 17.

Mocek was charged on four counts for this incident: (i) disorderly conduct; (ii) concealing identity with intent to obstruct, intimidate, hinder or interrupt; (iii) resisting, obstructing or refusing to obey an officer; and (iv) criminal trespass.  See Complaint ¶ 7, at 3. On January 20, 2011, a jury in Bernalillo County (New Mexico) Metropolitan Court, Case No. CR 2573709, tried Mocek.  See Complaint ¶ 86, at 20.   Mocek was able to restore his video footage, which had been deleted from his camera while he was at the Detention Center and his belongings remained at the Albuquerque Sunport, and used that footage in the state court trial. See Complaint ¶ 9, at 3; id. ¶¶ 83, 85, at 20.  On January 21, 2011, a jury acquitted Mocek of all four charges.  See Complaint ¶ 9, at 3; id. ¶ 88, at 21.

## PROCEDURAL BACKGROUND

Mocek asserts that his Complaint arises under: (i) the United States Constitution; (ii) the Civil Rights Act, 42 U.S.C. § 1983; (iii) The Declaratory Relief Act, 28 U.S.C. §§ 2201-02; and (iv) Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)("Bivens").  Complaint ¶ 11, at 3.  Mocek asserts that the Court has jurisdiction over his Complaint under 28 U.S.C. §§ 1331, 1332, 1343, and 2201, and has supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).  See Complaint ¶ 12, at 3-4.  Mocek asserts that venue is proper, because the acts set forth in the Complaint occurred in Bernalillo County.  See Complaint ¶ 13, at 4 (citing 28 U.S.C. §§ 1391(b),(e)).  Mocek also asserts that he has complied with the New Mexico Tort Claims Act, NMSA 1978 § 41-4-16, by "presenting a government claim within 90 days of the date upon which the cause of action accrued."  Complaint ¶ 14, at 4.

Mocek brought claims against the following Defendants: (i) the City of Albuquerque; (ii) the AAPD; (iii) Katz, in his official capacity as Chief of Police at the AAPD; (iv) Breedon, in his individual capacity and his official capacity as a TSA agent; (v) Romero, in his individual capacity and his official capacity as a TSA agent; (vi) Schreiner, in his individual capacity and his official capacity as a TSA agent; (vii) Dilley, in his individual capacity and his official capacity as an AAPD officer; (viii) Wiggins, in his individual capacity and his official capacity as an AAPD officer; (ix) De La Pena, in his individual capacity and his official capacity as an AAPD officer; and (x) certain unnamed Does, who Mocek alleges are responsible in some manner for his injuries and damages.  See Complaint ¶¶ 16-25, at 4-5.  The Federal Defendants, Breedon, Romero, and Schreiner, filed a Memorandum in Support of Individual Federal Defendants' Motion to Dismiss, filed June 1, 2012 (Doc. 25-1)("Federal MTD"), and were dismissed from the case on January 14, 2013.  See MOO at 1-2, 123.

Mocek asserts that the "Defendants' unlawful and unconstitutional conduct resulted in Mocek's arrest, detention, seizure and attempted destruction of his property, institution of baseless criminal proceedings against him, and other financial and emotional distress." Complaint ¶ 89, at 21.  He asserts that he incurred "in excess" of $34,000.00 in legal fees for his legal defense to the criminal charges against him.  Complaint ¶ 90, at 21.  Mocek also asserts that the Defendants have "set a dangerous standard[,] and sent a message to individuals" flying through the Albuquerque Sunport that "they should be fearful of exercising their right to interstate air travel without having to provide documentation of identity and their right to photograph and film in publicly accessible areas of the airport," because TSA agents or AAPD officers may conspire to retaliate against individuals so acting, and may arrest such individuals. Complaint ¶ 91, at 21.  Mocek asserts that the Defendants' conduct "in threatening arrest and prosecution would chill a person of ordinary firmness from continuing to engage in lawful, constitutionally protected activity."  Complaint ¶ 91, at 21.

Mocek brought eight claims, six of which survive to be heard here.  See MOO at 123.  He asserted as Count I an action under Bivens v. Six Unknown Agents, 403 U.S. 388 (1971)("Bivens") against the TSA agents and Does 1-25, in their individual capacities, for having violated his First Amendment rights.  See Complaint ¶¶ 92-93, at 21-22.  Mocek asserts that these Defendants' "policies, practices, and conduct in unlawfully ordering Plaintiff to cease video and audio recording" of them, and then summoning law enforcement officers, resulted in his unlawful arrest, the search and seizures of his camera, an attempted destruction of the "evidence" on his camera, and the filing of criminal charges against him, all of which "were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted."   Complaint ¶ 93, at 21-22.   This Count was

- 11 -

dismissed.  See MOO at 123.

Mocek asserts as Count II an action under 42 U.S.C. § 1983 against the AAPD officers and Does 1-25 in their individual capacities for the violation of his First and Fourteenth Amendment rights.  Mocek asserts that these Defendants' "policies, practices, and conduct," which Mocek asserts includes his unlawful arrest, the search of his camera, and an attempt to destroy "evidence" by deleting the contents of his camera, "were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future."  Complaint ¶ 95, at 22.  This Count survived the Federal MTD.

Mocek asserted in Count III that the TSA agents and Does 1-25 violated his Fourth Amendment rights, and Mocek brings this claim under Bivens against the TSA agents in their individual capacities.  See Complaint at 22.  Mocek asserts that these Defendants' "policies, practices, and conduct in summoning law enforcement," which Mocek asserts resulted in him being subjected to excessive force, the search of his person, the seizure of his camera, and an attempt to destroy "evidence," "in willful, wanton, and reckless disregard" of his rights, violated his right to be free from unreasonable search and seizure, and from excessive force.  Complaint ¶ 97, at 23.  This Count was dismissed.  See MOO at 123.

Mocek asserts in Count IV that the AAPD officers and Does 1-25 violated his Fourth and Fourteenth Amendment rights, and he brings this claim under 42 U.S.C. § 1983.  Mocek argues that these Defendants' "policies, practices, and conduct in seizing and arresting Plaintiff without reasonable suspicion or probable cause," and these Defendants' use of excessive force, searching his person and seizing his camera, and attempting to destroy "evidence" by deleting the contents of his camera, were actions done in "willful, wanton, and reckless disregard of Plaintiff's rights,"

and violated Mocek's rights to be free from unreasonable search and seizures and excessive force under the Fourth Amendment.  Complaint ¶ 99, at 23.  This Count survived the Federal MTD.

Mocek asserts as Count V a false arrest claim[1] against the AAPD officers and Does 1-25 in their individual capacities for damages that he incurred as a result of these Defendants' "policies, practices, and conduct," which included seizing and arresting him knowingly without probable cause or legal justification.  Complaint ¶ 101, at 23-24.  This Count survived the Federal MTD.

Mocek asserts as Count VI a claim against the AAPD officers and Does 1-25 for malicious abuse of process under New Mexico state law, on the grounds that these Defendants instituted criminal judicial proceedings against Mocek in misuse of the legal process by "filing a criminal complaint against [him] without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against [him] for his video and audio recording of them."  Complaint ¶ 103, at 24.  This Count survived the Federal MTD.

Mocek asserts as Count VII a claim against the City of Albuquerque for damages under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), and under 42 U.S.C. § 1983.  See Complaint at 24.  Mocek asserts that the City of Albuquerque "through its policymakers had in force and effect a policy, practice, or custom to prohibit lawful photography and filming in publicly accessible areas of the Albuquerque airport, even though no statute or ordinance prohibits such photography and filming."  Complaint ¶ 105, at 24.  Mocek asserts that the City of Albuquerque also had in place a policy, practice, or custom "to require

---

[1] Mocek's Complaint does not specify whether this claim is pursuant to § 1983 or New Mexico state law, so the Court will construe the Count as containing both a claim for false arrest under § 1983 and a state tort claim.  See Complaint ¶¶ 100-01, at 23-24.

individuals to provide documentation of identity even when providing such documentation is not required."  Complaint ¶ 105, at 24.  Mocek alleges that the City of Albuquerque had a policy, practice, or custom to "arrest or threaten to arrest individuals who seek to engage in such lawful actions."  Complaint ¶ 105, at 24.  Mocek asserts that the City of Albuquerque had a "policy, practice, or custom" of "engag[ing] in retaliatory behavior" against individuals who "seek to exercise their lawful right to use cameras in areas where no legitimate time, place, and manner restrictions were in place."  Complaint ¶ 106, at 25.  Mocek asserts that the City of Albuquerque had a "policy, practice, or custom to fail to properly discipline, train, and supervise City police officers . . . in the legality of not having to provide documentation of identity, in the legality of filming in the Albuquerque airport, and in the illegality of retaliating against individuals who seek to exercise their lawful rights."  Complaint ¶ 107, at 25.  Mocek asserts that the City of Albuquerque's policy makers had "actual or constructive knowledge of these unlawful practices yet failed to take any reasonable or adequate steps to remedy them."  Complaint ¶ 108, at 25. Mocek asserts that the City of Albuquerque led its law enforcement officers to believe that "misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated, making it foreseeable that officers would violate individuals' rights in precisely the manner in which Plaintiff's rights were violated."  Complaint ¶ 109, at 25.  Mocek asserts that the City of Albuquerque's policy makers were "deliberately indifferent to this risk." Complaint ¶ 109, at 25.  Mocek asserts that the City of Albuquerque's "policies, practices, or customs were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process, causing damages to Plaintiff."  Complaint ¶ 110, at 25.  This Count survived the Federal MTD.

Mocek asserts as Count VIII a claim for declaratory relief under 28 U.S.C. §§ 2201-2202

against "all defendants in their official capacities." Complaint ¶ 112, at 26. Mocek asserts that an "actual, present, and justiciable controversy" exists between him and the Defendants regarding their "rights and duties with respect to the Defendants' conduct described herein." Complaint ¶ 112, at 26. Mocek asserts that the Defendants deny that their conduct violates his rights under the Constitution and the "laws of the United States," and Mocek asserts that he is afraid that he will "again be subject to such unlawful and unconstitutional actions." Complaint ¶ 112, at 26. Mocek "seeks a judicial declaration that Defendants' conduct deprived Plaintiff of his rights under the Constitution and the laws of the United States." Complaint ¶ 112, at 26. The Federal Defendants were dismissed from this Count, but it survived the Federal MTD as to the City Defendants. See MOO at 1-2, 123.

At a much later stage in the case -- in the opposition brief to this motion -- Mocek purported to amend his Complaint to add claims against the AAPD officers for violations of his rights under (i) the Fifth and Fourteenth Amendments to the Constitution and (ii) the Sixth and Fourteenth Amendments to the Constitution. See Opposition to Defendants' Motion to Dismiss and Request for Leave to File Amended Complaint at 23, filed Mar. 2, 2013 (Doc. 57)("Opposition"). Mocek conceded in the hearing on this motion that he had not followed proper procedure for amending the Complaint, but the Court indicated that it would nonetheless rule on the claims on the merits. See Transcript of Hearing at 19:16-17 (Simpich), taken July 12, 2013 ("2013 Tr."); id. at 23:19-23 (Court).[2]

Mocek requests the following relief: (i) "a judicial declaration that Defendants' actions as alleged in this Complaint violated the First and Fourth Amendments of the United States

---

[2] The Court's citations to the transcripts of both of the hearings referenced in this opinion refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

Constitution;" (ii) "a court order enjoining Defendants from prohibiting the use of cameras and other recording devices in publicly accessible areas of the Albuquerque airport where no legitimate time, place, and manner restrictions are in place," and prohibiting the Defendants from retaliation "against individuals who seek to exercise their right to use such cameras and other recording devices;" (iii) "a court order requiring Defendants to undertake training and other prophylactic measure to ensure Defendants' conduct is not repeated in the future;" (iv) compensatory, nominal, and special damages; (v) prejudgment and post judgment interest; (vi) costs and expenses, under 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and (vii) "other relief as is just and proper." Complaint at 26-67. Mocek also demands a jury trial. See Complaint at 27.

Mocek takes issue with certain statements he asserts Breedon and Schreiner made regarding the incident. See Complaint ¶ 74, at 17. He does not provide a date for either statement. Neither does he quote more than a few phrases from either statement; instead, Mocek includes a summary of the statements. See Complaint ¶ 75, at 17-18; id. ¶ 77, at 18-19. Mocek asserts that "Breedon's statement importantly indicates that he did not request police involvement until he asked Mocek to cease using his camera." Complaint ¶ 76, at 18. Mocek quotes Breedon's statement that the situation "escalated again," after the AAPD officers arrived. Complaint ¶ 75, at 18. Mocek asserts that Breedon fails to mention that "much of the escalation was due to the conduct of the officers and not Mocek, who throughout remained calm and composed." Complaint ¶ 76, at 18. Mocek quotes from Schreiner's description of Mocek as "hostile" and "belligerent," and Schreiner's statement that Mocek took photographs "in a threatening manner." See Complaint ¶ 77, at 18. Mocek asserts that video footage of the incident does not support Schreiner's description of his actions. He also asserts that the statement does not explain how Mocek took pictures in a "threatening manner." Complaint ¶ 78,

- 16 -

at 19.

The TSA agents moved the Court, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, for the entry of an order dismissing Mocek's claims against them for failure to state a claim upon which relief can be granted.  See Federal MTD.  In that motion, Mocek's claims against the City of Albuquerque, the AAPD, and members of the AAPD were not at issue.  See Federal MTD at 1.  In support of the motion, the Federal Defendants referred to their memorandum of law and two exhibits.  The TSA agents attached to their MTD statements from Breedon and Schreiner regarding the incident.  See Statement from Jonathan Breedon; Statement from Anthony M. Schreiner.  The TSA agents relied on these statements in their MTD to relate that Breedon "indicated he would contact the TSA's Security Operations Center to attempt to verify the Plaintiff's identity so that he could fly," Federal MTD at 13 (citing Statement from Jonathan Breedon at 1), and to assert that the Complaint "demonstrates that the TSA defendants were not responsible for the complained-of injuries, namely the Plaintiff's arrest, the handling of his property, or the filing of criminal charges," Federal MTD at 16 (citing Statement from Anthony M. Schreiner at 2).

Mocek opposed the motion.  See Plaintiff's [Amended] Opposition to Individual Federal Defendants' Motion to Dismiss, filed June 30, 2012 (Doc. 30)("Federal Response").  The TSA agents contended that they are entitled to qualified immunity on both of the constitutional claims against them.  The TSA agents asserted that the Court should dismiss his First Amendment retaliation claim, because they "acted reasonably, under the circumstances, in requesting that the Plaintiff cease recording their activities at the airport's security checkpoint," which the TSA agents assert is a nonpublic forum.  Federal MTD at 2.  The TSA agents also contended that they did not cause the injuries Mocek alleges resulted from the violation of his First Amendment

rights -- specifically, the TSA agents argued that they did not cause Mocek to be arrested, or his person or property to be searched.  The  TSA agents further asserted that "it was not clearly established that Plaintiff had a First Amendment right to video record TSA agents conducting alternative screening procedures to verify his identity at a security checkpoint" and they are thus entitled to qualified immunity on this claim.  Federal MTD at 2.  Regarding Mocek's Fourth Amendment claims, the TSA agents asserted that Mocek has not shown that his Fourth Amendment rights were violated, because the Complaint does not allege that the TSA agents "caused or participated in his seizure or the search, and alleged mishandling, of his property." Federal MTD at 2.  The TSA agents asserted that "'summoning law enforcement,' is not a clearly established violation of the Plaintiff's Fourth Amendment Rights."  Federal MTD at 2 (quoting Complaint ¶ 97, at 23).

To allege a violation of Mocek's rights under the First Amendment, the TSA agents argued that Mocek must establish:

> (1) that the plaintiff was engage in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action as substantially motivated as a response to the plaintiff's exercise of constitutional protected conduct.

Federal MTD at 10-11 (quoting Klen v. City of Loveland, 661 F.3d 498, 508 (10th Cir. 2011)). The TSA agents asserted that Mocek must allege facts which allow the Court to "draw the reasonable inference that defendant is liable for the misconduct alleged," and that a complaint which includes facts "'merely consistent with' a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.'"  Federal MTD at 11 (quoting Ashcroft v. Iqbal, 556 U.S. 626, 678 (2009))(internal citations omitted)).

The  TSA  agents  contended  that  no  court  has  recognized  Mocek's  alleged

"constitutionally protected right to record audio and video."  Federal MTD at 11 (quoting

Complaint ¶ 93, at 21-22).  The TSA agents further contended that, even if Mocek has a right to

the activity alleged, the restrictions imposed by the TSA agents were reasonable and permissible

under the First Amendment, and, further, that "there is no causal connection between the Federal

Defendants' actions and the injury he claims resulted from his engagement in protected activity."

Federal MTD at 11.

        The TSA agents asserted that "publicly-owned airports such as Albuquerque International

Sunport are nonpublic fora."  Federal MTD at 11 (citing Int'l Soc'y for Krishna Consciousness,

Inc. v. Lee, 505 U.S. 672, 679 (1992)).  The TSA agents asserted that restrictions on speech at an

airport terminal "need only be reasonable."  Federal MTD at 11 (citing Int'l Soc'y for Krishna

Consciousness, Inc. v. Lee, 505 U.S. at 683).  The TSA agents further asserted that, "'when the

government permits speech on government property that is a nonpublic forum, it can exclude

speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint

neutral and reasonable in light of the purpose served by the forum.'"  Federal MTD at 12

(quoting Davenport v. Washington Educ. Ass'n, 551 U.S. 177, 189 (2007)).

        The TSA agents asserted that the United States Congress created the TSA to maintain

"'security in all modes of transportation'" and that this charge requires TSA to "'provide for the

screening of all passengers and property . . . that will be carried aboard a passenger aircraft.'"

Federal MTD at 2-3 (quoting 49 U.S.C. § 114(d); 49 U.S.C. § 44901(a)).  The TSA agents

contended that the screening requirement requires TSA agents to confirm "that the traveler who

presents himself at the security checkpoint shares the same identity as the individual named on

the boarding pass in order to ensure that all passengers have been appropriately vetted against

federal watch lists pursuant to 49 U.S.C. § 44903(j)(2)(C)."  Federal MTD at 3.  The TSA agents

asserted that this screening must take place before boarding, and that the screening is "critical to TSA's ability to efficiently and effectively carry out its duties, and is [a] mandatory [p]recondition for boarding and flying on commercial airlines."   Federal MTD at 3 (citing 49 U.S.C. § 44901(a)).   The TSA agents also asserted that passengers are prohibited from interfering with screening personnel who are performing their duties at an airport screening checkpoint.  See Federal MTD at 3-4 (citing 49 C.F.R. § 1540.109).

The TSA agents pointed out that Mocek willfully refused to provide identification to TSA agents at the Albuquerque Sunport.  See Federal MTD at 4; id. at 13.  The TSA agents also pointed out that Mocek inquired about the legality of taking photographs at security checkpoints at a TSA website before the incidents in the Complaint occurred.  See Federal MTD at 4; id. at 12-13.  The TSA agents asserted that a TSA website informed Mocek that "there was no general prohibition against taking photographs 'as long as you're not interfering with the screening process or slowing things down.'"   Federal MTD at 4 (quoting Complaint ¶¶ 31-32, at 7-8).  The TSA agents also pointed out that Mocek was informed by a TSA agent that the security checkpoint is a "restricted area . . . just for ticketed passengers," and that he should coordinate in advance with TSA agents if he wished to film at or near the screening checkpoint, which the TSA agents pointed out Mocek did not do.  See Federal MTD at 4-5; id. at 13 (citing Complaint ¶ 32, at 7-8; id. ¶ 37, at 9; id. ¶¶ 39-41, at 9-10).

The TSA agents asserted that, during the incident, Breedon informed Mocek that he would "'need to stop filming,'" but that Mocek continued to film and stated that he believed that filming was not illegal.  Federal MTD at 5 (quoting Complaint ¶ 46, at 11).  The TSA agents pointed out that Mocek repeatedly refused to stop filming, despite Romero asking Mocek to stop.  Federal MTD at 5 (citing Complaint ¶¶ 48-48, at 11-12; id. ¶ 69, at 15-16).  The TSA agents

pointed out that, when AAPD officers were allegedly summoned to the scene, the AAPD officers indicated to Mocek that he was causing a commotion, but Mocek continued to record.  <u>See</u> Federal MTD at 6 (citing Complaint ¶¶ 49-52, at 11-12).  The TSA agents pointed out that AAPD officers informed Mocek that he was part of a criminal investigation and required him to produce his identification, and that AAPD officers ultimately arrested Mocek for concealing his identity. <u>See</u> Federal MTD at 6-7 (citing Complaint ¶¶ 54-55, at 12-13; <u>id.</u> ¶ 57, at 13).

The TSA agents asserted that these actions were reasonable responses to Mocek's "attempt to create a disturbance by willfully refusing to provide his identification and filming the alternative screening process that ensued."  Federal MTD at 13.  The TSA agents asserted that checkpoint disturbances can be dangerous situations and that a disturbance at a checkpoint could allow others to evade security.  They also asserted that federal law allows TSA agents to summon "a checkpoint screening supervisor and law enforcement officer" when a disturbance occurs. Federal MTD at 13-14 (quoting 67 Fed. Reg. 8340, 8344)(citing 49 C.F.R. § 1542.215).  The TSA agents asserted that Mocek's "refusal to provide identification and his video recording of the screening process raised legitimate concerns about transportation security."  Federal MTD at 14.  The TSA agents also contended that a "reasonable TSA officer could not responsibly assume that the Plaintiff was neither attempting to evade the security system nor testing the system responses for future operations."  Federal MTD at 14.  The TSA agents also asserted that they must have discretion to stop a passenger from recording security procedures, so as to protect the public from passengers with malicious intent, even though filming the procedures is not prohibited.  <u>See</u> Federal MTD at 14.  The TSA agents asserted that Breedon took reasonable action under the circumstances by attempting to end Mocek's disruption and by requesting the AAPD officers' assistance.  <u>See</u> Federal MTD at 15.

The TSA agents argued that Mocek has failed to show that their actions would "chill a person of ordinary firmness from continuing to engage in a protected activity."  Federal MTD at 15 (citing Klen v. City of Loveland, 661 F.3d 498 (10th Cir. 2011)).  The TSA agents asserted that the Complaint shows that they are not responsible for the injury that Mocek allegedly suffered through his arrest, from the handling of his property, and from the filing of criminal charges against him.  See Federal MTD at 16 (citing Complaint ¶¶ 49-67, at 11-15; id. ¶ 83, at 20; id. ¶ 93, at 21-22).  The TSA agents asserted that the Complaint clearly sets forth that Dilley, and not any of the TSA agents, "made the decision to arrest the Plaintiff."  Federal MTD at 16 (citing Complaint ¶¶ 51-55, at 12-13).

The TSA agents also asserted that Mocek has failed to allege a Fourth Amendment violation, because "the Plaintiff's recitation of the facts does not allege that TSA defendants personally participated in or directed the police defendants in this case to search or seize the Plaintiff or his belongings."  Federal MTD at 18 (citing Complaint ¶ 97, at 23).  The TSA agents pointed out that Mocek has not alleged that they used any force against him, searched him or his camera, or seized his camera.  See Federal MTD at 18.  The TSA agents asserted that Mocek has not provided any facts indicating that they used any "excessive force, or any force," in the incident, and contend that facts do not support the allegations in Counts III and IV.  Federal MTD at 18 n.10.  The TSA agents asserted that, according to the Complaint, their involvement with Mocek ended as soon as the AAPD officers arrived.  See Federal MTD at 18-19 (citing Complaint ¶¶ 51-52, at 12; id. ¶ 54, at 12).  The TSA agents asserted that the United States Court of Appeals for the Eighth Circuit has found that a defendant who summons the police is not liable for any alleged Fourth Amendment violations committed by police who arrest a plaintiff, because the action of summoning the police was not the proximate cause of the plaintiff's

claimed injuries.  See Federal MTD at 19 (citing Green v. Nocciero, 676 F.3d 748, 755 (8th Cir. 2012)).  The TSA agents contended that, similarly, they did not cause the Fourth Amendment violations of which Mocek complains.  See Federal MTD at 19-20.

