1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3

   PHILLIP MOCEK,
4
                      Plaintiff,
5
            vs.                        NO:  CIV-11-1009 JB/KBM
6
   CITY OF ALBUQUERQUE, ALBUQUERQUE
7  AVIATION POLICE DEPARTMENT,
   MARSHALL KATZ, in his official
8  capacity as Chief of Police of the
   Albuquerque Aviation Police
9  Department, JONATHAN BREEDON,
   GERALD ROMERO, ANTHONY SCHREINER,
10 ROBERT F. DILLEY a/k/a BOBBY
   DILLEY, LANDRA WIGGINS, JULIO DE LA
11 PENA, and DOES 1-25, inclusive,

12                   Defendants.

13       Transcript of Motion Hearing before The Honorable

14 James O. Browning, United States District Judge, held in

15 Albuquerque, Bernalillo County, New Mexico, commencing on

16 Tuesday, November 20, 2012, at 9:07 a.m. and concluding at

17 10:48 a.m.  Proceedings recorded by mechanical stenography;

18 transcript produced by computer-aided-transcription.

19

20

21

22            Danna Schutte Everett, CRR, RPR, RMR, CCR 139
                    United States Court Reporter
23                     100 N. Church Street
                  Las Cruces, New Mexico  88001
24                  Phone:  (575) 528-1656
                     Fax:  (575) 528-1645
25                  dannadawn@comcast.net

```
1    For the Plaintiff:

2         LAW OFFICE OF MARY LOUISE BOELCKE
          6707 Academy Road, Northeast, Suite A
3         Albuquerque, New Mexico  87109
          BY:  MS. MARY LOUIS BOELCKE
4
     For the City Defendants:
5
          THE BAKER LAW FIRM
6         20 First Plaza, Northwest, Suite 402
          Albuquerque, New Mexico  87102
7         BY:  MR. JEFFREY L. BAKER

8    For the Individual Federal Defendants:

9         U.S. Department of Justice
          Post Office Box 7146
10        Washington, D.C.  20044
          BY:  MR. EDWARD J. MARTIN, Telephonically
11
     Also Present:  Mr. Phillip Mocek
12                  Ms. Mary Liddy, TSA

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning, everyone.  I appreciate
 2   everyone making themselves available to me this morning.
 3              All right.  The court will call Phillip Mocek versus
 4   City of Albuquerque, et al., Case Number 1:11CIV1009 JB.  This
 5   case has been reassigned, so it's JB/KBM.
 6              If counsel will enter their appearances.  Let's start
 7   with the plaintiff.
 8              MS. BOELCKE:  Mary Lou Boelcke for the plaintiff.
 9              THE COURT:  Ms. Boelcke, good morning to you.
10              MS. BOELCKE:  Good morning.
11              THE COURT:  And is your client on the phone?
12              MS. BOELCKE:  Yes, he is on the phone.
13              THE COURT:  Mr. Mocek, are you there?
14              MR. MOCEK:  Yes, Your Honor, I am.
15              THE COURT:  All right, Mr. Mocek, good morning to
16   you.
17              And do you have a co-counsel that's on the phone?
18              Mr. Wheaton?  Mr. Wheaton?
19              All right.  All right.  And for the defendants.
20   Let's start with the City of Albuquerque defendants.
21              MR. BAKER:  Your Honor, Jeff Baker on behalf of the
22   City of Albuquerque, the Albuquerque Aviation Police
23   Department, Marshall Katz, Robert Dilley, Landra Wiggins, and
24   Julio De La Pena.
25              THE COURT:  All right.  Mr. Baker, good morning to
```

1    you.

2            And for the federal defendants.

3            MR. MARTIN:  Good morning, Your Honor.  Edward Martin

4    on behalf of the individual federal defendants.

5            And with me is Mary Liddy from the TSA.

6            THE COURT:  All right.  Mr. Martin, Ms. Liddy, good

7    morning to you.

8            All right.  We're here on the federal defendants'

9    motion to dismiss.  Ms. Wild and I were asking each other --

10   Marshall Katz, it seems like we've had him in some cases

11   before, but --

12           It's not coming up?

13           All right.  His name seemed somewhat familiar, not

14   from anything I know outside of the courtroom, but I thought I

15   had had some cases with a Katz as a police officer, not with

16   the Aviation Department, but some other cases, but it's not

17   showing up, so --

18           MR. BAKER:  Your Honor, Chief Katz's son is with the

19   Bernalillo County Sheriff's Department.

20           THE COURT:  Okay.  I thought it was Bernalillo

21   County.  That's what I was associating with.

22           All right.  On the motion to dismiss, what I would

23   suggest we do -- we can do this however the federal defendants

24   would like, it's their motion, but what I would suggest is we

25   break this down a little bit and take it a bit in bites because

```
 1   of the three causes of action that are here.

 2            What I was going to suggest, Mr. Martin, if you're

 3   taking the lead on it, is maybe you do an overview, whatever

 4   you want to say preliminarily, and then I'll give Ms. Boelcke

 5   the same opportunity, and then we'll come back and deal with --

 6   I think everybody started with the First Amendment violation --

 7   or alleged violation first, if that's all right with you.

 8            MR. MARTIN:  Yes, Your Honor.  Actually, we were

 9   hoping to get right into the First Amendment issue.

10            THE COURT:  All right.  Do you have anything else you

11   want to say, or do you want to just go to First Amendment?

12            MR. MARTIN:  The only thing we want to say, we think

13   this is a classic case in which qualified immunity is

14   appropriate because the plaintiff has not alleged a clearly

15   established constitutional violation.  Basically, as we've

16   indicated in our briefs, there is no case law concerning

17   recording at TSA checkpoints, and, of course, with that being

18   the case, there's no case law concerning recording alternative

19   screening processes at TSA checkpoints.

20            THE COURT:  Well, let's take the -- Let's take the

21   alleged violation first, because I always -- under Saucier and

22   Pearson I find it's somewhat difficult to figure out if there's

23   clearly established law unless I can first figure out what the

24   alleged constitutional violation is.  Is that -- It seemed to

25   make sense, but the Supreme Court has now said it doesn't
```

1   matter which we take first, but in many cases there's a dispute

2   as to what the alleged violation is and you've got to kind of

3   figure that out before you can go match it with the case law.

4           Talk to me a second about something that has troubled

5   me a little bit about -- The TSA's position is that they don't

6   seem to have a regulation on this.  I would think that if they

7   had a problem with recording they would have a regulation on

8   it, and my sense is that probably they don't care if news crews

9   come out, but they care if Mr. Mocek comes out, and that

10  concerns me, that there may be some unevenness in the -- in how

11  they deal with recording.

12          Your thoughts on that.

13          MR. MARTIN:  Your Honor, they do have a policy.  They

14  have a policy that you're allowed to record or photograph at a

15  TSA checkpoint in general, but then, of course, they have to be

16  allowed some discretion, and one of the issues was, you know,

17  you can't record the basic screens.  There are certain things

18  that are sensitive, sensitive information.

19          And what the problem you had here is, it wasn't just

20  recording at the TSA checkpoint, it was recording an

21  alternative screening process.  And, of course, you have to

22  then go back to the full circumstances of this case, which is,

23  one, you had an individual who showed up and refused to provide

24  his identification at the TSA checkpoint, so that kind of

25  ratchets up the security consciousness at that point; and he's

1    then sent to an alternative screening process.  That

2    alternative screening process is designed to try to determine

3    who exactly he is and whether he should be allowed to fly or

4    not, whether it's safe to allow him to fly.

5            Now, of course, when he goes to the alternative

6    screening process he then pulls out his video recorder and

7    decides to begin recording that process.  And, again, that's

8    where the security issue comes in.  We've now ratcheted up to

9    the point where first he's a concern, now he's doing a second

10   activity that's a concern, and that's when the TSO's called the

11   local law enforcement, because the TSO's are not law

12   enforcement.

13           Now, why I say all that, why I say there is a policy,

14   and -- you know, a general policy, and that what the TSO's did

15   was reasonable in this case, of course, the Supreme Court has

16   indicated in Davis v. Scherer that whether they had a policy or

17   not does not prevent there from being or failing to be a

18   clearly established constitutional violation.  And we've

19   provided a Tenth Circuit case, as well, that says the same

20   thing.

21           So we would argue that it's not terribly relevant

22   whether they had a policy, whether they had a regulation or

23   not, that, in fact, what they did under these circumstances was

24   reasonable and, therefore, there was no First Amendment

25   violation, but their conduct was reasonable in the course of

 1   this case.

 2            THE COURT:  But when I read the -- When I read the

 3   Complaint -- which this is a motion to dismiss; nobody's trying

 4   to convert it to a summary judgment -- don't I have to assume

 5   that Mr. Mocek was not creating a disturbance?  There's nothing

 6   in his allegations that would suggest that he was creating a

 7   disturbance.  So this sort of heightened and increasing

 8   confrontation is really not there in his recitation of the

 9   events, right?

10            MR. MARTIN:  I would respectfully disagree, Your

11   Honor.  Basically, you only -- you don't have to take

12   conclusory statements from Mr. Mocek; you're allowed to look at

13   the facts as they were presented, and, of course, because he

14   summarized two statements from the TSO's, we have attached

15   those to our motion to dismiss as we're allowed to do.

16            Now, as we've indicated, disturbance didn't

17   necessarily mean raising your voice, which seems to be the

18   plaintiff's contention.

19            THE COURT:  Let's talk about these things you've

20   attached.  I guess certainly I've been in securities cases and

21   contract cases where somebody refers to an insurance policy or

22   to an S1 or K1 or something like that, but I'm not sure I've

23   been in a case, in a 1983 case for example, which is more

24   typical, where somebody's attached the police report and said,

25   Well, you've got to take our version of the events.  So I've

1   not seen this before.   Why do I get to consider the police

2   reports in this case?

3          MR. MARTIN:   Again, Your Honor, we didn't attach a

4   police report because a police report would cover a whole bunch

5   of conclusions and things other than the individual statements.

6   What we did is attach two statements which plaintiff

7   summarized, because the plaintiff had copies of these, so the

8   plaintiff summarized it in his pleadings, and, therefore, to

9   provide the entire story the Supreme Court and as far as I know

10   the --

11          THE COURT:   Does he refer to these reports in his --

12   in his Complaint?

13          MR. MARTIN:   Yes, Your Honor.   He refers to these

14   specific statements and summarizes them, and that's why you're

15   allowed to consider them.

16          THE COURT:   All right.   Well, if I hear the TSA, it's

17   not really defending -- this morning it's not really saying

18   much about the constitutional violation here, it's just wanting

19   to go clearly -- to the clearly established.