The TSA agents also asserted that the rights which Mocek alleges were violated are not clearly established.  The TSA agents asserted that an allegedly violated right must be clearly established under case law that holds the same right was violated in a similar context.  See Federal MTD at 20 (citing Saucier v. Katz, 533 U.S. at 209).  The TSA agents contended that, if "officers of reasonable competence could disagree on the issue, a right is not clearly established."  Federal MTD at 21 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The TSA agents contended that there is no case law precedent for a factual scenario such as that which Mocek alleges, and the TSA agents asserted that the absence of case law precedent demonstrates that the right that Mocek alleges was violated was not clearly established.  See Federal MTD at 21.  The TSA agents also asserted that case law "clearly indicates that an individual does not have the right to remain outside the attention of law enforcement when the individual is acting in a manner that sparks suspicion in a reasonable officer's mind."  Federal MTD at 21 (citing United States v. Cothran, 286 F.3d 173, 176 (3rd Cir. 2002)).  The TSA agents further asserted that the "question of whether there is a clearly established right to videotape police conduct in a public forum or public street . . . is unsettled in the Circuits."  Federal MTD at 22.  The TSA agents pointed out that, while the United States Court of Appeals for the First Circuit and the United States Court of Appeals for the Eleventh Circuit have recognized the right to videotape police conduct in public, the United States Court of Appeals for the Third Circuit and the United States Court of Appeals for the Fourth Circuit have held that the right is not clearly established.  See Federal MTD at 22 (citing Smith v. City of Cumming, 212 F.3d 133,

1333 (11th Cir. 2000); Glik v. Cunniffe, 655 F.3d 78, 82-84 (1st Cir. 2011); Kelly v. Borough of Carlisle, 622 F.3d 248, 251 (3rd Cir. 2010); Szymecki v. Houck, 353 F. App'x 852, 853 (4th Cir. 2009)).

The TSA agents additionally asserted that the line of cases addressing whether there is a clearly established right to videotape the police in public is distinguishable from the right which Mocek asserts was violated, because: (i) "airport security checkpoints are not public fora and First Amendment activity at such checkpoints is subject to reasonable restrictions;" and (ii) "TSA agents are not law enforcement officials and the Plaintiff conceded that the law enforcement authority exercised in his case that allegedly gave rise to the constitutional violations was performed by the police and not the TSA agents."  Federal MTD at 23.  The TSA agents asserted that videotaping TSA agents at a security checkpoint is similar to videotaping police officers' conduct while at a traffic stop, which the Third Circuit held was not a clearly established constitutional right.  See Federal MTD at 22 (citing Kelly v. Borough of Carlisle, 622 F.3d at 251).  The TSA agents asserted that videotaping TSA agents at a security checkpoint is unlike videotaping police from a distance in a public park, which the First Circuit found was a clearly established right.  See Federal MTD at 22 (citing Glik v. Cunniffe, 655 F.3d at 85).  The TSA agents further argued that the right is not clearly established in the Tenth Circuit, because there is no decision on point from the United States Court of Appeals for the Tenth Circuit or from the Supreme Court, and there is as split of authority in other circuits.  See Federal MTD at 24 (citing Wilson v. Layne, 526 U.S. 603, 618 (1999)).  The TSA agents asserted that the "fact that there is disagreement [among] the judges makes it clear that qualified immunity on the Plaintiff's First Amendment claim is appropriate for TSA defendants."  Federal MTD at 24.

The TSA agents similarly asserted that the Fourth Amendment right which Mocek alleges

was violated -- to be free from the TSA agents "summoning law enforcement" -- is not clearly established, and, further, the TSA agents contended that their actions were "within the boundaries of acceptable constitutional behavior."   Federal MTD at 25-27 (citing Complaint ¶ 97, at 23). The TSA agents asserted that the "vast majority of airport search cases involve challenges to the actions of the officers who <u>actually</u> conducted the searches," but that Mocek has rather alleged claims against the TSA agents based upon actions with which they "had nothing to do."  Federal MTD at 25 (emphasis in original).  The TSA agents contended that, although there is "no clearly established weight of authority from other courts concerning the 'summoning' of law enforcement," nor is there Supreme Court or Tenth Circuit precedent on point, "courts that have considered the issue have found no constitutional violation when the police make their own independent decision to arrest or search."  MTD Moo. at 25 (citing <u>Green v. Nocciero</u>, 808 F. Supp. 2d at 850).  The TSA agents asserted that Mocek has challenged only the TSA agents' "ability to contact law enforcement upon being confronted with a passenger who raises security concerns by refusing to comply with the agency's screening procedures or follow the direction of the TSA agents."  Federal MTD at 26.  The TSA agents contended that, because "it is not clearly established that referring a passenger who refuses to follow the directions of TSA agents to local law enforcement for further investigation violates the Fourth Amendment," the TSA agents are entitled to qualified immunity.  Federal MTD at 26.

Lastly, the TSA agents contended that Mocek is not entitled to declaratory relief that his constitutional rights were violated, because, the TSA agents asserted, his constitutional rights were not violated.  <u>See</u> Federal MTD at 26-27.

Mocek responded to the Federal MTD on June 30, 2012.  <u>See</u> Federal Response.  Mocek first contended that the TSA agents "mischaracterize[d]" and "recast" the allegations in his

Complaint.  Federal Response at 2.  Mocek asserted that he did not "premeditate" to video record his interactions with TSA agents and, rather, asserts that he began to use his camera at the Albuquerque Sunport only "after it became clear that Albuquerque TSA agents were subjecting him to an 'atypical, alternative identification policy.'"  Federal Response at 2 (quoting Complaint ¶ 46, at 11).  Mocek asserted that he was unaware that attempting to pass through security without identification would "result in him being denied access to the secure areas of the airport, including departure gates," because he had previously successfully flown without identification.  Federal Response at 2 (citing Complaint ¶¶ 27-28, at 6).  Mocek also asserted that the Federal MTD falsely portrayed him "as a disorderly passenger intent on acting disruptively."  Federal Response at 3.  Mocek asserted that, as set forth in the Complaint, he "at no time acted disruptively," and was rather "calm and restrained" when law enforcement and TSA agents became increasingly agitated.  Federal Response at 3 (citing Complaint ¶¶ 4-5, at 2; id. ¶¶ 69, 71-72, at 15-17).  Mocek asserted that there is no evidence that he disturbed passengers.  See Federal Response at 3.  Mocek asserted that this re-characterization of his actions was an attempt by the Defendants to "falsely accuse Mocek of disorderly conduct," the same charge of which a jury acquitted him in 2009.  Federal Response at 4.

Mocek also asserted that the Complaint states a proper claim that the TSA agents violated his First Amendment rights.  See Federal Response at 4.  Mocek contended that, although the AAPD officers conducted the arrest and seizure, the TSA agents "must answer for the unlawful, unreasonable and unconstitutional order to cease recording events of public interest occurring in a public place."  Federal Response at 5.  Mocek asserted that the TSA agents' orders created a constitutional injury, and that his video recording was lawful, peaceful, and not causing a threat to any person.  Mocek asserted that his injury was "compounded" when the TSA agents "enlisted

the police to give force to their unconstitutional demand." Federal Response at 5.

Mocek asserted that "a reasonable construction of the Complaint shows that the federal defendants caused plaintiff an injury that would chill a person of ordinary firmness from continuing to engage in that activity." Federal Response at 8. Mocek asserted that the First Amendment protects the public's right to gather information and that this protection extends equally to all citizens engaged in newsgathering. See Federal Response at 6-7 (citing Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576, 586-88 (1980); First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978); Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978)). Mocek asserted that intent is an element of a claim for retaliation against a plaintiff's expression of his or her civil rights, and that the TSA agents' actions were "substantially -- if not entirely -- motivated by plaintiff's exercise of constitutionally protected conduct." Federal Response at 7-8 (citing Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000); Lackey v. Cnty. of Bernalillo, 166 F.3d 1221 (10th Cir. 1999)(unpublished table decision); Thomas v. Carpenter, 881 F.2d 828, 829 (9th Cir. 1989)).

Mocek asserted that the TSA agents violated his First Amendment rights by attempting to stop his newsgathering, when Romero and Breedon "ordered Mocek to put down the camera and repeatedly tried to seize the camera." Federal Response at 8 (citing Complaint ¶¶ 46, 48, at 11). Mocek asserted that his actions did not violate any law, regulation or policy, and he pointed out that he remained in the publicly accessible areas of the Albuquerque Sunport at all times of the incident. See Federal Response at 8. Mocek asserted that the TSA agents "intended to do everything they could to prevent" the exercise of his rights, and that the purpose of the TSA agents' orders was to "not only chill but freeze his right to gather information about public officials conducting public duties in a public place." Federal Response at 8. Mocek asserted that

the TSA agents' actions, as he alleges in the Complaint, would be sufficient to chill a plaintiff of ordinary firmness from continuing to video record at the screening checkpoint.  See Federal Response at 9.

Mocek asserted that the TSA agents' actions were "substantially motivated as a response" to his exercise of "constitutionally protected conduct."  Federal Response at 9.  Mocek pointed out that he was ordered to "cease doing anything" only after he began filming the TSA agents' activities.  Federal Response at 9.  Mocek asserted that he was falsely described as "hostile" and "belligerent," and accused of "taking photographs in a threatening manner," after he asserted that taking pictures was not prohibited, and that he was arrested for having recording the TSA agents' activities.  Federal Response at 9-10.

Mocek also asserted that his right to gather news is clearly established.  See Federal Response at 10.  Mocek asserted that TSA's "own policy was clear and had been communicated in writing, directly to the Plaintiff, as well as to the general public: Recording was permitted." Federal Response at 10.  Mocek asserted that it was not only TSA's policy to allow recording at security checkpoints, but also that the law permitted such recording.  See Federal Response at 10. Additionally, Mocek asserted that the standard of "clearly established law" does not require a "case directly on point," but rather that "a general constitutional rule can apply with obvious clarity to the specific conduct in question, even though such conduct has not previously been held unlawful."  Federal Response at 10-11 (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2093 (2011); York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)).  Mocek asserted that his Complaint sets forth the violation of a "general constitutional rule."  Federal Response at 11 (internal quotation omitted).

Mocek asserted that the First Circuit, Third Circuit, and the United States Court of

Appeals for the Ninth Circuit have "held that recording police officers and officials in the course of carrying out their duties is directly protected by the First Amendment."  Federal Response at 11 (citing Glik v. Cunniffe, 655 F.3d at 82-84; Gilles v. Davis, 427 F.3d 197, 212 (3d Cir. 2005); Fordyce v. City of Seattle, 55 F.3d 436, 438-39 (9th Cir. 1995)).  Mocek asserted that the "weight of circuit authority thus supports" his right to gather news via his video and audio recording. Federal Response at 11.  Mocek asserted that the cases to which the TSA agents cite in support of their contention that the Circuits are split on the issue, Kelly v. Borough of Carlisle and Szymecki v. Houck, post-date the events of the Complaint, and thus do not demonstrate a split of circuit authority.  See Federal Response at 11-12, 12 n.5.  Mocek further contended that these cases are factually distinguishable in that the First Circuit in Glik v. Cunniffe "rejected the use of these cases in the defendants' attempts to support qualified immunity" and held that neither case was relevant "to the determination of whether the right to film police in the performance of their duties in a public place was clearly established."  Federal Response at 12.  Mocek also noted that, in relying on Szymecki v. Houck, the TSA agents are relying on an unpublished authority which holds no precedential value.  Lastly, Mocek contended that, in Glik v. Cunniffe, the First Circuit distinguished Kelly v. Borough of Carlisle, because the factual situation of attempting to videotape a police officer during a traffic stop was "worlds apart" from the arrest in Glik v. Cunniffe, which occurred in a public park, and because videotaping during the traffic stop raised concerns of public danger because of the moving vehicles.  Federal Response at 12 (citing Glik v. Cunniffe, 655 F.3d at 84).  Mocek also asserted that the court in Kelly v. Borough of Carlisle recognized a "broad right to videotape police," save for when the videotaping was done without an expressive purpose.[3]  Federal Response at 12 (citing Kelly v. Borough of Carlisle, 622 F.3d at

_____

[3] Mocek did not define what "an expressive purpose" means.  Federal Response at 12-13.

262).  Mocek asserted that he has an expressive purpose: "documenting what he perceived to be an atypical, alternative identification policy."  Federal Response at 12-13.

Mocek asserted that what the TSA agents refer to as a "lack of clarity" in this area is evidence that Mocek's activity was constitutionally protected: "The 'terseness' and 'brevity' of First Amendment discussion in those cases that have recognized a right to film government officials or matters of public interest in public spaces is a result of the fundamental and virtually self-evident nature of the First Amendment's protections in this area."  Federal Response at 13 (citing Glik v. Cunniffe, 655 F.3d at 85)(internal quotations omitted).  Mocek contended that, in 2009, TSA agents "stated unequivocally that recording was permitted in public areas," and that there is no confusion about the constitutionality or legality of Mocek's conduct during the incident.  Federal Response at 14.

Mocek also asserted that the Complaint clearly sets forth that the TSA agents violated his Fourth Amendment rights.  See Federal Response at 14.  Mocek contended that the TSA agents' assertion that the AAPD officers were contacted because of Mocek's lack of identification is "wholly inaccurate" and a direct contradiction of the Complaint.  Federal Response at 15. Mocek asserted that he would not have been arrested but-for the TSA agents' actions.  See

---

In Kelly v. Borough of Carlisle, the Third Circuit clarified that an expressive purpose is akin to "speech," and distinguished an "expressive purpose" from information gathering.

> In Whiteland Woods, L.P. v. Township of West Whiteland, we held that a planning committee's adoption of a resolution prohibiting videotaping of public meetings did not violate the First Amendment.  193 F.3d 177, 183 (3d Cir. 1999). We analyzed that case as one involving the First Amendment right to access information, and declined to apply the speech forum doctrine because it "[t]raditionally . . . applies to 'expressive' or 'speech' activity," and the alleged constitutional violation "consisted of a . . . right to receive and record information," not "speech or other expressive activity."

Kelly v. Borough of Carlisle, 622 F.3d at 262.

- 30 -

Federal Response at 15.  Mocek asserted that the TSA agents had "no basis whatsoever for summoning" the AAPD officers, that the "false statements about Mocek's behavior" were pretexts for calling the AAPD to the scene, and, thus, that the TSA agents' actions are "necessarily linked to the false arrest."  Federal Response at 16.  Mocek asserted that he has established causation between the TSA agents' actions and his arrest by showing that the TSA agents "'set in motion a series of events'" which they "'knew or reasonably should have known would cause others'" to deprive him of his constitutional rights.  Federal Response at 17 (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990)).  Mocek maintained that the TSA agents put into motion a series of events that was designed to cause Mocek harm, because the TSA agents did not have the authority to arrest him.  See Federal Response at 17.  Mocek further asserted that he was arrested unlawfully and that the Complaint sets forth a cause of action for unlawful arrest.  See Federal Response at 17 (citing Hodge v. Lynd, 88 F. Supp. 1232, 1234 (D.N.M. 2000); Complaint ¶¶ 20-22, at 4-5; id. ¶¶ 46-49, at 11-12).  Mocek argued that any question whether the Complaint adequately sets forth the facts for a cause of action for unlawful arrest should be resolved in his favor, as the TSA agents have the responsibility of proving that Mocek's injuries resulted from other causes.  See Federal Response at 18 (citing Northington v. Marin, 102 F.3d 1562 (10th Cir. 1996); Caballero v. City of Concord, 956 F.2d 204, 206 (9th Cir. 1992); Graham v. Connor, 490 U.S. 386 (1989)).  He further asserted that the TSA agents hold the evidence showing who, exactly, caused Mocek to be unlawfully arrested and that he thus should not be faulted for not pleading that information.  See Federal Response at 18 (citing Mendocino Envtl. Ctr. v. Mendocino Cnty., 14 F.3d 457, 463-64 (9th Cir. 1994)).

　　　Mocek also asserted that the TSA agents did not have probable cause to arrest him, and that the statements they have submitted regarding Mocek's arrest are insufficient to provide the

"facts and circumstances" necessary to support finding probable cause.  Federal Response at 18-29 (citing <u>Whiteley v. Warden</u>, 401 U.S. 560, 568 (1971)).   Mocek asserted that, unlike the plaintiff in <u>Green v. Nocciero</u>, a case upon which the TSA agents rely, Mocek did not engage in disorderly conduct that would support his arrest, as he argues that he did not refuse to leave the airport and was arrested only pursuant to the AAPD's command that he follow the TSA agents' orders.  <u>See</u> Federal Response at 20 (citing <u>Green v. Nocciero</u>, 676 F. 3d at 751).   Mocek contended that his arrest is more similar to a situation where a defendant provides false information to support a search warrant, which, under Tenth Circuit precedent, would negate a qualified immunity defense.  <u>See</u> Federal Response at 20 (citing <u>Beard v. City of Northglenn</u>, 24 F.3d 110 (10th Cir. 1994)).

Regarding the TSA agents' asserted qualified immunity defense, Mocek argued that the law is clear, and not confusing, that recording is permitted at the security checkpoint, and that he may not be arrested without probable cause.  <u>See</u> Federal Response at 20.  Mocek argued that the "qualified immunity inquiry in unlawful arrest cases is an objective one, focusing on whether 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." Federal Response at 20 (quoting <u>Hunger v. Bryant</u>, 112 S. Ct. 534, 537 (1991)(per curiam)). Mocek also asserted that the TSA agents' knowledge is "relevant, since the objective analysis is focused on a reasonable officer confronted with the clearly established law and information 'readily available' to the officer."  Federal Response at 20 (quoting <u>Romero v. Fay</u>, 42 F.2d 1472, 1476-77 (10th Cir. 1995)).  Mocek argued that he was not acting in a disorderly manner, that he was not asked to leave the screening checkpoint, and that he did not stop recording because he was "completely within his rights, as he was violating no law or regulation."  Federal Response at 21.  Mocek further argued that the TSA agents were "incompetent" in summoning the police

and "illegally demand[ing] that Plaintiff stop filming," which led to his arrest and prosecution. Federal Response at 21.  Mocek argued that, "[a]t a minimum," the TSA agents should not have pursued "their complaint about recording," and determined whether to let him board the plan or ask him to leave the airport, and that the TSA agents should not have summoned the police unless they determined that he was violating a regulation by "recording or by refusing to comply with a requirement to leave the airport."  Federal Response at 21.  Mocek asserted that, because the TSA agents' actions did not proceed in that order, they were asking the AAPD to enforce an unconstitutional demand "and made false statements to effectuate the arrest."  Federal Response at 21.

Mocek asserted that, under the Supreme Court's precedent, "no 'likelihood of recurrence' need be shown if the injury suffered in the past has 'continuing, present adverse effects.'" Federal Response at 21 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)(citing O'Shea v. Littleton, 4145 U.S. 488, 496 (1974); Rizzo v. Goode, 423 U.S. 362, 372 (1976)). Mocek asserted that an injury to one's First Amendment freedom of expression is a "classic constitutional injury with . . . continuing present effects," and that a "chilling effect on free speech is . . . a sufficient continuing injury to merit standing to enjoin the unconstitutional statute or policy."  Federal Response at 21 (citing Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 956-57 (1984); Dumbrowski v. Pfister, 380 U.S. 479, 491 (1965)).  Mocek further asserted that police conduct which "violates, infringes or deters expressive activity protected by the First Amendment" poses a "continuing, present adverse effect" sufficient to grant a plaintiff standing to challenge the police conduct.  Federal Response at 22 (citing Meese v. Keense, 481 U.S. 465, (1987); Allen v. Wright, 468 U.S. 737, 751 (1984); Laird v. Tatum, 408 U.S. 1, 14 (1972)).  Mocek thus argued that he need not demonstrate a likelihood that the unconstitutional

conduct of which he complains will re-occur "so long as the chilling effect of the past violations is justified by the realistic possibility that the violations will recur."   Federal Response at 22 (alterations omitted).

The TSA agents replied to Mocek's Federal Response that the "constitutional claims against the [TSA agents] . . . must be dismissed because the allegations in the complaint are insufficient to plausibly give rise to the inference of unconstitutional conduct on the part of these federal employees."   Reply to Plaintiff's Opposition to the Individual Federal Defendants' Motion to Dismiss at 1, filed July 27, 2012 (Doc. 33)("Federal Reply").   The TSA agents first argued that, because Mocek did not dispute their position that "their response to the Plaintiff's actions was reasonable and therefore did not violate the First Amendment," he has conceded the TSA agents' stance.   Federal Reply at 2.   The TSA agents further pointed out that Mocek did not contest that the Albuquerque Sunport is a nonpublic forum, a location in which restrictions on speech need only be reasonable, nor did Mocek argue that the TSA agents engaged in viewpoint discrimination, or that the TSA agents would be unreasonable to limit First Amendment activity where that activity causes a disruption at a screening checkpoint.   See Federal Reply at 2-3.   The TSA defendants further contended that the Complaint's facts "clearly demonstrate that the Plaintiff's actions were disruptive and caused the TSA to divert considerable resources to deal with the Plaintiff's attempt to challenge the system."   Federal Reply at 3.   The TSA agents pointed out that at least five TSA agents were required to handle Mocek at the screening checkpoint, because he refused to provide identification, and that the employees had to leave their other duties to respond to Mocek before he began video recording.   See Federal Reply at 3-4.   The TSA agents asserted that Mocek's intentional challenge to TSA security procedures raised a security concern, which was heightened when he began video recording the officers dealing

with his refusal to provide identification.  The TSA agents further argued that Mocek caused a disturbance by requiring the involvement of multiple TSA agents, "who should have been performing other duties."  Federal Reply at 4.  The TSA agents asserted that it is reasonable for them to "ask disruptive or suspicious passengers to cease filming at the checkpoint and, if necessary, refer them to law enforcement officers quickly, for further inquiry" given TSA's mission to identify dangerous materials or individuals at the screening checkpoint.  Federal Reply at 4.

The TSA agents again asserted that they did not cause Mocek's arrest and other adverse actions of which he complains in Count I.  See Federal Reply at 4.  The TSA agents asserted that, because Mocek admits that AAPD officers arrested him, he has failed to show that the TSA agents' actions caused Mocek to suffer an injury which would chill a person of ordinary firmness from continuing to engage in that activity.  See Federal Reply at 4-5.  The TSA agents further asserted that the AAPD officers did not intend to arrest Mocek before or upon their arrival to the scene, but rather decided to arrest Mocek after he refused to provide the AAPD officers with identification.  See Federal Reply at 5.

The TSA agents also argued that the Complaint does not mention Mocek's right to "gather information," the right which the TSA agents allegedly violated.  Federal Reply at 5. The TSA agents further pointed out that, even if Mocek was exercising his First Amendment right to gather information, he has nonetheless failed to state a cause of action for the violation of that right, because he alleges that he did not stop recording the TSA agents, despite their repeated requests that he cease.  See Federal Reply at 5.  The TSA agents thus argued that they did not interfere with this right to gather news, because he did not stop recording when the TSA agents directed him to stop.  See Federal Reply at 5-6.