20          MR. MARTIN:   Obviously, we think you can consider

21   both, Your Honor, but Pearson does, certainly, give you the

22   opportunity to jump straight to not clearly established.   And

23   what that does, of course, is it let's you, you know, apply the

24   general rule of constitutional avoidance; it avoids us of

25   having the potential problem of you finding something

```
 1    constitutionally -- a constitutional violation but then not

 2    clearly established, of course.  That would be great for the

 3    individual federal defendants, but then the TSA is stuck with a

 4    ruling concerning the constitutionality of this issue.

 5            The bottom line is, there is not a lot of case law

 6    about these checkpoints.  I mean, they're all post-9-11

 7    checkpoints.  There is no case law concerning recording at

 8    these checkpoints, no case law concerning recording alternative

 9    proceedings at these checkpoints, and then even the fairly far

10    removed issue brought up by the plaintiffs of police --

11    recording of police activity in a public place, there's no

12    Supreme Court case on that issue, there's no Tenth Circuit case

13    law, and the circuits are split.

14            So this is a classic case, really a textbook case in

15    which the First Amendment allegation fails because the

16    plaintiffs have failed to demonstrate that there was a clearly

17    established violation.

18            And, of course, the Fourth Amendment, if you'd like

19    to do it separately, we can, but the Fourth Amendment is even

20    easier, because the plaintiffs have cited no cases in which

21    merely summoning law enforcement is, in fact, a clearly

22    established violation.

23            THE COURT:  Well, let's focus on the constitutional

24    violation.  I clearly want to hear about it.  I don't know if

25    this is the Pearson situation where we shouldn't -- we should
```

```
 1   just go to the clearly established, but --

 2              MR. MARTIN:  Yes, Your Honor.  Would you like to

 3   discuss First Amendment, then, first?

 4              THE COURT:  Yeah.  I want to hear from Ms. Boelcke

 5   before we go to the Fourth Amendment.

 6              But on the First Amendment, I guess I still don't

 7   understand the United States's position on this as to when -- I

 8   mean, it seems very fuzzy, which is usually not a good place

 9   for the government to be on First Amendment issues, is when

10   somebody can photograph and when they can't.  I don't

11   understand the position.

12              MR. MARTIN:  The United States --

13              THE COURT:  Since it doesn't have a reg, I can't go

14   read a regulation.  You're probably the one person that can

15   tell me what the government's position is.

16              MR. MARTIN:  Yes, Your Honor.  The government's

17   position is that because we are in a nonpublic forum, the

18   Supreme Court has indicated this is a nonpublic forum, that the

19   actions of the TSO's had to be reasonable to avoid there being

20   a First Amendment violation, and that's where we get back to

21   what actually happened here and why they did what they did.

22              So, first of all, the plaintiff comes in, refuses to

23   show his identification.  That -- So, normally, if you go

24   through an airport, you deal with one person.  Here, now,

25   because he refuses to show his identification, we now have to
```

1    send him to an alternative screening person.  So now he's

2    dealing with a second TSO.  That TSO has to call a centralized

3    office, who will provide the questions, who will provide the

4    information to decide whether Mr. Mocek can fly or not.

5              Likewise --

6              THE COURT:  But if the whole point of him wanting to

7    film is he wants to film an encounter in which he doesn't have

8    an ID, why is it relevant that he -- that he doesn't have an

9    ID?

10             MR. MARTIN:  Because, again --

11             THE COURT:  It sounds to me like the whole purpose of

12   going to the airport without an ID and then beginning this

13   filming was to -- was to -- was, in fact, to film what happens

14   to somebody that doesn't have an ID.

15             MR. MARTIN:  But how would the TSO's know that, Your

16   Honor?  Of course, their job --

17             THE COURT:  But isn't it really when it comes to the

18   First Amendment what the public knows about whether they can

19   film or not?

20             MR. MARTIN:  Really what we're going to is what's

21   reasonable.  That's the test in this case, what's reasonable

22   for the TSA's -- TSO's, excuse me.  And they don't know why

23   he's there filming.  He doesn't say.  So could he be attempting

24   to film to decide on the vulnerabilities of the system, or

25   could he be setting a distraction so other people can go around

```
 1    the system?  They don't know that.  That's why they have to
 2    call the local law enforcement to investigate further.
 3            THE COURT:  But if we go to these cases about filming
 4    police activity you don't know why they're filming it, either.
 5    It doesn't seem that the circuits -- and I could be corrected
 6    here -- but the ones that have said that you can film police
 7    activity haven't been that interested in the purpose of it.
 8            MR. MARTIN:  They have certainly been interested in
 9    where it occurred.  Obviously, the one on the Boston Commons,
10    the First Circuit case, talks about --
11            THE COURT:  But that's a different issue, about where
12    it occurs.
13            MR. MARTIN:  Right.
14            THE COURT:  But they don't seem to be interested in
15    why it's occurring.
16            MR. MARTIN:  Again, because there you're in a public
17    forum, so now you're talking about strict scrutiny, a very
18    difficult standard.  You've got the three different types of
19    forums, the difference between a public and a nonpublic forum.
20    So the nonpublic forum, an airport, takes it down to the
21    reasonableness standard, and that's the difference between --
22    one of the differences, obviously, between those cases.
23            THE COURT:  Well, let's explore that a second,
24    because I'm not sure I've had a case in this area.
25            But if the -- If the government allows First
```

```
 1    Amendment activity in a nonpublic forum, which you're saying

 2    the airport is --

 3              MR. MARTIN:  Yes, Your Honor.

 4              THE COURT:  -- they make a decision to allow it,

 5    you're still saying that once they -- once they allow it,

 6    then -- then the reasonableness standard applies.

 7              MR. MARTIN:  That's correct, Your Honor.

 8              THE COURT:  So they can pick and choose on that day

 9    who's going to engage in First Amendment activity and who's

10    not.

11              MR. MARTIN:  There's always going to have to be

12    discretion at security checkpoints, Your Honor, for what

13    actions they're going to take.  There cannot be written rules

14    for each and every --

15              THE COURT:  Let's pull it out of the security

16    context, and let's just put it in the Hare Krishna context.

17    What -- They can just pick and choose?  Once they allow the

18    activity, strict scrutiny goes out the door and we're just back

19    to reasonableness, and they just have to present a reason as to

20    why this group can engage in First Amendment activity and this

21    group can't?

22              MR. MARTIN:  They obviously can't do it for viewpoint

23    purposes, and that's where you got into the Hare Krishna case.

24    The viewpoint versus context issue.  And that was a case in

25    which, of course, they were attempting to provide religious
```

```
 1    material in an airport, and the Supreme Court said, Listen,

 2    they're not stopping the Hare Krishnas because of their

 3    religious views, the viewpoint discrimination; they're going to

 4    stop anybody from soliciting at an airport because that's

 5    disruptive to people passing through a airport, and that was a

 6    reasonable basis -- that was a reasonable reason for that.  So

 7    that's why the Supreme Court allowed that in the Hare Krishna

 8    case.  And I think that's applicable here, too.

 9            Again, Mr. Mocek never said what his viewpoint was.

10    He does in his Complaint.  He talks about the reason why he

11    wouldn't provide his ID, because he thinks that's a way for the

12    airlines to make money, and he doesn't believe -- he believes

13    it's then used for the various watch lists that the government

14    has, but he didn't tell that to the individual federal

15    defendants in this case.  He just says, "I will not provide my

16    ID."  They send him to an alternative checkpoint, and at that

17    point he decides to film, and when he's asked not to film, he

18    refuses.  And at that point, again, it was reasonable for them

19    to call.  And that's, of course, all they do.  All they do is

20    they call the local police.

21            THE COURT:  What is -- What is the alternative

22    security checkpoint?  He makes the allegation that he can go

23    through here, and has many times, without an ID.  Is that

24    possible?

25            MR. MARTIN:  It is possible.  My understanding of the
```

1    process, Your Honor, is what they do, is they call a

2    centralized office, and that centralized office uses the

3    various computer data basis available to them to allow TSO on

4    the ground to ask questions to the individual to confirm his or

5    her identity.  Now, if they can't do that, if they can't

6    identify him or, obviously, if he's on some watch list, then,

7    in fact, he will not be allowed to fly at that point.

8        THE COURT:  And that requires a certain amount of

9    cooperation, to fly without --

10       MR. MARTIN:  That's exactly right, Your Honor.  So

11   instead of -- In this case, instead of answering their

12   questions, although they never really got to the

13   answering-questions process, the plaintiff is going to film

14   instead.  So he's going to stand there and film while the

15   gentleman's attempting to ask him questions.

16       THE COURT:  Well, I guess that's my question.  If

17   they never got to the alternative procedures, if somebody can

18   fly without an ID and they never got to that procedure, then --

19   then is -- I mean, is TSA calling the police because of the

20   filming?