Regarding Mocek's alleged Fourth Amendment injury, the TSA agents asserted that Mocek is wrong to causally connect the TSA agents to the AAPD officers' actions, because, under Mocek's "theory of causation, anyone who contacts the police is then responsible for allegations of police misconduct." Federal Reply at 6. The TSA agents asserted that, in a Bivens action against individual federal agents, "personal participation in the alleged misconduct is necessary." Federal Reply at 6 (citing Ashcroft v. Iqbal, 556 U.S. at 677). The TSA agents asserted that, because the AAPD officers, not the TSA agents, committed Mocek's alleged Fourth Amendment injury, he has failed to plead a cause of action under the Fourth Amendment against the TSA agents. See Federal Reply at 6. The TSA agents further asserted that the Complaint makes clear that the AAPD officers did not intend to arrest Mocek and arrested him only after he refused to provide the officers with identification. See Federal Reply at 6 (citing Complaint ¶¶ 51-55, at 12-13). The TSA agents asserted that, as set forth in the Complaint, they did not participate in the decision to arrest Mocek. See Federal Reply at 6-7 (citing Complaint ¶¶ 51-55, at 12-13). The TSA agents asserted that Mocek concedes that the AAPD officers did not intend to arrest him in his Federal Response. See Federal Reply at 7 (citing Federal Response at 9, 16). The TSA agents also asserted that they were not the proximate cause of Mocek's arrest. See Federal Reply at 7-8 (citing CSX Transp., Inv. v. McBridge, 131 S. Ct. 2630 (2011); Green v. Nocciero, 676 F.3d at 753). They argued that their summoning the AAPD officers did not cause Mocek's arrest and that their actions were too remote from the arrest to be the proximate cause. In support of this contention, the TSA agents asserted that the AAPD officers did not rely upon the information which the TSA agents provided them in deciding to arrest Mocek. See Federal Reply at 8.

Regarding Mocek's response to their qualified immunity defense, the TSA agents

asserted that Mocek has defined his rights in "very general terms" unsupported by any case law. Federal Reply at 8-9.  The TSA agents further asserted that recording TSA agents at a nonpublic screening checkpoint is very different from a bystander recording police activity in a public park from a distance, which the <u>Glik v. Cunnife</u> held to be protected activity under the First Amendment.  The TSA agents thus asserted that Mocek's alleged right to record TSA agents, who are not law enforcement officers, at a screening checkpoint was not clearly established.  <u>See</u> Federal Reply at 9.

The TSA agents further asserted that, even if "the right to film police activities at a distance in a public space was relevant to this case," the Circuits have split regarding whether that right is clearly established, and there is no Supreme Court or Tenth Circuit case on point. Federal Reply at 9.   The TSA agents also argue that Mocek takes the Third Circuit's position in <u>Kelly v. Borough of Carlisle</u> "completely out of context" when Mocek argued that the Third Circuit "'acknowledged that there is a right to videotape police,' narrowed only by the qualification that 'videotaping without an expressive purpose may not be protected.'"  Federal Reply at 10 (quoting Federal Response at 12).  The TSA agents asserted that the Third Circuit recognized a Circuit split regarding the right to video record police activity in public.  <u>See</u> Federal Reply at 11.

The TSA agents also asserted that Mocek's reliance on TSA policy to support his alleged clearly established right to videotape TSA agents is incorrect, because officials "'sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.'"  Federal Reply at 11 (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 194 (1984)).  The TSA agents asserted that, without a Tenth Circuit or Supreme Court case on point, the existence of a TSA policy cannot create a clearly established

right for Mocek.  See Federal Reply at 11 (citing <u>Zia Trust Co. ex rel. Causey v. Montoya</u>, 597 F.3d 1150, 1155 (10th Cir. 2010)).  The TSA agents thus asserted that, even if there were a TSA policy that permitted video recording of TSA agents, such a policy would not create a clearly established right for Mocek to video record TSA agents at a screening checkpoint.  See Federal Reply at 11 (citing <u>Herring v. Keenan</u>, 218 F.3d 1171, 1180 (10th Cir. 2000)).

The TSA agents also asserted that Mocek has not alleged the violation of a clearly established right under the Fourth Amendment, because he provided no case for his position that summoning police officers makes the TSA agents responsible for the harm which followed the summons.  See Federal Reply at 12.  The TSA agents asserted that Mocek has not provided a case which supports his proposition that persons who are not law enforcement personnel and who request assistance from law enforcement personal are liable for constitutional violations that the law enforcement personnel commit.  The TSA agents asserted that, under <u>Green v. Nocciero</u>, courts which have considered similar conduct have found that persons who are not law enforcement personnel committed no constitutional violation when the police made their own independent decision to arrest or search.  The TSA agents also asserted that the AAPD officers' decision to arrest Mocek was made independent from any information which the TSA agents provided to the officers.  See Federal Reply at 12.

Lastly, the TSA agents asserted that Mocek has not suffered any constitutional violations at the TSA agents' hands and that, thus, he is not entitled to declaratory relief against them.  See Federal Reply at 12.

The Court held a hearing on November 20, 2012.  See Transcript of Hearing, taken Nov. 20, 2012 ("2012 Tr.").  The TSA agents began by asserting that this "is a classic case in which qualified immunity is appropriate because the plaintiff has not alleged a clearly established

constitutional [] violation."  2012 Tr. at 4:12-15 (Martin).  The Court suggested that the parties first discuss what the alleged constitutional violation is, even though the order of inquiry does not matter in qualified immunity cases, because the Court finds that determining qualified immunity is easier once any disputes regarding an alleged violation have been resolved.  See 2012 Tr. at 4:19-5:2 (Court).  The Court inquired whether TSA has a policy on video recording at checkpoints, and the Court indicated it may be concerned if news reporters are treated differently than individuals, such as Mocek, when either attempts to record TSA activities.  See 2012 Tr. at 5:3-11 (Court).

The TSA agents responded that TSA has a policy and that, "in general," recording and photographing of TSA activities at a checkpoint is permitted, but that TSA agents are permitted some discretion to stop the recording or photographing of a screening process because of the sensitive information which may be documented.  2012 Tr. at 5:11-17 (Martin).  The TSA agents asserted that, in Mocek's case, security issues were raised, because he began recording after an alternative screening process was initiated.   See 2012 Tr. at 6:3-6 (Martin).  The TSA agents nonetheless asserted that the presence of a policy does not create a clearly established constitutional right, under Tenth Circuit and Supreme Court case law, and thus argued that the presence of any TSA policy is "not terribly relevant" to Mocek's claims.  2012 Tr. at 6:11-22 (Martin).  The TSA agents asserted that the validity of Mocek's claims rests upon whether the TSA agents acted reasonably.  See 2012 Tr. at 6:22-24 (Martin).

The Court addressed the statements which the TSA agents attached to their MTD -- statements from the TSA agents regarding the incident, the same statements to which the TSA agents allege Mocek refers in the Complaint.  See 2012 Tr. at 7:10-13 (Martin); id. at 17:17-18 (Court).  The Court stated that it had not seen statements or police reports attached in previous 42

- 39 -

U.S.C. § 1983 cases, and the Court thus inquired of the TSA agents why it should be allowed to consider the statements attached to the MTD.  See 2012 Tr. at 7:17-25 (Court).  The TSA agents responded that they should be allowed to attach the statements, because Mocek refers to them in his Complaint.  See 2012 Tr. at 8:9-13 (Court, Martin).

The Court turned to defining the alleged violation and inquired of the TSA agents what TSA's position is regarding photographing.  See 2012 Tr. at 9:20-23, 10:1-7 (Court).  The Court noted that there is no federal regulation regarding Mocek's conduct.  See 2012 Tr. at 10:9-11 (Court).  The TSA agents asserted that because "we are in a nonpublic forum the Supreme Court has indicated . . . that the actions of the [TSA agents] had to be reasonable to avoid there being a First Amendment violation."  2012 Tr. at 10:12-16 (Martin).  The Court inquired why it was relevant to the reasonableness of the TSA agents' actions that Mocek attempted to pass through the screening checkpoint without identification, because the "whole[] point of him wanting to film is he wants to film an encounter in which he doesn't have" identification.  2012 Tr. at 11:2-5 (Court).  The TSA agents asserted that they could not have known Mocek's intention at the time, but the Court questioned whether the relevant inquiry was whether the TSA agents knew of Mocek's intention or whether Mocek was aware of a prohibition on filming.  See 2012 Tr. at 11:11-15 (Martin, Court).  The TSA agents asserted that the "test" for their actions is whether they were acting reasonably, and that they could not have known whether Mocek was attempting to film "vulnerabilities of the system" or "setting a [distraction] so other people can go[] around the [] system."  2012 Tr. at 11:16-22 (Martin).  The TSA agents asserted that the Circuits which have dealt with similar situations have not focused their inquiry on the purpose of a plaintiff's filming.  See 2012 Tr. at 12:1-4, 12:9-10 (Martin).

The Court questioned whether, under the TSA agents' interpretation of the law, the

government must allow any First Amendment activity in a nonpublic forum, and whether, if the government decided to allow some First Amendment activity, whether restrictions on that activity would be subject only to a reasonableness standard.  See 2012 Tr. at 12:18-13:1 (Court, Martin).  The Court inquired whether such a standard allows government officials to "pick and choose on that day" who would be allowed to engage in First Amendment activity.  2012 Tr. at 13:3-5 (Court).  The TSA agents asserted that, rather, government officials have "discretion at security checkpoints."  2012 Tr. at 13:6-9 (Martin).  The TSA agents asserted that the government's discretion does not extend to viewpoint discrimination, but rather the government has discretion to stop disruptive First Amendment activities, such as the Supreme Court upheld in Int'l Soc'y for Krishna Consciousness, Inc. v. Lee.  See 2012 Tr. at 13:17-14:2 (Martin).  The TSA agents asserted that, at the time of the incident, Mocek did not attempt to propagate a viewpoint, but rather, only his Complaint set forth a viewpoint.  See 2012 Tr. at 14:3-9 (Martin).

Regarding the alternative screening procedures through which the TSA agents took Mocek, the TSA agents asserted that Mocek could go through the alternative procedures as many times as he would like without identification and be allowed to board a plane.  See 2012 Tr. at 14:15-18 (Court, Martin).  The TSA agents stated that the alternative procedures allow TSA agents to confirm a person's identity through a series of questions, which also allow TSA to determine if a person without identification is on a watch list.  See 2012 Tr. at 14:18-25 (Martin).  The TSA agents stated that the alternative procedures require the person without identification to cooperate.  See 2012 Tr. at 15:1-3 (Court, Martin).  The TSA agents asserted that, rather than answering their questions, Mocek began filming during the alternative screening procedures.  See 2012 Tr. at 15:3-8 (Martin).  The Court inquired whether the TSA agents called the police because of Mocek's filming, given that he did not get to the point in the alternative screening

where he answered questions, and the TSA agents asserted that the police were not summoned because of Mocek's filming and that the alternative screening procedures had begun before the police were summoned.  See 2012 Tr. at 15:9-19 (Court, Martin).  The TSA agents stated that the latter phases of the alternative procedures were not completed, because Mocek began filming and would not stop, and the TSA agents did not want Mocek filming the alternative procedures.  See 2012 Tr. at 15:20-25 (Martin).  The TSA agents stated that, although there is not a specific policy regarding the filming of alternative procedures, Mocek is not allowed to film the monitors during the screening procedures.  See 2012 Tr. at 16:4-9 (Martin).  The TSA agents stated that, from Mocek's position -- ten to twenty feet away from the main screening line -- he could film the entire checkpoint location.  See 2012 Tr. at 16:14-22 (Martin, Court).

The TSA agents argued that defining the constitutional violation that Mocek suffered is difficult from the Complaint's facts, because Mocek did not assert a First Amendment right to gather news as the basis for his actions in the Complaint.  See 2012 Tr. at 17:15-23 (Martin).  The TSA agents further asserted that the issue is whether Mocek had a constitutionally protected right to film TSA agents at the checkpoint and not whether there was a regulation on videotaping at a checkpoint.  See 2012 Tr. at 18:6-15 (Martin).  The TSA agents asserted that the Circuits have split regarding whether recording police activity in a public place is a constitutionally protected activity and that, thus, the TSA agents did not violate a clearly established law by attempting to keep Mocek from recording at the checkpoint.  See 2012 Tr. at 18:15-25 (Martin).

Mocek asserted that the First Amendment issue is whether the TSA agents may stop somebody from filming at the screening checkpoint.  See 2012 Tr. at 20:15-22 (Court, Boelcke).  Mocek asserted that the "fact that they stopped him from filming right when he started is viewpoint discrimination."  2012 Tr. at 21:2-4 (Boelcke).  The Court inquired what Mocek's

response is to the TSA agents' position that the TSA agents did not discriminate against Mocek's viewpoint, because they were unaware that Mocek was expounding a viewpoint through filming. See 2012 Tr. at 21:6-10, 21:15-17 (Court).  Mocek asserted that the TSA agents "assumed what his viewpoint was and based on their assumptions they told him to stop."  2012 Tr. at 21:18-21 (Boelcke).  The Court inquired whether Mocek's actions at the time were "somewhat ambiguous" and whether Mocek believes the TSA agents would not be allowed to interfere with filming if the person filming the TSA agents were attempting to hassle them.  2012 Tr. at 22:6-9, 22:12-17 (Court).  Mocek asserted that "hassling" would be a different situation than the events set forth in the Complaint.  2012 Tr. at 22:22-24 (Boelcke).  Mocek asserted that, even if the TSA agents did not have knowledge of his viewpoint at the time, stopping him without knowing his viewpoint could be viewpoint discrimination as well.  See 2012 Tr. at 23:8-15 (Court, Boelcke). The Court inquired what Mocek's purpose was for filming the TSA agents, and Mocek's counsel, Ms. Mary Louise Boelcke, replied that she does not know.  See 2012 Tr. at 24:4-9 (Court, Boelcke).

The Court inquired why, if Mocek agrees that the standard for gauging the TSA agents' actions is reasonableness, Mocek does not agree that they acted reasonably.  See 2012 Tr. at 24:10-20 (Court, Boelcke).  Mocek asserted that he has a constitutional right to film public officials and gather information in a public space, and that any action which interferes with those rights "is unreasonable," regardless whether the government actors can assert a reason for their interference.  2012 Tr. at 24:21-25:5 (Boelcke).  Mocek pointed out that, in United States v. Wells, 789 F. Supp. 2d 1270 (N.D. Okla. 2011), the United States District Court for the Northern District of Oklahoma found that police officers had no privacy interests in surveillance videos from a hotel room which filmed the police officers while they were conducting a search of the

room.  See 2012 Tr. at 25:6-16 (Boelcke).  Mocek asserted that the TSA agents similarly have no privacy interest in the material which he was recording, in so far as the TSA agents were conducting a search of private citizens.  See 2012 Tr. at 25:16-24 (Boelcke).  Mocek asserted that, just as the court in United States v. Wells found that an expectation of privacy should not allow law enforcement officers to carry out activities in secret, the TSA agents have no expectation of privacy in their work conducted in a public area of the airport.  See 2012 Tr. at 26:2-13 (Boelcke).

The Court stated that it does not believe the TSA agents are attempting to argue that they had a privacy interest in the activity which Mocek was attempting to film.  See 2012 Tr. at 26:21-22 (Court).  The Court stated that the reasonableness standard for TSA agents regarding First Amendment protected activity seems to be "fairly low," given that, if every passenger chooses not to conform to TSA's procedures, security concerns would be quickly raised.  2012 Tr. at 27:1-7 (Court).  Mocek stated that he would agree that, had he been verbally assaulting the TSA agents, then they would have been able to reasonably restrain his freedom of expression, but that he would have to do more than just speak to the TSA agents to give them reason to restrain his First Amendment rights.  See 2012 Tr. at 27:12-21 (Court, Boelcke).

Mocek asserted that the Complaint establishes the elements for a cause of action for the violation of his First Amendment rights.  See 2012 Tr. at 27:24-25 (Boelcke).  Mocek asserted that he was engaging in a constitutionally protected activity: videotaping government officials in a public area in the airport.  See 2012 Tr. at 28:3-7 (Boelcke).  Mocek asserted that he suffered an injury which would chill a person of ordinary firmness from continuing to engage in the activity when the TSA agents attempted to take away his camera, and summoned AAPD officers to "have him arrested and seize his property."  2012 Tr. at 28:12-17 (Boelcke).  Lastly, Mocek asserted

that the TSA agents' "adverse actions" were motivated as a response to his constitutionally protected conduct, in that the TSA agents summoned the AAPD officers "because he was taking photographs in a 'threatening manner'" and allegedly causing a disturbance.  2012 Tr. at 28:18-24 (Mocek).  Mocek asserted that he never refused to leave the airport and did not disobey any of the TSA agents' orders except the order that he stop filming them.  See 2012 Tr. at 29:2-7 (Boelcke).

Mocek stated that he does not agree with the TSA agents that the Court may rely upon the additional facts set forth in the statements attached to the MTD.  See 2012 Tr. at 29:10-14 (Court, Boelcke).  Mocek did not indicate that he desired to convert the MTD into one for summary judgment.  See 2012 Tr. at 29:10-30:6 (Court, Boelcke).  Mocek asserted that, when extra evidence is submitted on a motion to dismiss, it should be converted into a motion for summary judgment.  See 2012 Tr. at 30:3-6 (Boelcke).  The Court noted that the Tenth Circuit has some limited law which allows a court to consider the underlying contract in a breach of contract case or securities documents in a securities case.  See 2012 Tr. at 30:7-17 (Court).  Mocek contended that the TSA agents' statements are not the basis of the Complaint and, thus, are "more tangential to [the] Complaint than a contract would be in a case on a contract or a securities case, where the entire case rests on that one document."  2012 Tr. at 30:18-23 (Boelcke).

Mocek stated that he believes the clearest indication that TSA officers are not allowed to stop a person who is filming without making a disturbance is the Supreme Court's line of cases regarding an individual's right to gather information and news in a public place.  See 2012 Tr. at 31:13-19 (Court, Boelcke).  Mocek admitted that there are no Tenth Circuit cases directly on point, but asserted that the standard applied to the TSA agents' actions is whether their conduct was reasonable, and that it was only fair for citizens to be able to video record police, given that

"police officers videotape and audiotape every instance they have with the public." 2012 Tr. at 32:3-9 (Boelcke).

The TSA agents responded that they were not basing their MTD on the legal theory that their expectation of privacy was violated. See 2012 Tr. at 32:17-20 (Martin). The TSA agents further asserted that, because Mocek admits that his viewpoint was not made clear to them, the TSA agents were acting reasonably in the interests of security in stopping him from causing a disruption, or, "preventing the process from bogging down." 2012 Tr. at 32:19-33:3 (Martin). The TSA agents argued that they were not acting incompetently when they called the AAPD to assist. See 2012 Tr. at 33:5-8 (Martin). The TSA agents further asserted that, if Mocek is allowed to summarize their statements, they should be allowed to provide the complete statements, as they have, by attaching them to the Federal MTD. See 2012 Tr. at 33:9-16 (Martin). The TSA agents asserted that there is no Supreme Court case regarding the right to videotape police officers in a public place and that the only cases in which the Supreme Court has dealt with the issue is in the unrelated context of news reporters having access to police meetings. See 2012 Tr. at 33:22-34:2 (Martin).

The Court stated that it is inclined to grant the Federal MTD with regard to Mocek's First Amendment claim, at least because the law is not clearly established, and possibly because the TSA agents were not engaging in viewpoint discrimination. See 2012 Tr. at 34:12-19 (Court). The Court stated that, in light of the Circuit split in similar cases, "it would be difficult to say that there's been a violation of clearly established law," even if the Court does not address the constitutional violation beyond stating what the alleged violation is. 2012 Tr. at 34:22-35:6 (Court).

Regarding Mocek's Fourth Amendment claims, the TSA agents contended that his

allegations are "conclusory" and that the Complaint specifically provides that the AAPD arrested Mocek. 2012 Tr. at 35:9-36:9 (Martin). The TSA agents thus argued that Mocek has not pled that they personally participated in the constitutional violation, as Ashcroft v. Iqbal requires. See 2012 Tr. at 36:10-14 (Martin). The TSA agents further argued that, in light of the Eight Circuit's decision in Green v. Nocciero, the TSA agents' actions did not proximately cause Mocek's alleged Fourth Amendment violations. See 2012 Tr. at 36:14-17 (Martin). The TSA agents also argued that Mocek's complained of constitutional violation is not clearly established, because he did not plead a single case in which a defendant is liable for law enforcement officers' constitutional violations for having only summoned the law enforcement. See 2012 Tr. at 36:18-24 (Martin).

Mocek asserted that the TSA agents set in motion a series of events which caused his ultimate arrest, a situation akin to a malicious abuse of process or malicious prosecution where an arrest is predicated upon false statements or statements made with reckless disregard for the truth. See 2012 Tr. at 37:16-23 (Boelcke). The Court stated that the Constitution requires a personal involvement in an alleged constitutional violation for a defendant to be liable; thus, once law enforcement are called, a defendant whose action ended with calling the law enforcement cannot be liable for the law enforcement officers' alleged constitutional violations. See 2012 Tr. at 38:4-13 (Court). Mocek asserted that the TSA agents used information which they knew was false to summons the AAPD officers, and thus they can be held liable for the constitutional violations which followed. See 2012 Tr. at 38:18-39:4 (Boelcke). Mocek asserted that he is not arguing for a "collective [] knowledge doctrine," but rather that, because the TSA agents called the AAPD officers on the premise that Mocek was not "obeying an order," and the TSA agents knew that their order to Mocek to stop filming was not valid, the TSA agents "set in

motion the [f]acts that resulted in his arrest." 2012 Tr. at 39:8-24 (Boelcke).

       The Court responded that, although there is certainly but-for causation between the TSA agents' actions and the AAPD officers' actions, but-for causation may not be enough to hold the TSA agents liable.  See 2012 Tr. at 40:3-4 (Court).  The Court stated that its "sense is that once the A[A]PD was called there was no more involvement with TSA" and thus the TSA agents could not be held liable for the constitutional violations which the AAPD officers committed. 2012 Tr. at 40:9-14 (Court).  Mocek asserted that the TSA agents were present during his entire interactions with the AAPD.  See 2012 Tr. at 40:15-18 (Boelcke).

       The Court inquired of the TSA agents whether the Court would have to decide if there is a Fourth Amendment violation present before deciding if the alleged violation was contrary to clearly established law.  See 2012 Tr. at 41:7-11 (Court).  The TSA agents asserted that the Court need not decide whether there was a Fourth Amendment violation, because the Complaint clearly sets forth that the AAPD officers arrested Mocek, and that the officers did not decide to arrest Mocek before arriving at the screening checkpoint, thus indicating that the TSA agents' information relayed to the AAPD officers did not provide the basis for Mocek's arrest.  See 2012 Tr. at 41:12-19 (Martin)(citing Complaint ¶ 54, at 12-13).  The TSA agents asserted that, to the extent Mocek is alleging that they violated his Fourth Amendment rights by having told the AAPD officers to arrest Mocek, the Complaint sets forth that the AAPD officers decided to arrest Mocek after arriving at the scene, and not before, as would be true if the AAPD officers' decision was based upon the TSA agents' information.  See 2012 Tr. at 41:7-20 (Martin).  The TSA agents also asserted that they left Mocek's immediate vicinity when the AAPD officers arrived and were speaking a distance away with Mocek's traveling companion.  See 2012 Tr. at 43:6-21 (Martin). The TSA agents asserted that, even though the TSA agents relayed to the AAPD officers that

Mocek was causing a disturbance by impeding their normal job functions, the AAPD officers did not decide to arrest Mocek until Mocek refused to provide the officers with identification.  See 2012 Tr. at 45:23-46:16 (Martin).  The TSA agents asserted that the Court should review their statements to refute some of Mocek's allegations regarding the incident.  See 2012 Tr. at 45:2-23 (Martin).  The TSA agents asserted that, under New Mexico law, a person may be arrested for failing to provide identification in the course of an ongoing police investigation.  See 2012 Tr. at 47:10-16 (Martin).  The Court inquired whether the AAPD's investigation was dependent upon the existence of criminal activity, which, possibly, the TSA agents led the AAPD officers to believe was occurring when they summoned the officers.  See 2012 Tr. at 47:17-20, 47:23-25 (Court).  The Court inquired whether the police may ask for identification for any purpose, and counsel for the TSA agents, Mr. Edward J. Martin, responded that he is not certain.  See 2012 Tr. at 49:1-6 (Court, Martin).