21       MR. MARTIN:  No, Your Honor.  And perhaps I misspoke.

22   They did actually begin the procedure.  They didn't begin the

23   questions.  The agent in this case, Breedon, actually did call,

24   and he tells -- he tells you that in his statement.  He did

25   call the centralized office.  He did request a behavioral

```
 1   specialist to come view the situation.

 2           What didn't happen is the later phases of this

 3   procedure, where they begin actually asking the questions,

 4   because, of course, Mr. Mocek began filming at that point, and

 5   once he began filming they asked him to put down the camera,

 6   because they did not want him to film these alternative

 7   screening processes.

 8           THE COURT:  Well, is that across the board?  Is that

 9   the TSA's position, that these alternative screening procedures

10   are not to be filmed?

11           MR. MARTIN:  Again, they don't have any specific --

12   that I'm aware of, they don't have any specific procedures for

13   filming all these.  They have a general guidance for that you

14   can film at these checkpoints; however, there are certain

15   things you can't film.  For example, the screens that they

16   have.

17           THE COURT:  Well, I don't know this well enough, but

18   I would think that if somebody's pulled out of the lines and is

19   now undergoing an alternative screening process you're away

20   from the cameras.  Am I right or wrong on that?

21           MR. MARTIN:  We were actually at the airport

22   yesterday again, Your Honor.  You don't have this in the

23   pleadings, so I'm not sure if it helps you that much.  But it

24   is not that far.  I mean, basically, from the front line he was

25   only 10 or 15 feet, maybe 20 feet away from where he originally
```

```
 1   started.  So you're not taken to a separate room or anything
 2   like that.
 3           THE COURT:  You could film from that location?
 4           MR. MARTIN:  You could film the entire checkpoint
 5   from that location, yes, Your Honor.
 6           THE COURT:  I guess the thing that troubles me, that
 7   didn't seem to be the reason, though, that they told him to
 8   quit filming.  They don't say, "Don't film these cameras here,"
 9   or "these videos," or the protectors or whatever they're
10   concerned about.  They don't say that.
11           MR. MARTIN:  Right.  And again, I guess we come back
12   to, Your Honor, if this troubles you, then certainly Pearson
13   allows you to go straight to the not-clearly-established prong,
14   because that is plain as indicated in Pearson.
15           THE COURT:  I guess before -- This is what I kind of
16   said at the beginning.  I don't know what the constitutional
17   violation is, unless we sort of massage a little bit.  Even if
18   I decide that I need to jump, I think I have to be able to
19   figure out exactly what the -- what the violation is before I
20   can go, then, and start matching up the clearly established
21   law.
22           MR. MARTIN:  And that is difficult from the
23   Complaint, Your Honor.  The Complaint alleges that the
24   plaintiff was ordered to cease recording, which caused his
25   arrest and seizure of his belongings.  But then when we get to
```

```
1   their opposition they claim that the constitutional violation
2   was -- his right to information gathering was violated.  So
3   somewhat similar, but, obviously, the right to gather
4   information was not ever mentioned in the Complaint itself.  We
5   don't see that until the opposition.
6           But the bottom line here is, what we're talking about
7   here is filming an alternative screening process at a security
8   checkpoint.  I mean, that is what the First Amendment issue is
9   about in this case.
10          THE COURT:  But is -- But I guess -- I mean, is
11  that -- Is that unlawful -- I mean, does TSA ban that sort of
12  filming of the alternative screening process?
13          MR. MARTIN:  TSA does not -- as far as I'm aware,
14  does not have any regulations, but, again, I go back to
15  Davis v. Scherer.  Regulations are not the issue here.  It's
16  whether it's a constitutional issue or not or whether it's a
17  clearly established constitutional violation or not.  And just
18  like probably in the Boston Commons there was probably no
19  regulations that said you can't videotape here.  There was no
20  regulation, there's no specific regulation for this specific
21  instance.
22          But in the end it doesn't matter.  It goes to whether
23  it's constitutional or not.  And while the First and the
24  Eleventh Circuit have said it's a constitutional violation to
25  prevent recording in a public place of police activity, the
```

```
 1   Third, Fourth and a number of district courts have said
 2   differently, and when you have a split in circuits like that,
 3   of course, that doesn't provide any information.  And these
 4   individual federal defendants are not lawyers, are not held to
 5   trying to decide which side is, in fact, right.  The Tenth
 6   Circuit has not talked about it, nor does the Supreme Court,
 7   and, therefore, it's -- this is just a textbook case of being
 8   not clearly established.
 9           THE COURT:  All right.  Anything else you want to say
10   on the First Amendment issue?
11           MR. MARTIN:  No, Your Honor.
12           THE COURT:  All right.  Thank you, Mr. Martin.
13           Do you have anything on this issue, Mr. Baker?
14           MR. BAKER:  No, sir.
15           THE COURT:  All right.  Ms. Boelcke, do you wish to
16   address the -- any preliminary remarks you want to make, and
17   then if you want to address the First Amendment issue first?
18           MS. BOELCKE:  Yes.  First, I would just like to say
19   that the defendants have inserted facts into their motion which
20   are not in the plaintiff's allegations in his Complaint.
21           THE COURT:  Well, I read your -- I read your -- I
22   read your response, but Mr. Martin and I have kind of distilled
23   a little bit down to what may be the actual scene for the First
24   Amendment.
25           What is it that troubles you about that?  What is it
```

1    that is inconsistent with the way we were sort of parsing it at

2    the very end as a way of the Court looking at what occurred

3    there?

4            MS. BOELCKE:  I think if the Court looks at the case

5    Tobey versus Napolitano there's a First Amendment violation of

6    a person who was traveling who got not just to the security

7    checkpoint, who got to the -- all the way to the X-ray

8    machines, and the case is very similar on the First Amendment,

9    and the Court decided it could not dismiss the case because

10   if -- It was the same issue.  There were TSA officers who

11   called in the airport police to make the arrest, and the Court

12   held that if, as the plaintiff alleged in the Complaint, those

13   officers called the local officers in because of the First

14   Amendment activity by the traveler, then that would be a First

15   Amendment violation, and the Court did not dismiss the

16   Complaint on the 12(b)(6) motion.

17           THE COURT:  Well --

18           MS. BOELCKE:  I'm not sure if that's what you're

19   asking me, but I'm not sure what you are asking me.

20           THE COURT:  I guess for the First Amendment purposes

21   it seems to me that it's irrelevant whether we call in APD,

22   City of Albuquerque, FBI, whatever.

23           The question is whether they can stop somebody from

24   filming.  Isn't that the -- That's the First Amendment issue,

25   right?

```
 1              MS. BOELCKE:  Yes, that's the First Amendment issue.
 2    And because -- Because they don't have -- they had no reason to
 3    ask him to stop.  There's -- There is a policy that allows them
 4    to -- people to photograph or film in that area.  The
 5    Albuquerque police videotape every encounter they have with the
 6    public.
 7              THE COURT:  Theoretically.
 8              MS. BOELCKE:  Well, they're supposed to under an
 9    order by the mayor and chief of police.
10              THE COURT:  We see them from time to time.
11              MS. BOELCKE:  Okay.  And the fact that they stopped
12    him from filming right when he started is viewpoint
13    discrimination.  I don't think there's any other way to look at
14    it.  They had no other reason to stop him.
15              THE COURT:  Well, I guess what Mr. Martin's saying is
16    that it's hard -- it's hard to have -- it's hard for the TSA to
17    do a viewpoint discrimination if they don't know why the guy is
18    filming.  I guess that's what he's saying.
19              Is that fair, Mr. Martin?
20              MR. MARTIN:  Yes, Your Honor.
21              THE COURT:  Okay.  So that's his response to the
22    viewpoint, that --
23              MS. BOELCKE:  So if --
24              THE COURT:  -- you've got to have a viewpoint while
25    you're filming before you can discriminate.  And your thoughts
```

```
 1   on that.

 2           MS. BOELCKE:  There is no evidence that they ever

 3   asked him for a viewpoint as to why he was filming.  I believe

 4   they assumed what his viewpoint was, and based on their

 5   assumptions they told him to stop.

 6           If -- If that's true, that you can -- If you have the

 7   right viewpoint you're allowed to tape, and if you've got the

 8   wrong viewpoint you're not.  That's viewpoint discrimination.

 9           THE COURT:  Well, let's say Channel 13 shows up out

10   there and wants to do this.  It sounds like they're probably

11   going to allow it, you know, as long as they can position the

12   camera right and stuff like that.  Then it looks to the -- to

13   someone that that is news gathering or information gathering or

14   something like that.

15           Isn't the position -- Isn't the -- Isn't the picture

16   that Mr. Mocek was giving that day somewhat ambiguous?  I mean,

17   you don't know -- It seems a reasonable officer could say, "I

18   don't know why he's doing this."

19           MS. BOELCKE:  I don't -- Because they don't know, I

20   don't think that gives them a right to stop it by not knowing.

21           THE COURT:  Well, let's say it's just a -- you know,

22   I've got lots of people here with psychological reports, it's

23   just somebody that's not wired well that day and is just there

24   to kind of hassle, not particularly a viewpoint at any point,

25   they just -- you know, they don't know if he left his ID on
```

1    purpose or accidentally or what the deal is.

2              Your thoughts on that?

3              MS. BOELCKE:  If the person is --

4              THE COURT:  They can't explore that some more?

5              MS. BOELCKE:  If the person is hassling, that's a

6    different scenario than we have.  We don't have any hassling by

7    Mr. Mocek.  We have a person --

8              THE COURT:  That's fair enough.

9              MS. BOELCKE:  -- filming.

10             THE COURT:  No, I think I can assume that for

11   purposes -- But at least it could present itself even without a

12   confrontation, without a disturbance, as an ambiguous thing,

13   rather than viewpoint discrimination, I guess is my point.

14   Isn't that true?  I mean, you kind of have to have some

15   knowledge of something before you can discriminate against it.

16             MS. BOELCKE:  That's true.

17             THE COURT:  I'm wondering if there's enough knowledge

18   here presented by the picture to discriminate against it on the

19   basis of viewpoint.

20             MS. BOELCKE:  Well, not knowing the viewpoint could

21   be a viewpoint discrimination also.  And if that was their

22   position, then that should have been the policy and position

23   that they informed Mr. Mocek of prior to him even going to the

24   airport.

25             Their general policy, as Mr. Martin said, is filming

```
1    is fine.  Anybody can film.  We're going to stop you if -- you

2    know, if we have -- We have discretion to stop you, though, if

3    we think it's necessary, you know.

4            There was no necessary cause here to stop him,

5    because he was acting in a totally peaceful way and not doing

6    anything -- anything to cause them to arrest him.  If they had

7    not -- You can't jump from -- They jumped -- As soon as he

8    started filming, they arrested him.  That was a violation of

9    his First Amendment right to gather news and information for

10   whatever reason he has.  You know, he didn't show any purpose,

11   but he didn't show any bad purpose, he didn't show any what

12   they would possibly consider good purpose.

13           THE COURT:  What was he going to do with this?  Was

14   he going to put it on the Internet, or what's the purpose of

15   him filming this?

16           MS. BOELCKE:  You know, I'm not really sure what his

17   purpose was in filming this.  I don't want to speak for him at

18   this point, Your Honor.

19           THE COURT:  Well, let's assume for a second that

20   there wasn't viewpoint discrimination.  Let's assume that for a

21   second.  Do you agree that the standard here is reasonableness,

22   we don't need to get into strict scrutiny because of the

23   nonpublic forum of the nature?

24           MS. BOELCKE:  Yes.

25           THE COURT:  So that's the standard?
```

```
 1            MS. BOELCKE:  Yes.

 2            THE COURT:  And why do you, then -- If there was no

 3   viewpoint discrimination, why do you say that TSA acted

 4   unreasonably?

 5            MS. BOELCKE:  Because Mr. Mocek had a right under the

 6   Constitution to film public officials that are in a public

 7   space.  It might not be a traditional public forum as we think

 8   about it under the First Amendment, but it is a public space

 9   where the public is allowed.  These were government officials

10   going about government business that affects the public.  He

11   has a right to gather information in that space.  So anything

12   that's going to interfere with that is unreasonable when

13   there's no -- no valid reason for it, when they cannot show

14   that there is a reason for it.

15            There's a case I'd like to refer to the Court -- we

16   didn't put this in the brief -- U.S. versus Wells, 789

17   F.Supp.2d, 1270, out of the Northern District of Oklahoma, and

18   it involved a sting operation by the FBI in a motel.  They

19   were -- There was an undercover officer staying there.  The FBI

20   wiretapped the entire room, and then later some other police

21   officers went in that room allegedly to conduct a search.

22   While they were there criminal activity happened in that room

23   and those police officer defendants, the Tulsa police officers

24   were arrested, and in their trial -- they filed a motion to

25   suppress the surveillance videos.  And this goes to the privacy
```