The TSA agents nonetheless contended that the issue with Mocek's alleged Fourth Amendment violation is whether the TSA agents proximately caused Mocek's complained-of injuries.  See 2012 Tr. at 49:6-17 (Martin).  The Court stated that it is concerned that, if the TSA agents remained at the location, and the AAPD officers' investigation required reasonable suspicion of criminal activity to ask for identification, then Mocek's arguments regarding a "collective information" or "intervention" doctrine could hold more sway.  2012 Tr. at 49:18-50:2 (Court).  The TSA agents asserted that they are not law enforcement officers, that they summoned the AAPD because of their concerns regarding security and Mocek's disruptions, and that it was the AAPD officers who determined whether criminal activity was occurring.  See 2012 Tr. at 50:2-7 (Martin).  The TSA agents asserted that they are not allowed to make arrests, and that they are "required to have prior arrangements with either local police or private security

agencies to take care of these types of issues, because TSA [employees] are neither trained nor authorized to do such things."  2012 Tr. at 50:17-23 (Court, Martin).  The TSA agents stated that they are trained regarding the scope of the permissible searches under the Fourth Amendment, but that their training is limited and "fairly basic," and that, if they are in doubt, they are trained to call law enforcement officers.  2012 Tr. at 51:8-25 (Court, Martin).  The TSA agents stated that their training on excessive force is limited to them being trained not to arrest anybody and that they may only conduct pat-downs.  See 2012 Tr. at 52:2-6 (Court, Martin).

The Court stated that it is inclined to think that, "once TSA calls law enforcement, [] they are much in the same situation as a private citizen calling law enforcement, [and] they're not going to be responsible for any of the alleged constitutional activity of the police at that point." 2012 Tr. at 52:21-53:2 (Court).  The Court stated that there may be other claims available against the TSA agents, but the Court does not see a Fourth Amendment claim against them, because they were not personally involved nor did they direct the alleged constitutional violation.  See 2012 Tr. at 53:2-11 (Court).

Regarding his claim for declaratory relief, Mocek asserted that his claim is against the TSA agents in their official capacity, and, because qualified immunity extends only to claims against the TSA agents in their individual capacity, his request for declaratory judgment should remain notwithstanding a decision by the Court to dismiss the claims against the TSA agents in their individual capacity.  See 2012 Tr. at 54:6-11 (Boelcke).  Mocek asserted that he could still have a claim against the government for a constitutional violation even if the TSA agents receive qualified immunity individually and that he would thus still have a claim against the TSA, which the MTD did not raise.  See 2012 Tr. at 54:16-22 (Boelcke).  Mocek stated that he would still seek a declaratory judgment that "citizens have a right to use cameras and other recording

devices in the publicly accessible areas of the Albuquerque airport," and would seek an injunction stopping TSA agents from being allowed to "retaliate against individuals who seek to exercise that right by using cameras or other recording devices."  2012 Tr. at 55:3-8 (Boelcke). Mocek stated that he still would seek an order requiring the TSA to undertake training "and other prophylactic measures to ensure that the [D]efendants do not keep people from exercising their rights in those areas."  2012 Tr. at 55:16-20 (Boelcke).  Mocek asserted that the MTD does not address this claim, because even if the TSA agents are entitled to qualified immunity because Mocek's rights were not clearly established, Mocek could still receive declaratory relief stating that his constitutional rights were violated.  See 2012 Tr. at 55:23-56:4 (Boelcke).

The TSA agents asserted that the Mocek has not made a claim that "the United States did not follow its own procedures" and stated that they do not believe that Mocek's requests for declaratory relief could remain if the TSA agents are entitled to qualified immunity.  See 2012 Tr. at 56:10-16 (Court, Martin).  The TSA agents asserted that Mocek has requested declaratory relief related to his alleged constitutional violations and that, thus, if his alleged constitutional violations are dismissed, his request for declaratory relief cannot remain.  See 2012 Tr. at 56:14-23 (Martin).  The TSA agents contended that TSA is not named as a defendant in this case and that Mocek is not entitled to declaratory relief if "there's no constitutional violation and is not clearly established."  2012 Tr. at 57:10-17 (Martin, Court).

The Court inquired of Mocek whether he would have a claim for declaratory relief against the TSA agents if the Court finds that there was no First or Fourth Amendment violation, and Mock stated that he would not.  See 2012 Tr. at 58:2-9 (Court, Boelcke).  Mocek stated that it would be a "different situation" if the Court finds that the TSA agents are entitled to qualified immunity because their actions were not in violation of a clearly established law.  2012 Tr. at

58:12-16 (Court, Boelcke).  The Court informed the parties that it has a case on a similar issue, in which the Court found that a genuine issue of material fact existed as to a plaintiff's alleged constitutional violations, but the Tenth Circuit reversed the Court on the grounds that the Court should have proceeded directly to determining whether the law is clearly established.  See 2012 Tr. at 58:24-59:7 (Court).  The Court suggested that the parties examine the Tenth Circuit's opinion: Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).  See 2012 Tr. at 59:1-14 (Court, Wild).

The TSA agents asserted that Mocek's only claim against any Defendant in their official capacity is his request for declaratory relief, and that they are not being sued in their official capacity for Mocek's alleged constitutional injuries under the First or Fourth Amendment, because Bivens actions are not available against individuals in their official capacity.  See 2012 Tr. at 60:17-61:1 (Martin, Court).  The TSA agents further asserted that declaratory relief is not available against individuals.  See 2012 Tr. at 61:10-16 (Martin).

The Court stated that it was unsure how it will deal with Mocek's request for declaratory relief.  See 2012 Tr. at 61:21-22 (Court).  The Court stated that it was inclined to grant the MTD, although it would take the parties' arguments regarding Mocek's request for declaratory relief under advisement.  See 2012 Tr. at 62:4-6 (Court).  The Court allowed both parties to file additional briefing regarding Mocek's request for declaratory relief.  See 2012 Tr. at 63:24-64:1 (Court, Martin); id. at 65:4-7 (Boelcke, Court).

The TSA agents filed a supplemental brief after the hearing, in which they asserted that Mocek "failed to provide a jurisdictional basis for his request for declaratory relief against the federal defendants in their official capacities."  Federal Defendants' Supplemental Briefing, filed Nov. 29, 2012 (Doc. 43)("Supp. Brief").  The TSA agents asserted that the Declaratory Relief Act, 28 U.S.C. § 2201, does not provide federal courts with an independent basis for subject-

- 52 -

matter jurisdiction over a claim against the United States, which is a claim against a federal employee in his or her official capacity. Supp. Brief at 1 (citing Atkinson v. O'Neil, 867 F.2d 589, 590 (10th Cir. 1989); Schulke v. United States, 544 F.2d 453, 455 (10th Cir. 1976)). The TSA agents assert that a federal court does not have subject-matter jurisdiction "over claims against the United States for which it has not waived sovereign immunity," and contends that Mocek's asserted bases of jurisdiction -- 28 U.S.C. §§ 1331, 1332, and 1343 -- are not statutes under which the United States has waived sovereign immunity. Supp. Brief at 2 (citing Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.2d 1225, 1232 (10th Cir. 2010)). The TSA agents asserted that §§ 1331 and 1332 are grants of "general jurisdiction and require an accompanying waiver of sovereign immunity." Supp. Brief at 2 (citing Merida Delgado v. Gonzales, 428 F.3d 916, 919 (10th Cir. 2005); Gen. Ry. Signal Co. v. Corcoran, 921 F.2d 700, 703 (7th Cir. 1991)). The TSA agents also asserted that the Tenth Circuit has found that § 1343(a)(4) does not waive the United States' sovereign immunity. See Supp. Brief at 3 (citing Trackwell v. United States Gov't, 472 F.3d 1242, 1244 (10th Cir. 2007)). The TSA agents thus argued that Mocek has failed to bear his burden of proving that the Court has jurisdiction over his claims against the TSA agents in their official capacity. See Supp. Brief at 3 (citing Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999)).

The Court granted the Federal Defendants' Motion to Dismiss in full. See MOO. It held that Mocek has no First Amendment right to record TSA or police operations at an airport security screening checkpoint, and that even if he did, such a right was not clearly established. See MOO at 89-103. It further held that -- as the AAPD officers had reasonable suspicion to demand that Mocek produce identification, and, upon his refusal, probable cause to arrest him -- the AAPD officers had not violated Mocek's clearly established Fourth Amendment rights, and

thus the Federal Defendants could not be held liable for causing the alleged violation.  See MOO at 103-119.  The Court further held that the suit against the federal entities in their official capacities had not been brought under a statute in which they have waived their sovereign immunity and thus dismissed those claims for lack of jurisdiction.  See MOO at 119-121.

The City Defendants reacted by filing their own MTD two weeks later, asking the Court to dismiss all the remaining claims.  See City MTD at 1.  They contend that law-of-the-case doctrine compels dismissal under rule 12(b)(6) of the Federal Rules of Civil Procedure, as the basis for the Court's dismissal of the claims against the TSA agents was that Mocek's First and Fourth Amendment rights were not violated by either TSA agents or the AAPD officers.  See City MTD at 5, 10.  They acknowledge that "law-of-the-case doctrine is 'discretionary, not mandatory,' and that the rule 'merely expresses the practice of courts generally to refuse to reopen what has been decided, [but is] not a limit on their power.'"  City MTD at 6 (quoting Stifel, Nicolaus & Co. v. Woolsey & Co., 81 F.3d 1540, 1544 (10th Cir. 1996), and Messenger v. Anderson, 225 U.S. 436, 444 (1912)(Holmes, J.))(internal quotation marks omitted).  They contend however, that departure from the doctrine is generally limited to "three major grounds: 1) an intervening change in controlling law; 2) availability of new evidence; and 3) the need to correct clear error or prevent manifest injustice."  City MTD at 8-9 (citing Major v. Benton, 647 F.2d 110, 112 (10th Cir. 1981)).

The City Defendants contend that, "[i]n the context of a district court case, the law-of-the-case doctrine traditionally applies to subsequent motions which are premised on the same standard of review."  City MTD at 7 (citing Robbins v. Wilkie, 433 F.3d 755, 765 (10th Cir. 2006)).  They further contend that none of the exceptions to the application of the doctrine are applicable here, because: (i) "the[ City] Defendants have not asked this Court to consider any

material outside the Plaintiff's Complaint;" (ii) "there is no law in either the Tenth Circuit or the United States Supreme Court which has issued since this Court rendered its determination less than a month ago that would change the Court's analysis or holdings on Plaintiff's First Amendment, Fourth Amendment, or Excessive Force claims;" and (iii) the clearly erroneous standard is inapplicable to this situation, because in the absence of new evidence or case law, it applies only to "to correct clear error or prevent manifest injustice," and "'should be used sparingly.'"   City MTD at 8-9 (quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed. 1995)).

The City Defendants recite a number of the Court's holdings from its MOO on the Federal Defendants' Motion to Dismiss, including conclusions that Mocek has not suffered any constitutional violations, that even if he has, such violations were not of clearly established law, and that there was probable cause for his arrest.  See City MTD at 11-13.  The City Defendants cite to language in the MOO to support their assertions that an airport security screening checkpoint is a nonpublic forum for First Amendment purposes, and thus is subject to "reasonable time, place, and manner restrictions," so long as they are viewpoint-neutral.  See City MTD at 13.  They further assert that, "because at no time did Plaintiff allege that he expressed any viewpoint to the Defendant officers, his First Amendment retaliation claim is insufficient as a matter of law."  City MTD at 13.

The City Defendants concede that "[c]ourts have recognized that the First Amendment's protection does not end at the spoken or written word [and] 'conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments,'" City MTD at 13 (quoting Garcia v. Jaramillo, No. CIV 05-1212 JB/RLP, 2006 WL 4079681, at *10 (D.N.M. Nov. 27, 2006)(Browning, J.)), but note that "the United States

Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea." City MTD at 14 (quoting United States v. O'Brien, 391 U.S. 367, 376 (1968)).  They assert that, "[i]n determining whether particular conduct possesses sufficient communicative elements to warrant First Amendment protection, courts should assess whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'"  City MTD at 14 (alterations in original)(quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)).  The City Defendants argue that as the "Plaintiff did not allege that he was conveying any message . . . [his] contention that he was engaged in protected First Amendment conduct is dubious at best."  City MTD at 14, 16.

The City Defendants argue that, even if Mocek's allegations "are construed as a First Amendment retaliatory arrest claim, [they] would still fail.  This Court has already ruled that Defendant Dilley had probable cause to arrest Plaintiff."  City MTD at 16 (citing MOO at 106). They assert that "[p]robable cause to arrest in the context of a retaliatory arrest claim precludes Plaintiff from proceeding with this claim.  The United States Supreme Court in Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) rejected the Tenth Circuit's reasoning that qualified immunity was not available to officers on the grounds that they had probable cause to arrest in the context of a First Amendment retaliatory arrest claim."  City MTD at 16.

The City Defendants further argue that the Court's findings on Mocek's Fourth Amendment claims in the MOO are dispositive of the claims against the City Defendants.  See City MTD at 19.  They recite a series of holdings from the MOO, including that the AAPD officers had reasonable suspicion to direct Mocek to produce identification, and that, upon his refusal, the AAPD officers had probable cause to arrest Mocek.  See City MTD at 19-20.  They

assert that "under state law, Defendants Dilley, Wiggins, and De la Pena were not only authorized, but compelled to investigate once the TSA agents advised them of Plaintiff's conduct, and if they hadn't they could potentially be liable under state law for failing to investigate."  City MTD at 22 (citing N.M. Stat. Ann. § 29-1-1 ("It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware . . . .")).  They note that, even if concealment of identity were not itself a crime under New Mexico law, "it is not clearly established that an arrest based on refusal to provide identification is a Fourth Amendment violation and not[e] that sister circuits have not found that it is."  City MTD at 24 (citing Albright v. Rodriguez, 51 F.3d 1531 (10th Cir. 1995)). The City Defendants also state that the excessive force claim is non-actionable, as Mocek did not allege specific facts sufficient to support a plausible claim.  See City MTD at 25.

The City Defendants contend that the AAPD officers' probable cause to arrest Mocek renders his false arrest and malicious abuse of process claims untenable.  See City MTD at 26, 27.  The City Defendants argue: "An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest."  City MTD at 26-27 (internal quotation marks omitted)(quoting Santillo v. New Mexico Dep't of Pub. Safety, 173 P.3d 6, 10 (N.M. Ct. App. 2007)).  The City Defendants further argue: "Claims of false arrest, false imprisonment, and malicious prosecution must be premised on a lack of probable cause."  City MTD at 27 (internal quotation marks omitted)(quoting Hoffman v. Martinez, 92 F. App'x 628, 631 (10th Cir. 2004)).

The City Defendants also argue that the police department and Katz are improperly named parties to the suit.  City MTD at 29.  The City Defendants argue: "[I]n this district a

police department is not a legal entity that may be held liable apart from a municipal corporation."  City MTD at 29 (quoting <u>Kline v. City of Santa Fe</u>, No. CIV 00-495 (March 8, 2001)(Conway, J.)).  They further argue: "Where a plaintiff chooses to sue both the municipality and the municipal officials in their official capacities, courts routinely dismiss the official capacity claims as redundant."  City MTD at 29 (citing <u>Castro Romero v. Becken</u>, 256 F.3d 349, 355 (5th Cir. 2001)).  Lastly, the City Defendants argue that declaratory relief against the City is inappropriate, as the Court has found that Mocek suffered no deprivation of constitutional rights.  City MTD at 30 ("[M]unicipalities can be held liable only when an injury was inflicted . . . .").

Mocek opposes the motion to dismiss.  <u>See</u> Opposition.  He argues that the AAPD officers' "arrest and search was a sham.  It was a spontaneous and pretextual act to injure the Plaintiff's rights, seize the camera, and make the film unusable at trial or anywhere else."  Opposition at 17.  Mocek asserts that, "[a]lthough 'reasonable suspicion is conducted with an objective analysis, a pretextual search -- where officers attempt to justify on a ground which does not correspond to their real purpose -- may cause a constitutional violation."  Opposition at 17.  Mocek argues that the pretextual nature of the search and arrest is

self-evident in that

(a) Mr. Mocek was not disturbing the TSA officers;

(b) nonetheless, he agreed to be escorted away;

(c) the TSA defendants did not ask the City defendants that [Mocek] be arrested;

(d) [t]he City defendants arrested Mr. Mocek even though he had identified himself, and then lied and claimed that he did not identify himself;

(e) [t]he numerous misstatements made in the City Defendants' reports;

(f) [t]he City defendants seized the camera because it contained "evidence," but they then tried their best to destroy that evidence.

Opposition at 17 (citing <u>Winters v. Bd. of Cnty. Comm'rs</u>, 4 F.3d 848 (10th Cir. 1993)).

Mocek argues that, "[e]ven if there was no pretext, defendants would <u>still</u> be liable for constitutional violations." Opposition at 20 (emphasis in original). He cites <u>Tobey v. Jones</u>, 706 F.3d 379, 2013 WL 286226 (4th Cir. 2013), a case in which a plaintiff took off his shirt at a TSA security screening checkpoint to display the text of the Fourth Amendment written on his chest. <u>See</u> Opposition at 20. Mocek contends that the court in that case found that "[f]reedom of speech and protection from retaliation are rights protected under the 1st Amendment, even inside TSA checkpoints," "[i]gnorance of the 1st Amendment by law enforcement is no excuse," and "[p]rotest or other expressive conduct is not per se disruptive." Opposition at 20 (citing 2013 WL 286226, at *5, *8-10, *9-10, *7-8).

Mocek reaffirms his earlier arguments that the City Defendants' conduct violates his First and Fourteenth Amendment rights, because "(1) [he] was engaged in constitutionally protected activity; (2) [the AAPD officers'] action caused [Mocek] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) [the AAPD officers'] adverse action was substantially motivated as a response to [Mocek's] exercise of constitutionally protected conduct." Opposition at 18 (quoting <u>Klen v. City of Loveland</u>, 661 F.3d 498, 508 (10th Cir. 2011))(internal quotation marks omitted).

Mocek also seeks to amend his Complaint to add claims for violations of his Sixth Amendment right to a fair trial -- "based on" <u>Geter v. Fortenberry</u>, 849 F.2d 1550 (5th Cir. 1988) -- and his Fifth Amendment right to remain silent -- "based on" <u>Cooper v. Dupnik</u>, 963 F.2d 1220 (9th Cir. 1992)(en banc). Opposition at 18, 22. Mocek argues that the law-of-the-case doctrine is inapplicable to this motion, "as new evidence is being presented . . . [,] includ[ing] the above-described pretextual evidence." Opposition at 23. Lastly, Mocek argues that his "municipal

liability claim should go forward, as unconstitutional acts are alleged." Opposition at 23 (emphasis and title case removed).

The City Defendants filed a reply to Mocek's Opposition. See City of Albuquerque Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss and Request for Leave to File Amended Complaint, filed Mar. 26, 2013 (Doc. 62)("Reply"). They assert that the

> Plaintiff's insistence that he was not causing a disturbance does not provide a sufficient basis to prove that his arrest was pretextual where, as here, the Court has determined that the Defendant Officers' actions were lawful. Furthermore, Plaintiff's subsequent acquiescence during his escort by the airport police is immaterial to the probable cause analysis.

Reply at 2-3. They further note that Mocek's "contention that he identified himself and/or that the Defendants lied about it . . . directly contradicts [his] Complaint and [Opposition], whereby he notes that he refused to identify himself prior to his arrest, electing instead to 'remain silent.'" Reply at 3 (quoting Complaint ¶ 54, at 12 and Opposition at 6).

The City Defendants attempt to distinguish Winters v. Board of County Commissioners, 4 F.3d 848 (10th Cir. 1993), arguing that Mocek's camera was properly seized incident to his arrest -- a valid exception to the warrant requirement. See Reply at 5. The City Defendants say that Mocek's case is unlike the facts in the Winters v. Board of County Commissioners case, in which police seized a ring from a pawn shop in violation of the warrant requirement. The evidence taken in Mocek's case was ultimately used by Mocek in his criminal trial, where it was "the key to his full acquittal" -- again unlike the Winters v. Board of County Commissioners case, where the evidence involved was incriminating, and submitted against the criminal defendant. Reply at 5 (emphasis omitted)(quoting Opposition at 18)(internal quotation marks omitted). They furthermore argue that "the withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of

evidence, the criminal defendant is denied a fair trial."  Reply at 8 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985))(internal quotation marks omitted).  They also cite Tenth Circuit precedent holding that, "[r]egardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."  Reply at 8 (quoting <u>Morgan v. Gertz</u>, 166 F.3d 1307, 1310 (10th Cir. 1999))(internal quotation marks omitted).

The City Defendants contend that Mocek has not stated a proper claim that his Fifth Amendment rights were violated, as the police were merely asking Mocek for his identity, and "[a] person's refusal to disclose his name, based not on any articulated real and appreciable fear that his name would be used to incriminate him, . . . but rather based on his belief that he was not required to identify himself, is not protected by the Fifth Amendment."  Reply at 10 (citing Complaint ¶ 54, at 12 and <u>Hoffman v. United States</u>, 341 U.S. 479, 486 (1951)(A person "is not exonerated from answering merely because he declares that in so doing he would incriminate himself -- his say-so does not of itself establish the hazard of incrimination.")).

The City Defendants also contend that the Court should reject Mocek's purported amendments to his Complaint, because they were not "submitted in a separate pleading pursuant to Fed. R. Civ. P. 7(b)."  Reply at 9.

The Court held a hearing on July 12, 2013.  <u>See</u> 2013 Tr.  The City Defendants reiterated the arguments made in their MTD and Reply.  <u>See</u> 2013 Tr. at 5-8 (Baker, Court).  The City Defendants stated their belief that the Court's finding in the previous opinion that the AAPD officers had reasonable suspicion to ask Mocek for identification, and probable cause for arrest upon his refusal, proved dispositive of their motion.  <u>See</u> 2013 Tr. at 6:8-17 (Baker).  They assert that, because the Court "conclude[d] that [Mocek] did not suffer a Fourth Amendment violation

at the AAPD officers' hands," with regard to the claims against the Federal Defendants, law-of-the-case doctrine would bar those claims against the City Defendants.   2013 Tr. at 6:19-20 (Baker).

The City Defendants contended that Mocek cannot prevail on his retaliatory arrest First Amendment claim, stating that "if the underlying arrest is valid then there cannot be a retaliatory free speech claim."  2013 Tr. at 8:13-14 (Baker)(citing Storey v. Taylor, 696 F.3d 987, 997 (10th Cir. 2012)).  They also argued that Mocek improperly amended his Complaint and argued that, if he wanted the Court to refrain from applying law-of-the-case doctrine to the present motion, he "might have asked you to reconsider, but they did not have any legal grounds to do so, they do[] not have new facts, there was not a new case that had been published, and there was nothing to suggest that your decision was clearly erroneous."  2013 Tr. at 9:5-9 (Baker).  He further stated that Mocek could not prevail against the "clearly erroneous" standard, noting that "it's been analogized to a several-day-old dead fish."  2013 Tr. at 9:3 (Baker).

The City Defendants discussed a brief that the Department of Justice filed under 28 U.S.C. § 517 as an interested party in a case called Garcia v. Montgomery County, No. 8:12-cv-03592-JFM (D. Md.).  See 2013 Tr. at 11:19-13:10 (Baker, Court).  Mocek asked the Court to consider the brief, the City Defendants did not oppose this request, and the Court indicated that it would read it over.  See 2013 Tr. at 12:24-13:1, 13:4-11, 14:5-7 (Baker, Court).  The DOJ's position in the brief is in favor of recognizing some individual right to video record police officers undertaking their official duties.  See 2013 Tr. at 12 (Baker).  The City Defendants first noted that the brief was not a judicial opinion and had no binding effect on the Court.  See 2013 Tr. at 12:21-24 (Baker)("[W]ith all due respect to the quality of [lawyering] in the Department of Justice, this is simply a lawyer's brief.  It's not from a Court, much less an appellate court . . . .").