1    argument that I believe Mr. Martin was talking about, there's
2    privacy interests in this material.
3            The Court there denied the motions because he said
4    the officers had no expectation of privacy in the work they
5    were conducting in the motel room, and if law enforcement
6    officers are granted privacy carrying out searches of citizens'
7    properties and not subject to this type of oversight, then
8    overreaching by officers would be encouraged or at least
9    protected.  And all sorts of violations could be committed by
10   them without repercussions for the law enforcement officers.
11           The court said no expectation of privacy should be
12   recognized that it would allow these defendants or any law
13   enforcement officers to carry out alleged activities in secret.
14           So they were exercising their authority granted them
15   by the state to enter these premises, and they should be
16   expected to be monitored to ensure that that power that they
17   have comports with the requirements of our Constitution.
18           The same thing here.  The TSA officials, they have no
19   expectation of privacy in the work they're doing in the public
20   area of the airport, so giving that to them wouldn't serve any
21   constitutional or any social interests.
22           And it's like the -- You know, Mr. Martin is trying
23   to argue that they have some kind of right to privacy in what
24   they're doing in this public area of the airport.  And I think
25   the Wells court states it very well, that police officers or

```
 1   any kind of government officials, in carrying out these types
 2   of activities, their work, basically, don't have that kind of
 3   expectation of privacy.
 4           THE COURT:  Well, but I don't know if he's really
 5   going to go on the privacy route as much as -- I mean, the
 6   whole reason you've got this is security, and everybody's
 7   antennas are a little bit up at these places, and if everybody
 8   doesn't conform it's sure going to bog things down.  I mean,
 9   it's hard enough getting through airports as it is, and if
10   you -- if you have everybody acting this way, then it's going
11   to bog you down.  So there is a premium or a value in everybody
12   just doing what they're told.  And then if somebody doesn't, at
13   what point does the security concerns get heightened to the
14   point that they satisfy the reasonableness standard?  It seems
15   to me that's a fairly low standard.
16           MS. BOELCKE:  I don't think it's that low.  I don't
17   think it's as low as they would have it be, and I don't think
18   it's as -- when you have -- I don't think it's reasonable when
19   you have a policy --
20           THE COURT:  If he started cursing at the TSA people
21   and filming, would you agree that then they -- it may meet the
22   reasonableness standard?
23           MS. BOELCKE:  If he was assaulting them, I would
24   agree.  If he's mumbling under his breath obscenities, I don't
25   think I would call that a heightened reason to call in
```

```
 1    security.  But if there's an assault happening --

 2              THE COURT:  Verbal assault?

 3              MS. BOELCKE:  Probably a verbal assault.  You know,

 4    threatening, you know, going beyond just speaking with them.

 5              THE COURT:  All right.  Anything else on the First

 6    Amendment issue?

 7              MS. BOELCKE:  We didn't actually touch on the

 8    elements.  Do you want to touch on the elements?

 9              THE COURT:  Please.  Yeah.

10              MS. BOELCKE:  Yes?

11              THE COURT:  That would be fine.

12              MS. BOELCKE:  Okay.  The first element, of course, is

13    engaging in the constitutionally protected activity, and I

14    think we've addressed that, which is videotaping government

15    officials in a public area in the airport.  I think that's the

16    right -- the right that Mr. Mocek had and that he was asserting

17    in this case.

18              And I do think there are cases which support that he

19    was engaged in a constitutionally protected activity at the

20    time.

21              If he suffered an injury, that would chill a person

22    of ordinary firmness from continuing to engage in the activity.

23    Because the defendants tried to take his camera and called in

24    police officers to have him arrested and seized his property, I

25    think that's definitely an injury that would chill a person
```

1   from continuing to engage in the activity.

2          Finally, that the defendant's adverse action was

3   motivated as a response to plaintiff's exercise of

4   constitutionally protected conduct.  Plaintiff alleged the

5   reason that the TSA officers called the police to arrest him

6   was because he was taking photographs in a, quote, threatening

7   manner, quote, taking pictures of all of us, won't put his

8   camera down, and was creating a disturbance.  Defendant Romero

9   tried to take Mocek's camera.  And the TSA did nothing to

10  indicate that Mocek was breaking the law until he began filming

11  the officers.  Only when Mocek challenged the notion that

12  taking pictures was prohibited did defendant Schreiner claim

13  that plaintiff was hostile, belligerent, and taking photographs

14  in a threatening manner.  Mocek never refused to leave the

15  airport and he never disobeyed other than the stop-filming

16  order by the TSA agents.

17         You know, the allegations in the Complaint showed

18  that he was calm, not disruptive --

19         THE COURT:  Do you agree with Mr. Martin, that I can

20  rely upon the additional facts that are stated in the full

21  reports that are attached to his motion?

22         MS. BOELCKE:  No.  I would object to the admission of

23  those statements, Your Honor.

24         THE COURT:  You think I'm stuck with just the facts

25  you pull out of the reports -- the statements, rather than --

```
 1   rather than looking at the full statement?

 2              MS. BOELCKE:  Yes, Your Honor.  I think if those

 3   statements are allowed in, which are outside the record, then

 4   Mocek's videotape should be allowed in.  I mean, that's -- this

 5   is the evidence we have from the -- from the incident, and so

 6   these are witness statements.

 7              THE COURT:  Now, he said that you refer to these

 8   statements in your Complaint and, therefore, because you refer

 9   to them in the Complaint and are summarizing them I can look at

10   the -- I can look at the entire statements.  Your thoughts

11   about that?

12              MS. BOELCKE:  I don't believe in a motion to dismiss

13   the defendants can bring in extra evidence, and usually when

14   that's done the motion is converted into a motion for summary

15   judgment and then the plaintiff --

16              THE COURT:  Well, the Tenth Circuit has some limited

17   law that if you, for example -- if it's a contract and you're

18   suing for breach of contract and you refer repeatedly to the

19   contract and it's clear that you're basing it on the written

20   contract, if the defendant wants to bring in the written

21   contract and there's no dispute about the genuineness of the

22   copy the Court can consider that on 12(b)(6).  I do -- In

23   securities cases, I can look at the K1, S1, or something like

24   that, if the plaintiff is continuing to refer to it.

25              If you refer to these statements, why wouldn't this
```

 1    come under that same doctrine?

 2              MS. BOELCKE:  Well, I don't think the statements by

 3    the defendants were -- are the basis of our Complaint

 4    necessarily, so they're probably more tangential to the

 5    Complaint than a contract would be in a case on a contract or a

 6    securities case, where the entire case rests on that one

 7    document.  And because the plaintiff refutes what those

 8    statements say, the content of the -- the content of the

 9    statements themselves, as opposed to a contract, which is --

10    can't be -- the contents of the contract can't be disputed,

11    although the interpretation of it could be.

12              THE COURT:  All right.  Anything else you want to say

13    on the constitutional-violation prong of qualified immunity

14    before we move to clearly established?

15              MS. BOELCKE:  No.  That would be it, Your Honor.

16              THE COURT:  All right.  What do you want to say on

17    clearly established?  What do you think your closest Supreme

18    Court or Court of Appeals, Tenth Circuit Court of Appeals case

19    is going to be?

20              MS. BOELCKE:  For me, Your Honor, on the Fourth

21    Amendment or on the First Amendment?

22              THE COURT:  No.  First Amendment.  I mean, what are

23    you going -- What is your -- What is it that you think gives

24    the clearest indication to TSA officers that they can't stop

25    filming in a nondisturbance situation?

```
 1              MS. BOELCKE:  I believe it would be the cases -- the

 2   U.S. Supreme Court cases that allow an individual the right to

 3   gather information and news in a public place.

 4              THE COURT:  Are any of those in a nonpublic forum?

 5              MS. BOELCKE:  There was a case that was in a hallway

 6   in a government building, which I don't believe the hallway in

 7   the building is a traditional public forum.  I can't really

 8   tell you where the other ones were, but I do recall that one.

 9              THE COURT:  And how about the Tenth Circuit?  What

10   would you say is your closest Tenth Circuit case to this?

11              MS. BOELCKE:  Hold on.

12              I don't believe there's a -- we have cited any Tenth

13   Circuit case directly allowing -- speaking to allowing

14   videotaping of police officers, but I would look to the

15   reasonableness of the conduct, given that the police officers

16   videotape and audio tape every instance they have with the

17   public, and I think that that talks to the reasonableness of

18   allowing the public to also have a right to videotape.

19              THE COURT:  All right.  Anything else you want to say

20   on the clearly established or anything else on the First

21   Amendment issue?

22              MS. BOELCKE:  No, Your Honor.

23              THE COURT:  All right.  Thank you, Ms. Boelcke.

24              MS. BOELCKE:  Thank you.

25              THE COURT:  All right.  Mr. Martin.
```

 1          MR. MARTIN:  Your Honor, if it's possible, can I just

 2   clean up a couple issues --

 3          THE COURT:  Certainly.

 4          MR. MARTIN:  -- that were discussed?

 5          The expectation of privacy.  I don't recall

 6   mentioning it.  If I did, it was a mistake.  And certainly not

 7   in our briefing, so expectation of privacy is not an issue in

 8   this case as far as we're concerned.

 9          The fact that plaintiff's counsel is willing to admit

10   that Mr. Mocek did not show any purpose takes viewpoint

11   discrimination out of this case, it's done.  I mean, at this

12   point, as you indicated, there was several reasons why they

13   called the local police.  We called it disruption.  You called

14   it preventing the process from bogging down.  And then

15   security.

16          And the fact that they had these reasons for calling

17   the local police is simply reasonable, because, again, these

18   guys are not held to a standard, Malley v. Briggs.  You know,

19   clearly incompetent is the standard.  It's not clearly

20   incompetent for them to call somebody to find out what's going

21   on with this individual.

22          As far as the statements go, paragraph 75 is

23   entitled, in the Complaint, Breedon's statement, and then it

24   goes on for a full page of the Complaint, a summary of his

25   statement.  Paragraph 77 is Schreiner's statement.  That's

 1    probably only about three-quarters of the page the Complaint

 2    goes on.

 3            So if the plaintiff is allowed to summarize those two

 4    statements, certainly we're allowed to provide you with what

 5    the statements actually say.

 6            Again, your question concerning what are the closest

 7    cases.  And we get back with a very general Supreme Court case

 8    that I believe talked about newspaper reporters and was more in

 9    that context, of what they had a right to do and what they

10    didn't have a right to do, but none of it had to do with TSO's.

11    There is no Supreme Court case that I'm aware of that talks

12    about police officers in a public place.  It was more about

13    looking at meetings, whether they could view meetings or

14    videotape meetings or videotape other interaction, often in a

15    newspaper-reporting-type context.  And again, those are just

16    too far removed from what we have here.