- 62 -

They also expressed that they thought that Mocek's case could be distinguished from the facts in Garcia v. Montgomery County., because "on the very first page [of the brief] it says the United States [urges] the Court to find both the [F]irst and [Fourth Amendments] protect an individual who peacefully photographs police activity on a public street." 2013 Tr. at 12:10-13 (Baker). The Court stated that it would take judicial notice of the brief. See 2013 Tr. at 25:15-20 (Court).

Mocek did not expound upon his new Fifth Amendment claim, and mentioned his Sixth Amendment claim only to note that he "do[es not] think there's really any difference between the First Amendment analysis for the [de]struction of the evidence and the Sixth Amendment analysis regarding the fair trial issue." 2013 Tr. at 19:20-23 (Simpich). He conceded that he "think[s] the First Amendment argument is stronger because there's some language in the Sixth Amendment cases suggesting that if you got an acquittal that's the end of the matter . . . ." 2013 Tr. at 19:24-20:2 (Simpich). Mocek also conceded that his attempt to amend his Complaint by way of his Opposition brief was not "do[ne] . . . in the form required by the Tenth Circuit," but asked the Court to consider the new claims anyway. 2013 Tr. at 19:16-17 (Simpich). The Court stated that, while the amendments were "not done in an appropriate manner," it would address the new claims on the merits. 2013 Tr. at 23:19-23 (Court). The Court also indicated that, "because of the interlocutory nature of the [previously decided] motion," it would not apply law-of-the-case doctrine to the resolution of the motion, 2013 Tr. at 4:1 (Court), but it would grant the motion to dismiss on the merits, using the MOO as persuasive authority. See 2013 Tr. at 24:15-25 (Court).

## LAW REGARDING THE APPLICATION OF LAW-OF-THE-CASE DOCTRINE TO INTERLOCUTORY ORDERS

"Generally, the 'law of the case' doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case." Been v. O.K. Indus., 495

F.3d 1217, 1224 (10th Cir. 2007)(citing <u>Homans v. City of Albuquerque</u>, 366 F.3d 900, 904 (10th Cir. 2004)).  Unlike vertical <u>stare decisis</u>, however, "the rule is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power." <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 823 (10th Cir. 2007)(stating that the doctrine is merely a "presumption, one whose strength varies with the circumstances").  District courts should depart from an appellate court's ruling on the same case only in a few exceptionally narrow circumstances: (i) "when the evidence in a subsequent trial is substantially different;" (ii) "when controlling authority has subsequently made a contrary decision of the law applicable to such issues;" or (iii) "when the decision was clearly erroneous and would work a manifest injustice." <u>McIlravy v. Kerr-McGee Coal Corp.</u>, 204 F.3d 1031, 1035 (10th Cir. 2000)(quoting <u>United States v. Alvarez</u>, 142 F.3d 1243, 1247 (10th Cir. 1998)).

"On the other hand, district courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In fact, in the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).

## <u>LAW REGARDING RULE(12)(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must

accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").[4]  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the

---

[4] Gossett v. Barnhart is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Gossett v. Barnhart has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." 91 F. App'x at 85. There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Court analogized to a statute of limitations -- and found that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."

167 F. App'x at 704-05.

The Court has previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use the interviews and letters attached to a motion to dismiss which evince that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired in the Court's ruling.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contest alone, as the complaint did not incorporate the documents by reference, let alone refer to the documents.  See 2012 WL 3656500, at *22-23.  On the other hand, in a securities class action, the Court has found that a defendant's operating certificate, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs' adequately alleged a loss, falls within an exception to the general rule, and may be considered by the Court when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cnty Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  As the Supreme Court has explained, there are only two allegations required to state a cause of action under § 1983: (i) "some person has deprived [the plaintiff] of a federal

right;" and (ii) "the person who has deprived [the plaintiff] of that right acted under color of state or territorial law." Gomez v. Toledo, 446 U.S. 635, 640 (1980)(emphasis added)(citing Monroe v. Pape, 365 U.S. 167, 171 (1961)).

The Tenth Circuit has stated that "Section 1983 does not . . . provide a basis for redressing violations of state law, but only for those violations of federal law done under color of state law." Jones v. City & Cnty. of Denver, 854 F.2d 1206, 1209 (10th Cir. 1988)(citing Gomez v. Toledo, 446 U.S. at 640)(emphasis in original).  The rule in Jones v. City & County of Denver effectuates Congress' intent when enacting § 1983, which was to enforce the Fourteenth Amendment, and the federal rights it protects, against a wave of violence that the Ku Klux Klan perpetrated during Reconstruction.   See Ngiraingas v. Sanchez, 495 U.S. 182, 187-88 (1990)(explaining that § 1983 "was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment" following "a wave of murders and assaults . . . against both blacks and Union sympathizers" that the Ku Klux Klan committed (citations omitted)(internal quotations omitted)); Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 684-85 (1978)(instructing that "statements of the supporters of [§ 1983] corroborated that Congress, in enacting [§ 1983], intended to give a broad remedy for violations of federally protected civil rights," and quoting a statement by the Chairman of the Senate Judiciary Committee that § 1983 "'is one that I believe nobody objects to, as defining the rights secured by the Constitution when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill, which have since become a part of the Constitution'" as the Fourteenth Amendment).

"[A] breach of state procedural requirements is not, in and of itself, a violation of the Due Process Clause." Atencio v. Bd. of Educ., 658 F.2d 774, 779 (10th Cir. 1981).  A violation of a

state's procedural requirements becomes a violation of the Due Process Clause when the plaintiff

has been "denied a fair forum for protecting his state rights."  658 F.2d at 779-80.  The Tenth

Circuit agreed with the United States Court of Appeals for the Sixth Circuit that

> [i]t is not every disregard of its regulations by a public agency that gives rise to a
> cause of action for violation of constitutional rights. Rather, it is only when the
> agency's disregard of its rules results in a procedure which in itself impinges upon
> due process rights that a federal court should intervene in the decisional processes
> of state institutions.

Id. at 779 (quoting Bates v. Sponberg, 547 F.2d 325, 329-30 (6th Cir. 1976)).

When state officials fail to comply with a state's procedural requirements, a plaintiff may

only sue if that failure also violates the minimum requirement of a fair forum under the Due

Process Clause.  See Atencio v. Bd. of Educ., 658 F.2d at 779-80.  When a state guarantees more

procedural rights than the Due Process Clause demands, § 1983 cannot be used to expand the

Due Process Clause to cover that violation.  See 658 F.2d at 779 n. 11 ("We are not persuaded by

cases which appear to hold that where a state grants procedural protections for a property right

above and beyond the constitutional minimum, these additional provisions are themselves

enforceable under § 1983 and the Due Process Clause."); Eguia v. Tompkins, 756 F.2d 1130,

1137 (5th Cir. 1985)("If the State of Texas demands that its officials afford a more elaborate

process than the Constitution requires, its demand cannot alone expand the boundaries of federal,

constitutional due process." (citations omitted)); Goodrich v. Newport News School Bd., 743

F.2d 225, 227 (4th Cir. 1984)("When the minimal due process requirements of notice and

hearing have been met, a claim that an agency's policies or regulations have not been adhered to

does not sustain an action for redress of procedural due process violations." (citations omitted)).

As the United States Court of Appeals for the Fifth Circuit has noted, a contrary rule would mean

that a citizen's federal right to due process would depend on where he lived and what procedures

- 70 -

his home state chose to guarantee, instead of applying in the same manner to all Americans regardless of their residence.  See Eguia v. Tompkins, 756 F.2d at 1137 n. 11 ("To hold otherwise would be to acknowledge a constitutional requirement of one due process for the citizens of Texas, [and] another for the citizens of Louisiana . . . .  We decline to make such a shambles of the Constitution's uniform grant of rights to all United States citizens.").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economu, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the

> plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

1.    **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer

mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's precedent and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases;" (ii) "it appears that the question will soon be decided by a higher court;" (iii) deciding the constitutional question requires "an uncertain interpretation of state law;" (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual

basis for the . . . claim . . . may be hard to identify;" (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question, because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. at 2080 (quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  Cf. Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27, 2012)(Browning, J.)(expressing concern regarding Justice Elena Kagan's comments about "large" and "small" cases, and noting that, as a trial court judge, the Court must both find the law and facts correctly and accurately, but must also give its attention and time to each litigant before the Court).  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the

qualified immunity issue.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colorado Dept. Of Corrections, 429 F. App'x 707,  710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279,

1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.   "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).   While a case directly on point is not required, the Supreme Court held that "existing precedent must have placed the statutory or constitutional question beyond debate."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."   Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."   Ashcroft v. al-Kidd, 131 S. Ct. at 2084.   The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.   Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, that although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."   Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).   In Kerns v. Bader, dealing with the search of a home, the

Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."   Kerns v. Bader, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## RELEVANT LAW REGARDING PLEADING ALLEGATIONS IN THE CONTEXT OF QUALIFIED IMMUNITY

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The "degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: . . . .  Fair notice under Rule 8(a)(2) depends on the type of case."  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008)(citing Phillips v. County of Allegheny, 515 F.3d 224, 231-232 (3d Cir. 2008).  Although the same standard applies "in evaluating dismissals in qualified immunity cases as to dismissals generally, complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants."   Robbins v. Oklahoma, 519 F.3d at 1249 (quoting Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir.

1997))(internal quotations omitted).  The Tenth Circuit has articulated the standard required to

give adequate notice to government actors sued in their individual capacities under § 1983:

> In § 1983 cases, defendants often include the government agency and a number
> of government actors sued in their individual capacities.  Therefore, it is
> particularly important in such circumstances that the complaint make clear exactly
> who is alleged to have done what to whom, to provide each individual with fair
> notice as to the basis of the claims against him or her, as distinguished from
> collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-1250 (emphasis in original).

## LAW REGARDING FIRST-AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to

inhibit exercise of the protected right.'"  Hartman v. Moore, 547 U.S. 250, 256 (2006)(quoting

Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1988)).  It is therefore "settled that as a general

matter, the First Amendment prohibits government officials from subjecting an individual to

retaliatory actions, including criminal prosecutions, for speaking out."  Hartman v. Moore, 547

U.S. at 256 (citation omitted).  The protections of the First Amendment have been incorporated

to apply against state governments as well as the federal government under the Due Process

Clause of the Fourteenth Amendment.  See Gitlow v. New York, 268 U.S. 652 (1925).

In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation

. . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights."

How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir. Feb. 22, 2007).  See Perez v.

Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005)("The First Amendment bars retaliation for

exercising the right of association.").  The Tenth Circuit has explained that "any form of official

retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution,

bad faith investigation, and legal harassment, constitutes an infringement of that freedom."  How

v. City of Baxter Springs, 217 F. App'x at 797 (quoting Worrell v. Henry, 219 F.3d 1197, 1212

(10th Cir. 2000)).   To establish a claim of retaliation, outside the employment context, for exercising the right to associate guaranteed under the First Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the defendant's adverse action.   See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v. Henry, 219 F.3d at 1212).   In line with Hartman v. Moore, the Tenth Circuit has held that a plaintiff must establish the following elements to allege a cause of action under the First Amendment against a defendant who is not his employer:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.   Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).

When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective, and not subjective inquiry.   Smith v. Plati, 258 F. 3d 1167, 1177 (10th Cir. 2001).   If a plaintiff is seeking to prove the causal connection between the retaliatory animus of a third party, and the action of another, the Tenth Circuit requires that "the plaintiff . . . show a causal connection between the third-party's animus and the action."   Leverington v. City of Colorado Springs, 643 F.3d 719, 731 n.10 (10th Cir. 2011).

1.      **Newsgathering and the First Amendment.**

While newsgathering has some First Amendment protection, its protection does not necessarily include a right to access all news-worthy information.  The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,'" that right is limited, by its terms, to the ability to gather information from sources legally that are legally available to the public.  Houchins v. KQED, Inc., 438 U.S. 1, 10-12 (1978)(quoting Branzburg v. Hayes, 408 U.S. 665, 681-82 (1972)).  "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."  Branzburg v. Hayes, 408 U.S. at 684.  First Amendment protection over newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source.  Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680).  Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[5]  Houchins v. KQED, Inc., 438 U.S. at 10-11.

_____

[5] As the Tenth Circuit has noted:

> [T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question.  See, e.g., Press–Enter. Co. v. Super. Ct., 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings).  Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir. 1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati,  258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

Also, the Supreme Court has found that an international passenger who asserted that the
Secretary of State's refusal to validate his passport to travel to Cuba violated his First
Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad
of our Government's policies, foreign and domestic, and with conditions abroad which might
affect such policies," had not suffered a First Amendment violation.  Zemel v. Rusk, 381 U.S. 1,
16-17 (1965).  The Supreme Court explained:

> There are few restrictions on action which could not be clothed by ingenious
> argument in the garb of decreased data flow.  For example, the prohibition of
> unauthorized entry into the White House diminishes the citizen's opportunities to
> gather information he might find relevant to his opinion of the way the country is
> being run, but that does not make entry into the White House a First Amendment
> right.  The right to speak and publish does not carry with it the unrestrained right
> to gather information.

Zemel v. Rusk,  381 U.S. at 16-17.

According to the Tenth Circuit, it is "well-settled  that  there  is  no  general  First
Amendment right of access to all sources of information within governmental control."  Smith v.
Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9
(1978)).  "This applies equally to both public and press, for the press, generally speaking, do not
have a special right of access to government information not available to the public."  Smith v.
Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417
U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes,
408 U.S. at 684-85; Zemel v. Rusk, 381 U.S. at 17).  See Okla. Hosp. Ass'n v. Okla. Pub.
Co.,  748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that,
whatever the extent of protection warranted newsgathering, it is no greater than the right of the
general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

2.      **Recording Police Conduct and the First Amendment.**

Neither the Tenth Circuit nor the Supreme Court has directly addressed a right -- constitutional or otherwise -- to record police or law enforcement activity in public.   In McCormick v. City of Lawrence, 130 F. App'x 987, 988-989 (10th Cir. 2005)(unpublished), the Tenth Circuit was presented with an appeal by two plaintiffs -- self-identified "constitutional rights activists and vocal critics of the Lawrence, Ks., police department" -- of a grant of summary judgment in favor of police officers whom the plaintiffs asserted violated their First Amendment rights by retaliating against them for their recording of "officers' conducting a sobriety checkpoint on June 28, 2002, and a traffic stop on July 13, 2002."  130 F. App'x at 988. The plaintiffs asserted that the officers had retaliated by "threatening plaintiffs with arrest, charging them with crimes, attacking them, searching their video and audio recording devices, and destroying tapes."  130 F. App'x at 988.  The district court dismissed the plaintiff's First Amendment claims, finding first that the plaintiffs' protests were "fighting words," McCormick v. Lawrence, 325 F. Supp. 2d 1191, 1201- 02 (D. Kan., 2004), and not protected speech, and that the "destruction of recording was not a clearly established First Amendment violation." McCormick v. Lawrence, 130 F. App'x at 988.   On appeal, the Tenth Circuit agreed, and affirmed the district court "for substantially the same reasons stated by the district court." 130 F. App'x at 988-989.

Other Circuits that have found a First Amendment right to photograph or video tape police conduct qualify the right as "subject to reasonable time, manner, and place restrictions." E.g., Smith v. Cumming, 212 F.3d at 1333.  Even the First Circuit, which found that the right was "unambiguously" established by "[b]asic First Amendment principles, along with case law from this and other circuits," noted that the right "is not without limitations. . . . [and] may be subject

to reasonable time, place, and manner restrictions."  <u>Glik v. Cunniffe</u>, 655 F.3d 78, 82, 84 (1st

Cir. 2011).  The First Circuit looked to the Supreme Court's decisions in <u>First Nat'l Bank v.</u>

<u>Bellotti</u>, 435 U.S. 765, 783 (1978), and <u>Houchins v. KQED, Inc.</u>, 438 U.S. at 11, and determined

that, under the First Amendment's "proscriptions on laws abridging the freedom of speech, or of

the press," and the Supreme Court's decisions upholding the public's access to legally available

information, the "filming of government officials engaged in their duties in a public place,

including  police  officers  performing  their  responsibilities,  fits  comfortably  within  these

principles."  <u>Glik v. Cunniffe</u>, 655 F.3d at 83 (internal quotations omitted).  The First Circuit

stated that the gathering of information "about government officials in a form that can readily be

disseminated to others serves a cardinal First Amendment interest in protecting and promoting

'the free discussion of governmental affairs.'"  <u>Glik v. Cunniffe</u>, 655 F.3d at 83 (quoting <u>Mills v.</u>

<u>Alabama</u>, 384 U.S. 214, 218 (1966)).  Applying these principles, the First Circuit found that a

plaintiff had a First Amendment right to record police officers in the Boston Common, a public

park -- "the apotheosis of a public forum" -- in which the government has a "sharply

circumscribed" ability to limit the exercise of First Amendment activity.  655 F.3d at 84.  The

First Circuit noted that the plaintiff had "filmed the officers from a comfortable remove, and

neither spoke to nor molested them in any way (except indirectly responding to the officers when

they addressed him)," which amounted to a "peaceful recording of an arrest in a public space that

does not interfere with the police officers' performance of their duties," and was thus not

"subject to limitation."  655 F. 3d at 84 (internal quotations removed).

       The Ninth and Eleventh Circuits have also recognized a right to videotape police activity

in  public.   In  <u>Smith v. Cumming</u>, the  Eleventh  Circuit  found  that  a  plaintiff  had  a  First

Amendment right to videotape police conduct, grounded in the First Amendment's protection of

"the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."  212 F.3d at 1333.  Similarly, the Ninth Circuit has stated that the First Amendment "right to film matters of public interest" extends to a plaintiff videotaping a police protest march.  Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995).

On the other hand, the Third Circuit has found, looking to its own precedent and that of other Circuits, that there is "insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on fair notice that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment."  Kelly v. Borough of Carlisle, 622 F.3d 248, 262 (3d Cir. 2010).  Although the Third Circuit's ruling was dispositive on whether the right was clearly established, and did not address whether the arrest or seizing the camera violated the Constitution, the Third Circuit pointed out that other cases fell short of finding that similar conduct violated the Constitution. See 622 F.3d at 262.  The Third Circuit noted that, while the Eleventh Circuit in Smith v. Cummings announced a "broad right to videotape police," the Third Circuit's own precedent in Giles v. Davis, 427 F.3d 197 (3d Cir. 2005), suggested a "narrower right," and implied that the plaintiff's conduct might not be protected.  Kelly v. Borough of Carlisle, 622 F.3d 262.  Lastly, the Third Circuit stated that any right to record matters of public concern is "not absolute; it is subject to reasonable time, place, and manner restrictions."  Kelly v. Borough of Carlisle, 622 F.3d at 262.  Similarly, in an unpublished opinion, the Fourth Circuit has found that there is not a clearly established right to record police activities on public property.  See Szymecki v. Houck, 353 F. App'x 852, 853 (4th Cir. 2009).

3.      **Reasonable Time, Place, and Manner Restrictions on Speech in a Public Forum.**

"[T]he Court [has] identified three types of forums: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Def. & Ed. Fund, Inc., 473 U.S. 788, 802 (1985). "Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (quoting Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 45 (1983)). "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. at 677 (quoting Cornelius v. NAACP Legal Defense & Ed. Fun., Inc., 473 U.S. at 800).

"Designated public fora . . . are created by purposeful governmental action." Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. at 677. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. at 802. Accord Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992)(stating that a designated public forum is "property that the State has opened for expressive activity by part or all of the public"). The Supreme Court looks to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. at 802. "If the government excludes a speaker who falls within the class to which a designated public forum is

made generally available, its action is subject to strict scrutiny."  Arkansas Educ. Television

Comm'n v. Forbes, 523 U.S. at 677.

"Other government properties are either nonpublic fora or not fora at all."  Arkansas

Educ. Television Comm'n v. Forbes, 523 U.S. at 655 (citing Int'l Soc'y for Krishna

Consciousness, Inc. v. Lee, 505 U.S. at 678-79).  Governmental restrictions on access to a

nonpublic forum are valid so long as "the restrictions are reasonable and [are] not an effort to

suppress expression merely because public officials oppose the speaker's view."  Cornelius v.

NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800.

> With respect to activities on government property, the Constitution does not
> require "the Government freely to grant access to all who wish to exercise their
> right to free speech on every type of Government property without regard to the
> nature of the property or to the disruption that might be caused by the speaker's
> activities."

Ramos v. Carbajal, 508 F. Supp. 2d 905, 913 (D.N.M. 2007)(Browning, J.)(quoting Cornelius v.

NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800).

The Supreme Court "has adopted a forum analysis as a means of determining when the

Government's interest in limiting the use of its property to its intended purpose outweighs the

interest of those wishing to use the property for other purposes."  United States v. Kokinda, 497

U.S. 720, 726 (1990).

> Regulation of speech activity on governmental property that has been traditionally
> open to the public for expressive activity, such as public streets and parks, is
> examined under strict scrutiny.  Regulation of speech on property that the
> Government has expressly dedicated to speech activity is also examined under
> strict scrutiny.  But regulation of speech activity where the Government has not
> dedicated its property to First Amendment activity is examined only for
> reasonableness.

United States v. Kokinda 497 U.S. at 726-27 (citing Perry Educ. Ass'n v. Perry Local Educators'

Ass'n, 460 U.S. at 45-46)(internal citations omitted).  The Supreme Court has determined that

- 86 -

this tripartite framework is necessary, because "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 803.  The Supreme Court has explained that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981)).

The Supreme Court determined in International Society for Krishna Consciousness, Inc. v. Lee that airport terminals are nonpublic forums and thus subject to reasonable time, place, and manner restrictions.  See 505 U.S. at 679-83.  In reaching this decision, the Supreme Court found that the "tradition of airport activity does not demonstrate that airports have historically been made available for speech activity."  505 U.S. at 680-81.  The Supreme Court noted that, "given the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having 'immemorially . . .  time out of mind' been held in the public trust and used for purposes of expressive activity."  505 U.S. at 680 (quoting Hague Comm. for Indus. Org., 307 U.S. 496, 515 (1939)).  The Supreme Court stated that, given the "rather short history of air transport," various religious and non-profit organizations had come to use commercial airport terminals only in recent years as a "forum for the distribution of literature, solicitation of funds, the proselytizing of new members, and other similar activity," the conduct at issue in the case.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 680.  The Supreme Court also noted that airport terminals are unlike other "transportation nodes," which the plaintiffs asserted are forums in which free speech is historically protected, because airport terminals are

public locations, which include security checkpoints, and because the Federal Aviation Administration "not infrequently" restricts public access to airport terminals.  505 U.S. at 681.

The Supreme Court further noted that airport terminals, whose primary purpose is to "provide services attractive to the marketplace," are not forums which have a principal purpose of promoting the "'free exchange of ideas.'"  505 U.S. at 682 (quoting Cornelius v. NAACP Legal Def. & Ed. Fund, Inc., 473 U.S. at 800).  The Supreme Court noted that the purpose of airport terminals is "passenger air travel, not the promotion of expression," with an emphasis on efficient air travel.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 681.  On this basis, the Supreme Court found that "neither by tradition nor purpose can the terminals be described as satisfying the standards we have previously set out for identifying a public forum." Id. at 505 U.S. at 681.

Regarding reasonable time, place and manner restrictions on speech in a nonpublic forum, the Supreme Court emphasized in International Society for Krishna Consciousness, Inc. v. Lee that the "restriction need only be reasonable; it need not be the most reasonable or the only reasonable limitation."  505 U.S. at 683 (emphasis in original)(citation omitted).  Before the Supreme Court was an airport's prohibition on solicitation within the terminal.  The Supreme Court found that the prohibition was reasonable, noting that solicitation often has a "disruptive effect . . . on business."  505 U.S. at 683.  The prohibition also kept passengers from having to alter their paths within the terminal to avoid solicitors, which could cause congestion and inefficiency, and be costly to the airport and passengers therein, "as a flight missed by only a few minutes can result in hours' worth of subsequent inconvenience."  505 U.S. at 683-84.  The Supreme Court also noted that passengers in an airport are often on tight schedules and may not complain about inappropriate solicitation out of a desire to catch their flight.  Additionally, the

airport had allowed solicitors to continue their activities on the sidewalk outside the terminals, an area frequented by the general public, and thus the solicitors were not completely cut off from reaching airport passengers.  See 505 U.S. at 684-85.