17            What we have here is videotaping nonlaw enforcement

18    agencies -- these guys are TSO's -- in a nonpublic forum, a

19    security checkpoint, and the recording was an alternative

20    screening procedure, which, again, is specifically done for

21    security purposes.

22            So it's our position that there's, one, there's no

23    constitutional violation of the First Amendment, and, two, it's

24    not clearly established.

25            And that's all I have on the First Amendment, Your

1   Honor.

2            THE COURT:  All right.  Thank you, Mr. Martin.

3            Well, I'm going to take this under advisement, the

4   First Amendment issue, but I'm inclined to think that it's at

5   least going to fall on the clearly established.  I think

6   there's enough play in the reasonableness standard that, even

7   assuming the facts as I think I must, that there was no

8   disruption here.

9            I think that the lack of any viewpoint discrimination

10  is going to make it either, A, there was no violation of the

11  First Amendment, or I go ahead and skip over that or also find

12  that there was no clearly established law.

13           And I think the TSA situation is different enough

14  from the police filming cases, which there's a split in the

15  circuit on, and some differences there, that I think it would

16  be difficult to say that there's been a violation of clearly

17  established law.

18           So I'm inclined to grant that portion of the motion,

19  although I may not exactly know how I'm going to get there at

20  the present time, whether it's necessary to address the

21  constitutional violation or at least address it enough to state

22  correctly what the issue is in this case, but I think it's at

23  least going to go out on clearly established.

24           All right.  If you want to go, Mr. Martin, to the

25  next issue, the Fourth Amendment.

 1          MR. MARTIN:  Yes, Your Honor.  The Fourth Amendment

 2  is considerably simpler in this case, because, of course what

 3  you have here is allegations that the TSO's were somehow

 4  involved with the arrest, the seizure of Mr. Mocek and his

 5  property and then damage to his camera.  And, fortunately, in

 6  the pleadings themselves, dispute that -- those allegations or

 7  those assertions -- those conclusory assertions, I guess I

 8  should say.

 9          The Complaint itself indicates that once the law

10  enforcement showed up, that they took control of the situation.

11  And, in fact, the Complaint says that when law enforcement

12  initially showed up they asked Mr. Mocek to comply with the

13  TSO's or he would be removed from the airport.

14          There was no mention of arrest, no mention of

15  seizure, no mention of searches.  And when Mr. Mocek indicates

16  he won't comply, the local police ask him again to comply, and

17  then finally the local police ask Mr. Mocek for his

18  identification.  Mr. Mocek refuses to provide that.  And that's

19  what it says in the Complaint, and the Complaint specifically

20  indicates that the lead local police officer, a Mr. -- Officer

21  Dilley, tells Mr. Mocek, "All right, listen, if you don't

22  provide us ID, we're involved in an investigation here, we're

23  going to have to arrest you."  And at that point the Complaint

24  says, "Officer Dilley changed his mind" -- or "Officer Dilley

25  changed his mind" -- it actually uses those words -- "and

1   decided that he would arrest the plaintiff for failing to show

2   his ID."

3          So there's no involvement whatsoever, no personal

4   participation by the individual federal defendants as required

5   by Iqbal, and because there's no personal participation there's

6   no constitutional violation.  No constitutional violation, of

7   course, then it's clearly established.  And we've provided an

8   Eighth Circuit case, Green, that runs along similar facts,

9   similar issues of proximate cause and causation and comes to

10  the same result.

11         Add the bottom line is, when we get -- not only is

12  there no constitutional violation, of course, then it's not

13  clearly established because the plaintiffs have not cited a

14  single case in which merely summoning law enforcement is enough

15  to cause a Fourth Amendment violation.

16         And that's really all I've got on that issue, Your

17  Honor, subject to your questions.

18         THE COURT:  All right.  Let me talk to Ms. Boelcke

19  first, and then I may have some questions.  Thank you,

20  Mr. Martin.

21         Ms. Boelcke, I guess -- Let's take it out of the --

22  Let's take it out of the -- what's unusual about this case.

23  We've got two governments, state and federal here, so let's'

24  just take it that somebody calls the cops because they don't

25  like something that somebody's doing, and clearly that person

1  can do it.  They're protected by the First Amendment.

2  Somebody's complaining because there's a parade going down

3  Central protesting the war, and so it's clearly First

4  Amendment, and some shop owner doesn't like it, calls the

5  police, and APD shuts the parade down.

6       Would the -- Would a plaintiff be able to sue the

7  shop owner, saying, "You called the cops and tried to suppress

8  First Amendment"?  Would you be able to do that?

9       MS. BOELCKE:  You would only be able to do it if --

10 Like in a malicious abuse of process under state law or a

11 malicious prosecution claim under federal law, where the person

12 knew what they were saying was false or there was reckless

13 disregard for the truth of what they were saying.  And that's

14 basically the crux of this matter, is where the defendants here

15 caused -- set in motion a series of events that caused the

16 ultimate arrest when they know --

17      THE COURT:  Well, there's certainly a but-for

18 causation.  I mean, you know, there's a but-for in the sense

19 that if TSA hadn't called APD, yes, they would have -- they

20 wouldn't have shown up --

21      MS. BOELCKE:  True.

22      THE COURT:  -- but the Constitution requires this

23 sort of direct and personal involvement in the constitutional

24 violation.

25      It seems to me that once -- once they call somebody,

```
1   whether they were dead wrong or not, once they call they don't
2   violate the Constitution.  Yes, there's a but-for, but they
3   don't violate the Constitution, that -- Let's just say APD
4   started just, you know, macing Mr. Mocek and beating him.
5              Could they really be held for excessive force, for
6   example, the TSA officers?
7              MS. BOELCKE:  Probably --
8              THE COURT:  They don't know -- I mean, they didn't --
9   They probably didn't even have in their mind that the way to
10  end this thing was to ask for his ID and him not provide it.
11  And I'm not sure that that would have crossed TSA's mind.  Do
12  you?
13             MS. BOELCKE:  I don't know, but I do know that there
14  are cases, like Snell versus Tunnell, where when they look at
15  the qualified immunity and if the officers, the complaining
16  officers, so to speak, if they're using information they know
17  to be false or to get another public official, like, let's say,
18  a magistrate, to get a warrant, you know, as in Franks versus
19  Delaware, if they're getting a warrant or they're causing --
20  telling information to the police which causes them to arrest
21  when they know that information, they know it's not an actual
22  violation of the law, they can be held responsible for that.
23  That's enough involvement for them to be --
24             THE COURT:  So that's what you're relying on, is the
25  collective knowledge doctrine?  Grouping all these police
```

```
 1    together, TSA, APD, there's no distinction here?
 2             MS. BOELCKE:  No, it's not -- I don't -- I don't know
 3    if I'm doing that.  What I'm looking at is the case Wulf versus
 4    City of Wichita, which is a Tenth Circuit case.  So when you
 5    have a defendant who -- It's -- The defendant doesn't have to
 6    personally make the arrest.  This actually happened in the Buck
 7    case, which involved the protest here in Albuquerque and the
 8    Iraq war case, and we went to the Tenth Circuit and talked
 9    about -- That was supervisory liability, but it was -- it also
10    relied on Snell, where the officer either directed the arrest
11    of somebody and another officer did it or gave information to
12    another officer that they knew was false.  These TSA defendants
13    knew that he had not -- there was no reason to tell him to put
14    down the camera, to stop filming.
15             So by calling in the Albuquerque Police Department
16    and saying they're not -- they're not -- he's not obeying an
17    order, a valid order when it's not a valid order, they set in
18    motion the facts that resulted in his arrest.
19             You know, without their complaint and without their
20    calling in the Albuquerque aviation police there wouldn't have
21    been an arrest.
22             THE COURT:  Well, there's certainly but-for causation
23    here, but I'm wondering if that's enough.  I mean, generally,
24    if you have a group of officers, say, at a scene and there's an
25    unlawful arrest or there's excessive force, that before you can
```

```
 1   hold all 15 officers liable for what one officer is doing there
 2   has to be an opportunity to intervene and to stop the
 3   unconstitutional activity, so you have to be personally
 4   involved in the unconstitutional activity.
 5           I'll have to look at the Complaint and the
 6   allegations closely, but my sense is that once the APD was
 7   called there was no more involvement with TSA, they were just
 8   out -- they were back to screening passengers.  Am I wrong?
 9           MS. BOELCKE:  I believe they were there during the
10   entire time that Mr. Mocek was involved with the Albuquerque
11   aviation police.  That's my belief without reading the
12   Complaint in detail.
13           THE COURT:  All right.  Anything else on the Fourth
14   Amendment?
15           MS. BOELCKE:  No.  We rest on what we wrote in our
16   brief.
17           THE COURT:  All right.
18           MS. BOELCKE:  Thank you.
19           THE COURT:  Thank you, Ms. Boelcke.
20           Mr. Martin, let's -- Let's say that I on the First
21   Amendment issue do what you want me to do, and that is jump to
22   the clearly established and say the law's not clearly
23   established, dismiss the First Amendment on Pearson grounds.
24           MR. MARTIN:  Yes, sir.
25           THE COURT:  It sounds to me like what Ms. Boelcke is
```

```
1   saying is her Fourth Amendment claim is dependent on there

2   being an unlawful order.  Am I going to have to decide that

3   constitutional issue that we've avoided now under Pearson to

4   decide whether there's a Fourth Amendment violation?

5                MR. MARTIN:  No, Your Honor, because when you look

6   at -- take a close look at the Complaint -- and I'm citing now

7   paragraph 54, and it specifically says, "Dilley then changed

8   his mind about escorting Mocek out of the airport, stating he

9   was going to need to see Mocek's I.D." -- Dilley is the

10  police -- "or else he was going to arrest Mocek for concealing

11  ID."

12               So the bottom line here is that when the police

13  showed up they had no intent of arresting Mr. Mocek.  And

14  how --

15               THE COURT:  Is that crucial, though, whether they

16  are -- I know it would be for the Fourth Amendment violation,

17  but is it crucial -- I guess we've already decided the First

18  Amendment violation, and we pretty much decided that was

19  irrelevant for the First Amendment violation, right, whether

20  they arrested him, escorted him out --

21               MR. MARTIN:  Yeah, that's all Fourth Amendment.

22               THE COURT:  The key point there is just telling him

23  not to film, right?  That's the key point?

24               MR. MARTIN:  Correct.

25               THE COURT:  So here on the Fourth Amendment violation
```

1  the significance of him changing his mind is what?

2          MR. MARTIN:  The significance of changing his mind is

3  because part of the plaintiff's allegations seem to be --

4  again, I don't want to put words in their mouth -- but seem to

5  be that the individual federal defendants told the airport

6  securities police that they should arrest plaintiff.  Well,

7  clearly, that's not the case, because here Mr. -- or Officer

8  Dilley had no intentions of arresting him.  In fact, if he

9  complied with the TSO's he was going to be able to do whatever

10 he wanted to do.  If he didn't, he was going to be escorted out

11 of the airport.