In sum, the Supreme Court in International Society for Krishna Consciousness, Inc. v. Lee stated that the "inconveniences to passengers and the burden on the [airport] officials flowing from solicitation activity may seem small, but viewed against the fact that pedestrian congestion is one of the greatest problems facing the three terminals, . . . the [airport] could reasonably worry that even such incremental effects would prove quite disruptive."  505 U.S. at 685.  The Supreme Court also noted that, if every group of solicitors were allowed inside the terminal, as the airport would be required to permit so as to remain viewpoint neutral, the concern regarding congestion and crowd control would only be accentuated.  The Supreme Court thus concluded that the airport's ban on all solicitation within the terminal was a reasonable time, place and manner restriction in the nonpublic forum of an airport terminal.  See 505 U.S. at 685.

## RELEVANT LAW ON THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949)(incorporating the rights of the Fourth Amendment to apply against state governments as well as the federal government), overruled on

- 89 -

other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

**1.      Arrests and Probable Cause.**

A legal arrest must be supported by probable cause, which is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). See Tennessee v. Garner, 471 U.S. 1, 7 (1985). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000,

1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

> ### 2.        **Relevant Law on Excessive Force.**

"Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Saucier v. Katz, 533 U.S. 194, 207 (2001).  See Cordova v. Aragon, 569 F.3d 1183, 1188 (10th Cir. 2009)("A Fourth Amendment claim of excessive force is analyzed under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries.").  Hence, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989).  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors:  the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(quoting Graham v. Connor, 490 U.S. at 1151-52)(internal quotation marks and citations omitted).  Additionally, a court must judge the reasonableness of a particular use of force from the "perspective . . . of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d at 1152 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))(citations and internal quotes omitted).

When analyzing a § 1983 claim for both excessive force and unlawful arrest, a court must look first at whether the arrest was lawful and then at whether the officers' use of force was

reasonable in light of the lawfulness of the arrest. The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007)(emphasis added).  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Cortez v. McCauley, 478 F.3d at 1126.  See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M.

2009)(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate

with the circumstances" depends upon whether the arrest was lawful).  Thus, if it is clear that the

amount of force used would have been reasonable if the detention or arrest had been appropriate,

then the plaintiff can recover damages only for the unlawful arrest -- including any damages that

flow from the officers' use of force during the arrest -- but there will be no separate excessive-

use-of-force claim.  See Cortez v. McCauley, 478 F.3d at 1127 (holding that a plaintiff must

present evidence that the force used was more than that which would be required in effectuating

a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful arrest and the

use of excessive force).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS

The Supreme Court has made clear that there is no respondeat superior liability under 42

- 92 -

U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dept. of Soc. Servs. of N.Y.C., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).  The Tenth Circuit has recognized that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and a unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)(internal quotation marks omitted)).

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 "unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise."  Kiesling v. Troughton, 107 F.3d 880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table decision)(citing Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988)).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the

municipality.   The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the

municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

     The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate,

supervisory liability for government officials based on an employee's or subordinate's

constitutional violations.   <u>See</u> <u>Garcia v. Casuas</u>, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at

*25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th

Cir. 2010)).   The language that may have altered the landscape for supervisory liability in

<u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983

suits, a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution."   556 U.S. at 676.   The Tenth Circuit in <u>Dodds</u>

<u>v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we
> conclude the following basis of § 1983 liability survived it and ultimately resolves
> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses
> responsibility for the continued operation of a policy the enforcement (by the
> defendant-supervisor or her subordinates) of which "subjects, or causes to be
> subjected" that plaintiff "to the deprivation of any rights . . . secured by the
> Constitution . . . ."

<u>Dodds v. Richardson</u>, 614 F.3d at 1199 (quoting 42 U.S.C. § 1983).   The Tenth Circuit noted,

however, that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously

understood it in this circuit in ways we do not need to address to resolve this case."   614 F.3d at

1200.   It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously

enunciated § 1983 causation and personal involvement analysis."   <u>Dodds v. Richardson</u>, 614 F.3d

at 1200.   More specifically, the Tenth Circuit recognized that there must be "an 'affirmative'

link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or

policy . . . -- express   or   otherwise   --   showing   their   authorization   or   approval   of   such

misconduct." 614 F.3d at 1200-01.  The specific example that the Tenth Circuit gave to illustrate this principle was Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, police commissioner, and other city officials liable under 42 U.S.C. § 1983 for constitutional violations that unnamed individual police officers committed.   See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).   The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a "deliberate plan by the named defendants to crush the nascent labor organizations."  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371)(internal quotation marks omitted).

## LAW REGARDING MALICIOUS ABUSE OF PROCESS UNDER NEW MEXICO STATE LAW

New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process.  See DeVaney v. Thriftway Mktg. Corp., 124 N.M. 512, 518, 953 P.2d 277, 283 (1997), overruled by Durham v. Guest, 204 P.3d 19 (N.M. 2009).  "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process."  Richardson v. Rutherford, 109 N.M. 495, 501, 787 P.2d 414, 420 (1990).  The Supreme Court of New Mexico has held that

> an abuse of process arises when there has been a perversion of the court processes to accomplish some end which the process was not intended by law to accomplish, or which compels the party against whom it has been used to perform some collateral act which he legally and regularly would not be compelled to do.

Richardson v. Rutherford, 109 N.M. at 500, 787 P.2d at 419.

The Supreme Court of New Mexico recently revised the necessary elements of the tort of malicious abuse of process.  In Durham v. Guest, the Supreme Court of New Mexico held that:

(i) an arbitration proceeding is a judicial proceeding for the purposes of a claim for malicious abuse of process, see 204 P.3d at 28; and (ii) that the requirement that the defendant initiate judicial proceedings against the plaintiff -- which had previously been an essential element to a malicious-abuse-of-process claim -- was no longer an element, see 204 P.3d at 26.  The tort of malicious abuse of process under New Mexico law now has only three elements: (i) "the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge;" (ii) "a primary motive in the use of process to accomplish an illegitimate end;" and (iii) damages.  Durham v. Guest, 204 P.3d at 26.

> In elaborating upon the first element, the Supreme Court of New Mexico commented:
>
> An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process.  A use of process is deemed to be irregular or improper if it (1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt.  Finally, we emphasize that the tort of malicious abuse of process should be construed narrowly in order to protect the right of access to the courts.

204 P.3d at 26.  About the general policies underlying the malicious-abuse-of-process tort, the Supreme Court said:

> When the judicial process is used for an illegitimate purpose such as harassment, extortion, or delay, the party that is subject to the abuse suffers harm, as does the judicial system in general.  Thus, the malicious abuse of process tort makes the process abuser liable to the other party for the harm caused by the abuse of process.

204 P.3d at 27.  The tort of malicious abuse of process is construed narrowly to protect the right of access to the courts.  See DeVaney v. Thriftway Mktg. Corp., 953 P.2d at 284.  "[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious

motive." Richardson v. Rutherford, 787 P.2d at 421 ("There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions . . . ." (citation omitted)). "[A] malicious-abuse-of-process plaintiff attempting to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." DeVaney v. Thriftway Mktg. Corp., 953 P.2d at 287. If an officer had probable cause to obtain the warrant for the plaintiff's arrest, then he acted with authority when he arrested her, and he cannot be held liable for malicious abuse of process based on a lack of probable cause, but can still be held liable under a "procedural impropriety" theory. Santillo v. N.M. Dep't of Pub. Safety, 173 P.3d at 13-14 (noting that "the procedural impropriety theory, unlike the lack of probable cause theory, does not stand or fall on the merits of the underlying claims," and that "even in meritorious cases the legal process may be abused").

**LAW REGARDING MUNICIPALITY UNDER 42 U.S.C. § 1983**

A municipality will not be held liable under 42 U.S.C. § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged. See 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants. See 450 F.3d at 1218.

**LAW REGARDING 28 U.S.C. §§ 2201-02**

Section 2201 of Title 28 of the United States Code provides that:

> In a case of actual controversy within its jurisdiction, except with respect to
> Federal taxes other than actions brought under section 7428 of the Internal
> Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in
> any civil action involving an antidumping or countervailing duty proceeding
> regarding a class or kind of merchandise of a free trade area country (as defined in
> section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering
> authority, any court of the United States, upon the filing of an appropriate
> pleading, may declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could be sought.  Any
> such declaration shall have the force and effect of a final judgment or decree and
> shall be reviewable as such.

28 U.S.C. § 2201(a).  The Supreme Court, in Maryland Casualty Co. v. Pacific Coal & Oil Co.,

312 U.S. 270 (1941), announced the test for determining whether, as contemplated by the

Declaratory Judgment Act, an actual controversy exists: "Basically, the question in each case is

whether . . . there is a substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  312 U.S. at

273.  Accord United States v. Fisher–Otis, Inc., 496 F.2d 1146, 1151 (10th Cir. 1974).  "'A

declaratory judgment is meant to define the legal rights and obligations of the parties in

anticipation of some future conduct, not simply proclaim liability from a past act.'"  Copar

Pumice Co., Inc. v. Morris, No. CIV 07–0079 JB/ACT, 2009 WL 5201799, at *17 (D.N.M. Oct.

23, 2009)(Browning, J.)(quoting Lawrence v. Kuenhold, 271 F. App'x 763, 766 (10th Cir.

2008)), aff'd, 639 F.3d 1025 (10th Cir. 2011).  See Utah Animal Rights Coal. v. Salt Lake City

Corp., 371 F.3d 1248, 1266 (10th Cir. 2004)(McConnell, J., concurring)("[A] declaratory

judgment action involving past conduct that will not recur is not justiciable.").

The Tenth Circuit has stated that a district court should consider the following factors

when deciding whether to entertain a request for declaratory relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it
> would serve a useful purpose in clarifying the legal relations at issue; [3] whether
> the declaratory remedy is being used merely for the purpose of procedural fencing
> or to provide an arena for a race to res judicata; [4] whether use of a declaratory

action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994).  Additionally, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.  Thus, "declaratory relief is alternative or cumulative and not exclusive or extraordinary."  Fed. R. Civ. P. 57 advisory committee's note.

## ANALYSIS

The Court will not apply law-of-the-case doctrine, but will consider the issues on the merits without deferring to the findings or conclusions of the MOO.  Mocek's Complaint asserts no viable claims.  He contends that the AAPD officers violated his First and Fourteenth Amendment "constitutionally protected right to record audio and video where such recording was permitted, and chill [him] from such activity in the future."  Complaint ¶ 95, at 22.  Mocek has not alleged, however, sufficient facts to show that the AAPD officers' conduct was unreasonable, and neither Supreme Court nor Tenth Circuit precedent clearly establishes this asserted constitutional right.  The AAPD officers are thus entitled to qualified immunity as to his First Amendment claims in Count II.  Regarding Mocek's Fourth and Fourteenth Amendment claims against the AAPD officers, Mocek first of all has not pled facts which would put the AAPD officers on notice that he was treated with excessive force, and the excessive force claims, as related to the AAPD officers, are thus dismissed for failure to state a claim.  Additionally, the Court concludes that, upon arrival at the screening checkpoint, the AAPD officers had reasonable suspicion -- based on all the surrounding facts that Mocek alleged in his Complaint, including those relayed to the AAPD officers by the TSA agents -- to believe that Mocek was engaged in criminal conduct.  The AAPD officers were, thus, authorized to demand Mocek's identification,

and when he did not produce identification, the AAPD officers then had probable cause to arrest him.   Mocek has thus not sufficiently alleged that he suffered a violation of his Fourth Amendment rights, and the AAPD officers are therefore entitled to qualified immunity as to Mocek's alleged injuries of an unlawful search and seizure which he asserts in Count IV.   That the arrest was made with probable cause is similarly fatal to Mocek's claims of false arrest, in Count V, and malicious abuse of process, in Count VI.   Mocek's Fifth Amendment claim fails, because the only alleged attempt that the AAPD officers made to prompt Mocek to inculpate himself was their request that Mocek produce ID, which, as a matter of law, is insufficient to constitute a violation of the Fifth Amendment.   Mocek's claim that his Sixth Amendment right to a fair criminal trial was violated fails, because Mocek received a fair trial and was acquitted of all charges.   Last, Mocek's requests for municipal liability and declaratory relief fail: because Mocek suffered no constitutional violation, even if there were an illegal policy, practice, or custom in place, it would not be the proximate cause of any injury to Mocek.

## I.   THE COURT WILL NOT APPLY LAW-OF-THE-CASE DOCTRINE TO RULE ON THE CITY MTD.

Because of the interlocutory nature of the Court's MOO granting the Federal MTD, the Court will not rely on law-of-the-case doctrine, but will consider the issues on the merits without deferring to the findings or conclusions of the MOO.   See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(holding that "law of the case doctrine has no bearing on the revisiting of interlocutory orders").   There has been no appellate decision on this case, so application of the doctrine is at the discretion of the Court, and the findings and conclusions in the MOO are, at most, persuasive authority.   See Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)(stating that the doctrine is merely a "presumption, one whose strength varies with the circumstances").

II.   **THE COURT WILL DISMISS COUNT II, BECAUSE MOCEK HAS NOT ALLEGED A VIOLATION OF HIS CLEARLY ESTABLISHED FIRST AMENDMENT RIGHTS, AND THE AAPD OFFICERS ARE THUS ENTITLED TO QUALIFIED IMMUNITY.**

Mocek asserts that he has a First and Fourteenth Amendment right to "gather information," Federal Response at 6, which the TSA agents -- and, consequently, the AAPD officers -- violated through "unlawfully ordering [him] to cease video and audio recording of them and summoning law enforcement," Complaint ¶ 93, at 21.  Whether construed as a right to newsgathering or to record police conduct in public, neither the Tenth Circuit nor the Supreme Court has recognized either right in a factual situation similar to that set forth in Mocek's Complaint.  Further, to the extent that Tenth Circuit or the Supreme Court has recognized either right, neither the Tenth Circuit's nor the Supreme Court's precedent establishes that either the TSA agents' or AAPD officers' conduct clearly violated Mocek's First Amendment rights.

A.   **MOCEK HAS NOT SUFFICIENTLY ALLEGED THAT THE AAPD OFFICERS VIOLATED HIS FIRST AMENDMENT RIGHT TO GATHER NEWS.**

Mocek asserts that his conduct of "using his camera to video record" the TSA agents' implementation of an "alternative identification policy," Complaint ¶ 46, at 11, was an exercise of his "long . . . established" First Amendment-protected right to "gather information," Federal Response, at 6.  He asserts that the TSA agents' orders, and the AAPD officers' subsequent questioning and arrest, were in retaliation against him for having video and audio recorded the TSA agents.  See Complaint ¶ 93, at 21-22.  To establish a claim against a defendant, who is not an employer, for retaliation under the First Amendment, Mocek must show that: (i) he was engaged in constitutionally protected activity; (ii) the AAPD officers' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that the AAPD officers' adverse actions were substantially motivated as a

response to the plaintiff's exercise of constitutionally protected conduct.  See Worrell v. Henry, 219 F.3d at 1212.  Mocek fails to meet this burden.

Although there is an "undoubted right to gather news from any source by means within the law," which the government may not "violate . . . by deterring news sources from communicating information," Houchins v. KQED, Inc., 438 U.S. at 10-12 (internal citation omitted), the Tenth Circuit has established that there "is no general First Amendment right of access to all sources of information within governmental control," Smith v. Plati, 258 F.3d at 1178.  Further, the "right to speak and publish does not carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. at 16-17.  The Tenth Circuit has ruled that "engaging in newsgathering activities" does not exempt a person from Federal Aviation Administration safety regulations.  Hill v. Nat'l Transp. Safety Bd., 886 F.2d 1275, 1282 (10th Cir. 1989).  Even if Mocek were engaged in newsgathering, an assertion he does not make in his Complaint, his right to do such is not without limitation.  Further, if Mocek were exercising his asserted right to record "police officers and officials in the course of carrying out their duties," Federal Response at 11, that right, which the Tenth Circuit has not yet recognized as protected First Amendment activity, is subject to reasonable to "reasonable time, manner, and place restrictions," Smith v. Cumming, 212 F.3d at 133, in the Circuits which do recognize the right. Thus, the Court can determine whether the AAPD officers' actions caused Mocek to suffer a constitutional violation only by examining whether their action was beyond the limits that may be imposed on this conduct.

The Supreme Court has determined that airport terminals are nonpublic forums and thus subject to reasonable government restrictions on First Amendment activity.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683.  In International Society for Krishna

Consciousness, Inc. v. Lee, the Supreme Court found that an airport's prohibition on solicitation inside the airport terminal did not violate the plaintiff's First Amendment rights, even though the ban precluded the plaintiffs from engaging in their religious ritual of "sankirtan," which consisted of "going into public places, disseminating religious literature and soliciting funds to support the religion." 505 U.S. at 674, 678-85. The Supreme Court found that it was "uncontested that the solicitation at issue in this case is a form of speech protected under the First Amendment," yet nonetheless found that the airport's ban on solicitation was a reasonable limitation on the plaintiffs' conduct. 505 U.S. at 677. On the other hand, the Supreme Court has held that the "right to speak and publish does not carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. at 17. Moreover, the Tenth Circuit recognizes "no general First Amendment right of access to all sources of information within governmental control." Smith v. Plati, 258 F.3d at 1178. Further, if Mocek's filming is viewed as an exercise of his right to record "officials in the course of carrying out their duties" in public, Federal Response at 11, the Supreme Court has not made an unambiguous announcement that such conduct is "uncontested" First Amendment activity. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 677. Moreover, the Circuits which have found that recording police activity in public is protected under the First Amendment analyze the activity in the context of the right to gather information regarding public officials' activity on public property and regarding matters of public interest, a right which the Tenth Circuit and the Supreme Court indicate is limited in its scope. Compare Smith v. Cumming, 212 F.3d at 1333 (finding that the right to record police activity in public flows from the "general right to gather information about what public officials do on public property, and . . . a right to record matters of public interest"), and Fordyce v. City of Seattle, 55 F.3d at 439 (finding that recording a police protest march is included in the First

Amendment right to "film matters of public interest"), with Zemel v. Rusk, 381 U.S. at 17 (finding that the "right to speak and publish does not carry with it the unrestrained right to gather information"), and Smith v. Plati, 258 F.3d at 1178 (finding that there is "no general First Amendment right of access to all sources of information within governmental control"). Thus, accepting Mocek's assertions as true that he was engaged in "newsgathering," or recording the activity of government officials in public, at the screening checkpoint, see Federal Response at 6-8, 11, his recording entails less First Amendment protection than that of the plaintiffs in International Society for Krishna Consciousness, Inc. v. Lee, conduct of which a reasonable regulation included a complete prohibition.

        Mocek recorded the TSA agents at the Albuquerque Sunport's terminal and in an even more specific location: the screening checkpoint. Moreover, Mocek began recording the TSA agents when he was standing in a separate and different line than that which passengers normally use at the checkpoint. See Complaint ¶¶ 44-45, at 10-11. Mocek asserts that he was informed that photography and video recording are not prohibited at the Albuquerque Sunport TSA screening checkpoint, but he was also informed that advance coordination of such activities is encouraged. See Complaint ¶¶ 37-42, at 9-10. These assertions fall short of showing that the screening checkpoint has "historically been made available for speech activity." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 680-81. First, Mocek has not alleged any facts which support a finding that the checkpoint's primary purpose is the "free expression of ideas" or that the TSA has "intentionally open[ed] a nontraditional public forum for public discourse." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800, 802. Further, Mocek alleges that the incident underlying the Complaint took place in "publicly accessible areas of the airport," Complaint ¶ 56, at 13, but a forum analysis does not turn on whether the public could

access the screening checkpoint, but rather on whether the screening checkpoint "has been traditionally open to the public for expressive activity,"[6] or the TSA "expressly dedicated" an area to speech activity, United States v. Kokinda, 497 U.S. at 726-27.  The Supreme Court has already found that airport terminals, which are publicly accessible, are nonpublic forums.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 679-83.  Indeed, the presence of security checkpoints at airport terminals was one of the factors which the Supreme Court used to differentiate airport terminals from other "transportation nodes," such as railway or bus stations, thus indicating that the TSA screening checkpoint at the Albuquerque Sunport is nonpublic forum, just as the Albuquerque Sunport airport terminal is.  505 U.S. at 680.  Rather than the "free expression of ideas," the primary purpose of a screening checkpoint is the facilitation of passenger safety on commercial airline flights, and the safety of buildings and of the people for whom a plane can become a dangerous weapons.  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800.  See 49 C.F.R. § 1542.201 (explaining that airports are required to "prevent and detect the unauthorized entry, presence, and movement of individuals" from an airport's secured areas).  The Court cannot soundly conclude that the Albuquerque Sunport screening checkpoint is an area traditionally open to the public for expressive activity, nor has it been designated a public forum by government action "intentionally opening a nontraditional

---

[6] The Supreme Court has used the terms of "expressive activity" and "speech activity" interchangeably in the context of describing activity that comes under the First Amendment's guarantee of the freedom of speech.  See United States v. Kokinda, 497 U.S. at 726 ("Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny." (emphasis added)); Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 678 (referring to the Supreme Court's tripartite test for the regulation of First Amendment activity and noting that "regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny," whereas, under the last category which includes areas that are neither the traditional public forum nor the designate public forum, "expressive activity conducted on this last category of property must survive only a much more limited review" (emphasis added)).

public forum for public discourse." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc. 473 U.S. at 802. Thus, taking Mocek's allegations as true and drawing all reasonable inferences in his favor, he has not alleged that the Albuquerque Sunport screening checkpoint is different from an airport terminal, an area "where the Government has not dedicated its property to First Amendment activity," and regulation of First Amendment activity therein is "examined only for reasonableness." United States v. Kokinda, 497 U.S. at 726-27.

A reasonable restriction "need not be the most reasonable or the only reasonable limitation." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683. Mocek asserts that the TSA agents unlawfully ordered him to cease recording their alternative screening procedures and summoned law enforcement when he did not comply. See Complaint ¶ 93, at 21-22. The TSA agents assert that they acted reasonably in response to Mocek's filming the alternative screening process. See MTD at 13. The Constitution does not require the TSA "'to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'" Ramos v. Carbajal, 508 F. Supp. 2d 905, 913 (D.N.M. 2007)(Browning, J.)(quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800). The Supreme Court has previously upheld a ban on all solicitation within an airport terminal on the grounds that solicitation has a "disruptive effect" on airport business, because solicitation could cause passengers to be delayed or even miss their flight, thus increasing the airport's overall costs. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683. Similarly, even if Mocek's recording was not noisy or verbally disruptive to passengers at the screening checkpoint, filming screening procedures could have a disruptive effect, because the TSA agents at the checkpoint must determine whether the filming is being done for legitimate or

illicit purposes.  Mocek declined to notify the TSA agents at the Albuquerque Sunport in advance that he intended to film at the screening checkpoint.  Moreover, he did not communicate his purpose while filming the TSA agents, nor did he provide them with other guarantees that he was not videotaping portions of the screening process which the TSA does not believe should be publicly disseminated, such as the monitors.  Mocek's persistent filming also diverted the attention of TSA agents, who could have assisted other passengers who had forgotten their identification and needed to proceed through the alternative screening procedures so as to be able to board their flights, unlike Mocek, who chose to engage in the alternative screening procedures so as to document the process.  Mocek's filming could thus have resulted in delays to other passengers, causing them to incur increased costs, and Mocek distracted the TSA agents with his filming, which could have allowed a passenger with an illicit purpose to pass through the screening checkpoint more easily.  The TSA agents' order for Mocek to stop filming, their subsequent summoning of law enforcement, and the AAPD officers' decision to question Mocek, are thus unlike the police officers' arrest of the plaintiff in Glik v. Cunniffe, which was a constitutional violation, in part, because the plaintiff "filmed the officers from a comfortable remove . . . [and] neither spoke to nor molested them in any way," and did not "interfere with the police officers' performance of their duties."  655 F.3d at 84.  Rather, Mocek's filming required the attention of multiple TSA agents, not only because he did not relate the purpose of his filming at the screening checkpoint, but also because the Department of Transportation and TSA have determined that "distractions" to TSA agents at screening checkpoints which require the employees to "turn away from his or her normal duties to deal with the disruptive individual," may "affect the screening of other individuals," or may be evidence that the disruptive individual is "attempting to discourage the screener from being as thorough as required," and thus such

distractions "potentially can be dangerous."  67 Fed. Reg. 8340-01, 8344.  Even if Mocek was engaged in conduct that has some First Amendment protection, in light of the potential danger to other passengers which Mocek's filming could have caused, the AAPD officers' order for Mocek to stop was not unreasonable.  See Kelly v. Borough of Carlisle, 622 F.3d at 262 (finding that recording police while at a traffic stop is not a clearly established right under the First Amendment, in part because traffic stops are "inherently dangerous" to officers).  The Court cannot, therefore, find that ordering Mocek to stop recording an alternative screening procedure was unreasonable, especially when Mocek did not explain why he was recording, nor did he assure the TSA agents or the AAPD officers that he was not documenting portions of the procedure which the TSA desires to keep from public dissemination, such as the monitors.  Mocek's recording could thus have had, or have led to, a "disruptive effect," making a limitation on his recording reasonable.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683.