12         So how can my clients, the individual federal

13 defendants, be held liable for something that clearly the

14 police on their own decided to do?

15         THE COURT:  Do they allege in their Complaint that

16 they called APD over to arrest him?

17         MR. MARTIN:  No, they do not.

18         THE COURT:  They do not.  What is the -- What is the

19 reason that they called -- that they, given the Complaint --

20         MR. MARTIN:  I'll have to go back and find that for

21 you, Your Honor.  It says "Breedon" -- Breedon's one of my

22 clients -- "called for police assistance.  In the meantime ...

23 Schreiner, a TSA security supervisor, and ... Romero, a TSA

24 manager" -- again my clients -- "approached the security

25 checkpoint..."  So it doesn't give any reasoning for why they

1    called the local police.

2           And again, to your earlier point, and it was maybe

3    slightly on point about the location, there is nothing in the

4    Complaint about the location of the TSO's while the police take

5    it over.  Now, again, we did add that statement from

6    Mr. Schreiner, one of the two defendants' exhibits, and he says

7    what they did is they went over and they talked to -- Mr. Mocek

8    had a traveling companion, and when he came to the security

9    checkpoint he gave his ID to the traveling companion, in theory

10   so he could be truthful about saying, "I don't have any ID"

11   when he walked up.

12          So the traveling companion apparently was concerned

13   about Mr. Mocek being -- you know, dealing with the police, and

14   he asked some questions, and the TSO's went over and talked to

15   him about the situation, but then told him, "You'll have to

16   talk to the police about it, because they're handling the

17   situation."  So that's where the TSO's were during this

18   process.

19          THE COURT:  They were -- I guess I'm picturing the

20   Albuquerque airport where those little kind of podiums are.

21   That's where this took place?

22          MR. MARTIN:  Yes, Your Honor.  When you first walk

23   through the podiums, right behind the podiums is probably 10 to

24   20 feet of space.  That's where they were.  That's where most

25   of this activity took place.  And again, people came from all

```
 1   different directions, because the police are stationed in some

 2   areas, the supervisors in others.  And, of course, Mr. Breedon

 3   was right behind the main line of guys who take your ID and

 4   check on your --

 5            THE COURT:  He's always there?

 6            MR. MARTIN:  He or someone else like him is always

 7   there.  So he's the first guy there.  He was going to take care

 8   of the --

 9            THE COURT:  Which one was the person at the podium?

10   Which one of these three?

11            MR. MARTIN:  Actually, are you meaning the first

12   gentleman he talks to?

13            THE COURT:  Right.

14            MR. MARTIN:  That's Rodriguez.  He's not involved in

15   this case.

16            THE COURT:  He's not involved?

17            MR. MARTIN:  Because what he does is stays there and

18   continues dealing --

19            THE COURT:  He keeps working?

20            MR. MARTIN:  He hands off to Breedon.  Breedon is

21   going to handle the alternative screening process.  He's the

22   supervisor.  Now, of course, his job is to supervise all those,

23   and he can't do that now because he's got to take care of

24   Mr. Mocek.  And it's when he pulls out the camera and asks him

25   not to film that he calls for police assistance, and that's
```

1   when police assistance arrives.

2           And again, one of the statements, and we quoted in it

3   in our brief, specifically says, "and the police took over the

4   situation."

5           THE COURT:  And the other two TSA people are who?

6           MR. MARTIN:  They're supervisors.

7           THE COURT:  Supervisors of Breedon?

8           MR. MARTIN:  That's correct.  They come -- Again, if

9   you're familiar with when you walk into the screening section,

10  to your far right -- I think we tried to guess it was about 40,

11  50 yards away -- to the right is where the supervisors are

12  sitting.  They have some cameras.  Again, we won't go into what

13  they have, but they have some other jobs that they're concerned

14  with.  And of course when they hear a request for a local

15  police they immediately come, as well.

16          THE COURT:  What about -- What about Ms. Boelcke's

17  argument that -- She doesn't use this language, but it's

18  sounding to my ears like she's trying to use the collective

19  knowledge doctrine, that they could not make false statements

20  about -- as officers and pass it on to other officers who then

21  make the arrest.

22          MR. MARTIN:  Again, we'd ask you to look at the

23  statements, because for the most part they use the -- "they,"

24  the plaintiffs -- use the TSA statements to refute some of the

25  allegations made by the police.  Now, the big difference, of

1    course, happens to be the disturbance issue.

2          The TSO's consider this disturbance, as we indicated

3    in our pleadings, because of the large number of people they

4    now have to have involved in the situation.  Not only do you

5    have the one guy who first would take your paperwork -- that's

6    your normal one -- but they get up to six folks from TSA

7    involved in this process of having to take care of Mr. Mocek.

8    That's a disturbance in their view; that they are not allowed

9    to do their normal job proceedings, but they have to handle and

10   put this much resources to one individual.

11         Now, of course, that's only one factor, as we talked

12   about; the security concern is the other one.  Now, because

13   they have these two concerns they call the local police.

14         But I guess what we come back to at the end of the

15   situation is, even when they provide that information to the

16   local police the local police are not going to arrest

17   Mr. Mocek.  The decision to arrest does not occur -- and they

18   said he changed his mind -- until he refuses to provide his ID.

19         And how the individual federal defendants know that

20   when he's asked twice to provide his ID, that the second time

21   he's going to invoke his rights and ask to see an attorney, I

22   mean, that's just implausible.

23         And, of course, that's what we get into with

24   pleadings, isn't it?

25         THE COURT:  Well, if you -- If you had -- If you had

1   the TSA -- A lot of times we have these joint, oh, say,

2   protests or state drug task forces so there's a mixture of

3   federal and state folks.  I wouldn't think that it would make a

4   lot of difference under the Fourth Amendment whether you were a

5   federal person, and the state person or the local person is

6   violating somebody's constitution rights.  The duty to

7   intervene's going to be the same, right?

8            MR. MARTIN:  I agree, Your Honor.

9            THE COURT:  So if -- If they -- If they saw the APD

10  officers arresting him for not producing his ID, there has to

11  be -- before the police officers can do that, they have to --

12  there has to be some reasonable suspicion of criminal activity,

13  correct?

14           MR. MARTIN:  That's right, Your Honor.  And, you

15  know, we cited a case -- I think it's a footnote in our

16  reply -- that talks about the elements under New Mexico law for

17  failure to provide an ID, and it's pretty much, you're asked --

18  there's an ongoing investigation, you're asked for ID, and to

19  prevent that investigation from continuing you fail to provide

20  it.  So --

21           THE COURT:  But if the TSA people knew there was no

22  criminal activity, how could they -- how could they then allow

23  APD to use the existence of criminal activity to ask for the

24  ID?

25           MR. MARTIN:  Again, I'm not quite following you, I

1    don't think, Your Honor.

2            THE COURT:  Well, it seems that the APD's actions is

3    dependent upon there being criminal -- at least a reasonable

4    suspicion of criminal activity.

5            MR. MARTIN:  I guess I would disagree here in a

6    security context.  When they get there, they're not going to

7    arrest him.  They're coming to see if there's a security or a

8    disturbance concern.  The disturbance is not what they're

9    looking for as criminal activity.  It's more, let's move this

10   process along.  Remember what the goal of an airport is, is

11   safe travel, but also moving people through these lines.

12           So they call not necessarily because they want

13   Mr. Mocek arrested, but because they want --

14           THE COURT:  But doesn't the APD need the existence of

15   reasonable suspicion of criminal activity to ask for the ID?

16           MR. MARTIN:  They need it for their investigation,

17   and the investigation -- Again, what their exact standard is --

18   again, my guys aren't law enforcement officials, so I don't

19   think they're really involved.  I guess I take it more as an

20   example of someone on the street calling police because there's

21   some disturbance on the street, and then when the police

22   arrives the person who's making the disturbance takes a swing

23   at them and they arrest them for taking a swing.  Well, that's

24   what we have here.

25           They call the police because of a disturbance and

1    security concerns.  Not necessarily to have him arrested.  And

2    it's clear from the Complaint the police had no intent of

3    arresting him, and it's not until they ask for ID because

4    they're doing this type of investigation that, in fact, they

5    decide to arrest him.

6         THE COURT:  Well, I guess I'll have to look a little

7    bit at the state law.  I don't -- I'm not familiar enough with

8    that requirement to produce ID.  Can they just ask for ID for

9    any purpose?

10        MR. MARTIN:  You're right, Your Honor, I do not

11   consider myself an expert in that issue either.  Although, I

12   guess I -- Excuse me.  What we're really talking about here is

13   proximate cause, and that's the Green case we cited out of the

14   Eighth Circuit, where a school official called the local police

15   and told them -- actually told them that he's creating a

16   disturbance and we would like this individual to leave, you

17   know, some type of public -- I think it was some type of a

18   meeting about school issues.

19        And then when the police got there they made their

20   own determination concerning the individual and they asked him

21   to leave and he refused and they arrested.  And the Eighth

22   Circuit said, no, you can't blame the individual for merely

23   calling the police and giving his opinion of what the situation

24   is.

25        THE COURT:  I'll have to study Green, but was the --

```
 1   It seems to me the difference here is that you -- I'm still

 2   grappling with Ms. Boelcke talking about this

 3   collective-information doctrine and this intervention doctrine.

 4   The TSA people remained at the location, and if it did require

 5   reasonable suspicion of criminal activity to ask for the ID,

 6   then it concerns me a little bit that the TSA people -- they

 7   didn't think there was any criminal activity.  We already kind

 8   of dealt with that as far as viewpoint discrimination.  They

 9   didn't know why he was acting the way he did.

10             MR. MARTIN:  I guess I go back to, Your Honor, these

11   are not law enforcement agents.  They're not making a

12   determination as to whether there's criminal activity or not.

13   They're simply concerned with disruptions and security.  It's

14   the police who have to make the decision whether there's

15   criminal activity or not.

16             THE COURT:  Well, maybe you're right.  I haven't

17   thought TSA agents -- I don't know if they are law enforcement

18   agents or not.  What are they?

19             MR. MARTIN:  We've provided you a cite in our brief

20   that specifically indicates they are not law enforcement

21   agents.  They do not have the right to make arrests; they don't

22   carry weapons.  They're just TSA officials.  They are federal

23   officials to move people through the lines of getting on

24   airplanes safely and securely.

25             THE COURT:  And they don't make any arrests?  They
```

1   call police for that?

2           MR. MARTIN:  That's right.  We've actually cited that

3   for you, the statutory cites that say the TSA is required to

4   have prior arrangements with either local police or private

5   security agencies to take care of these type of issues, because

6   the TSA's are neither trained nor authorized to do such things.