In light of the Supreme Court's decision in Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, the Court cannot soundly conclude that the AAPD officers' order for Mocek to stop recording was an unreasonable limitation on his right to gather news at the screening checkpoint. Prohibiting Mocek from recording an alternative screening procedure is all the more reasonable than the prohibition upheld in Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, given that the screening checkpoint's purpose is to maintain passenger safety and the TSA agents' desire is to keep Mocek from documenting the process so as to develop a way to evade TSA screening protocol.  See 67 Fed. Reg. at 8344.  Furthermore, Mocek was not without the ability to record TSA agents completely -- his own investigation indicated that, had he notified the TSA in advance of his desire to film at the Albuquerque Sunport screening checkpoint, his request could have been accommodated.  Additionally, just as in Int'l Soc'y for Krishna Consciousness, Inc. v.

Lee, where the Supreme Court found that a prohibition on solicitation inside an airport terminal was reasonable in part because the airport allowed solicitation "on the sidewalk areas outside the terminals," the TSA indicated that Mocek would be allowed to record at the screening checkpoint if he had made advance coordination, and the TSA agents' actions did not inhibit his ability to gather news in other areas of the terminal, where the TSA's security concerns are likely less poignant.  505 U.S. at 694.  Thus, Mocek has not alleged that the TSA agents' and AAPD officers' orders that he stop recording constituted an unreasonable restriction on his right to gather news or record government officials' activity in public -- rights subject to reasonable time, place, and manner restrictions.  Governmental restrictions on access to a nonpublic forum are valid so long as "the restrictions are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius v. NAACP Legal Def. Fund, Inc., 473 U.S. at 800.  Mocek did not allege in his Complaint that the order to stop filming or his subsequent removal from the area were done in opposition to his viewpoint, as Mocek did not relay his viewpoint to the TSA agents or AAPD officers while filming.  His only basis for the assertion that they discriminated against him because of his viewpoint is Mocek's argument that the TSA agents and AAPD officers "assumed what his viewpoint was." 2012 Tr. at 21:18-21 (Boelcke).  Mocek contends that the TSA agents' and the AAPD officers' decision to stop him, even without knowing his viewpoint, could still constitute discrimination against his viewpoint. See 2012 Tr. at 23:8-15 (Boelcke).

In Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, the Supreme Court found that a ban on the plaintiffs' distribution of their organization's literature and solicitation of funds for the organization was reasonable in an airport terminal, and Mocek's silent recording is much less expressive of a viewpoint than that of the plaintiffs' in Int'l Soc'y for Krishna Consciousness,

- 109 -

Inc. v. Lee.  505 U.S. at 674, 679-85.  The AAPD officers' attempts to stop Mocek from recording at the screening checkpoint are, thus, reasonable in light of the Supreme Court having upheld a prohibition on conduct which propounded a viewpoint in Int'l Soc'y for Krishna Consciousness, Inc. v. Lee.  Without factual assertions in the Complaint that the AAPD officers asked him for identification or arrested him out of opposition to his unstated viewpoint, the Court cannot soundly conclude that the AAPD officers' actions were aimed at suppressing Mocek's viewpoint.  That they had other concerns is just as likely, and, under Ashcroft v. Iqbal and Bell Atl. Corp. v. Twombly, more is needed than mere possibilities in order to survive a rule 12(b)(6) motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. at 681-82 (noting the allegations in a complaint were "consistent with" the plaintiff's theory that the defendants "purposefully designated detainees of high interest because of their race, religion, or national origin," but that, because the facts did not foreclose the possibility of the defendants having a non-discriminatory motive, the complaint failed to allege discrimination as a "plausible conclusion"); Bell Atl. Corp. v. Twombly, 550 U.S. at 567-68 (finding that a plaintiff failed to sufficiently allege an antitrust violation, because an "obvious alternative [innocent] explanation" existed for defendants' conduct).  Thus, Mocek has not sufficiently stated a plausible claim that the AAPD officers violated his First Amendment rights in Count I of the Complaint.

   **B.    THE AAPD OFFICERS' ALLEGED FIRST AMENDMENT VIOLATIONS DO NOT CONSTITUTE A BREACH OF CLEARLY ESTABLISHED LAW, AND THEY ARE THUS ENTITLED TO QUALIFIED IMMUNITY.**

   Mocek characterizes the right he says the AAPD officers violated in two ways.  He asserts that "the right to engage in information gathering is a right that was clearly established." Federal Response at 10.  He also asserts that numerous Circuits have held that "recording police officers and officials in the course of carrying out their duties is directly protected by the First

Amendment."  Federal Response at 11.  The City Defendants contend that Mocek's asserted rights are not clearly established, as "there is no Supreme Court or Tenth Circuit decision on point."  Federal Reply at 33.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).

Just as the Court finds that the AAPD officers did not violate Mocek's right to gather news, which entails some First Amendment protection, neither the Tenth Circuit nor the Supreme Court has found that Mocek's right to gather news in this context is clearly established.  See Smith v. Plati, 258 F.3d at 1178 (noting that it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control").  In the specific context of airports, the Supreme Court has not reprimanded airport authorities for restricting First Amendment conduct, but has rather found that, in the nonpublic forum of an airport terminal, restrictions on First Amendment conduct need only be reasonable.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 679-683.  Thus, to the extent that the right to gather news has been addressed, precedent indicates that the government may limit the right by a reasonable restriction.  Rather than being "so thoroughly developed and consistently recognized under the law as to be indisputable and unquestioned," Lobozzo v. Colorado Dept. of Corrections, 429 F. App'x at 710, the Supreme Court has upheld reasonable limitations on First Amendment conduct in airport terminals, and thus a reasonable TSA agent in the TSA agents' shoes would not likely   understand that telling Mocek to stop recording and subsequently

summoning the police when he refused to comply violated his rights.

Looking at Mocek's conduct in a different light, Mocek asserts that numerous Circuits have upheld a right under the First Amendment to record "police officers and officials in the course of carrying out their duties." Federal Response at 11. Neither the Tenth Circuit nor the Supreme Court, however, has recognized such a right, and the weight of authority from other circuits has not found the law to be as Mocek maintains. See Currier v. Doran, 242 F. 3d at 923 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

The only case in which the Tenth Circuit has, in passing, addressed a First Amendment right to record law enforcement activity is an unpublished decision, McCormick v. City of Lawrence. The Tenth Circuit affirmed a district court's judgment that destruction of plaintiff's videotapes -- containing recordings of police conduct at a sobriety checkpoint and traffic stop -- was "not a clearly established First Amendment violation." McCormick v. Lawrence, 130 F. App'x at 988. This decision would, if anything, inform a reasonable TSA employee or officer that Mocek's recording at the screening checkpoint was not a First Amendment right that an order to stop would violate. Similarly, where other Circuits have found the right, "reasonable time, manner, and place restrictions" limit the right to record police conduct in public. Smith v. Cumming, 212 F.3d at 1333. The AAPD officers' order for Mocek to cease recording in the nonpublic forum of a screening checkpoint was a reasonable limitation as to the time, manner, and place. See Glik v. Cunniffe, 655 F.3d at 82 (noting that the right is not without limitations, such as "reasonable time, place, and manner restrictions). The Third Circuit has noted that recording police activity at a traffic stop raises safety concerns, as traffic stops are "inherently

dangerous situations."  Kelly v. Borough of Carlisle, 622 F.3d at 262-63 (noting that the right to record matters of public concerns is "not absolute," but rather "subject to reasonable time, place, and manner" limitations).  In not finding that the right was clearly established, the Third Circuit noted that the unique safety concern raised at a traffic stop distinguished the facts before the Third Circuit from that of other cases, where safety concerns were not at issue.  See 622 F.3d at 262-63.  Similarly, recording TSA agents at a screening checkpoint raises safety concerns, because, if Mocek had ill intentions and was able to record information regarding the TSA's screening procedures which would allow someone to evade the procedures, the safety of passengers at commercial airports would be jeopardized.  Thus, Mocek's conduct is more like that of the plaintiff in Kelly v. Borough of Carlisle, who did not have a clearly established right to record police while the plaintiff was detained at a traffic stop, than the plaintiff in Glik v. Cunniffe, for whom the First Circuit found the right clearly established to record police officers from a distance, in a public park, without interfering with their duties.  See Glik v. Cunniffe, 655 F.3d at 84.  The Court cannot thus soundly conclude that the weight of authority from other Circuits is "sufficiently clear that every reasonable official would have understood" that ordering Mocek to stop recording at the screening checkpoint -- and then enforcing that order by investigating Mocek, and demanding his ID -- would violate his First Amendment right.  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  Thus, because Mocek's alleged First Amendment violations were not clearly established, the AAPD officers are entitled to qualified immunity on his First Amendment claims in Count II.

**III.    THE COURT WILL DISMISS COUNT IV, BECAUSE MOCEK HAS NOT ALLEGED A VIOLATION OF HIS CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS, AND THE AAPD OFFICERS ARE THUS ENTITLED TO QUALIFIED IMMUNITY.**

The AAPD officers assert that they cannot be liable for the injuries which Mocek alleges

in Count IV of the Complaint, for the alleged violation of his Fourth and Fourteenth Amendment

rights, because they had reasonable suspicion to demand that Mocek identify himself, and, upon

his refusal, probable cause to arrest him.  Mocek also fails to allege specific facts amounting to a

claim for excessive force.  The Court concludes that Mocek did not suffer a violation of a clearly

established Fourth Amendment right, and thus grants the AAPD officers qualified immunity as to

Mocek's claims in Count IV of the Complaint.

### A.        MOCEK HAS NOT STATED A CLAIM FOR EXCESSIVE FORCE.

As the Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising
> from a single encounter, it is necessary to consider both the justification the
> officers had for the arrest and the degree of force they used to effect it.  If the
> plaintiff can prove that the officers lacked probable cause, he is entitled to
> damages for the unlawful arrest, which includes damages resulting from any force
> reasonably employed in effecting the arrest.  If the plaintiff can prove that the
> officers used greater force than would have been reasonably necessary to effect a
> lawful arrest, he is entitled to damages resulting from that excessive force. These
> two inquiries are separate and independent, though the evidence may overlap. The
> plaintiff might succeed in proving the unlawful arrest claim, the excessive force
> claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127 (emphasis added).  The Court concludes that Mocek's

arrest was lawful, thus precluding him from receiving damages from any force used in

effectuating his arrest.  Further, Mocek's Complaint contains no allegations that the AAPD

officers used more force than was reasonably necessary in arresting him.

A court assesses "objective reasonableness based on whether the totality of the

circumstances justified the use of force, and [must] pay careful attention to the facts and

circumstances of the particular case." Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255,

1260 (10th Cir. 2008)(internal quotation marks omitted).  Additionally, "[t]he 'reasonableness'

of a particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396. Mocek does not assert that any of the AAPD officer touched him or that a pat-down search was conducted. See Complaint ¶¶ 51-58, at 12-13. Mocek states that the AAPD officers "walked [him] across the airport to the Aviation Police Department office." Complaint ¶ 57, at 13. Although Mocek characterizes his holding cell at the AAPD offices as "small," he provides no factual basis for finding that his remaining in a "small" holding cell for two hours was an unreasonable use of force. Complaint ¶¶ 57-58, at 13. On the limited allegations in the Complaint, this conduct was not objectively unreasonable, and strikes much more closely to the reasonable level of force which police may use in effectuating a lawful arrest for Mocek's refusal to provide identification. See Ashcroft v. Iqbal, 556 U.S. at 681-82 (noting the allegations in a complaint were "consistent with" the plaintiff's theory that the defendants "purposefully designated detainees of high interest because of their race, religion, or national origin," but that, because the facts did not foreclose the possibility of the defendants having a non-discriminatory motive, the complaint failed to allege discrimination as a "plausible conclusion."). The facts in Mocek's Complaint, thus, do not support a plausible conclusion that he was subjected to excessive force, in violation of his Fourth Amendment rights.

### B. MOCEK HAS NOT STATED A CLAIM FOR UNREASONABLE SEARCH OR ARREST.

Mocek asserts that he suffered violations of his "rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment," when the AAPD officers arrested him, searched his belongings, and erased the memory on his camera. Complaint ¶ 97, at 23. The AAPD officers' arrest of Mocek was unreasonable if the AAPD officers lacked probable cause, based upon "facts and circumstances within" their knowledge "sufficient . . . to warrant a man of reasonable caution in the belief" that Mocek had committed

or was currently committing an offense.  United States v. Valenzuela, 365 F.3d at 896-97.

Mocek's allegations that the arrest was pretextual, even if taken as true, are irrelevant if there

was probable cause to arrest him for the commission of a crime.  See Howards v. McLaughlin,

634 F.3d 1131, 1142 (10th Cir. 2011)("Under the Fourth Amendment, the constitutionality of an

arrest does not depend on the arresting officer's state of mind.").

Mocek alleges that Dilley's incident report describes Mocek as having caused a

disturbance by disorderly conduct, refusing to identify himself, and refusing to comply with a

criminal trespass order.[7]  See Complaint ¶ 68, at 15.  Mocek asserts that the AAPD officers did

not issue him a criminal trespass order and thus, taking the facts which he has set forth as true,

the AAPD officers could not have had probable cause to arrest him for his noncompliance with

such an order.  See Complaint ¶ 69, at 15.  The Court will also take as true that, at all times

during the incident, Mocek "remained calm and restrained."  Complaint ¶ 5, at 2.

The Court concludes that after Mocek refused the AAPD officers demand that he produce

identification, they had probable cause to arrest Mocek for the crime of concealing identity under

New Mexico law.  See N.M. Stat. Ann. 1978 § 30-22-3.  For that demand to have been legal,

however, the AAPD officers must have had reasonable suspicion that Mocek was engaged in

criminal conduct.  The Court concludes that the AAPD officers did have reasonable suspicion,

and thus concludes that the arrest and incident search of Mocek was not unreasonable.

---

[7] Mocek was not informed at the time of his arrest why he was being arrested.  See Complaint ¶ 55, at 13.  Mocek sets forth that Dilley filed an incident report for the arrest, which stated that Mocek was engaged in disorderly conduct, he refused to identify himself, and he refused to comply with a criminal trespass order.  See Complaint ¶ 68, at 15.  Construing the Complaint in the light most favorable to Mocek, the Court thus concludes that Mocek was arrested for the alleged conduct which Dilley describes in his incident report.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd, 551 U.S. at 322 (holding that only if a "reasonable person could not draw an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.").

1.      **The AAPD Officers Had Reasonable Suspicion to Demand That Mocek Produce Identification.**

Police officers "lacking 'reasonable suspicion to believe [a person] was engaged or had engaged in criminal conduct' may not demand identification and arrest the person for failing to provide it." Romero v. Schum, 413 F. App'x 61, 64 (10th Cir. 2011)(alterations in original)(quoting Brown v. Texas, 443 U.S. 47, 53 (1979). The Tenth Circuit has stated that this requirement of reasonable suspicion to order identification "remains black letter Fourth Amendment law." Romero v. Schum, 413 F. App'x at 64. See Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(holding, following Brown v. Texas, that, "to arrest for concealing identity, there must be reasonable suspicion of some predicate, underlying crime"). Thus, the AAPD officers had the authority to order Mocek to produce identification if they also had reasonable suspicion that he was, or had been, engaging in criminal conduct.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir.2004)). This standard is met by information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134. See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

For reasonable suspicion to exist, officers are not required "to observe the equivalent of direct evidence of a particular specific crime" as long as "there is reasonable suspicion of criminal activity." United States v. Pack, 612 F.3d 341, 357 (5th Cir.2010). "Likewise, to establish that reasonable suspicion exists, officers have no obligation to articulate a specific

offense which they believe the suspect may have committed." United States v. Harmon, 871 F. Supp. 2d 1125, 1160 (D.N.M. 2012)(Browning, J.). See United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(not requiring evidence of a specific crime when the defendant "showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home"); United States v. Reyes-Vencomo, No. CR 11-2563, 2012 WL 843611, at *16 (D.N.M. Feb. 13, 2012)(Browning, J.)(stating that, in United States v. Ceballos, "[t]he Tenth Circuit did not require the officer to identify the particular crime of which he she had reasonable suspicion, or even to acknowledge that he had reasonable suspicion").   Additionally, when analyzing the reasonableness of an officer's suspicion, a court should examine whether "the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed," and the Tenth Circuit has stated "that the officer's 'subjective characterization of his actions is irrelevant.'" United States v. Rodriguez, 836 F. Supp. 2d 1258, 1274 (D.N.M. 2011)(Browning, J.)(quoting United States v. Ceballos, 355 F. App'x at 227-29).

Mocek alleges that, when the AAPD officers arrived at the scene, TSA agents informed the AAPD officers that Mocek was "causing a disturbance," would not "put his camera down," and was "taking pictures of all" of the TSA agents.  Complaint ¶ 49, at 11-12.  Taking Mocek's facts as true, Mocek remained calm and did not raise his voice throughout the entire incident. On the other hand, his calm demeanor does not necessarily contradict TSA agents' statements that he was causing a disturbance.  The term "disturbance" does not have a specific meaning that would include only noisy or boisterous conduct.  Webster's Third New Int'l Dictionary 661 (Philip B. Gove, et. al.)(1993)(defining a "disturbance" as "the act or process of disturbing or the

state of being disturbed."); Webster's Third New Int'l Dictionary 661 (defining "disturb" as "to turn or distract (a person) by disturbance").  The Court has concluded that Mocek's recording was a distraction to the TSA agents, and his recording could have raised safety concerns at the screening checkpoint.  Passengers are prohibited from interfering with, assaulting, threatening, or intimidating TSA screening personnel in the performance of their duties at a screening checkpoint.  See 49 C.F.R. § 1540.109.  Passengers are also prohibited from tampering with or interfering with the screening procedures at screening checkpoint.  See 49 C.F.R. § 1540.105.  Furthermore, the TSA at the Albuquerque Sunport is required to have a security program, which provides for law enforcement personnel "in the number and manner adequate to support each system for screening persons and accessible property."  49 C.F.R. § 1542.215.  The TSA has contemplated that summoning law enforcement personnel may be necessary when an individual interferes with a TSA agents' duties at the screening checkpoint, or otherwise distracts TSA agents from the screening procedures.  See 67 Fed. Reg. 8344.  Thus, the TSA agents could truthfully tell the AAPD officers that Mocek was causing a disturbance in so far as his conduct was distracting the TSA agents from their normal duties, and his conduct could have been interpreted as having a ulterior purpose of allowing others to pass through the screening checkpoint unnoticed because of the TSA agents' distraction.  Mocek's informing the TSA agents that he was not trying to stop them from doing their jobs does not obviate that his Complaint also sets forth that his recording caused at least two TSA agents, and three AAPD officers, to divert their attention to him.  See Complaint ¶ 51, at 12.  Further, the AAPD officers observed Mocek refusing to comply with the TSA agents' order that Mocek cease filming, a reasonable order under the circumstances, because Mocek's right to film at the checkpoint is subject to reasonable time, place, and manner restrictions.  See Complaint ¶ 52, at 12.  Mocek alleges that he contested

the AAPD officers' assertions that he could not film at the screening checkpoint.  See Complaint ¶ 52, at 12.  Additionally, after Dilley requested Mocek to produce identification, Mocek did not initially comply, but rather asserted that he "had not disturbed the peace."  Complaint ¶ 54, at 12.

Thus, upon arriving at the screening checkpoint, a potentially dangerous location, the AAPD officers: (i) were truthfully and actually informed by TSA agents that Mocek's actions were causing a disturbance; (ii) were informed by TSA agents that Mocek would not comply with their order to cease filming; (iii) observed Mocek refusing to comply with the TSA agents' and the AAPD officers' orders; and (iv) observed that Mocek's conduct had drawn at least two TSA agents away from their normal duties.  The AAPD officers need not "observe the equivalent of direct evidence of a particular crime" to have reasonable suspicion of criminal activity.  United States v. Pack, 612 F.3d at 357.  The TSA agents' summoning of the AAPD officers is one basis upon which the AAPD officers could form reasonable suspicion, given that screening checkpoints are potentially dangerous locations when TSA agents are distracted from their screening duties and TSA agents informed the AAPD officers that Mocek would not comply with their orders during an alternative screening procedure.  See 67 Fed. Reg. 8344 (noting that screening checkpoint disruptions can be "potentially dangerous" when the disruption requires a TSA employee to turn away from his or her normal duties, and that summoning law enforcement may be appropriate in such situations).  Under a totality of the circumstances, the AAPD officers were summoned to a potentially dangerous screening checkpoint in response to Mocek's conduct, which had distracted at least two TSA agents from their duties, and a reasonable police officer could form reasonable suspicion that Mocek had an intent to film sensitive screening procedures, or otherwise disrupt the screening procedures so that another could evade the TSA agents' screening procedures.  Although, taking the facts set forth in the Complaint as true,

Dilley was incorrect in describing Mocek as having raised his voice and refused to lower it, see Complaint ¶ 68, at 15, Dilley's "subjective characterization" of Mocek's actions is irrelevant in assessing reasonable suspicion, United States v. Ceballos, 355 F. App'x at 227-29. Mocek's conduct may fall short of the crime of disorderly conduct, which, under New Mexico law requires that a person was "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace," N.M. Stat. Ann. 1978 § 30-20-1, but the AAPD officers may still have had reasonable suspicion even if his conduct did not make him culpable under the crime with which he was charged. The AAPD officers "have no obligation to articulate a specific offense which they believe" Mocek committed for their suspicion to have been reasonable. United States v. Harmon, 871 F. Supp. 2d at 1160. The Court has previously found that, when police are summoned to a convenience store in response to a 911 call, although the call does not impart reasonable suspicion alone, when the police observe individuals with partially concealed firearms, and the caller informed the police that the individuals were showing the guns to each other inside the convenience store, the police had reasonable suspicion to believe that the individuals were carrying concealed firearms without a license, in contravention of New Mexico law. See United States v. Rodriguez, 836 F. Supp. 2d 1258, 1282 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 481 (10th Cir. 2013). Here, the AAPD officers were informed that Mocek was causing a disturbance, and arrived and saw that he was not complying with the TSA agents' orders, and Mocek subsequently refused to comply with the AAPD officers' order that he cease filming. That the TSA agents, government agents charged with assessing "current and potential threats to the domestic air transportation system," informed the AAPD officers that Mocek was causing a problem makes the information which they relayed to the AAPD officers all the more weighty than that of a 911 caller in assessing whether the

AAPD officers had reasonable suspicion.  49 U.S.C. § 44904(a).  The AAPD officers were not required to rule out the possibility that Mocek was engaged in innocent recording to have reasonable suspicion that his filming of the TSA agents, which drew them away from their duties, was done with an ulterior motive to secure sensitive information, create a disturbance that allowed others to evade screening procedures, or to commit a crime at the screening checkpoint where such disruptions are potentially dangerous.  Thus, under a totality of the circumstances, and taking all of the facts which Mocek has alleged as true, the Court cannot soundly conclude that the AAPD officers were without reasonable suspicion that Mocek had been, or currently was, engaging in criminal activity when Dilley demanded his identification.