7   So they wouldn't be making law enforcement decisions.  There's

8   no probable cause issues for these guys.

9           THE COURT:  So if somebody were to just burst through

10  the line and try to get through they would not --

11          MR. MARTIN:  They call law enforcement officials.  I

12  mean, I'm not saying one of them might not tackle the guy, but

13  they have no arresting authority.  They're holding them for

14  them.  It would be like you or me making a public arrest.  They

15  are just holding them until the local law officials show up.

16          THE COURT:  What kind of training do they have?  Do

17  they have any training for the pat-downs?  Do they have

18  training in Fourth Amendment at all to say, well, you can pat

19  down this much if you have this much amount of suspicion; if

20  you have this much, you can do some more intrusive or --

21          MR. MARTIN:  My understanding is, and from what I've

22  seen is they have a number of -- I like to call them flow

23  charts.  If this happens, you go here; if this happens, you go

24  here.  Fairly simple, fairly basic.

25          I do have somebody from the TSA here who can provide

1   a lot more information for you on this issue than I can, but

2   I've asked the same question.

3        THE COURT:  But that's the limit of it, they sort

4   of -- their, say, legal training and Fourth Amendment training

5   is this flow chart with pat-downs?

6        MR. MARTIN:  Those type of issues, yes.  And the

7   bottom line is, if in doubt, call the local law enforcement,

8   because they're the experts on that area.  That's what they're

9   there for.

10        THE COURT:  They don't get any training on excessive

11   force, arrest, any of those areas?

12        MR. MARTIN:  Other than you're not supposed to do any

13   arrests because you're not law enforcement, you're not supposed

14   to do anything beyond the touchdown -- touch -- you know, the

15   pat-downs, so, you know, there can't be excessive force.

16        THE COURT:  Yeah.  And I assume they don't get any

17   training in laws, that somebody could be arrested for doing

18   different things at the -- at the checkpoint?

19        MR. MARTIN:  Again, Your Honor, that's probably not

20   something I should be speaking about.  I don't -- I've asked

21   some of those questions and got some basic answers, but I don't

22   have enough specifics for that area.

23        The big thing that we've cited in our briefs is that

24   they are not law enforcement officers and, therefore, do not

25   have that authority, and they're required to have local law

1    enforcement present to do those type of activities.  That's

2    really what you have in front of you.

3           THE COURT:  All right.  Anything else on the Fourth

4    Amendment?

5           MR. MARTIN:  No, Your Honor.

6           THE COURT:  Well, I'll take this under advisement as

7    I did with the First Amendment, but I'm inclined to think that

8    once -- once the TSA calls law enforcement, that they are much

9    in the same situation as a private citizen calling law

10   enforcement, that they're not going to be responsible for any

11   of the alleged unconstitutional activity of the police at that

12   point.

13           There may be some other claims, like malicious abuse

14   of process or something like that, but I don't -- I don't see

15   it as being a Fourth Amendment violation.  I think you've got

16   to participate personally and directly in the constitutional

17   violation.  And if they're not really trained as another police

18   officer to intervene in a rather, perhaps, subtle arrest on

19   state law charges, I'm not sure that they can be responsible,

20   so I think that at least my initial reaction here is that I

21   should grant the motion to dismiss on the Fourth Amendment

22   violation, as well.  But I'll take that under advisement.

23           And the last one is just a -- is just a request for

24   declaratory relief.  Am I not mistaken?

25           MR. MARTIN:  That's correct, Your Honor.

```
1            THE COURT:  And I guess that would just follow from
2   the others, that if I'm not -- if I'm either not finding -- I
3   guess it's really qualified immunity on both grounds, then,
4   particularly if I'm finding it's not clearly established, I
5   shouldn't be making a declaratory judgment of those rights, as
6   well.
7            MR. MARTIN:  That's what we would ask, Your Honor.
8            THE COURT:  All right.  Ms. Boelcke, on the
9   declaratory judgment, let's say I did what I am inclined to do
10  on the first two counts as to the federal defendants.  What
11  would I do -- What would you -- Is there anything left to do as
12  far as a declaratory judgment, or should I -- if I do what I am
13  inclined to do on the first two, should I also dismiss the
14  third count as to the federal defendants, or is there anything
15  else you need there?
16           MS. BOELCKE:  I believe the claim for a declaratory
17  judgment against the federal defendants was against them in
18  their official capacities, and the qualified immunity only goes
19  to the claims against them in their individual capacities, so I
20  believe the count would still remain as a claim against them in
21  their official capacity.
22           THE COURT:  All right.  Tell me what -- Tell me what
23  would be left.  If I were to grant qualified immunity on the
24  First and Fourth Amendment, what would be left against the
25  officers in their official capacity?
```

1           MS. BOELCKE:  If the policies that they were

2    following -- You know, they could have qualified immunity and

3    you could still have a claim against the government in the

4    official capacity for a violation of a constitutional amendment

5    even if they got a qualified immunity individually, so I

6    believe we have claims against the TSA in its official

7    capacity, and those claims were not raised in this motion,

8    and --

9           THE COURT:  What are those claims?  What are you

10   suing TSA --

11          MS. BOELCKE:  Let me see.

12          THE COURT:  -- effectively for?  What is it you would

13   want the Court to declare?

14          MS. BOELCKE:  That the citizens have a right to use

15   cameras and other recording devices in the publicly accessible

16   areas of the Albuquerque airport and stopping asking for an

17   injunction to not allow them to retaliate against individuals

18   who seek to exercise that right by using cameras or other

19   recording devices.

20          THE COURT:  Read that one again.

21          MS. BOELCKE:  This is on page 26 of the Complaint.

22   It's paragraph B.  "Issue a court order enjoining Defendants

23   from prohibiting the use of cameras and other recording devices

24   in publicly accessible areas of the Albuquerque airport," and

25   stop them from retaliating against individuals who seek to

1  exercise their right to use cameras and other recording devices

2  in the publicly accessible areas of the airport.

3         And then paragraph C is, "Issue a court order

4  requiring Defendants to undertake training and other

5  prophylactic measures to ensure that the Defendants'" do not

6  keep people from exercising their rights in those areas.

7         THE COURT:  All right.  So you think that this motion

8  doesn't touch that portion?

9         MS. BOELCKE:  Not on the official policy claim,

10  because, as I said, you can have -- an officer could have

11  qualified immunity personally; however, there could still be a

12  constitutional violation, maybe the right -- where the right

13  wasn't clearly established, but they still violated the

14  plaintiff's constitutional rights, which can lead to a Monell

15  or a policy-type claim.

16         THE COURT:  All right.  Anything else on the

17  declaratory judgment, Ms. Boelcke?

18         MS. BOELCKE:  No.  That would be it, Your Honor.

19         THE COURT:  All right.  Thank you, Ms. Boelcke.

20         MS. BOELCKE:  Thank you.

21         THE COURT:  Mr. Martin, are you in agreement with

22  Ms. Boelcke, that the qualified immunity only covers the

23  individual claims, so we're going to have to address any sort

24  of official claims on another day?

25         MR. MARTIN:  No, Your Honor, there's no APA claim

 1   here; there's no claim that the United States did not follow

 2   its own procedures.

 3           As I read the Complaint, it's a Complaint against all

 4   defendants in their official capacities.  It's not against --

 5   Now, I agree, an official Complaint against a defendant is

 6   generally against the organization itself, but this asks for

 7   declaratory relief as it relates to the earlier claims, and,

 8   obviously, if those claims go away there's no declaratory

 9   relief, in fact, available to the plaintiff in this case.

10           THE COURT:  Well, what about just on a simple level?

11   Your motion only touches the individual claims on qualified

12   immunity, right?

13           MR. MARTIN:  My motion is for the individual claims,

14   but also says -- addresses very briefly the declaratory relief,

15   that if -- there is no claims against these individuals because

16   there is no constitutional violation and it's not clearly

17   established that the Court should not be granting the

18   declaratory relief.

19           THE COURT:  So what Ms. Boelcke read as her relief is

20   not against these individuals, it's against TSA, effectively?

21           MR. MARTIN:  It says "claim for equitable relief

22   against all defendants in their official capacities."  Again,

23   TSA is not named as a defendant in this case, but if you name

24   individuals in their official capacity you're really suing the

25   United States.

```
 1              THE COURT:  TSA, right.
 2              MR. MARTIN:  So, again, our point is, if there's no
 3    constitutional violation and it's not clearly established if
 4    qualified immunity is appropriate in this case, then there
 5    should also be no declaratory relief.  It at least appears,
 6    from what Ms. Boelcke's reading in some of it -- I mean,
 7    obviously, to do a training and whatnot, that doesn't even have
 8    to do with a Bivens claim.  That's got to do with a 1983 claim
 9    and a Monell claim.
10              I assume she's talking about the state defendants
11    there and not the individual federal defendants.  So I think
12    she's reading it much broader than what can actually apply to
13    U.S. defendants.
14              THE COURT:  Well, let me -- Stay right there,
15    Mr. Martin.
16              But, Ms. Boelcke, it sounds to me like the relief
17    that's being asked, it would be against the TSA, but it
18    wouldn't be against these individuals, at least as a result of
19    the alleged violations.  So if I find that there is no Fourth
20    Amendment and a First Amendment claim and the request here is
21    more against the TSA, is there really anything to declare as to
22    these individuals?
23              MS. BOELCKE:  Not as to these individuals.  And if
24    they're -- If you find there's no constitutional violation
25    occurred by the conduct of these individuals, then that --
```

```
 1    there wouldn't be any reason for the declaratory relief.  If
 2    the motion is granted based on the fact that there is no
 3    clearly established right --
 4              THE COURT:  Clearly established.
 5              MS. BOELCKE:  -- I think it's a different situation.
 6              THE COURT:  What do you think about that?
 7              MR. MARTIN:  That's an interesting question, Your
 8    Honor.  I'd probably have to look back at that and brief it.  I
 9    have not seen situations where the case goes away against the
10    Bivens individuals and because of their conduct declaratory
11    relief then follows on because the Court found not clearly
12    established.
13              THE COURT:  I had a similar incident -- If you're
14    going to look at this, you might look at -- I had a case from
15    the Tenth Circuit.  The case is called Kerns.  Ms. Wild's
16    getting the number up.  It's CIV-07-771.  And the -- It's a
17    little bit different situation, but I had found -- I had found
18    that there was a genuine issue of material fact on the
19    constitutional violations, and the Tenth Circuit said, no, I
20    should have jumped directly to Pearson and the clearly
21    established.  The problem was, there was still a state claim,
22    and so I had to say, well, I've already found there's a genuine
23    issue of material fact on the state claim.  296 is the one.
24    I'm not sure which one -- document 296.
25              Is that the one on remand?
```

1            MS. WILD:  Yes.

2            THE COURT:  Okay.  So you might take a look at that.

3            MR. MARTIN:  We'll take a look at it, Your Honor.

4            THE COURT:  It's not on point, but it's a similar

5    situation, where even with Pearson I couldn't avoid deciding --

6            MR. MARTIN:  The constitutional issues.

7            THE COURT:  -- the constitutional, because of the

8    impact of some other issue in the case.  That's one of the

9    things that is coming up a lot with Pearson, is, if you jump to

10   that second on just the federal Constitutional you often have a

11   bundle of claims and it's hard sometimes to avoid it even if

12   you've decided to avoid it.