2.      **The AAPD Officers Had Probable Cause to Arrest Mocek**.

Because the Court concludes that the AAPD officers had reasonable suspicion that Mocek was engaging in criminal activity at the screening checkpoint, the Court further concludes that Mocek's arrest was lawful.  The AAPD officers could legally demand Mocek to produce identification, because they had reasonable suspicion that he was engaged in criminal activity. His failure to produce that identification thus gave the AAPD officers probable cause to arrest him.  Concealing one's identity is a misdemeanor under New Mexico law:

> Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

> Whoever commits concealing identity is guilty of a petty misdemeanor.

N.M. Stat. Ann. 1978 § 30-22-3.   See Albright v. Rodriguez, 51 F.3d 1531 (10th Cir. 2002)(holding that a sheriff's sergeant was entitled to qualified immunity from a § 1983 claim alleging unreasonable arrest, where the sergeant had reasonable suspicion to ask the plaintiff for

ID, and the plaintiff's refusal to provide it constituted probable cause for the plaintiff's arrest for concealing identity); State v. Dawson, 983 P.2d 421 (N.M. Ct. App. 1999)(holding that passive refusal to provide ID can constitute the offense of concealing identity).

The AAPD officers decision to arrest Mocek was legal, because under New Mexico law an officer may arrest a suspect who commits a misdemeanor in the officer's presence. See Tanner v. San Juan Cnty. Sheriff's Office, 864 F. Supp. 2d 1090, 1124 n.23 (D.N.M. 2012)(Browning, J.)(recognizing that "New Mexico . . . follows the 'misdemeanor arrest rule' that 'an officer may only arrest without a warrant one guilty of a misdemeanor if committed in his presence.'" (quoting City of Santa Fe v. Martinez, 2010-NMSC-033 ¶ 6, 148 N.M. 708, 710-11, 242 P.3d 275, 277-78 (2010))).  The subsequent search of Mocek was also proper.  "For a search incident to an arrest to be legitimate, the following must be true: '(1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search.'"  United States v. Giangola, No. CR 07-0706 JB, 2008 WL 6020505, *17 (D.N.M. July 24, 2008)(Browning, J.)(quoting United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998)). The Court concludes that the search incident to Mocek's arrest was valid, because the AAPD officers had probable cause to arrest him, and because, as Mocek alleges, he was searched as soon as he was taken to the AAPD offices, immediately after his arrest.  See Complaint ¶ 57, at 13.  The Court thus concludes that Mocek has not stated a violation of his Fourth Amendment right to be free from unreasonable search and seizure.

**C.    THE AAPD OFFICERS' CONDUCT DID NOT VIOLATE MOCEK'S CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS, AND THEY ARE THEREFORE ENTITLED TO QUALIFIED IMMUNITY.**

Mocek asserts that he suffered Fourth Amendment deprivations at the AAPD officers' hands.  See Complaint ¶ 99, at 23.  He asserts that, when the AAPD officers arrived at the

screening checkpoint, the TSA agents informed the AAPD officers that Mocek was "causing a disturbance."   Complaint ¶ 49, at 11.   The Complaint sets forth in numerous instances that he was not raising his voice, yelling, or otherwise disturbing the passengers who attempted to pass through the screening checkpoint.   See Complaint ¶ 5, at 2; id. ¶¶ 69, 71, 73, at 15-17.   The City Defendants contest this assertion as "conclusory."   2012 Tr. at 7:8-10 (Martin).   The Court's analysis does not rest on Mocek's use of the term "disturbance" in the Complaint.   Taking Mocek's allegations as true, Mocek did not raise his voice, yell, or disrupt the passengers proceeding through the screening checkpoint during the entire incident.   Also taking Mocek's allegations as true, Mocek refused to cease recording when the TSA agents and the AAPD officers ordered him to stop.   The Court has already concluded that the TSA agents' order for Mocek to cease, and the AAPD officers' actions upon Mocek's refusal, were reasonable under the circumstances.   See 67 Fed. Reg. 8344.   The Court's analysis of the TSA agents' qualified immunity does not rest upon whether Mocek was distracting passengers or whether he raised his voice at the screening checkpoint, but rather is determined by Mocek's admitted refusal to cease recording at the screening checkpoint, where his right to do so is subject to reasonable time, place, and manner limitations.

Taking the facts in the Complaint as true, and construing all inferences in Mocek's favor, the AAPD officers' conduct did not violate clearly established Tenth Circuit or Supreme Court law.   The TSA agents had the authority to order Mocek to cease filming, under the circumstances, and the AAPD officers were entitled to enforce and rely upon that authority.   The AAPD officers' conduct is unlike that of the defendants in Trask v. Franco, who lacked the authority to search the plaintiffs' home, or that of the defendants in Martinez v. Carson, who lacked reasonable suspicion that the plaintiffs were engaging in criminal activity.   The AAPD

officers are thus not liable for the harm of which Mocek complains in Count IV, and the Court

grants them qualified immunity as to those claims.

IV.     **THE COURT WILL DISMISS COUNT V, BECAUSE MOCEK HAS  NOT STATED A PROPER CLAIM FOR FALSE ARREST.**

Mocek's claim that the AAPD officers are liable under New Mexico tort law for false

arrest fails for the same reason that his Fourth Amendment unreasonable search and arrest claim

fails: the AAPD officers had probable cause to arrest him.  In New Mexico, "an essential element

of [false arrest] is a lack of probable cause." Jackson v. N.M. Pub. Defender's Office, 361 F.

App'x 958, 964 (10th Cir. 2010).  See Hoffman v. Martinez, 92 F. App'x 628, 632 n.3 (10th Cir.

2004).[8]  "An officer who has probable cause to arrest a person cannot be held liable for false

arrest or imprisonment, since probable cause provides him with the necessary authority to carry

out the arrest." Santillo v. N.M. Dep't of Pub. Safety, 173 P.3d 6, 10 (N.M. Ct. App. 2007).

Mocek's Complaint does not make clear whether his false arrest claim arises under §

1983 or state tort law, but it makes no difference.  See Complaint ¶¶ 100-01, at 23-24.  The Tenth

Circuit has held that a plaintiff must establish that the arresting officer lacked probable cause in

order to prevail on a § 1983 false arrest claim.  See Taylor v. Dillards Dep't Stores, Inc., 971 F.2d

---

[8] These two cases are unpublished opinions, but the Court can rely on unpublished
opinions to the extent their reasoned analyses are persuasive in the case before it.  See 10th Cir.
R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their
persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that these cases
have persuasive value with respect to a material issue, and will assist the Court in its disposition
of this memorandum opinion and order.

601, 603 (10th Cir. 1992)(stating that "[p]robable cause constitutes a complete defense to an action for false arrest," and "malice and ill will[] are irrelevant" (first alteration in original)(citation omitted)(internal quotation marks omitted)); Jackson v. N.M. Pub. Defender's Office, 361 F. App'x at 964.  The Court, therefore, will dismiss Count V of the Complaint.

## V.    THE COURT WILL DISMISS COUNT VI, BECAUSE MOCEK HAS NOT STATED A CLAIM FOR MALICIOUS ABUSE OF PROCESS UNDER NEW MEXICO STATE LAW.

Mocek's claim of malicious abuse of process fails, because the AAPD officers had probable cause to arrest him when they did.  New Mexico recognizes two broad theories of liability for malicious abuse of process: the "lack of probable cause theory" and the "procedural impropriety theory."  Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. 84, 91, 173 P.3d 6, 13 (Ct. App. 2007); Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. 150, 159, 164 P.3d 31, 40 (2007).  Both theories have the same three elements: (i) "the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge;" (ii) "a primary motive in the use of process to accomplish an illegitimate end;" (iii) and damages. Durham v. Guest, 145 N.M. 694, 701, 204 P.3d 19, 26 (2009).  The two theories correspond to the two ways to satisfy the first element: either prove that (i) the complaint was filed without probable cause; or that (ii) "'process has been perverted to accomplish an ulterior purpose for which it was not designed,'" which can be established by proving "acts or failures to act prior to and after filing a complaint that suggest extortion, delay, or harassment." Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 91, 173 P.3d at 13 (quoting Richardson v. Rutherford, 109 N.M. 495, 501-02, 787 P.2d 414, 420-21 (1990)).

Mocek asserts the lack of probable cause theory[9] in his Complaint:

---

[9] It is possible that facts alleged elsewhere in Mocek's Complaint -- such as his allegation

that the AAPD officers attempted to destroy a videotape belonging to Mocek that ultimately became exculpatory evidence at his criminal trial -- might support a claim for malicious abuse of process under the procedural impropriety theory.  See Complaint ¶ 83, at 20; id. ¶¶ 87-88, at 20-21.  These same facts might support a claim under the Takings Clause, trespass to chattels, or common law negligence, as well; the Court is limited to assessing the claims presented to it by the parties, and Mocek's claim, fairly construed, alleges malicious abuse of process on the basis of an arrest without probable cause.  See U.S. Const. amend. V.

It is not clear that the Court could hear this claim even under the procedural impropriety theory.  With the federal causes of action all dismissed, the Court's only basis for jurisdiction over Mocek's state law malicious abuse of process claim is Mocek's unsupported assertion that the Court has diversity jurisdiction under 42 U.S.C. § 1332.  See Complaint ¶ 12, at 3.  Although Mocek is a citizen of Washington and the City Defendants are all citizens of New Mexico, Mocek has not alleged that this case meets or exceeds the $75,000 amount-in-controversy requirement.  The only dollar amounts mentioned in the Complaint are Mocek's "$34,000 in legal costs to defend against the criminal charges," and "bail [that was reduced] from $3,000 to $1,000."  Complaint ¶ 90, at 21; id. ¶ 80, at 19.  These amounts add up to less than half of the jurisdictional requirement.  See 42 U.S.C. § 1332.

Last, it is possible, although unlikely, that the AAPD officers are absolutely immune from this claim under New Mexico law.  N.M. Stat. Ann. 1978, 41-4-4 provides that "any public employee while acting within the scope of duty [is] granted immunity from liability for any tort."  There is an exception to this immunity for law enforcement officers, that provides that

> immunity . . . does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges, or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. 1978, 41-4-12.  The statute was passed in 1977, two decades before the Supreme Court of New Mexico merged the torts of malicious prosecution and abuse of process.  Hence, the new tort is not included in the statute.  However, its predecessor component torts are listed, and there are cases holding that a malicious abuse of process claim can be pursued against a law enforcement officer.  See, e.g., Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. 84, 173 P.3d 6 (Ct. App. 2007).  On the other hand, it is not clear from either the text of the statute or New Mexico case law whether Mocek must actually suffer "personal injury, bodily injury, wrongful death, or property damage," to trigger the waiver of immunity, or whether "deprivation of any right[]" is listed on the same level as the other forms of injury, and thus sufficient in itself.  The reading that requires tangible injury to waive immunity has some force, as the other interpretation allows "deprivation of any right[]" to swallow the other items in the list, rendering them without content.  If the Legislature had desired that result, it could have written a statute waiving immunity for all intentional conduct by law enforcement officers in a much shorter, clearer form.

Defendants' above-described policies, practices, and conduct in instituting criminal judicial proceedings against Plaintiff and misusing and actively participating in the misusing of the legal process by filing a criminal complaint against Plaintiff without probable cause or by inducing the filing of a criminal complaint against Plaintiff without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against Plaintiff for his video and audio recording of them, were intended to and did cause damages to Plaintiff.

Complaint ¶ 103, at 24 (emphasis added).

As the Court has concluded that the AAPD officers had probable cause to arrest Mocek, this claim fails on its own terms.  The Court, therefore, will dismiss Count VI.

## VI.   THE COURT WILL DISMISS MOCEK'S FIFTH AMENDMENT CLAIM, BECAUSE HE HAS NOT ALLEGED A VIOLATION OF HIS CLEARLY ESTABLSIHED FIFTH AMENDMENT RIGHTS, AND THE AAPD OFFICERS ARE THUS ENTITLED TO QUALIFIED IMMUNITY.

Mocek attempts to amend his Complaint to add a claim for violations of his Fifth and Fourteenth Amendment rights; the Court will consider this claim despite Mocek's improper procedure in attempting to amend the Complaint, and decide that he has not stated a proper claim.  Opposition at 21, 23.  An officer does not violate a suspect's constitutional right to remain silent by merely demanding that the suspect identify himself, and that is all that Mocek has alleged the AAPD officers did.

Mocek argues that the AAPD officers "sought to make [him] speak despite his attempts to remain silent, in the hope of obtaining a statement that could be used as a threat of impeachment if [he] testified in his own behalf."  Opposition at 21-22.  He asserts that "[s]uch conduct has been found as reprehensible" and asserts a Fifth Amendment violation "based on" Cooper v. Dupnik, 963 F.2d 1220 (9th Cir. 1992), the only case cited in support of his claim.  Opposition at 22.  In Cooper v. Dupnik, officers arrested a suspected rapist and interrogated him at their station house for four hours, ignoring persistent requests from the suspect to speak with

his attorney, and eliciting incriminating and embarrassing information before releasing him twenty-four hours later.  See 963 F.2d at 1237.  The facts here bear no resemblance.

A suspect's Fifth Amendment right to remain silent is shielded from police inquiry only when the suspect is in the custody of law enforcement.  See Miranda v. Ariz., 384 U.S. 436, 460-61; Cooper v. Dupnik, 963 F.2d at 1238.  Even assuming, however, that Mocek was in custody for the entire duration of his interaction with AAPD officers, he has still not stated a proper claim.  According to the Complaint, the only question the AAPD officers asked Mocek the entire time was what his name was.  See Complaint ¶¶ 49-63, at 11-14.  In fact, the AAPD officers on two occasions instructed Mocek "to stop talking."  Complaint ¶¶ 59, 60, at 13, 14.

The Supreme Court has held that a police officer's demand that a suspect identify himself or provide basic biographical information does not violate the suspect's Fifth Amendment or Miranda v. Arizona rights.  See Hoffman v. United States, 341 U.S. 479, 486 (1951); Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty., 542 U.S. 177, 188 (2004)("An identity request has an immediate relation to the Terry stop's purpose, rationale, and practical demands." (emphasis added)).  Under the Fourth Amendment, police must have reasonable suspicion that the suspect is engaged or about to engage in criminal activity to demand identification from the suspect -- and the AAPD officers had reasonable suspicion -- but this requirement does not bear on the Fifth Amendment analysis.  Far from violating clearly established law, the AAPD officers were acting within their investigatory authority in requesting that Mocek identify himself, and thus are entitled to qualified immunity on Mocek's Fifth Amendment claim.

## VII.   THE COURT WILL DISMISS MOCEK'S SIXTH AMENDMENT CLAIM, BECAUSE HE HAS NOT ALLEGED A VIOLATION OF HIS CLEARLY ESTABLISHED SIXTH AMENDMENT RIGHTS, AND THE AAPD OFFICERS ARE THUS ENTITLED TO QUALIFIED IMMUNITY.

Mocek attempts to amend his Complaint to add a claim for violations of his Sixth and

Fourteenth Amendment rights; the Court will consider this claim despite Mocek's improper procedure in attempting to amend the Complaint and decide that he has not stated a proper claim. See Opposition at 18, 23.  Mocek's Sixth Amendment claim is moot, because -- as suggested by Mocek in the hearing on the MTD -- his full acquittal at his criminal trial obviates any injury that might have otherwise been done to his right to a fair criminal trial.  See 2013 Tr. at 19:23-20:2 (Simpich).

Mocek asserts an unspecified violation of his Sixth Amendment right to a fair criminal trial.  See Opposition at 18, 23.  The factual basis for the claim appears to be the AAPD officers' alleged attempts to destroy Mocek's videotape, which he characterizes as "exculpatory evidence."  Opposition at 18.  The claim was not included in the Complaint, and in the six lines of text that his Opposition devotes to the argument, Mocek cites one case, Geter v. Fortenberry, 849 F.2d 1550 (5th Cir. 1988).  Opposition at 18.  That case is not a Sixth Amendment case and in fact does not reference the provision a single time.

Regardless of any illegality that the AAPD officers may have perpetrated, "the withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial."  United States v. Bagley, 473 U.S. 667, 678 (1985).  "[A] defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."  Morgan v. Gertz, 166 F.3d 1307, 1310 (10th Cir. 1999).  Because Mocek was acquitted of all charges at his criminal trial, his claim of a Sixth Amendment violation fails.[10]  See Complaint ¶ 88, at 21.

**VIII.  THE COURT WILL DISMISS COUNT VII, BECAUSE MOCEK HAS NOT**

---

[10] Mocek's lack of confidence in this claim was made plain not only from its omission from the Complaint and the scant attention given to it in the Opposition, but in the hearing on the City MTD as well:  "[T]here's some language in the Sixth Amendment cases suggesting that if you got an acquittal that's the end of the matter . . . ."  2013 Tr. at 19:25-20:2 (Simpich).

ALLEGED A VIOLATION OF ANY LEGALLY COGNIZABLE RIGHT.

After dismissing all of Mocek's claims against the AAPD officers and concluding that Mocek's constitutional rights -- and certainly his clearly established constitutional rights -- were not infringed, the Court must also dismiss Mocek's claims against the City of Albuquerque for municipal liability under § 1983.  "[T]o establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged."  Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LFG, 2007 WL 2219449, at *13 (D.N.M. May 14, 2007)(Browning, J.)(citing Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006)), rev'd on other grounds, 535 F.3d 1198 (10th Cir. 2008).  Mocek fails on prongs (i) and (iii), and could not prevail against the City of Albuquerque even if he could establish (ii).  Absent a violation of his legally cognizable rights, even if the City or the AAPD had "in force and effect a policy, practice, or custom" of violating individual rights, such a policy was not the proximate or legal cause of any injury to Mocek.  The Court, therefore, dismisses Count VII of the Complaint.

IX.    THE COURT WILL DISMISS COUNT VIII, BECAUSE MOCEK HAS NOT ALLEGED A VIOLATION OF ANY LEGALLY COGNIZABLE RIGHT.

Having concluded that Mocek has not suffered a violation of any legally cognizable right, the Court will dismiss his claim for declaratory and equitable relief under 28 U.S.C. §§ 2201-02.  Even if Mocek had alleged proper claims, they would not -- with the possible exception of his First Amendment claim -- be amenable to declaratory relief.  "'A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act.'"  Copar Pumice Co., Inc. v. Morris, No. CIV 07–0079 JB/ACT, 2009 WL 5201799, at *17 (D.N.M. Oct. 23, 2009)(Browning, J.)(quoting Lawrence v.

Kuenhold, 271 F. App'x 763, 766 (10th Cir. 2008)), aff'd, 639 F.3d 1025 (10th Cir. 2011).  See Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1266 (10th Cir. 2004)(McConnell, J., concurring)("[A] declaratory judgment action involving past conduct that will not recur is not justiciable.").  The alleged Fourth, Fifth, and Sixth Amendment violations, false arrest, and malicious abuse of process claims stem from a one-off encounter between Mocek and certain AAPD officers, no more likely to recur than any other incident that could give rise to a lawsuit, and, thus, is not appropriately addressed with declaratory relief.

Mocek asserts that the First Amendment violation he alleges is the result of an ongoing government policy, is likely to recur, and, thus, is ripe for declaratory relief.  Even if there were an ongoing policy of violating First Amendment rights at airport security screening checkpoints, it would likely be the TSA, not the AAPD or the City of Albuquerque, that controls such a policy, and the TSA agents have already been dismissed from this case.  At any rate, the Court need not go into a nuanced analysis of this issue, as the Court's conclusion that none of Mocek's rights were violated obviates the need for closer consideration: if Mocek has suffered no injury, he can receive no remedy.  The Court will dismiss Count VIII.

Taking the facts which Mocek sets forth as true, and reading the Complaint in the light most favorable to him, Mocek's allegations against the City Defendants fall short of plausibility. See Ashcroft v. Iqbal, 556 U.S. at 678.  Mocek has not stated that the AAPD officers plausibly violated his First Amendment rights, as he has not shown that their order -- and its subsequent enforcement -- for him to cease recording at the screening checkpoint was an unreasonable restraint on his right to gather news, a right with only limited constitutional protection. Additionally, Mocek has not shown that the AAPD officers acted in retaliation towards Mocek's viewpoint, as he did not express a viewpoint at any time during the incident.  Further, any right

that Mocek has to gather news in the nonpublic forum of an airport terminal, or to record police activity at a screening checkpoint, was not clearly established at the time of the incident, and thus the AAPD officers are entitled to qualified immunity on Mocek's First Amendment allegations.

Additionally, Mocek has failed to allege that he suffered Fourth Amendment violations at the AAPD officers' hands.  The Court concludes that the AAPD officers had reasonable suspicion that Mocek was engaging in criminal activity at the screening checkpoint, given that the TSA agents summoned the AAPD officers to assist with Mocek's refusal to comply with the TSA agents' orders, the AAPD officers observed Mocek refusing to comply with the TSA agents' orders, and Mocek refused to comply when the AAPD officers ordered him to cease filming. The TSA has determined that distracting situations at screening checkpoints can be potentially dangerous, and, thus, in light of the totality of Mocek's actions at the screening checkpoint, the AAPD officers were reasonable to suspect that Mocek was engaged in some form of unlawful conduct.   Dilley was, therefore, within the parameters of the law to demand Mocek's identification, and when Mocek refused, Dilley then had probable cause to arrest Mocek for the misdemeanor -- concealing identity -- committed in Dilley's presence.  Because Mocek's arrest was lawful, the search of him incident to his arrest was similarly lawful.  Moreover, Mocek has not alleged any facts which would support his contention that he was subjected to excessive force when the AAPD officers effectuated his arrest.  Further, the AAPD officers' conduct did not violate clearly established Tenth Circuit or Supreme Court law, and they are thus entitled to qualified immunity as to Mocek's claims.  The conclusion that the AAPD officers had probable cause to arrest Mocek is also dispositive of his false arrest and malicious abuse of process claims.

Mocek has not alleged a violation of his Fifth Amendment right to remain silent, because the only communications made by the AAPD officers to Mocek related to their demand that Mocek produce identification, which the Supreme Court has held does not violate a suspect's rights under the Fifth Amendment or <u>Miranda v. Arizona</u>.  Mocek has not properly alleged a violation of his Sixth Amendment right to a fair criminal trial, because any such violation was rendered moot by the fact that received a trial and was acquitted of all charges.

Last, Mocek is not entitled to declaratory relief, nor can the City be held liable as a municipality: even if the City of Albuquerque had an illegal policy in place, it could not be the cause of any injury to Mocek, because the AAPD officers did not violate his rights.

**IT IS ORDERED** that the City of Albuquerque Defendants' Motion to Dismiss, filed February 1, 2013 (Doc. 54), is granted.  The Court will dismiss all remaining Counts and claims in Mocek's Complaint.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Geoffrey King
James Wheaton
Lowell Chow
First Amendment Project
Oakland, California

--and--

William Simpich
Law Office of William Simpich
Oakland, California

--and--

- 134 -

Mary Louise Boelcke
Law Office of Mary Louise Boelcke
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Jeffrey L. Baker
Renni Zifferblatt
The Baker Law Firm
Albuquerque, New Mexico

     *Attorneys for Defendants City of Albuquerque, Albuquerque Aviation Police*
        *Department, and Marshall Katz, Robert F. Dilley, Landra Wiggins,*
        *and Julio De La Pena*

Kenneth J. Gonzales
   United States Attorney
Manuel Lucero
  Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

--and--

Edward J. Martin
United States Department of Justice
Civil Division
Washington, D.C.

     *Attorneys for Defendants Jonathon Breedon, Gerald Romero,*
        *and Anthony Schreiner*