13           MR. MARTIN:  Yes, Your Honor.  We'll take a look at

14   it.  Would you like us to brief that with some supplemental

15   briefing for you?

16           THE COURT:  Okay.

17           MR. MARTIN:  All right.  We'll put that together, if

18   it's all right, after Thanksgiving.

19           THE COURT:  That's fine.  That's fine.

20           Well, anything further you want to say on the

21   declaratory?

22           MR. MARTIN:  I do not, Your Honor.  Like I said, we

23   didn't spend a lot of time on that because our thoughts were,

24   if it goes away against the individuals, it certainly goes away

25   against everyone, because it was to do with individuals'

```
1    conduct.

2              THE COURT:  Yeah, I don't want to put -- Let's say on

3    the first two I grant your motion, on the First Amendment and

4    the Fourth Amendment, and putting aside whatever I do -- what

5    then happens on the official-capacity claims?  What goes --

6              MR. MARTIN:  See, there aren't any official capacity.

7    The only official-capacity claim is declaratory judgment.  The

8    government's not in this case other than the declaratory

9    judgment.

10             THE COURT:  So these individuals are not sued in

11   their individual -- in their official capacity on the First and

12   Fourth Amendment claims?

13             MR. MARTIN:  You cannot sue in a Bivens case official

14   capacity.  Bivens specifically says it has to be against the

15   individual.  And, of course, what that means is, the difference

16   here is, instead of, you know, the judgment fund paying for

17   judgments here, this comes out of the individual's pockets.

18   And that's why we take it so serious.

19             THE COURT:  Is there any individual claim under

20   Bivens for declaratory relief?

21             MR. MARTIN:  There is not, which is kind of

22   interesting.

23             THE COURT:  Is case law clear on that?

24             MR. MARTIN:  You know, again, we'll take another look

25   at that for you, Your Honor.  But, no, Bivens -- Bivens -- You
```

1   can only do a Bivens case, a constitutional case, against an

2   individual in their individual capacity, so that's why I assume

3   plaintiffs didn't move to -- for declaratory relief against the

4   individuals, because you can't go for injunctive relief against

5   individuals.  That makes sense, because they don't run the

6   place, they don't run the government.  It's the government only

7   that can grant injunctive relief.  And declaratory relief, of

8   course, is a form of equitable relief as opposed to monetary

9   relief.

10          THE COURT:  All right.  Well, I'm a little uncertain

11  as to how to deal with the declaratory, so I'll --

12          MR. MARTIN:  I am, too, Your Honor.

13          THE COURT:  -- just take that under advisement --

14          MR. MARTIN:  Fair enough.

15          THE COURT:  -- and think about it.

16          All right.  Anything further on your motion,

17  Mr. Martin?

18          MR. MARTIN:  No, Your Honor.  Appreciate your time.

19          THE COURT:  All right.  All right.  Well, I'm

20  inclined to grant it.  I'm not sure what to do with that third

21  count, and I am going to take this under advisement.  There are

22  some issues here I want to look at more closely, but I'm

23  inclined to grant that motion.

24          Now, I assume this is the first time that the Court,

25  at least I have seen you, but also Judge Black or any

1    magistrate judge or anybody.

2            I guess what I would be inclined to do is, to get

3    this case moving, because it's been around a little bit, is to

4    go ahead and set an initial scheduling conference, and then

5    I'll try to have this opinion to you by the time we get

6    together again, and that way -- I guess I'm inclined enough --

7            So you think that the end result, Mr. Martin, is that

8    you're going to be out of this case with this motion?

9            MR. MARTIN:  That was our intent, certainly, Your

10   Honor.  The individual federal defendants would be out, and

11   because there's no constitutional violations there can be no

12   declaratory relief, and, therefore, the United States is out

13   and the case would then become between the plaintiffs and the

14   local police.

15           THE COURT:  If Ms. Boelcke wanted to get her

16   declaratory relief against the TSA she would have to name the

17   TSA?

18           MR. MARTIN:  Again, that's something we're going to

19   have to look at, Your Honor.  But, again, if --

20           THE COURT:  Here's what I'm thinking is, is I'd like

21   to go ahead and get the case moving, because I think I know --

22   I think I'm going to be granting this motion as to your folks,

23   and so what I was going to do is set an initial scheduling

24   conference, get everybody going on the rest of the case, and I

25   guess my -- the question I'm having in my mind is whether I

```
 1    should require you to participate in that at all.  And I guess
 2    if I'm about to grant the motion I'd be inclined not to.  The
 3    only downside to that is, if we find out that there's something
 4    left, it may be -- it may create a difficulty down the road.
 5              MR. MARTIN:  Your Honor, we're certainly available.
 6    We'll participate if you'd like, if that makes sense for what
 7    you're saying.
 8              I guess the bottom line is, of course, if you find
 9    prong one, no constitutional violation, then certainly in both
10    the First and Fourth Amendment then clearly there can be no
11    declaratory relief, because that's what they're asking for,
12    that their conduct was, in fact, unconstitutional.  So that
13    would be inappropriate.
14              Now, if you're only going to find prong two, that it
15    was not clearly established, then I think that's the issue we
16    need to take a second look at.
17              THE COURT:  All right.  Well -- And you'll send me
18    something?
19              MR. MARTIN:  That, we will.
20              THE COURT:  Okay.  All right.  Because it sounds like
21    you may be -- there's a possibility you may be writing me a
22    letter saying, well, you've got to decide both because of the
23    way this is teed up.
24              MR. MARTIN:  We may, Your Honor.
25              THE COURT:  Okay.  All right.  Well, I'll wait for
```

 1    that.  Why don't, though, for the present time, because I think

 2    even if -- even if Ms. Boelcke agreed with you on the

 3    reasonableness standard, and I'm not seeing any viewpoint

 4    discrimination just because of the particular facts here, even

 5    if I were to do both, I'm inclined to think there wasn't

 6    either, A, a constitutional violation or a violation of clearly

 7    established law.  Why don't we not have you participate in the

 8    preparing of the initial scheduling -- yeah, the JSR and the

 9    pretrial order.

10            MR. MARTIN:  Fair enough, Your Honor.

11            THE COURT:  And so I'll just leave you out.  And if

12    we find out down the road that you need to participate in some

13    way, then we'll figure out how to bring you back into the

14    picture.

15            MR. MARTIN:  Appreciate it, Your Honor.  Thank you.

16            THE COURT:  How about you?  Let me start with you,

17    Ms. Boelcke.  Do you think -- Any problem with me proceeding

18    this way, going ahead and sending out a scheduling order and

19    get the case moving on the rest of the case and leaving

20    Mr. Martin and his clients out at the present time, and then

21    you and Mr. Baker can largely prepare the response?

22            MS. BOELCKE:  No.  We'd like to go forward with the

23    case.  Also, Your Honor, would we -- the plaintiff be allowed

24    to file something in regard to the declaratory --

25            THE COURT:  Yeah.

 1            MS. BOELCKE:  -- relief issue?

 2            Should we file it in response or should we just file

 3  simultaneously?

 4            THE COURT:  It's up to you.  Let me come back to that

 5  question a minute.

 6            Mr. Baker, are you okay with proceeding the way I'm

 7  talking?

 8            MR. BAKER:  Yes, sir.

 9            THE COURT:  Okay.  Do you have a sense as to maybe if

10  you sent that out when you would be setting the ISC?

11            Go back to your question.  It's probably going to be

12  early January, it's going to be the beginning of next year

13  before I see you again, and that will give me some time to

14  maybe put this opinion together.

15            So, you know, I don't have any particular preference

16  as to whether you wait until Mr. Martin sends his in and if you

17  want to respond to it or whether you want to get it in at the

18  same time.  Just be mindful that if I set this thing -- initial

19  scheduling conference in early January I'm going to be shooting

20  for having an opinion to you at that time.

21            MS. BOELCKE:  Right.

22            THE COURT:  I'm not promising it, because I've got

23  some trials I'm going to have to work through in December and

24  January, but I'll at least shoot for it, so you might want to

25  at least have it on my desk while I'm working on it.

 1              MS. BOELCKE:  Okay.

 2              THE COURT:  So I don't think we'll know today when

 3  we'll be setting the ISC.

 4              Mr. Martin, you're excused at the present time.  If

 5  all of a sudden we think something else is happening on these

 6  official claims or the declaratory judgment, then we may

 7  contact you and say, let's get on the phone and discuss it.

 8  Otherwise, you're excused from that.

 9              And then I'll try to have an opinion out for you, and

10  then I'll try to see you in early January to get the case

11  moving on the other claims.

12              All right.  Is there anything else we need to discuss

13  while we're together?  Anything else I can do for you?

14              Ms. Boelcke?

15              MS. BOELCKE:  No thank you, Judge.

16              THE COURT:  Mr. Baker?

17              MR. BAKER:  No, sir.

18              THE COURT:  Mr. Martin?

19              MR. MARTIN:  Not from the individual federal

20  defendants.  Thank you, Your Honor.

21              THE COURT:  All right.  Well, I appreciate your

22  presentations this morning.  I'll try to get this out to you as

23  soon as possible.

24              Y'all have a good Thanksgiving, good week.

25          (Court stood in recess at 10:48 a.m.)

```
1                    C-E-R-T-I-F-I-C-A-T E

2   UNITED STATES OF AMERICA

3   DISTRICT OF NEW MEXICO

4

5        I, Danna Schutte Everett, RPR, CCR, CRR, Official

6   Court Reporter for the State of New Mexico, do hereby

7   certify that the foregoing pages constitute a true

8   transcript of proceedings had before the said Court held

9   in the city of Albuquerque, New Mexico, in the matter

10  therein stated.

11       In testimony whereof, I have hereunto set my hand on

12  this 27th day of June, 2014.

13

14       _____
         DANNA SCHUTTE EVERETT
15       Registered Professional Reporter
         Registered Merit Reporter
16       Certified Realtime Reporter
         NM Certified Court Reporter #139
17       100 Church Street
         Las Cruces, New Mexico  88001
18       Phone:  (575) 528-1656
         Fax:  (575) 528-1656
19       dannadawn@comcast.net

20

21

22  November 20, 2012, Mocek vs. City of Albuquerque

23

24

25
```